## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

MARIA DEL SOCORRO MALINOWSKI, )
individually and as a personal representative )
of the Estate of Bryan K. Malinowski, )
deceased, and on behalf of the wrongful death )
beneficiaries of Bryan K. Malinowski, )
           )
             Plaintiff, )
           )
v. )
           )
UNITED STATES OF AMERICA, )
BUREAU OF ALCOHOL, TOBACCO, )
FIREARMS AND EXPLOSIVES (ATF), )
TIMOTHY BOLES, TROY DILLARD, )
CLAYTON MERRILL, TYLER COWART, )
MATTHEW SPRINKLES, JAMES BASS, )
MICHAEL GIBBONS, CHRIS GRIGGS, )
SHANNON HICKS, and AMY NESS, )
individually, )
           Defendants. )

**FILED**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT ARKANSAS**

MAY 1 5 2025

TAMMY H. DOWNS, CLERK
By_____
                **DEP CLERK**

Case No. 4:25-CV-486-BSM

This case assigned to District Judge Miller
and to Magistrate Judge Volpe

## COMPLAINT

Plaintiff Maria ("Maer") Malinowski, individually, as personal representative of her

husband's estate, and on behalf of the wrongful death beneficiaries of Bryan K.

Malinowski, brings this Complaint seeking damages against Defendants for their

unreasonable and unlawful acts of the predawn morning of March 19, 2024, which

culminated—less than two minutes after they arrived—in the killing of her husband acting

in defense of her and their home. In the darkness of that morning, ATF forced entry into

their home, broke down the door with a battering ram and, once inside, shot and killed

Bryan Malinowski in front of his panic-stricken wife. The ATF predicated this ultimate

seizure of his person on a federal search warrant sought and issued based on suspicion and belief that Mr. Malinowski, the Executive Director of the Bill and Hillary Clinton (Little Rock) National Airport with no criminal history or indication of being a threat, was acting as a firearms dealer without having secured a $200 firearms license. But the Constitution rightfully requires more of law enforcement, and is designed to prevent this very tragedy. The Constitution requires reasonableness and, specifically here, that Defendants both knock and announce their presence and purpose and wait a reasonable time before entry. The ATF failed to do so, resulting in an entirely predictable, needless and tragic outcome. The United States should be held liable under the Federal Tort Claims Act and the Individual Defendants held liable under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

## I.   <u>INTRODUCTION</u>

1.    "The law does not require us to close our minds to facts which are known to all reasonably intelligent people… If a person is awakened by banging on the door, an immediate and appropriate response may not be feasible. For at least a brief period, the erstwhile sleeper is likely to be too bewildered to react. He or she must then focus on the possibility that those demanding entry may have no legitimate business on the premises. This is especially true… [when] the bedroom is a considerable distance from the door, so that a suddenly awakened individual may not hear the officer's oral announcements identifying [themselves] as police officers armed with a search warrant… Moreover, most citizens are not clad… in a manner suitable for opening the door to strangers. If someone is not dressed, sufficiently or at all, dressing takes time. Finally, for most people awakened

2

or startled by loud banging [early] in the morning, the circumstances are not likely to be conducive to rational analysis or to swift or provident decision-making." *Griffin v. United States*, 618 A.2d 114, 121 (D.C. Cir. 1992) (internal citations omitted).

2.    Officers' entry into the home of an unaware person "may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan,* 547 U.S. 586, 594 (2006).

3.    Before dawn on the morning of March 19, 2024, ten carloads of federal and state law enforcement officers assembled in the dark and arrived in a quiet cul-de-sac in Little Rock, Arkansas.

4.    At 6:02:42 a.m., seven ATF agents and task force officers stacked onto the front porch steps of 4 Durance Court, a large gray stucco home, while the family who lived there slept inside.

5.    Inside the home Bryan Malinowski laid in bed next to his wife of 25 years, Maer Malinowski, and their two pug dogs.

6.    The carloads of agents and task force officers had assembled in the dark that morning to execute a search warrant on the Malinowski home. Bryan's suspected crime? Failing to secure a $200 federal firearms license before selling firearms at local gun shows.

7.    ATF agents covered up the Malinowskis' video doorbell camera with tape, and less than one minute later, the team leader ordered agents to pry open the locked, glass storm doors and break down the inner, wooden doors with a battering ram to breach the entry.

8.    Less than 20 seconds later, at 6:03:46 a.m., gunshots rang out, and Bryan

3

Malinowski crumpled to the ground, shot in the head by an ATF agent following an exchange of gunfire.

9.    Bryan had scrambled out of bed and crept into the dark hallway with his gun to protect himself and his wife from whom he reasonably believed were intruders. He did not know that he was under investigation, much less that the people who broke down his front doors were law enforcement, because they failed to adequately knock and announce their presence and give him a reasonable time to wake up and come to the door.

10.    Bryan's wife, Maer, did not heed his direction to stay in their bedroom, and instead followed her husband into the dark hallway where she saw him shot in the head.

11.    It was only after the exchange of gunfire when Maer heard a demand to put her hands up that she learned the men who broke down her front door and shot her husband were federal agents.

12.    Bryan Malinowski succumbed to his injuries two days later at the hospital, on March 21, 2024. He was 53 years old.

13.    More than 75 years ago, the Supreme Court grimly anticipated this scenario, noting:

> many home-owners in this crime-beset city doubtless are armed. When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot. A plea of justifiable homicide might result awkwardly for enforcement officers. But an officer seeing a gun being drawn on him might shoot first. Under the circumstances of this case, I should not want the task of convincing a jury that it was not murder. I have no reluctance in condemning as unconstitutional a method of law enforcement so reckless and so fraught with danger and discredit to the law enforcement agencies themselves.

*McDonald v. United States*, 335 U.S. 451, 461 (1948).

14.    Maer Malinowski, individually, as personal representative of the Estate of Bryan K. Malinowski, and on behalf of the wrongful death beneficiaries of Bryan K. Malinowski, brings this action against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the United States of America ("USA") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80; and brings this civil rights action against the individual defendant officers pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## II. JURISDICTION AND VENUE

15.    This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* & § 1346, *et seq.* for money damages for death and other injuries caused by institutional failures and the negligent or wrongful acts or omissions of one or more employees of the United States government while acting within the course and scope of their office or employment under circumstances where Defendant USA, if a private person, would be liable to Plaintiff in accordance with Arkansas law.

16.    This Court has original jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. §§ 1331, 1343, 1346. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17.    This action arises out of an incident that occurred in Pulaski County, Arkansas, the same county in which Plaintiff resides. Pulaski County lies in the Eastern District of Arkansas, Central Division.

18.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the acts or omissions which give rise to this cause of action occurred in

Pulaski County, Arkansas, which lies within the Eastern District of Arkansas.

19.    The United States of America has waived its immunity from suit for the acts and omissions set forth herein under the Federal Tort Claims Act ("FTCA") pursuant to 28. U.S.C. § 1346(b), 2401(b), 2671, et seq.

20.    Further, Plaintiff's action against the individual Defendants is authorized pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

### III. CONDITIONS PRECEDENT

21.    Pursuant to 28 U.S.C. § 2675(a), Plaintiff timely presented her claims to the United States by submitting administrative tort claims within the applicable time period, which were denied by the United States of America by letter dated January 10, 2025.

22.    Plaintiff's action under the FTCA is brought within six (6) months after the denial of their administrative tort claims was mailed.

23.    Plaintiff has exhausted her administrative remedies under the Federal Tort Claims Act and has fully complied with the statutory prerequisites for bringing this tort action against the Defendant USA.

### IV. PARTIES

24.    Plaintiff Maer Malinowski, the surviving spouse of Bryan Malinowski, was appointed personal representative of the Estate of Bryan K. Malinowski on April 12, 2024, by Order of the Circuit Court of Pulaski County, Arkansas in Case No. 60PR-24-812. A copy of the Probate Order is attached as **Ex. A**. Plaintiff sues both individually and as the personal representative of the Estate of Bryan K. Malinowsi, and is the proper person to

bring suit on behalf of the Estate of Bryan K. Malinowski pursuant to the Arkansas Survival of Actions Statute, Ark. Code Ann §16-62-101(a)(1) and on behalf of the wrongful death beneficiaries of Bryan K. Malinowski pursuant to the Arkansas Wrongful Death Statute, Ark. Code Ann. §16-62-102(b). Maer Malinowski is, and at all times during the incident that is the subject of this Complaint, was a resident of Little Rock, Pulaski County, Arkansas.

25.    Defendant United States of America acted through Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and its agents, its task force officers, and ancillary Little Rock Police Department ("LRPD") officers during the ATF's execution of a search warrant at the home of Bryan Malinowski on March 19, 2024.

26.    Defendant ATF, at all relevant times, acted as an agent of the United States of America as a federal law enforcement agency under color of law.

27.    Defendant Timothy Boles, at all relevant times, was a special agent with the ATF, and acted under the color of federal law. He is sued in his individual capacity.

28.    Defendant Troy Dillard, at all relevant times, was a special agent with the ATF, and acted under the color of federal law. He is sued in his individual capacity.

29.    Defendant Clayton Merrill, at all relevant times, was the resident agent in charge of the Little Rock ATF office, and acted under the color of federal law. He is sued in his individual capacity.

30.    Defendant Tyler Cowart, at all relevant times, was a special agent with the ATF, and acted under the color of federal law. He is sued in his individual capacity.

31.    Defendant Matthew Sprinkles, at all relevant times, was a special agent with

the ATF, and acted under the color of federal law. He is sued in his individual capacity.

32.    Defendant James Bass, at all relevant times, was a special agent with the ATF, and acted under the color of federal law. He is sued in his individual capacity.

33.    Defendant Michael Gibbons, at all relevant times, was a law enforcement officer employed by the North Little Rock Police Department, who was affiliated and embedded as a Task Force Officer ("TFO") with the ATF office based in Little Rock, Arkansas, and acted under the color of federal law. He is sued in his individual capacity.

34.    Defendant Chris Griggs, at all relevant times, was a law enforcement officer employed by the Mississippi County (Arkansas) Sheriff's Office, who was affiliated and embedded as a Task Force Officer ("TFO") with the ATF office based in Little Rock, Arkansas, and acted under the color of federal law. He is sued in his individual capacity.

35.    Defendant Shannon Hicks, at all relevant times, was a special agent with the ATF, and acted under the color of federal law. She is sued in her individual capacity.

36.    Defendant Amy Ness, at all relevant times, was a special agent with the ATF, and acted under the color of federal law. She is sued in her individual capacity.

## V. FACTUAL ALLEGATIONS

37.    Bryan Malinowski was a lifelong collector. As a child he started collecting coins, a hobby he carried into his adulthood. Several years ago, his father handed him down his gun collection, which sparked Bryan's interest in firearms. He became a gun collector and hobbyist.

38.    One of Bryan's interests was attending gun shows on the weekends, where he would set up a table, display his guns and coins, and buy, sell, and trade with others.

8

39.     Federal law charges the ATF with promulgating rules and regulations, through the Code of Federal Regulations,[1] which are necessary to carry out the provisions 18 U.S.C. Chapter 44.[2]

40.     In March 2024, federal regulations did not require an individual seller to hold a federal firearms license ("FFL") as a dealer in firearms unless that individual's principal objective in selling firearms was livelihood and profit. 27 CFR Part 478.

41.     Specifically, in March 2024, 27 C.F.R § 478.11 defined a "dealer in firearms" as "[a] person who devotes time, attention, and labor to dealing in firearms…*with the principal objective of livelihood and profit*." 27 C.F.R. § 478.11 ("Engaged in the business," subsection (c)) (emphasis added).

42.     At the time of his death, Bryan Malinowski was the highest paid city employee in the city of Little Rock as the Executive Director of the Little Rock Airport, where he earned an annual salary of more than $260,000.

43.     Upon information and belief, Bryan did not believe that by selling at gun shows he was engaging in conduct "with the principal objective of livelihood and profit," and therefore did not believe he needed an FFL to sell firearms at gun shows.

---

[1] See 18 U.S.C. § 926 (Attorney General is granted rule-making authority); see also 28 C.F.R. § 0.130(c) (Attorney General delegates rule-making authority to the ATF); ATF Final Rule 03-1657 (redesignating 28 C.F.R. § 47, with relevant parts designated as 28 C.F.R. § 478).
[2] 27 C.F.R. § 478.1 states that "[t]he regulations contained in this part… are promulgated to implement… 18 U.S.C. Chapter 44, of the Gun Control Act of 1968."

## A. <u>The ATF's Investigation and Search Warrant for the Malinowski Home</u>

44. In December 2023, the ATF opened an investigation and began following Bryan to and from work and on the weekends, placing a tracker on his car, and surveilling his daily activities.

45. During the investigation, at least two agents acting undercover interacted with Bryan at a gun show in Arkansas. Bryan answered one of the undercover agent's inquiries by noting that he was a private seller, meaning he believed he did not need an FFL.

46. During their investigation, ATF learned a lot about Bryan.

47. They knew he worked in a secure environment at the airport, where guns were not allowed.

48. They knew he had lived a law-abiding life with no criminal history, that he lived at home with his wife and two dogs, and that they kept a very regular schedule.

49. Bryan had no reason to believe that he was under investigation for violating federal law.

50. Bryan never received a letter of inquiry, audit, personal visit, or request for information from the ATF; nor did he ever receive a target or subject letter from the Department of Justice notifying him that he was under investigation.

51. On March 6, 2024, ATF Special Agent Troy Dillard obtained two federal search warrants, which authorized federal agents to search the Malinowski home and Bryan's vehicle for firearms, ammunition, electronics, sales records, and correspondence.

52. Importantly, it was <u>not</u> an arrest warrant. Nor did it set forth any facts that

10

would lead any person to believe Mr. Malinowski would evade law enforcement, fail to cooperate, be dangerous, or pose a threat or risk of destroying evidence.

**B. ATF's Efforts to Close the "Gun Show Loophole" and Announcement of Rule Change One Month After Bryan is Killed**

53.     On April 11, 2024, less than a month *after* the ATF raid that killed Bryan, the ATF announced a new rule to "close the gun show loophole," and expand the definition of what it meant to be "engaged in the business" of selling firearms, newly requiring anyone who sells guns at a profit to register as a federally licensed firearms dealer. ATF, Final Rule, *Definition of "Engaged in the Business' as a Dealer in Firearms*, (April 11, 2024), https://www.atf.gov/firearms/final-rule-definition-engaged-business-dealer-firearms.

54.     Specifically, the new rule revised 27 C.F.R. § 478.11 to change the definition of "engaged in the business" to remove the word "livelihood," thus reading "with the principal objective of profit."

55.     The law at the time had been "vague, exempting people who occasionally sold guns as a hobby but not spelling out how many sales was too many." Eduardo Medina, THE NEW YORK TIMES, *What Set the ATF and an Airport Leader on the Path to a Deadly Encounter?*, May 24, 2024, https://www.nytimes.com/2024/05/24/us/bryan-malinowski-arkansas-atf-guns.html.

56.     Before the rule change, the Everytown Research and Policy nonprofit, which advocated for the new administrative rule, published a paper noting that the "lack of clarity in the federal definition of 'engaging in the business' of selling firearms has created a hazy arena between firearm dealers who must obtain a license, and occasional sellers who need

not obtain a license or conduct background checks." Everytown, Nov. 12, 2015, *Business as Usual* Report, https://everytownresearch.org/report/business-as-usual/.

57.    The new administrative rule aimed to "close the gun show loophole," a move touted by the then-administration as the most significant increase in U.S. gun regulation in decades. Perry Stein, THE WASHINGTON POST, "*Biden Rule to Close Gun Show Loophole is Final, Increasing Background Checks,*" April 11, 2024, https://www.washingtonpost.com/national-security/2024/04/11/gun-show-loophole-closed-biden-atf/.

58.    Meanwhile, the change worried law-abiding gun owners nationwide about how the revision would target them as responsible gun owners. 12 NEWS NOW, *Gun owners concerned in light of Biden administration's crackdown on 'gun show loophole,'* April 15, 2024, https://www.12newsnow.com/article/news/local/gun-owners-concerned-in-light-of-biden-administrations-crackdown-gun-show-loophole/502-cdefa485-149b-4df6-a074-825f0f1b1527.

59.    The *New York Times* called the new regulation, which did not go into effect for another month until May 2024, "the broadest expansion of federal background checks in decades" and "likely to face legal challenges." Glenn Thrush & Erica Green, THE NEW YORK TIMES, *Biden Administration Approves Expansion of Background Checks on Gun Sales,* (April 11, 2024), https://www.nytimes.com/2024/04/11/us/politics/biden-guns-background-checks.html.

60.    In the months preceding his death, even though ATF's new regulation intended to tighten the definition of a person "engaged in the business of selling firearms"

had not yet gone into effect, the ATF concluded Bryan Malinowski had crossed the ambiguously defined line and violated federal law by not holding an FFL.

61.    They decided his suspected infraction was serious enough to warrant a pre-dawn dynamic raid at his home while they knew he and his family would be sleeping.

## C. ATF Develops its Operations Plan, Recognizing Bryan Was Not Dangerous

62.    According to Special Agent Timothy Boles, the Arkansas ATF office is a small office, and "anytime anybody's running an investigation, the other people know what's going on."

63.    As lead investigator, Special Agent Troy Dillard drafted and submitted the ATF Operations Plan for the execution of the search warrant at the Malinowski home.

64.    The Operations Plan was approved and signed by Special Agent in Charge (SAC) Clayton Merrill.

65.    Nothing in the Operations Plan indicated Bryan posed a danger to himself or others, or that he was not expected to comply with law enforcement if he knew they were at his door.

66.    The ATF agents—including Agent Boles—knew that Bryan did not pose a threat to their safety or the safety of others during the anticipated execution of the search warrant.

67.    Specifically, ATF investigative officers would learn during their months-long investigation leading up to Bryan's death that Bryan did not pose an immediate threat to their safety or the safety of others during the search; that Bryan had no criminal history or history of violence; that Bryan had never threatened law enforcement officers; and that

Bryan's wife and dogs lived with him and would be present during a pre-dawn search warrant execution at the family home.

68.     The agents never observed any person or event, and received no information that would change the circumstances as they understood them at the time Agent Dillard created, and RAC Merrill approved, the Operations Plan.

69.     According to Special Agent Shannon Hicks, Mr. Malinowski was "the last person I would have imagined that we would have been in an armed confrontation with."

70.     According to Special Agent Tyler Cowart, "[w]e thought this would be an easy search warrant and we'd be out of there pretty quick.  And [Mr. Malinowski] would cooperate and everything, and it was supposed to be easy."

71.     There was no indication or belief at any time that evidence would be, or was being, destroyed.

72.     Special Agent Dillard documented in the Operations Plan, and the agents and task force officers were aware, that:

     a.  Bryan Malinowski was the director of the Bill and Hillary Clinton National Airport in Little Rock, Arkansas;

     b.  He had no criminal history and no history of violence;

     c.  He lived at home with his wife and possibly a small-sized dog;

     d.  There were no other known occupants of the home;

     e.  Based on data obtained from a GPS tracking device that ATF placed on his vehicle, Bryan was not expected to leave for work until approximately 9:00 to 10:00 a.m.;

     f.  That Bryan worked in a gun-free zone, an airport;

14

g. That Bryan's home was situated on a 0.6 acre lot located at the end of a cul-de-sac;

h. Based on county records, Bryan's home was a large, single-story home, approximately 2,780 square feet with four (4) bedrooms, three (3) full bathrooms, and two (2) half bathrooms. According to Special Agent Adam Bass, it was "a big house."

73.    There was no indication or belief by law enforcement prior to or during the forced entry that Mr. Malinowski or his wife were a danger to any person or that they would not comply with the agents' requests or would in any way inhibit the agents' ability to execute the search warrant.

### D.  <u>ATF Plans and Prepares for a High-Risk Dynamic Entry</u>

74.    According to Agent Hicks, the vast majority of the search warrants executed by the Arkansas ATF team are dynamic entries, and that when ATF makes a dynamic entry into a home, they are usually "dealing with violent armed career criminals and drug dealers… [that's] the bulk of the types of cases that we work."

75.    According to the Operations Plan, if a "reasonable time" passed with no response, the entry team leader would give the command for the team to conduct a "limited penetration."

76.    A "limited penetration" is a type of dynamic entry where an ATF agent carrying the shield enters first. The agent with the shield then stops a foot or two inside the threshold of the door, followed by additional agents visually securing each part of the home visible from the front door threshold. Agents then call out to the occupants.

77.    In the wake of the chaos of ATF's 1993 raid of the Branch Davidian compound in Waco, Texas, the agency came under significant public criticism and

congressional scrutiny for using excessive force in carrying out their enforcement responsibilities.

78.    The resulting federal review of ATF's use of force and operations concluded that a "dynamic entry, which relies on speed and surprise and may involve forced entry, is a preferred tactic during high-risk operations—those where ATF believes that suspects pose a threat of violence or in operations where evidence can be easily destroyed," and that "a dynamic entry could be planned only after all other tactical options had been considered." *See* United States General Accounting Office ("GAO"), REPORT, *Use of Force*, at 6-7, https://www.gao.gov/assets/ggd-96-17.pdf

79.    Additionally, "through the use of dynamic entries in certain high-risk situations, law enforcement agents hope to act so quickly that the suspects do not have time to respond or, at a minimum, give agents the advantage by forcing suspects to react to agent actions rather than the reverse." *Id.* at 49.

80.    The GAO use-of-force report noted dynamic entries are meant to reduce "the potential for suspects to react to notification of warrant service." *Id.* at 7.

81.    Additionally, the GAO's Use of Force report identified several scenarios exemplary of ATF's dynamic entry when executing a search warrant in "high-risk" scenarios, including the following:

> An ATF agent knocks and announces ATF's identify and purpose. If there is no response after a reasonable period and the door is locked or fortified, one or two agents breach the door using a ram or other tool to gain entry to the premise. Teams carrying body bunkers then quickly enter and search the premise to locate suspects and clear the premise of any danger.

*See* United States General Accounting Office, REPORT, *Use of Force*, at 60,

16

https://www.gao.gov/assets/ggd-96-17.pdf

82.    This description matches the Arkansas ATF field office's Operations Plan for a "limited penetration" in executing its warrant at the Malinowski home.

83.    Despite knowing that Bryan did not pose a danger to them and believing that he would cooperate, ATF agents planned for a dynamic entry, approaching the Malinowski home wearing tactical gear, including ballistic vests and tactical helmets.

84.    Most were armed with semi-automatic Colt M4 carbine rifles chambered in 5.56 caliber—a common weapon used by the U.S. military. They also possessed 9mm handguns. One agent carried a battering ram, another carried a ballistic shield, and another had a Halligan pry tool.

85.    The agents and TFOs decided to approach the home stealthily and under the cover of darkness and planned to cover the home's video doorbell to obscure their presence.

86.    The agents chose to prepare for and execute a dynamic entry despite the Malinowski search warrant execution not posing a threat of violence or evidence destruction.

E. **Agents Call Off a Planned Raid on March 12, 2024, When They Learn Bryan is Out of Town**

87.    Agents had originally prepared to execute the search warrant on March 12, 2024, a week prior to the actual execution and raid on the Malinowski home.

88.    Agents, TFOs, and LRPD officers assembled in the pre-dawn hours in the parking lot of a Walmart located at 19301 Cantrell Rd., approximately 1.5 miles from the Malinowski home.

89.    They used the Walmart parking lot as a staging area to congregate before executing the search warrant.

90.    However, a law enforcement officer who was surveilling the Malinowski home notified the search warrant team that he had observed Bryan leave his home prior to 6:00 a.m., so they did not execute the warrant.

91.    Bryan had left his home early that morning to take a flight to Washington, D.C. for work.

92.    Nothing prevented the agents from executing the search warrant on March 12, 2024.

93.    Because Bryan was not at home when the agents intended to execute the search warrant, they aborted its execution.

94.    Agents Dillard, Boles, and Merrill decided to delay the execution of the search warrant until they could be assured Bryan would be present.

F.    **ATF Fails to Comply with the Operations Plan in Preparing for the Second Attempt at the Search Warrant Execution**

95.    Agent Dillard set a new date for the warrant execution, March 19, 2024, and prepared an Operations Plan on March 15, 2024, which SAC Merrill approved that day.

96.    After the aborted attempt a week prior, some of the agents assigned to the warrant execution changed. For example, the person assigned to "knock and announce" changed from TFO Robert Bell to Matt Sprinkles after Bell was unavailable March 19, 2024.

97.    The Operations Plan specifically called for the team to conduct a briefing on

March 18, 2024, the day before execution of the warrant. That briefing did not occur, despite the personnel changes from the original planned execution.

98.     Instead, the agents, TFOs, and LRPD officers were briefed at the nearby Walmart staging area just prior to executing the search warrant. It was at this briefing that they were assigned their roles and responsibilities.

99.     According to Entry Team Leader Agent Tim Boles in his interview with the Arkansas State Police two days after the shooting:

> We didn't really have a brief, another sit down brief at the office like we did [the week] before. We all met at the Walmart on Chenal, and got everybody together. Kind of went through a few things. I made the assignments. I told them that we were going to—told the team we were going to do a limited penetration on the house if nobody came to the door, if we had to breach the door. That was pretty much it for the brief.

100.     Agent Boles assigned specific tasks to certain people the morning of the raid, and recalled to Arkansas State Police that "other than a few other things, that's all I can think of as far as what we were briefing on here in the parking lot."

### G.     The "Team" Assembles and Divides Up Responsibilities for the Warrant Execution

101.     On March 19, 2024, the team, consisting of a total of thirteen (13) agents, task force officers, and LRPD officers, reassembled in the Walmart parking lot in preparation for executing the search warrant on the Malinowski home.

102.     Special Agent Merrill was the Resident Agent in Charge ("RAC") of the Little Rock Field Office. He was responsible for supervising all criminal investigations at the Little Rock field office, and he supervised Agent Dillard's investigation of Bryan

Malinowski.  On the morning of March 19, 2024, Agent Merrill served as the on-scene commander, and he formed part of the front perimeter with LRPD Officer Steve Woodall.

103.    Special Agent Timothy Boles was the entry team leader responsible for deciding when to initiate the knock and announce procedure, for ensuring that the knock and announce procedure would be conducted lawfully in compliance with the Constitution and applicable statutes, and for assigning roles and responsibilities for the team of agents forcing entry into the Malinowski home.

104.    Agent Boles ordered the initiation of the knock procedures, ordered the entry team to break the doors to the home, and ordered his agents to enter the home after they hesitated.

105.    ATF Agent Adam Bass was the first agent in the entry team "stack" as it approached the Malinowski front porch.  He placed tape over the video doorbell at the front door of the home, preventing any occupant from observing their presence—a practice commonly used in high-risk, dynamic entries where surprise and concealment are the goal.

106.    Bass was the agent who carried the ballistic shield and discarded it on the front porch of the home before the agents breached the front doors. In the event of a forced entry, he was supposed to be first in the home, leading the team with his ballistic shield emblazed with large, unobstructed "POLICE" across the front.  Agent Bass and the shield never made it into the home before agents shot and killed Bryan.

107.    ATF Agent Matthew Sprinkles was responsible for conducting the "knock and announce" procedure.

108.    Based on the operations plan, Agent Sprinkles was supposed to be the second

agent to enter the home, which would have placed him behind Agent Bass who had the shield. Instead, he entered first amid the disorganization and hesitation pursuant to Agent Boles' order.

109.    Agent Tyler Cowart was a member of the entry team, and in the event of a forced entry was responsible for using a Halligan pry tool to force open the glass, French-style storm doors protecting the main, wooden doors on the front porch.

110.    Agent Cowart expected to be approximately the fourth agent to enter the home during a forced entry, but unexpectedly found himself as the second agent to enter the home.

111.    Task Force Officer ("TFO") Michael Gibbons was assigned to carry the ram, which, in the event of a forced entry, would be used to break down the front, wooden doors of the home.

112.    Agent Troy Dillard, who was the agent in charge of the investigation, was also a member of the entry team.  He was positioned near the back of the "stack" as it approached the Malinowski home.

113.    Task Force Officer ("TFO") Chris Griggs was the final member of the seven-man entry team.

114.    Agents Shannon Hicks and Amy Ness walked around to the back of the home and formed the rear perimeter.

115.    Several Little Rock Police Department ("LRPD") officers assisted the ATF.

116.    Officer Steve Woodall was originally assigned to be on the entry team, but based on the recommendation of his supervisor at LRPD, was taken off the entry team and

instead stood with RAC Merrill as part of the front perimeter.

117.    LRPD Officer Olen Lakey parked in front of the home, facing a neighbor's house. Upon Agent Boles' command to initiate, Officer Lakey turned on his flashing lights and bumped his car's siren for approximately 1.5 seconds.

118.    Little Rock Police Department Officer Clint Williams parked his vehicle at the top of the cul-de-sac and was responsible for keeping any non-law enforcement personnel from entering the cul-de-sac.

119.    According to the Operations Plan, all agents, TFOs, and LRPD officers had the authority to abort the warrant execution.

**H.    None of the Agents, TFOs, or LRPD Officers Wore or Activated Their Body Cameras**

120.    None of the agents wore body cameras, despite a three-year-old policy initiated by the prior Administration that mandated ATF agents wear and activate body-worn cameras (Body Worn Cameras or "BWC") when executing search warrants. DOJ Policy, June 7, 2021, *Body Worn Camera Policy,* https://www.justice.gov/archives/dag/file/1144936-0/dl?inline=.

121.    None of the officers on scene who were equipped with body cameras activated their body worn cameras either, despite a 2022 policy that called for all TFOs detailed to the ATF to wear body-worn cameras when engaged in federal law enforcement operations. ATF POLICY, June 2, 2022, *Task Force Officer Body-Worn Camera,* https://www.atf.gov/file/170136/download.

122.    None of the LRPD uniformed Officers manually activated their body

22

cameras, despite LRPD's General Order 316, dated December 27, 2022, that LRPD officers "must activate his or her MVR [mobile video recording]/BWC [body worn camera]" during "the execution of search warrants…[and] forced entries…" and continue recording until the event has concluded.

123.    But an audio record exists. When LRPD Officer Lakey initiated his lights and bumped his siren, his MVR and the audio from his BWC—by design—automatically started recording.[3]

**I.    The Agents' and TFOs' Clothing Did Not Identify Them From the Side**

124.    On the morning of March 19, 2024, the ATF agents and TFOs on the entry team were all similarly dressed. They wore dark blue long-sleeved shirts, and any law enforcement insignia or identification on the front and back of their shirts were mostly or completely covered by their bullet proof vests.

125.    Any markings on the front of agents' vests that could have identified them as law enforcement were obscured by equipment strung across the chest and by the agents' arms and rifles, which were held in front of their bodies.

126.    The agents wore tactical helmets without identifying insignia.

127.    The rifles they carried were black and did not display any identifying markings.

128.    The shield that Agent Bass carried was the largest, most obvious, and only

---

[3] Though Lakey's vehicle faced a neighbor's home, the audio from his MVR allowed for an unbiased review and accurate timeline of ATF's actions.

unobscured method of identifying the agents as law enforcement because of the large "POLICE" lettering on its front. Additionally, the ballistic shield in and of itself is an indication of law enforcement presence because, due to its size and weight, it is impractical and uncommon for private citizens to possess one.

129.    However, as noted further in this Complaint, the entry team fell into disarray and the shield never made it into the home before Bryan was shot in the head.

130.    The agents' clothing and equipment failed to present any identifying words, emblems, or markings on their shoulders or sides.

131.    Any identification, if it was not otherwise obscured, was not visible to any person standing to the left or right of the agents.

## J.   The Agents Arrive in Darkness to a Quiet Home

132.    When the agents arrived at the Malinowski home before sunrise on March 19, 2024, their ten (10) vehicle caravan occupied the entirety of the cul-de-sac on Durance Court.

133.    It was still completely dark outside when agents arrived before 6:00 a.m.

134.    Agents, TFOs, and officers did not encounter any person or observe any indication that someone was alerted to their presence. Nothing occurred prior to or during the officers' presence outside the home that presented a danger to agents or caused alarm.

135.    There was no cause for the entry team to deviate from the constitutional and statutory requirement to knock and announce their identity and purpose and to wait a reasonable time so they could be admitted entry.

136.    While staged in the cul-de-sac before approaching the home, the agents

formed a line or "stack" consisting of seven (7) agents and task force officers.

137.  The agents maintained their stacked formation as they traversed the cobble-stoned pathway from the cul-de-sac to the eight steps leading to the front-entry landing and front doors.

138.  The Malinowski home's front entry consisted of two sets of doors:  a set of French-style, glass storm doors and the main doors behind them, which were two large wooden doors that provided entry into the home.

139.  As they did every night, the Malinowskis locked the doors before they went to bed the prior evening and set the security system. Both sets of doors—the glass, French-style storm doors and the wooden main doors, remained locked at 6:00 a.m. on the morning of March 19, 2024.

### K.  The Agents Hurriedly Knock and Fail to Clearly Announce

140.  The entry team was aware, or at least expected, that the Malinowski home had a video doorbell at the front door.

141.  As agents approached the front door of the home, the first agent in the stack, Agent Bass, placed a piece of painter's tape over the video doorbell camera, which was positioned just to the right of the front doors. This action disabled the camera and concealed the presence and identity of the armed team on the front porch.

142.  When all agents were in place and the video doorbell taped, Agent Boles gave the command to initiate the knock and announce procedure.

143.  The agents never rang the doorbell. Despite having Bryan Malinowski's phone number and noting it in their Operations Plan, no one called to notify him of their

presence.

144.    No officer or agent attempted to announce their presence by using an electronic public announcement (PA) system, though the Operations Plan provided that a PA system would be used to announce their presence.

**L.    Agents Fail to Wait a Reasonable Time Before Breaching the Malinowski Home and Fatally Shooting Bryan**

145.    At 6:02:58 a.m. on March 19, 2024, Agent Boles gave the command to "initiate." Little Rock Officer Lakey activated his vehicle's lights and sirens and then shut off the siren after one and a half (1.5) seconds.

146.    According to ATF Agent Matt Sprinkles, the LRPD officer simply "chirped the siren a few times."

147.    According to Special Agent Hicks, Officer Lakey performed this task "exactly like we asked him to do."

148.    After the siren was silenced, the blue flashing lights remained active, but neither the Malinowskis nor any neighbors in the Durance Court cul-de-sac saw the lights or heard the brief bump of the siren.

149.    In the subsequent investigation by the Arkansas State Police, special agents Justin Harmon and Jimmy Collins contacted residents of two homes on the cul-de-sac, and all stated that, although home in the pre-dawn hours of March 19, 2024, they did not hear any sirens or see the police lights—they slept through it.

150.    Arkansas State Police Major Stacie Rhoads also testified to this fact in front of an Arkansas Senate Judiciary Committee on September 30, 2024. Arkansas Senate

Judiciary        Committee        Video,        September        30,        2024,

https://www.youtube.com/watch?v=nqFQFja4Ye4.

151.    After the command to "initiate" from Commander Boles, Agent Sprinkles

began shouting and knocking on the glass of the Malinowski's outer storm doors protecting

their wooden front door.

152.    Agent Amy Ness, posted in the backyard of the home, later reported to the

Arkansas State Police investigator that she could not hear any knocking or announcing

from the backyard.

153.    Agent Sprinkles then paused his knocking for four seconds, before knocking

on the glass outer doors a final time.

154.    In total, the knocking on the Malinowskis' outer glass doors lasted

approximately nineteen (19) seconds, from 6:02:58 a.m. to 6:03:17 a.m.

155.    It was still dark outside, approximately an hour and ten minutes before

sunrise.

156.    At 06:03:17 a.m., less than twenty seconds from when ATF agents initiated

the operation, the agents stopped knocking. At this point, the entry team ceased its

knocking and shouting.

**M.    In 28 Seconds, Agents Begin Forcing Their Way into the Malinowski Home**

157.    Entry team leader Agent Boles stated in his interview with the Arkansas State

Police that while he could see through the angled plantation shutters into the home, he did

not see any lights turn on and did not observe any movement or hear any noises or voices

27

coming from inside the home.

158.    Boles told the Arkansas State Police that "I've got a clock in my head. It's like we're out here, we're exposed. Um, so I told them, go ahead and breach the door."

159.    Boles did not check his watch or keep track of the time on a watch or other device to measure how many seconds or minutes elapsed between the end of Agent Sprinkles' knocking and his decision to breach the home.

160.    Despite no objective indication that the entry team—as they stood on the front porch—was in any danger, and despite no belief that the evidence inside to be seized through the warrant was being disposed of, or any other exigency, Agent Boles ordered the team to breach the home.

161.    In less than twenty-eight (28) seconds from the time that Officer Lakey initiated the siren bump, Agent Boles ordered his agents to break the glass doors, breach the wooden doors, and enter the Malinowski home by force.

162.    Agent Boles claimed that once he gave the command, "it was not a quick process" because "they had to get the Halligan out," the pry tool they used to break open the glass storm doors.

163.    At 6:03:26 a.m., which was twenty-eight (28) seconds after Agent Boles' command to "initiate," Agent Cowart began striking the Malinowskis' glass storm doors with the Halligan tool to break them open.

164.    After Agent Cowart breached the glass storm doors, TFO Gibbons used a ram to batter the wooden front doors of the Malinowski home, causing the doors to burst open with a loud bang upon a single strike. This strike breaching the main doors occurred

at 6:03:35 a.m., followed by the clattering of the ram as TFO Gibbons dropped it onto the porch.

N.    **The Entry Team Falls into Disarray**

165.    When forced entry is made and doors are rammed open, it is protocol at the Arkansas ATF office that agents automatically enter the home and execute a "limited penetration." When executing a "limited penetration," the person carrying the shield enters first.

166.    In the process of breaking both sets of doors, the entry team became disorganized. According to Agent Sprinkles, "I think we were unprepared for the French doors."

167.    When the main wooden doors were rammed open by TFO Gibbons, Agent Sprinkles unexpectedly found himself at the front of the entry stack. As Agent Sprinkles recalled to investigators, "I wasn't supposed to be the first entry." Agent Sprinkles stood still waiting for Agent Bass, who carried the shield, to enter the home first.

168.    As previously stated, while the Operations Plan had called for Agent Bass to enter first utilizing the shield emblazoned with large letters identifying the agents as "POLICE," Bass discarded the shield near the front doors and never entered with it.

169.    Later, Agent Amy Ness told Arkansas State Police investigators that after the raid, the shield was blocking the entryway of the house, and that she "cleared the doorway of the shield for medics to come in" the house, moving it out of the way so no one tripped on it.

170.    At the moment that Agent Bass was supposed to lead the entry team in a

"limited penetration" with the shield, he was instead setting the shield down on the front porch. According to the entry team leader, Agent Boles, "I didn't know that at the time."

171.    Entry team leader Boles failed to heed the signs that his team had fallen into disarray.

172.    According to Agent Boles, "There was a brief hesitation [when the door opened], which I was surprised because with our package, once the door comes open, you go in. It was a split second, like that. And I said, 'go.' And then I don't know—you know. All I can see is black ATF agent stuff in front of me."

### O.    Two Agents Enter the Home with Guns Drawn

173.    Upon the command of "Go" from Agent Boles, Agent Sprinkles entered the home with his semi-automatic rifle drawn.

174.    Agent Sprinkles had ceased his knocking and shouting twenty seconds earlier at 6:03:17 a.m., yet as the agents pried open the glass doors and rammed into the wooden doors to breach the home, they were silent: no one announced their identity or purpose once the doors burst open.

175.    As Agent Cowart, the second one in the door, recounted, there were no voice commands given as agents breached the door into the Malinowskis' entryway.

176.    "I didn't say anything," Cowart recalled to state police investigators, and all he recalled Agent Sprinkles (the first agent in) saying once inside was "oh, shit."

177.    Bryan Malinowski stood approximately thirty (30) feet from the front main doors, directly to Agent Sprinkles' left.

178.    The ATF and TFO agents, including Agent Sprinkles and Cowart, were

dressed in dark tactical gear with no lettering, insignia, or badge on the shoulder or sides of their clothing to identify themselves from the side.

179.    Neither the "POLICE" shield nor Agent Bass made it into the home before Agent Cowart shot Bryan Malinowski in the head.

**P.    Bryan Malinowski Hears the Sound of Intruders and Acts to Defend Himself and His Wife**

180.    Bryan and his wife Maer, in bed in their room at the back of the house, never heard the police siren or any voices at their door.

181.    Upon hearing loud banging at their front door and someone trying to get inside, Bryan scrambled out of the bed he shared with his wife. Their bedroom sat in the northwest corner of the house, down a hallway, past his home office, and a considerable distance from the home's entryway.

182.    Bryan quickly grabbed his handgun from the top drawer of his bedside table and went into the closet to retrieve a magazine. Mindful of his wife's safety, Bryan motioned for his wife to stay back, pushing her down and out of the doorway.

183.    Bryan left the bedroom and moved approximately six to seven feet down a short side hallway to gain a view of the intruders coming through his front doors.

184.    Unbeknownst to Bryan, Maer refused to stay in the bedroom and followed him down the short hallway.

185.    Upon information and belief, Bryan believed intruders were breaking into his home, and he was going to defend himself, his wife, and his home from the intruders.

186.    From Bryan's vantage point about thirty feet away down the dark hallway,

there was no clothing or gear on the intruder that would have identified him as a law enforcement officer.

187.    Bryan had no reason to believe that the people who breached his front door were part of a team of federal agents. He had no idea that federal agents had been following him, investigating his firearms sales, or looking into his paperwork and transactions—much less that they had secured a warrant or would be executing it at his home more than an hour before sunrise.

188.    Believing they were intruders, Bryan fired his gun at the floor and hit one of the agents in the boot sole.

189.    Agent Cowart, who entered second in the stack directly behind Agent Sprinkle, returned fire, pointing his rifle at Bryan's head and pulling the trigger several times.

190.    At 6:03:43 a.m., just 48 seconds after agents first approached his door to cover his doorbell, Bryan Malinowski lay bleeding on the floor of his hallway, shot in the head.

191.    Several ATF agents and task force officers who subsequently entered the Malinowski home noted that although Bryan laid on the floor with a gunshot wound to the head, they could hear him struggling to breathe, yet offered no medical assistance because of the nature and extent of the bullet wound.

192.    The Arkansas State Police were notified about the officer-involved shooting and responded to the Malinowski home to conduct their investigation.

193.    Agent Bass noted in his subsequent interview to State Police investigators

32

that it takes "a while" to wake people up at that hour, telling investigators that after

Malinowski was shot and killed, it took some time for State Police to arrive, such that they

all "stood around outside for quite a while" because "it is 6:00, 6:30 in the morning at that

point, so it takes a while to get everybody woke up."

### Q.    Agents, TFOs, and Officers Detain Maer Malinowski in a Patrol Vehicle For Hours as She Begs to be Released

194.    Maer Malinowski, who had not followed her husband's directive to stay back

in their bedroom, had instead followed him into the hallway, relaying now what was

observable from where she stood.

195.    She watched helplessly as her husband was shot in the head just inches from

her. She stood by his body, screaming and crying, horrified to be covered with his blood.

196.    Frozen in horror after and realizing the intruders had fatally wounded her

husband, Maer saw several dark figures at the entryway.

197.    The men pointed their rifles at her and yelled at her to show them her hands.

It was only then that she realized they were law enforcement agents.

198.    The agents then ordered Maer to step over her husband's limp body and allow

them to secure her.

199.    The agents then escorted her to the back of an LRPD cruiser, where she was

held for the next several hours with no updates on her husband's condition.

200.    At 6:00 on the morning of March 19, 2024, the temperature in Little Rock,

Arkansas was approximately thirty-four (34) degrees Fahrenheit.

201.    Maer Malinowski, having been in bed when the sound of intruders breaking

down her front door jolted her and her husband, was only wearing a spaghetti strap tank top and a pair of boxers (no shoes) when ATF agents removed her from her home and placed her in the patrol vehicle.

202.  ATF agents placed Maer in the back of the LRPD patrol vehicle at approximately 6:07 a.m.  She sat cold in the vehicle without any covering until she was provided a blanket at approximately 6:51 a.m. Even after receiving the blanket, she was still cold.

203.  Maer repeatedly told the officers that she needed her clothes and medicine and to check on her dogs, and that she needed to use the bathroom.

204.  LRPD Officer Lakey and ATF agents denied Maer's requests to ride to the hospital in the ambulance with her husband.

205.  The audio from Officer Lakey's dash camera revealed Maer's desperation during those first few frantic moments. Less than ten minutes after the shooting, LRPD audio captured Maer recounting to the officers detaining her, what had happened:

> This is... This is a movie. It's a movie. We didn't do anything wrong. We don't, we don't- you got...you got the wrong house. Oh, you guys got the wrong house. We don't do anything wrong. We're honest people? Oh my God. Oh my God. Oh my God. Oh my god! Oh! Oh! Oh, no. This is no time for God. This is a nightmare.

...

> When they shot my husband, I opened the door from the bedroom because he closed it. We thought it was an intruder. So, I opened the door, he closed it, and then I opened it again. That's when they- he got shot.

206.  Nearly an hour later, Maer continued begging to be released, but officers ignored her hysterical cries and denied her requests to be let out of the squad car:

> Hear me out. Let me out! Let me out! Please hear me out. Don't. I need, I

need to go [unintelligible]. I need to... Oh my love, oh my love. Oh Bryan. Oh Bryan. You need to come [unintelligible]. You need to come. I don't know...I don't know what to do without him. God, I don't know what to do. Guide me, God. Guide me, God. Guide me. Guide me, God, please. I don't know what to do. I don't know what to do, God. I don't know what to do. Oh God. I don't know what to do, God. I can't- I don't know what to do. Help me! Help me!

207.    They denied her requests for clothes.

208.    They denied her requests for medicine.

209.    They denied her requests to go check on her dogs, assuring her that they were in the house and accounted for. Later, she spotted one of her dogs who had escaped and was lost nearly a mile away roaming in the neighborhood near a busy four-lane road.

210.    They denied her requests to use the bathroom at her neighbor's home.

211.    They held her for hours while she cried hysterically, repeatedly asking for an explanation.

212.    At approximately 7:20 a.m., ATF relented to her requests to use the bathroom. Agents and officers decided that Maer could use the restroom at a nearby fire station. However, they kept Maer in custody.

213.    Officer Gladina Harris with LRPD arrived at the Malinowski home around 7:20am. Officer Harris was equipped with a body camera and dash camera, and she activated both.

214.    Officer Harris drove Maer to a nearby Little Rock Fire Department station nearly three (3) miles from her home.

215.    At the fire station, Officer Harris left Maer in the back seat of the police patrol vehicle while she first contacted a firefighter at the front door. Officer Harris notified

the firefighter that she had "a prisoner" that needed to use the restroom because "her whole house is a crime scene."

216.   Maer Malinowski was still bare-footed and clad only in a tank top and boxers. Maer pulled the blanket over her shoulders to cover her body and legs as she entered the fire station.  Officer Harris told one of the firefighters that Maer "barely had any clothes on."

217.   When Maer walked into the fire station, one man held the door for her and Officer Harris.  Three other men and a woman stood near the bathroom staring at Maer as she walked through the front door and into the bathroom.

218.   When Maer entered the bathroom, Officer Harris entered with her, exclaiming, "I have to go in there with you." Officer Harris did not disable her body camera while Maer used the restroom in front of her, and her body worn camera captured the audio of Maer using the bathroom.

219.   That audio was later produced as part of the body camera footage in response to a FOIA request.

220.   Officer Harris then escorted Maer to the back seat of the patrol vehicle and drove her back to her cul-de-sac, where Maer remained in custody until after she provided an interview to the State Police.

221.   For more than three (3) hours after her husband was shot, Maer Malinowski was held in custody by LRPD officers at the direction of ATF agents.

222.   At approximately 9:15 a.m., agents turned Maer over to the Arkansas State Police so that they could interview her.

36

223. For several hours after Bryan was shot, the Malinowski home was secured, but not searched. During this time, ATF decided the Arkansas ATF team involved in that morning's raid would not conduct the search warrant.

224. SAC Merrill contacted the ATF office in Mississippi, which sent its agents to Little Rock to search the Malinowski home.

225. Additionally, the Arkansas State Police obtained a search warrant for the home as part of their officer-involved shooting investigation. The State Police did not turn over the Malinowski home to the ATF and RAC Merrill until 1:53 p.m. on March 19, 2024.

226. ATF agents did not begin to search the Malinowski home pursuant to the original warrant until after it was turned over to them that afternoon.

### R. Bryan Succumbs to His Gunshot Wound and is Pronounced Dead on March 21, 2024

227. After the ambulance arrived, Bryan Malinowski was taken to Baptist Medical Center in Little Rock, Arkansas.

228. Maer Malinowski, finally released by officers several hours later, arrived at the hospital to find her husband in such dire condition that her family friend and neighbor told her not to go in the room and see him.

229. Despite medical efforts, Bryan succumbed to his injuries two days later and was officially pronounced dead on March 21, 2024. He was 53.

230. Bryan received Last Rites by the family's priest at Maer's request.

231. In accordance with his wishes, five of his organs, including his liver and lungs, were retrieved and donated to save the lives of others.

232.    Plaintiff Maer Malinowski has been in continuous counseling since the event.

**S.    The Constitution Requires Officers to Knock and Announce and Wait a Reasonable Time Before Forcing Entry Where No Exigency Exists**

233.    In *Wilson v. Arkansas*, the Supreme Court held that the "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." 514 U.S. 927, 929 (1995).

234.    The requirement to knock and announce is also codified in 18 U.S.C. § 3109, stating that officers must give "notice of [their] authority and purpose," and must be refused admittance before forcing entry into a home.

235.    Prior to entering a home to execute a search warrant, officers must identify themselves as law enforcement and announce their purpose to execute a search warrant.

236.    This requirement has long been a fixture of the Fourth Amendment and is intended to protect the residents' privacy and dignity that can be destroyed by a sudden entrance.

237.    More importantly, it protects "human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006).

238.    The law presumes that a resident will submit to the lawful authority of officers and provide entry to them. *Hudson*, 547 U.S. at 594 (2006).

239.    The knock-and-announce rule "protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the 'opportunity to prepare themselves for' the entry of the police. 'The brief interlude between an

announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed.' In other words, it assures the opportunity to collect oneself before answering the door." *Id.* (citations omitted).

240. Absent a reasonable belief that waiting would be futile, dangerous, or would allow for the destruction of evidence, law enforcement officers are required to wait outside of the home until they are admitted or refused. *Richards*, 520 U.S. 385, 394-95 (1997). A "reasonable belief" cannot be speculative but must be based on specific and articulable facts. *Id.*

241. "An officer's delay before entering ordinarily should be long enough to ensure that the resident has had time to hear the police knock and to answer the door." *U.S. v. Vesey*, 338 F.3d 913, 915–16 (8th Cir. 2003), *citing Wilson v. Arkansas*, 514 U.S. 927, 931–32, 936 (1995) (holding a ten-second delay was reasonable where, unlike here, the warrant recipients were at risk of disposing illegal drugs and officers were serving a warrant at a "small apartment...in the afternoon, when it was likely that any occupants were awake").

242. As the United States Supreme Court held, the time it will take an occupant "to get to the door," will "vary with the size of the establishment," and it could take "perhaps...several minutes to move through a townhouse." *U.S. v. Banks*, 540 U.S. 31, 40 (2003).

243. But where circumstances are not exigent, such as where a suspected drug dealer might be disposing of drugs, as in *Banks*, and where police do not arrive "during the day, when anyone inside would probably have been up and around," officers must wait a

sufficient time to allow the delay in responding to fairly suggest the occupants' refusal to let them in. *Banks*, 540 U.S. at 40.

244.    "That is why, in the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door." *Id.* at 41.

245.    The class of offense suspected also bears on the exigency analysis. As the Supreme Court noted, "[p]olice seeking a stolen piano may be able to spend more time to make sure they really need the battering ram." *Banks*, 540 U.S. at 41.

246.    "Absent exigency, the police must knock and receive an actual refusal or wait out the time necessary to infer one." *Banks*, 540 U.S. 31, 43.

247.    In September 2021, the Deputy Attorney General announced a knock and announce requirement for federal law enforcement agencies, including ATF, "to limit the circumstances in which agents may seek to enter a dwelling pursuant to a warrant without complying with the 'knock and announce' rule." DOJ Press Release, *Department of Justice Announces Department-Wide Policy on Chokeholds and 'No-Knock' Entries*, Sept. 14, 2021, https://www.justice.gov/archives/opa/pr/department-justice-announces-department-wide-policy-chokeholds-and-no-knock-entries.

248.    The 2021 policy expressly incorporated the *Hudson v. Michigan* and *U.S. v. Banks* standards, stating agents must "'knock and announce' their identity, authority and purpose, and demand to enter," and then "must wait a reasonable amount of time based on the totality of the circumstances to permit the occupant to open the door before making

40

entry into a dwelling." *Id.*

249.    The 2021 DOJ Policy states the only exception is where "exigent circumstances arise at the scene such that knocking and announcing the agent's presence would create an imminent threat of physical violence to the agent and/or another person." *Id.*

250.    In limiting 'no knock' entries to instances where there is an imminent threat of physical violence, the mandatory DOJ Policy noted that "it is narrower than what is permitted by law," such that "the Department is limiting the use of higher-risk 'no knock' entries to only those instances where physical safety is at stake at the time of entry." *Id.*

251.    Despite the lack of exigency or physical danger to police at the Malinowski home at 6:01 a.m. on March 19, 2024, Defendants broke down the door and forcibly entered the Malinowski home before waiting a reasonable amount of time to permit the Malinowskis to open the door or refuse entry, *or* a sufficient time to infer a refusal.

**T.     Arkansans and Americans Are Outraged, And Congressional Leaders Call Bryan Malinowski's Death a Senseless "Horror That Should Not Occur to Any American"**

252.    Within days of Bryan's death, news spread nationally that the ATF agents had dynamically and forcefully breached the home's doors and killed Bryan Malinowski.

253.    News also spread that the agents involved were not wearing body cameras, in violation of the then-Administration's own policy.

254.    As the *New York Times* reported, "Bryan's death has been met with outrage by his family, friends and gun rights supporters in Arkansas and beyond, who say the raid on March 19 was ill-conceived, unnecessary and a shocking case of government

overreach." Eduardo Medina, THE NEW YORK TIMES, *What Set the ATF and an Airport Leader on the Path to a Deadly Encounter?*, May 24, 2024, https://www.nytimes.com/2024/05/24/us/bryan-malinowski-arkansas-atf-guns.html.

255.    Arkansas' United States Senators Tom Cotton and John Boozman began their own inquiry into Bryan's death, seeking answers as to how the agents' aggressive tactics complied with the law and ATF and DOJ's own policies.

 **Tom Cotton** ☑ 🅐
@SenTomCotton

  ···

The Department of Justice confirmed to me and @JohnBoozman last night that the ATF agents involved in the execution of a search warrant of the home of Bryan Malinowski weren't wearing body cameras. We will continue to press the Department to explain how this violation of its own policy could've happened and to disclose the full circumstances of this tragedy. Mr. Malinowski's family and the public have a right to a full accounting of the facts.

2:58 PM · Apr 19, 2024 · **82.3K** Views

256.    Arkansas Attorney General Tim Griffin demanded answers and called on the ATF to release all body camera footage. "Arkansas AG Demanding Answers, Bodycams from ATF Over Fatal SWAT Raid," April 17, 2024, https://saf.org/arkansas-ag-demanding-answers-bodycams-from-atf-over-fatal-swat-raid/.

257.    As state lawmakers called on the ATF to release body camera footage— before learning it did not exist—the U.S. House Judiciary Committee launched an investigation, sending a letter to ATF demanding answers. KATV, "House Judiciary Committee sends letter to ATF, demands answers in Malinowski raid probe," April 22,

2024,https://katv.com/news/local/house-judiciary-committee-sends-letter-to-atf-demands-answers-in-malinowski-raid-probe-republicans-clinton-airport-doj-investigation-biden-trump-sanders.

258.    As Judiciary Committee Chairman Jim Jordan put it in his letter to ATF Director Steven Dettelbach, the "circumstances surrounding the raid, the subsequent death of Mr. Malinowski, and recent related rulemaking by the ATF raises serious questions about the weaponization of the agency against Americans." **Ex. B,** House Judiciary Letter to ATF, April 22, 2024, *available at* https://judiciary.house.gov/media/press-releases/chairman-jordan-demands-details-atf-fatal-raid.

259.    Chairman Jordan further noted, "The circumstances of Mr. Malinowski's death raise questions about whether the ATF followed proper protocol during the execution of this search warrant. Department of Justice policy and President Biden's Executive Order 14074 requires ATF agents—including those who conducted the search warrant on March 19, 2024—to wear active body-worn cameras during the execution of a search warrant. The Department has since confirmed to the Malinowski family that ATF agents were not wearing body cameras during the raid, a violation of the Department policy." **Ex. B** at 2.

260.    As Chairman Jordan recognized, the Malinowski raid pre-dated the then-Administration's implementation of the new regulation to restrict private firearm sales:

> "In particular, ATF seeks to drastically expand the universe of Americans who would be classified as a 'dealer' under federal law requiring them to obtain a license to become a Federal Firearms Licensee (FFL), subjecting them to a term of imprisonment of up to five years and a fine of up to $250,000, or both. Mr. Malinowski exercised his Second Amendment rights and was a firearms enthusiast. Even if, as ATF has alleged, Mr. Malinowski violated federal law, it does not justify ATF's actions that

ultimately lead to the use of deadly force."

**Ex. B** at 3.

261.    Over the next few weeks and months, as more troubling details came to light, state and federal lawmakers pointed out that, in the absence of any reason to believe Bryan posed any threat to either the agents or of the destruction of evidence, ATF had a host of less-lethal search warrant options available, including serving the warrant at Bryan's workplace (a gun-free zone), knocking on his door during waking hours in the daylight, pulling him over in his vehicle and serving the warrant, or notifying him of their arrival through a "call out" via his cell phone or a bullhorn. John Besselman, Senior Legal Instructor, FEDERAL LAW ENFORCEMENT TRAINING CENTER MATERIALS,    *"The Knock and Announce Rule: 'Knock, Knock, Knocking on the Suspect's Door,"* https://www.fletc.gov/sites/default/files/imported_files/training/programs/legal-division/downloads-articles-and-faqs/research-by-subject/4th-amendment/knockandannounce.pdf.

262.    Instead, absent any reasonable basis for doing so, ATF chose the most dangerous route possible: a predawn dynamic raid not involving members of an organized and purpose-trained tactical unit, but random members of an investigative squad. ATF made a baseless and reckless decision destined to wake up sleeping and unsuspecting occupants, and otherwise created circumstances and set in motion a series of events any reasonable officer would expect to bring about a dangerous result.

263.    On May 22, 2024, the House Judiciary Select Subcommittee on the Weaponization of the Federal Government held a hearing focused on "actions taken by the

44

bureau that erode Americans' trust in the agency," with a particular focus on the Malinowski raid.

264.    During questioning, a bipartisan group of lawmakers expressed disgust at the ATF's actions in the case, with Rep. Gerry Connolly (D-VA) describing what happened to Bryan Malinowski as "really a horror that should not occur to any American citizen or American resident." **Ex. C at 48.**

265.    Rep. Greg Steube (R-FL) addressed Mrs. Malinowski directly, telling her, "This whole case is outrageous to me and, Ms. Malinowski, I feel like we owe you an apology on behalf of the American government today because ATF isn't going to give you that apology." **Ex. C. at 53.**

266.    Chairman Jordan closed the May 22, 2024 hearing by noting that Bryan Malinowski's case epitomized the weaponization of government:

> The ATF decided to change the definition of what an FFL—what a licensee was from principal livelihood to someone who's earning a profit, but it's even worse because they didn't have the definition changed and enacted when this terrible incident happened with Mr. Malinowski. That, to me, is the weaponization of government, unilaterally making changes without it going through the Legislative Branch of government the way our system is supposed to work—the checks and balances how they're supposed to work— and in the case we're talking about so much today they hadn't even fully made that change. They didn't even follow their own rule, for goodness sake, and we have an American who's no longer with us because of that.

**Ex. C at 68.**

267.    On May 23, 2024, the Committee met for a second day of ATF oversight hearings, during which time Chairman Jordan questioned ATF's then-Director Dettelbach about his agency's actions in the Malinowski investigation and raid.

268.    Chairman Jordan played for Dettelbach and the Committee a video he described as showing "ATF agents assembling in the Walmart parking lot a week before March 19th when they were going to execute this search warrant, again pre-dawn hours a week before, but decided not to because they realized Mr. Malinowski wasn't home. Then, it shows what happened a week later as they approached the Malinowski home." **Ex. D** at 3.

269.    Chairman Jordan then asked several questions of Dettelbach: "Why did you put the tape on the doorbell camera? Why did you cut the lights? Why didn't you wear the body cams? What are you trying to hide?" and finally, why weren't the Little Rock police officers who accompanied the ATF agents wearing their body worn cameras? **Ex. D** at 20-21.

270.    Dettelbach refused to answer.

271.    Rep. Darrell Issa (R-CA) asked Dettelbach, "If some group of ten carloads of people showed up and kicked in a door in the dark of night, and somebody came and shot at them, we wouldn't be talking about somebody getting shot in the toe, we would be talking exclusively about a planned murder of somebody, who may or may not be armed, but who had every right to have weapons in their home, an expectation they had weapons in their home, an expectation that they might use it." **Ex. D** at 28.

272.    When Dettelbach again refused to answer, Rep. Issa said, "I hope they appropriately find that in spite of qualified immunity, that you blew it badly enough that, in fact, criminal charges should be considered." **Ex. D** at 28.

273.    As Rep. Issa noted in his closing remarks, Bryan Malinowski would be alive

if it weren't for the ATF's recklessness and unreasonably dangerous actions that day:

> He was killed doing what any normal citizen does when people enter their home in the dark of night and they don't know who they are. If you had body cameras, maybe Ms. Malinowski didn't hear right. Maybe you said "Police," and identified yourself. Maybe he said, "I don't care," and maybe he fired the shots. I don't believe that, and I don't think you do either. I believe he had every real belief that he was defending his wife and family. He fired warning shots. A ricochet hit a police officer or an ATF agent, and you killed him. Those are the facts. We have consistently seen there are two ATFs: The one we need and want and deserve, and the one that plays fast and loose, like ten cars going in deliberately with a warrant that did not entitle an arrest. When in fact if you wanted to arrest him, it would have been reasonable to arrest him at work and simultaneously go into his home. If you had done that, he would be alive today and we would be talking about other things, including whether you acted legally.

**Ex. D** at 29.

## CAUSES OF ACTION

274.    The preceding paragraphs are incorporated and re-alleged as if fully set forth

herein.

275.    At all times relevant to this count, the individual Defendants were acting

under color of law and within the course and scope of their employment as law enforcement

agents (or duly authorized task force members) of the ATF.

276.    Despite knowing the Malinowskis were asleep at 6:00 a.m. and seeing no

movement inside the house for the precious few seconds they knocked on the outer glass

doors, and despite Mr. Malinowski having no criminal history or indications of violence,

the agents decided not to wait for even a minute before breaking down the doors and

forcibly entering the home, guns raised, in the dark pre-dawn hours of March 19, 2024.

They then shot and killed Mr. Malinowski—his needless death a direct result of their recklessness and negligence.

277.   Plaintiff seeks an award of compensatory and punitive damages and declaratory relief against Defendants, individually, as listed in Counts I-IV below pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

278.   Plaintiff also seeks an award of compensatory damages and declaratory relief against the United States of America, as listed in Counts V-X, below, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.

279.   The United States of America, if a private person, would be liable for the acts and omissions of its agents in the same manner and to the same extent as a private individual under like circumstances under the law of the state of Arkansas, where the acts and omissions occurred.

280.   The discretionary function exemption does not apply because the ATF agents' tortious actions violated the United States Constitution.

281.   Defendants' actions as alleged herein violated Plaintiff's clearly established, constitutionally guaranteed rights to be free from unreasonable and unlawful searches and seizures, and to be free from the use of excessive force.

282.   As a direct and proximate result of the conduct of Defendants, Bryan Malinowski suffered physical injury and emotional trauma when he was shot and then left to die.

283.   As a further direct and proximate result of Bryan's wrongful death, his statutory beneficiaries have suffered permanent economic damages, including, but not limited to, the benefit of the money, goods, and services that Bryan Malinowski would have contributed to Maer and his remaining statutory beneficiaries had he lived, as well as damages from the mental anguish suffered by Maer and the remaining statutory beneficiaries and reasonably probable to be suffered in the future, and the loss of consortium of Maer.

284.   Plaintiff also seeks damages for Bryan's loss of life, his inability to labor and earn income and value of his earnings lost, funeral and burial costs, property damage, his conscious pain and suffering prior to his death, medical expenses attributable to his injuries, and other expenses incurred and expected to be incurred in the future.

285.   In addition to her mental anguish due to the wrongful death of her husband, Plaintiff suffered and will continue to suffer, emotional pain and suffering due to her personal experience in witnessing the violent, unconstitutional invasion of her home and her unlawful detainment in her cul-de-sac, where she was exposed to the public strutiny of others, for three hours, during which she begged, but was refused, to be released and to attend to her husband, was denied requests for clothes, was denied requests for medicine, was denied requests to check on her dogs, was denied her request to use the bathroom in her neighbor's home but, instead, after one and a half hours,  was taken to a nearby fire deparment where the officer referred to and treated her as a "prisoner," for which she may recover economic and compensatory damages in amounts to be determined by the factfinder.

286.   Plaintiff also asserts a claim for damage to her home and personal property, , which occurred as a result of Defendants' conduct. Defendants' conduct was grossly negligent, reckless, malicious, willful, wanton, and conducted with a flagrant indifference for the value of human life with a subjective awareness of the risk that those within the residence would be seriously injured or killed, for which Plaintiff seeks punitive damages to the extent allowable by law.

## COUNT I: FAILURE TO KNOCK AND ANNOUNCE
### *BIVENS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS,* 403 U.S. 388 (1971)

### (Against the Individual Defendants)

287.   The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

288.   Without prior notice to Plaintiff of their presence or intent, Defendants used a show of force to enter onto the Malinowskis' property and into their domicile without sufficiently knocking and announcing their presence and purpose and without waiting a reasonable time before forcing entry as the law requires.

289.   Defendants violated Maer and Bryan Malinowski's Fourth Amendment rights to be free from unreasonable searches and seizures when they failed to adequately knock and announce their presence and purpose at the Malinowskis' front door and wait a reasonable time before forcing entry.

290.   Federal law enforcement officers executing a search warrant violate the Fourth Amendment and are subject to civil liability through a *Bivens* action when they enter a home before waiting a reasonable time to be admitted or refused, absent a

reasonable belief that waiting would be futile, dangerous, or would allow for the destruction of evidence. *Richards*, 520 U.S. 385, 394-95 (1997)

291.   Defendants' brief, 11-13 seconds of knocking on outer glass storm doors and yelling at the entry of the Malinowskis' large home in the predawn hours, was insufficient to provide Plaintiff and Bryan Malinowski notice of their identity, presence, and purpose and deprived him of sufficient time to get to the door. *See U.S. v. Vesey*, 338 F.3d at 915–16 (8th Cir. 2003).

292.   Defendants' conduct was done with reckless indifference or malice to Maer and Bryan Malinowski's federally protected rights.

293.   As a proximate result of the Defendants' conduct, Bryan Malinowski was shot, suffered traumatic physical injury and severe pain, was hospitalized, lost bodily function, and suffered until he died, resulting in his wife and statutory beneficiaries continuing to suffer ongoing pain, emotional distress, and past and present economic loss.

## COUNT II: UNLAWFUL ENTRY
*BIVENS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS,*
**403 U.S. 388 (1971)**

### (Against the Individual Defendants)

294.   The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

295.   Defendants' forced entry into the Malinowski residence less than one minute after they began knocking in the predawn hours was not reasonable.

296.   Defendants had no reasonable belief, based upon the totality of facts and circumstances, to believe that the Malinowskis had refused them entry, nor was any

51

exigency present to justify failing to wait a reasonable time after knocking and announcing their presence.

297.    Despite this, Defendants forcefully entered the Malinowski home without any legal right or justification and with a wholly unjustified degree of urgency and militaristic tactics, given the circumstances.

298.    Federal law enforcement officers executing a search warrant violate the Fourth Amendment and are subject to civil liability through a *Bivens* action when they enter a home without being denied entry (or waiting a reasonable time to infer denial of entry) and without exigent circumstances. *Hudson v. Michigan*, 547 U.S. 586, 58 (2006).

299.    Defendants' violation of the Malinowskis' Fourth Amendment rights was willful, egregious, and done with malice and deliberate indifference to their clearly established constitutional rights.

300.    As a proximate result of the Defendants' conduct, Bryan Malinowski was shot, suffered traumatic physical injury and severe pain, was hospitalized, lost bodily function, and suffered until he died, resulting in his wife and statutory beneficiaries continuing to suffer ongoing pain, emotional distress, and past and present economic loss.

301.    Plaintiff seeks an award of compensatory and punitive damages and declaratory relief against Defendants, individually, pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), as a result of their actions which deprived Plaintiff and her deceased husband of their constitutional rights.

## COUNT III: USE OF EXCESSIVE FORCE
*BIVENS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS,*
403 U.S. 388 (1971)
### (Against the Individual Defendants)

302.   The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

303.   Plaintiff seeks an award of compensatory and punitive damages and declaratory relief against Defendants, individually, pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), as a result of their actions which deprived Plaintiff and her deceased husband of their constitutional rights.

304.   Defendants used excessive force to enter onto the Malinowskis' property and into their domicile without waiting a reasonable time following knocking and announcing their presence and without any reasonable basis to believe that Bryan was a threat to the agents or TFOs.

305.   Defendants violated the Malinowskis' Fourth Amendment rights to be free from unreasonable searches and seizures when they unlawfully seized Bryan Malinowski by shooting and killing him, when they lacked an arrest warrant and created the danger that required him to defend himself.

306.   Defendants' actions were a direct result of their unconstitutional forced entry, which occurred in violation of Plaintiff's constitutional rights and was the proximate and but-for cause of Bryan Malinowski's death.

307.   Defendants' conduct was done with reckless indifference or malice to the Malinowskis' federally protected rights.

308. As a proximate result of the Defendants' conduct, Bryan Malinowski was shot, suffered traumatic physical injury and severe pain, was hospitalized, lost bodily function, and suffered until he died, resulting in his wife and statutory beneficiaries continuing to suffer ongoing pain, emotional distress, and past and present economic loss.

## COUNT IV: ILLEGAL DETENTION OF MAER MALINOWSKI
### *BIVENS V. SIX UNKNOWN NAMED AGENTS OF THE FEDERAL BUREAU OF NARCOTICS*, 403 U.S. 388 (1971)

### (Against the Individual Defendants)

309. The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

310. At all times relevant to this count, the individual Defendants were acting under color of law and within the course and scope of their employment as law enforcement agents of the ATF (or duly authorized task force members) when they seized and held Maer Malinowski in Officer Lakey's patrol car for hours following the shooting of her husband.

311. LRPD officers who participated in the unlawful detention of Maer Malinowski were acting at the command and direction of the ATF agents and TFOs and detained her on behalf of the ATF.

312. An objectively reasonable law enforcement officer would know that no probable cause existed to detain Maer Malinowski for hours after the shooting.

313. Defendants did not have a warrant for the arrest of Maer Malinowski.

314. Defendants did not have any reasonable articulable suspicion or probable cause that Maer Malinowski had committed any crime.

315.    Defendants did not execute the search warrant during the time—more than three (3) hours—that they detained Maer Malinowski.

316.    Maer Malinowski was not detained in her home, but exposed to the public scrutiny of neighbors when she was detained in her cul-de-sac, and was exposed to the public scrutiny of strangers when she was escorted into a fire station to use the restroom.

317.    Pre-existing law gave the individual Defendants fair warning that their actions violated Plaintiff's Constitutional rights.

318.    Plaintiff was seized when she was placed in the patrol car and denied the ability to leave the patrol car for hours, because "in view of all the circumstances, a reasonable person would have believed that she was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

319.    Plaintiff is entitled to recover economic, compensatory and punitive damages for the Constitutional deprivations she suffered at the hands of the Defendants in an amount to be determined by the factfinder.

## COUNT V: WRONGFUL DEATH
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

320.    The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

321.    At all times relevant to this count, the individual Defendants were acting as employees and/or agents of the United States and the ATF (or duly authorized task force

members) and in the course and scope of their employment and in their official capacity as employees or agents of the United States ATF.

322.    The United States of America, if a private person, would be liable for the acts and omissions of the law enforcement officers set forth herein under the law of the state where the acts and omissions occurred.

323.    The individual defendants, on behalf of the United States, committed various acts and omissions which would render them liable to the Plaintiff under the laws of the state of Arkansas if performed by a private person.

324.    Defendants' actions caused the wrongful death of Bryan Malinowski, resulting in damages recoverable under Ark. Code Ann. §§ 16-62-101 and 16-62-102.

325.    Bryan Malinowski's statutory beneficiaries under the Arkansas Wrongful Death Statute are his spouse, Maer Malinowski, his parents, Richard Malinowski of Millsboro, Delaware and Barbara Haigh of Easton, Pennsylvania, and his surviving siblings, Lynn Sosa of Easton, Pennsylvania and Lee Mociutec of Allentown, Pennsylvania. Bryan Malinowski was also survived by one brother, Matthew Malinowski, who died before the filing of this Complaint. Matthew Malinowski's wrongful death claim abated upon his death. *Fountain v. Chicago R.I. & P. Ry.*, 243 Ark. 947, 422 S.W.2d 878 (1968).

326.    Arkansas law entitles Plaintiff, as personal representative of Bryan's estate, to bring this wrongful death action on behalf of the wrongful death beneficiaries and to recover "for things such as medical bills, conscious pain and suffering, funeral expenses, and loss-of-life damages." *See Durham v. Marberry*, 156 S.W.3d 242 (2004).

327.    Damages under Arkansas wrongful-death statute include the benefit of the money, goods and services that Bryan Malinowski would have contributed to Maer and his remaining statutory beneficiaries had he lived, the mental anguish suffered by Maer and the remaining statutory beneficiaries and reasonably probable to be suffered in the future, and the loss of consortium of Maer. AMI 2216; *See* Ark. Code Ann. § 16-62-102(f).

328.    In addition, Bryan Malinowski's estate is entitled to recover damages for Bryan's loss of life, his inability to labor and earn income and value of his earnings lost, funeral and burial costs, property damage, his conscious pain and suffering prior to his death, medical expenses attributable to his injuries, and other expenses incurred and expected to be incurred in the future. AMI 2216; *See* Ark. Code Ann. § 16-62-101.

## COUNT VI: ASSAULT AND BATTERY
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

329.    The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

330.    At all times relevant to this count, the individual Defendants were acting as employees and/or agents of the United States and the ATF (or duly authorized task force members) and in the course and scope of their employment and in their official capacity as employees or agents of the United States ATF.

331.    The United States of America, if a private person, would be liable for the acts and omissions of the law enforcement officers set forth herein under the law of the state where the acts and omissions occurred.

57

332.    The individual defendants, on behalf of the United States, committed various acts and omissions which would render them liable to the Plaintiff under the laws of the state of Arkansas if performed by a private person.

333.    All of the individual Defendant ATF and task force members who entered the Plaintiff's home were investigative or law enforcement officers, meaning any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

334.    As described above, the individual Defendants committed acts of assault and battery against the Plaintiff in fatally wounding Bryan Malinowski.

335.    Under Arkansas law, a defendant cannot assert a justification defense if they are the initial aggressor. *Matthews v. Rogers*, 279 Ark. 328, 338 (1983). A defendant in a civil suit for damages for assault and battery must be free from fault or carelessness. *Tygart v. Kohler*, 109 S.W.3d 147, 151 (2003).

336.    As described above, the individual Defendants were the initial aggressors in carrying out the forcible, unreasonable and unlawful entry into the Malinowski home.

337.    The individual Defendants' acts of assault and battery are wrongful torts under Arkansas law. *Mullins v. Helgren*, 638 S.W.3d 864, 872, (Ark. Ct. App. 2022).

338.    As a direct and proximate result of Defendants' assault and battery, Plaintiff has suffered damages and is entitled to recover damages.

## COUNT VII: NEGLIGENCE
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

339. The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

340. At all times relevant to this count, the individual Defendants were acting under color of law and within the course and scope of their employment as law enforcement agents of the ATF (or duly appointed task force members).

341. All of the individual Defendant ATF agents who entered Plaintiff's home were investigative or law enforcement officers, meaning any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

342. The individual Defendants had a duty to act with reasonable care and to abide by the U.S. Constitution and follow the law and their own practices and procedures in executing the warrant.

343. The individual Defendants breached this duty of care by failing to adequately knock and announce their presence and purpose and wait a reasonable time before entry to either be denied entry or to reasonably infer a denial, as the law requires.

344. Defendants had a duty to comply with the terms of the warrant, which included knocking and announcing themselves prior to entering the Malinowski home and waiting a reasonable time to be granted or denied entry before forcing down the door.

345. Defendants breached this duty.

346.   The defensive force used by Bryan Malinowski was due to the agents' forcible, unreasonable and unlawful entry into his home.

347.   The Malinowskis knew, or had reason to believe, that an unlawful and forcible entry was occurring or had occurred at the time Bryan used defensive force.

348.   The Defendants, under the facts which were present at the time of their entry into the Malinowski home, had no right to enter the home in violation of the Fourth Amendment.

349.   None of the Individual Defendant agents identified themselves upon entry into the home, and Bryan did not know nor reasonably should have known, prior to any use of defensive force, that the individuals in his home were law enforcement.

350.   The use of deadly force on Bryan Malinowski by the Defendants was unreasonable, excessive, and in violation of clearly established Arkansas law prohibiting negligence.

351.   Furthermore, Bryan Malinowski was entitled to use deadly force under Arkansas' "stand your ground" law, Ark. Code Ann. §§ 5-2-607, 5-2-607, and 5-2-620 because he reasonably believed the agents were about to use unlawful deadly physical force against him.

352.   Defendants' armed, forced entry into the Malinowski home exhibited an excessive degree of physical force under the circumstances known to the agents at the time of entry.

353.   The individual Defendants' negligent acts are wrongful torts under Arkansas law.

354.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered damages and is entitled to recover compensatory damages.

355.    In addition, Defendants' conduct was grossly negligent, reckless, malicious, willful, wanton, and conducted with a flagrant indifference for the value of human life with a subjective awareness of the risk that those within the residence would be seriously injured or killed, for which Plaintiff seeks damages.

### COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

356.    The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

357.    At all times relevant to this count, the individual Defendants were acting as employees and/or agents of the United States and the ATF (or duly authorized task force members) and in the course and scope of their employment and in their official capacity as employees or agents of the United States ATF.

358.    The United States of America, if a private person, would be liable for the acts and omissions of the law enforcement officers set forth herein under the law of the state where the acts and omissions occurred.

359.    The individual defendants, on behalf of the United States, committed various acts and omissions which would render them liable to the Plaintiff under the laws of the state of Arkansas if performed by a private person.

360.    Arkansas law provides for damages for the tort of outrage, or intentional infliction of emotional distress, where a defendant commits extreme and outrageous conduct. *Holman v. Flores*, 551 S.W.3d 1, 4 (Ark. Ct. App. 2018).

361.    The individual defendants intended to inflict emotional distress on Plaintiff and her husband or knew or should have known that emotional distress was the likely result of their conduct in breaking down the door of their home in a predawn raid when they knew Plaintiff and her husband would be sleeping.

362.    The individual defendants' conduct was extreme and outrageous and beyond all possible bounds of decency and were the cause of Plaintiff's distress. *Marlar v. Daniel*, 247 S.W.3d 473, 477 (Ar. 2007).

363.    Finally, "the emotional distress sustained by Plaintiff was so severe that no reasonable person could be expected to endure it." *Id.*

## COUNT IX: ARKANSAS VICTIM OF FELONIES ACT— MANSLAUGHTER & NEGLIGENT HOMICIDE
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

364.    The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

365.    Arkansas law authorizes any person injured or damaged by reason of conduct of another that would constitute a felony to file a civil action to recover damages resulting from the conduct. Ark. Code Ann. § 16-118-107.

366.    In Arkansas, a person commits the felony offense of manslaughter, a class B felony, if they recklessly cause the death of another person. Ark. Code Ann. § 5-10-104(a)(3).

367.    Within Manslaughter lies the included offense of Negligent Homicide.

368.    In Arkansas, a person commits the felony offense of Negligent Homicide, a class D felony, if he or she negligently causes the death of another person by means of a deadly weapon. Ark. Code Ann. § 5-10-105(b)(2).

369.    A person is criminally liable for the conduct of another person if he or she is an accomplice of that person in the commission of an offense. Ark. Code Ann. § 5-2-402(2).

370.    No justification defense is available—even to a law enforcement officer—when a person "believes that the use of physical force is necessary," but the person is "reckless or negligent either in forming that belief or in employing an excessive degree of physical force." Ark. Code Ann. § 5-2-614(a).

371.    Additionally, a person—including a law enforcement officer—who recklessly or negligently creates a substantial risk of injury to a third party cannot avail themselves a justification defense. Ark. Code Ann. § 5-2-614(b)

372.    Under Arkansas law, "the right of an individual to defend himself… in the individual's home against harm, injury or loss by a person unlawfully entering or attempting to enter or intrude into the home is reaffirmed as a fundamental right." Ark. Code Ann. § 5-2-620(a).

373.    Furthermore, "There is a legal presumption that any force or means used to accomplish the purpose described in subsection (a) of this section was exercised in a lawful and necessary manner." Ark. Code Ann. § 5-2-620(b). The legal presumption can only be overcome by clear and convincing evidence to the contrary. *Id.*

374.    Arkansas law provides further protections to homeowners, noting that "a person may use deadly physical force" when in their home if that person "reasonably believes the use of deadly physical force is necessary to prevent the commission of a… burglary by a trespasser." Ark. Code Ann. § 5-2-608(b)(2).

375.    Defendants' act of entering the Malinowski home with firearms drawn was intended to produce, and did produce, the threat of bodily impact, restraint, or confinement upon the Malinowskis. Such conduct is "physical force" as defined in Arkansas' justification statutes in Ark. Code Ann. § 5-2-601(6), and it is considered "deadly physical force" as defined in Ark. Code Ann. § 5-2-601(2).

376.    Defendants recklessly or negligently formed the belief that deadly physical force was necessary—that they needed to make an armed forced entry into a peaceful home before being denied entry. And Defendants' armed, forced entry into the Malinowski home exhibited an excessive degree of physical force under the circumstances known to the agents at the time of entry.

377.    Defendants caused the death of Bryan Malinowski, without justification, making them liable for Manslaughter, or in the alternative, the included offense of Negligent Homicide, without justification.

378.    As a direct and proximate result of Defendants' actions that resulted in the death of Bryan Malinowski, which would constitute various felonies under Arkansas law, Plaintiff has suffered damages and is entitled to recovery.

## COUNT X: ARKANSAS VICTIM OF FELONIES ACT—
## BATTERY
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

379.    The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

380.    In Arkansas, a person commits the offense of Battery in the Second Degree, a class D felony, if the person recklessly causes serious physical injury to another person by means of a deadly weapon.  Ark. Code Ann. § 5-13-202(a)(3)(A).

381.    Defendants recklessly caused serious physical injury to Bryan Malinowski by means of a deadly weapon and under circumstances manifesting extreme indifference to the value of human life, making them liable for battery without justification.

382.    As a direct and proximate cause of Defendants' actions, Plaintiff suffered damages and is entitled to recovery.

## COUNT XI: ARKANSAS VICTIM OF FELONIES ACTION—
## AGGRAVATED ASSAULT
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

383.    The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

65

384.   In Arkansas, a person commits the felony offense of Aggravated Assault if that person engages in conduct that creates a substantial danger of death or serious physical injury to another person; or displays a firearm in such a manner that creates a substantial danger of death or serious physical injury to another person.  Ark. Code Ann. § 5-13-204(a)(1-2).  Such offense is a felony.

385.   Defendants' conduct in their planned dynamic entry and their unconstitutional, unjustifiable entry with rifles drawn created a danger of death or serious physical injury to both Bryan and Maer Malinowski.

386.   Defendants' unjustifiable shooting constitutes aggravated assault as it 1) created a substantial danger of death or serious physical injury toward Maer Malinowski and 2) was an unlawful display of a firearm that created a substantial danger of death or serious physical injury to Maer Malinowski.

387.   As a direct and proximate result of Defendants' actions that created a substantial danger of death or serious physical injury to both Bryan and Maer Malinowski, for which they suffered damages, Plaintiff is entitled to recovery.

## COUNT XII: ARKANSAS VICTIM OF FELONIES ACT— CRIMINAL MISCHIEF
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

388.   In Arkansas, a person commits the felony offense of Criminal Mischief in the First Degree if that person purposely and without legal justification destroys or causes damage to any property of another person; and such an offense is a felony if the

damage is valued at more than one thousand dollars ($1,000). Ark. Code Ann. § 5-38-203(b)(2-4).

389. Criminal Mischief in the Second Degree is an Included Offense of Criminal Mischief in the First Degree.

390. In Arkansas, a person commits the felony offense of Criminal Mischief in the Second Degree if that person recklessly destroys or damages any property of another person; and such an offense is a felony if the damage is valued at more than five thousand dollars ($5,000). Ark. Code Ann. § 5-38-204(b)(2).

391. Defendants purposely and without justification destroyed and caused damage to the home and property of Bryan and Maer Malinowski, in an amount that exceeded $5,000, making them liable for Criminal Mischief without justification.

392. As a direct and proximate result of Defendants' actions that resulted in extensive damage to the property of Bryan and Maer Malinowski, which would constitute various felonies under Arkansas law, Plaintiff has suffered damages and is entitled to recovery.

## COUNT XIII: FALSE IMPRISONMENT OF MAER MALINOWSKI
### FEDERAL TORT CLAIMS ACT

### (Against the United States)

393. The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

394. All of the individual Defendant ATF agents who participated in the detention of Plaintiff following her husband's death were investigative or law enforcement officers,

meaning any officer of the United States empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

395.    The individual Defendants' acts of false imprisonment and false arrest are wrongful torts under Arkansas law, which prohibits the unlawful violation of the personal liberty of another consisting of detention without sufficient legal authority. See *Headrick v. Wal-Mart Stores, Inc.*, 738 S.W.2d 418, 420, (Ark. 1987)

396.    The individual Defendants falsely arrested Plaintiff Maer Malinowski when they detained her for hours in an LRPD patrol car, refusing her requests to leave, without any reasonable articulable suspicion and without probable cause.

397.    Defendants did not have a warrant for the arrest of Maer Malinowski.

398.    Defendants did not have any reasonable articulable suspicion or probable cause that Maer Malinowski had committed any crime.

399.    Nor were Defendants executing the search warrant during the more than three (3) hours they detained Maer Malinowski against her will.

400.    Maer Malinowski was not detained in her home, but exposed to the public scrutiny of neighbors when she was detained in her cul-de-sac, and was exposed to the public scrutiny of strangers when she was escorted into a fire station to use the restroom.

401.    Plaintiff suffered emotional pain and suffering for which she may recover economic and compensatory damages in amounts to be determined by the factfinder.

402.    Defendants' conduct in the false imprisonment of Maer Malinowski was grossly negligent, reckless, willful and wanton, such that malice may be inferred, and for which  Plaintiff seeks damages.

403.   Defendant United States of America is liable for the acts of the individual Defendants under the Federal Tort Claims Act.

## NO EXCEPTIONS APPLY

404.   None of Plaintiff's claims asserted herein are subject to any of the exceptions to sovereign immunity found in 28 U.S.C. § 2680.

405.   Defendant USA, including the ATF and its employees, violated its own policies and procedures in executing the raid on the Malinowski home, and failed to exercise due care in the execution of its duties as described herein.

406.   The actions described herein do not involve discretionary functions or duties.

## DAMAGES

407.   The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

408.   As a direct and proximate result of the negligent conduct and failures of Defendants, Bryan Malinowski died and Plaintiff has suffered damages.

409.   By reason of the shooting and the death of Bryan Malinowski, Maer and the remaining statutory beneficiaries of Bryan Malinowski have suffered past and future pecuniary loss, meaning the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that they, in reasonable probability, would have received from Bryan Malinowski had he lived.

410.   By reason of the shooting and the death of Bryan Malinowski, Plaintiff has suffered past and future loss of companionship and society, meaning the loss of the positive

benefits flowing from the love, comfort, companionship, and society that Plaintiff, in reasonable probability, would have received from Bryan Malinowski had he lived.

411.   By reason of the shooting and the death of Bryan Malinowski, Maer and the remaining statutory beneficiaries of Bryan Malinowski have suffered past and future mental anguish, meaning the emotional pain, torment, and suffering experienced by Plaintiff because of the death of Bryan Malinowski, Deceased.

412.   As the personal representative of the Estate of Bryan K. Malinowski, deceased, Plaintiff further seeks compensatory and punitive damages to the extent allowable by law, for the physical pain and mental anguish Bryan endured from the time he was shot until the time of his death due to the negligence of Defendants. Ark. Code Ann. § 16-62-101.

413.   Plaintiff further seeks compensatory and punitive damages to the extent allowable by law, for her mental anguish, emotional pain, torment and suffering caused by her personal experience of the wrongful conduct and detention by Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays and demands verdict and judgment as follows:

a.  That summons and process issue and the Defendant be served with this Complaint as required by law and that Defendant be required to appear and answer;

b. That Plaintiff's claims under the Federal Torts Claims Act against the Defendant United States of America be tried to a judge sitting as the fact finder;

c. That Plaintiff be awarded the damages sought herein in an amount determined by the trier of fact;

a. That Plaintiff be awarded punitive damages against the individual Defendants in an amount to be determined to deter each Defendant and others from similar misconduct in the future;

b. That Plaintiff be awarded Plaintiff reasonable attorney's fees, expenses and costs of litigation pursuant to applicable state and federal laws;

c. That Plaintiff be awarded pre and post-judgment interest; and

d. For such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Dated: May 15, 2025                    Respectfully submitted,

| | |
|---|---|
| LAW OFFICES OF BUD CUMMINS, P.L.C.<br><br>*(signature)*<br><br>Bud Cummins, AR. No. 89010<br>1818 N. Taylor St., No. 301<br>Little Rock, Arkansas 72207<br>501-831-6125<br>bud@budcumminslaw.com | GRAVES GARRETT GREIM LLC<br><br>/s/ *Nathan F. Garrett*<br>Nathan F. Garrett*<br>Lucinda H. Luetkemeyer*<br>1100 Main Street<br>Suite 2700<br>Kansas City, Missouri 64105<br>Tel: (816) 256-3181<br>ngarrett@gravesgarrett.com<br>lluetkemeyer@gravesgarrett.com<br><br>*pro hac vice forthcoming |
| JAMES & CARTER, P.L.C.<br>/s/ *Paul James*<br>Paul James, AR. No. 83091<br>Matt Stauffer, AR. No. 2012284<br>100 River Bluff Dr., Suite 420<br>Little Rock, Arkansas 72202<br>(501) 372-1414<br>pjj@jamescarterlaw.com<br>matt@staufferfirm.com | APPELLATE SOLUTIONS, PLLC d/b/a<br>RIORDAN LAW FIRM<br>/s/ *Deborah Truby Riordan*<br>Deborah Truby Riordan, AR No. 93231<br>1501 N. University Ave., Suite 310<br>Little Rock, Arkansas 72207<br>(501) 235-8235<br>deb@arklawoffice.com |

# EXHIBIT A
# Probate Order

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2024-Apr-12 15:14:10
60PR-24-812
C06D12 : 3 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
**BRYAN K. MALINOWSKI, DECEASED**                                    CASE NO._____

### ORDER GRANTING PROBATE OF WILL AND
### APPOINTMENT OF PERSONAL REPRESENTATIVE

On this date there is presented to the Court the petition of Maria S. Malinowski for the probate of the Last Will and Testament of Bryan K. Malinowski, deceased, and for the appointment of an Executrix of the decedent's estate, and from such petition and other evidence in support thereof the Court finds:

1. That the decedent, Bryan K. Malinowski, age 53 years, who resided at 4 Durance Court, Pulaski County, Arkansas, died in Pulaski County, Arkansas, on or about March 21, 2024.

2. This Court has jurisdiction and venue properly lies in this county.

3. That a written instrument dated January 8, 2010, has been duly offered and proven as the Last Will and Testament of said decedent (the "Will").

4. That the instrument offered for probate was executed in all respects according to law when the decedent was competent to do so and acting without undue influence, fraud or restraint and has not been revoked.

5. That the Will of the decedent nominates Maria S. Malinowski to serve as Executrix of the estate without bond.

6. The proffered Will of Bryan K. Malinowski, deceased, should be admitted to probate and letters testamentary should be issued to Maria S. Malinowski acting as executor of the estate.

7. There is necessity for administration upon the estate of the decedent.

8. No demand for notice of proceedings to probate the decedent's Will or for the appointment of a personal representative of the estate has been filed herein, and the petition is not opposed by any known person and the same may be heard and decided forthwith.

IT IS, THEREFORE, CONSIDERED, ORDERED and DECREED that the proffered instrument be and the same hereby is admitted to probate as the Last Will of the decedent; that Maria S. Malinowski be and hereby is appointed personal representative without bond; that letters testamentary shall be issued to said executor by the clerk of this Court and administration on the estate of the decedent commenced.

DATED this _____ day of _____, 2024.

_____
Circuit Judge

Approved as to form:

McDaniel Wolff, PLLC
Vincent M. Ward (Ark. Bar # 2009211)
1307 W. 4th Street
Little Rock, AR 72201
Ph: (501) 954-8000
Fax: (866) 419-1601

By:

_____

Vincent M. Ward

*Attorneys for Maria S. Malinowski*



**Case Title:**      BRYAN KEITH MALINOWSKI

**Case Number:**    60PR-24-812

**Type:**           ORDER APPOINT PERS REPRESENT

So Ordered

Electronically signed by CBCONNORS12 on 2024-04-12     page 3 of 3

# EXHIBIT B

# House Judiciary Letter to ATF (April 22, 2024)

JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

April 22, 2024

The Honorable Steven Dettelbach
Director
Bureau of Alcohol, Tobacco, Firearms, and Explosives
99 New York Ave, N.E.
Washington, DC 20226

Dear Director Dettelbach:

The Committee continues to conduct oversight of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). We write regarding the deadly pre-dawn raid conducted by ATF in Little Rock, Arkansas, while executing a search warrant on the home of Bryan Malinowski, a local airport executive. The circumstances surrounding the raid, the subsequent death of Mr. Malinowski, and recent related rulemaking by the ATF raises serious questions about the weaponization of the agency against Americans.

In the early morning hours of March 19, 2024, armed ATF agents arrived at the Malinowski family home in at least ten vehicles to execute a search warrant.[1] According to the warrant, the ATF alleged that Mr. Malinowski was selling firearms without a license.[2] Footage from the Malinowskis' doorbell camera shows ATF agents approaching the house with riot shields and subsequently disabling the camera to prevent their conduct from being recorded.[3] Upon hearing the commotion and fearful of a home intrusion, Mr. Malinowski awoke and prepared to defend his family.[4] Mr. Malinowski encountered what he and his wife believed to be home intruders.[5] An exchange of gunfire ensued, Mr. Malinowski was shot in the head, and he died from his wounds two days later.[6]

---

[1] Neale Zeringue, *Attorney speaks on gun show loophole explained as cause for ATF raid on home of Bryan Malinowski*, KARK (Mar. 22, 2024).
[2] Alex Kienlen, Neale Zeringue, and Ryan Tuberville, *Released search warrant affidavit shows details of ATF case against Little Rock airport executive Bryan Malinowski*, KARK (Mar. 21, 2024).
[3] Austin Gelder, *Attorney releases video, says airport exec killed in early morning raid likely mistook ATF agents for intruders*, ARKANSAS TIMES (Apr. 7, 2024).
[4] *Id.*
[5] *Id.*
[6] *Id.*

The Honorable Steven Dettelbach
April 22, 2024
Page 2

The circumstances of Mr. Malinowski's death raise questions about whether the ATF followed proper protocol during the execution of this search warrant. Department of Justice policy and President Biden's Executive Order 14074 requires ATF agents—including those who conducted the search warrant on March 19, 2024—to wear active body-worn cameras during the execution of a search warrant.[7] The Department has since confirmed to the Malinowski family that ATF agents were not wearing body cameras during the raid, a violation of the Department policy.[8]

It is also unclear whether ATF agents complied with Justice Department policy on "no knock" entries. That policy, issued on September 13, 2021 by Deputy Attorney General Monaco, directs the ATF and other federal law enforcement agencies "to limit the circumstances in which agents may seek to enter a dwelling pursuant to a warrant without complying with the 'knock and announce' rule."[9] In explaining the rationale for this policy, Deputy Attorney General Lisa Monaco noted that "because of the risk posed to both law enforcement and civilians during the execution of 'no knock' warrants, it is important that this authority be exercised in the most compelling circumstances."[10] Furthermore, Monaco directed that the use of "no knock" entries should be restricted to instances in which an "agent has reasonable grounds to believe at the time the warrant is sought that knocking and announcing the agent's presence would create an imminent threat of physical violence to the agent and/or another person."[11] ATF has not explained why it resorted to a no knock entry of Mr. Malinowski's home when it could have peacefully executed the warrant while he was away from his residence.

ATF's pre-dawn, no-knock raid of the Malinowski home coincided with the agency's implementation of a regulation to restrict the right to private lawful sales of firearms.[12] In particular, ATF seeks to drastically expand the universe of Americans who would be classified as a "dealer" under federal law requiring them to obtain a license to become a Federal Firearms Licensee (FFL),[13] subjecting them to a term of imprisonment of up to five years and a fine of up to $250,000, or both.[14] Mr. Malinowski exercised his Second Amendment rights and was a

---

[7] Exec. Order No. 14074, 87 C.F.R. 32945 (2022) and Memorandum from Lisa Monaco, Deputy Attorney General, U.S. Dep't of Justice, to Bureau of Alcohol, Tobacco, Firearms, and Explosives, Drug Enforcement Administration, Federal Bureau of Investigation, United States Marshals Service, Assistant Attorney General for Administration, and Executive Office for United States Attorneys, *Body-Worn Camera Policy* (Jun. 7, 2021); Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Dep't of Justice, *Special Agent Body Worn Cameras* (Jun. 2, 2022).

[8] Louis Casiano, *Arkansas senators say Clinton airport executive killed by ATF with no bodycam: "Violation of it own policy,"* N.Y. Post (Apr. 20, 2024).

[9] Memorandum from Lisa Monaco, Deputy Attorney General, U.S. Dep't of Justice, to Bureau of Alcohol, Tobacco, Firearms, and Explosives, Drug Enforcement Administration, Federal Bureau of Investigation, Federal Bureau of Prisons, United States Marshals Service, Office of Inspector General, Heads of Litigating Components, Executive Office for United States Attorneys, and United States Attorneys, *Chokeholds & Carotid Restraints; Knock & Announce Requirement* (Sep. 13, 2021).

[10] *Id.* at 2.

[11] *Id.* at 3.

[12] Alcohol, Tobacco, Firearms, and Explosives Bureau, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61993 (Sep. 8, 2023) [hereinafter "ATF Rule"].

[13] *Id.*

[14] 18 U.S.C. § 922(a)(1)(a); 18 U.S.C. § 924(a)(1)(D).

The Honorable Steven Dettelbach
April 22, 2024
Page 3

firearms enthusiast. Even if, as ATF has alleged, Mr. Malinowski violated federal law, it does not justify ATF's actions that ultimately lead to the use of deadly force.

To advance the Committee's oversight of ATF with respect to this tragedy, we request that you produce the following documents and information:

1. All documents and communications referring or relating to the planning and execution of the search warrant that took place at Bryan Malinowski's residence on March 19, 2024, including but not limited to:

   a. An unredacted copy of the affidavit and all supporting documents of the warrant to search Bryan Malinowski's residence on March 19, 2024;

   b. All audio recordings from the execution of the search warrant that took place at Bryan Malinowski's home on March 19, 2024;

   c. All operations plans for the execution of the search warrant that took place at Bryan Malinowski's home on March 19, 2024;

   d. All documents and communications referring or relating to the ATF's failure to follow Justice Department body camera policy during the raid on Bryan Malinowski's home on March 19, 2024; and

   e. All documents and communications between or among the ATF Little Rock Field Office, ATF Headquarters, the Justice Department, and the U.S. Attorney's Office for the Eastern District of Arkansas referring or relating to the execution of the search warrant at Bryan Malinowski's residence on March 19, 2024.

2. All documents and communications referring or relating to ATF's implementation of the memorandum from the Deputy Attorney General dated September 13, 2021, concerning knock and announce requirements, including but not limited to documents sufficient to show the number of "no knock" entries performed by ATF each year since 2021 and the identities of the subjects of these warrants.

We ask that you provide this information as soon as possible but no later than 5:00 p.m. on May 6, 2024.

The House Committee on the Judiciary has jurisdiction over the Bureau of Alcohol, Tobacco, Firearms and Explosives and federal administrative procedure pursuant to House Rule X. If you have any questions about these requests, please contact Committee staff at (202) 225-6906.

The Honorable Steven Dettelbach
April 22, 2024
Page 4

Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

cc:    The Honorable Jerrold L. Nadler, Ranking Member

# EXHIBIT C
# House Judiciary Hearing (May 22, 2024)

# HEARING ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT

## HEARING

### BEFORE THE

### SELECT SUBCOMMITTEE ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT

#### OF THE

### COMMITTEE ON THE JUDICIARY
### U.S. HOUSE OF REPRESENTATIVES

#### ONE HUNDRED EIGHTEENTH CONGRESS

##### SECOND SESSION

WEDNESDAY, MAY 22, 2024

**Serial No. 118–80**

Printed for the use of the Committee on the Judiciary



Available via: *http://judiciary.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

55–793                     WASHINGTON : 2024

## COMMITTEE ON THE JUDICIARY

JIM JORDAN, Ohio, *Chair*

DARRELL ISSA, California
MATT GAETZ, Florida
ANDY BIGGS, Arizona
TOM McCLINTOCK, California
TOM TIFFANY, Wisconsin
THOMAS MASSIE, Kentucky
CHIP ROY, Texas
DAN BISHOP, North Carolina
VICTORIA SPARTZ, Indiana
SCOTT FITZGERALD, Wisconsin
CLIFF BENTZ, Oregon
BEN CLINE, Virginia
KELLY ARMSTRONG, North Dakota
LANCE GOODEN, Texas
JEFF VAN DREW, New Jersey
TROY NEHLS, Texas
BARRY MOORE, Alabama
KEVIN KILEY, California
HARRIET HAGEMAN, Wyoming
NATHANIEL MORAN, Texas
LAUREL LEE, Florida
WESLEY HUNT, Texas
RUSSELL FRY, South Carolina
Vacancy

JERROLD NADLER, New York, *Ranking Member*
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, Jr., Georgia
ADAM SCHIFF, California
ERIC SWALWELL, California
TED LIEU, California
PRAMILA JAYAPAL, Washington
J. LUIS CORREA, California
MARY GAY SCANLON, Pennsylvania
JOE NEGUSE, Colorado
LUCY McBATH, Georgia
MADELEINE DEAN, Pennsylvania
VERONICA ESCOBAR, Texas
DEBORAH ROSS, North Carolina
CORI BUSH, Missouri
GLENN IVEY, Maryland
BECCA BALINT, Vermont

———

## SELECT SUBCOMMITTEE ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT

JIM JORDAN, Ohio, *Chair*

DARRELL ISSA, California
THOMAS MASSIE, Kentucky
ELISE M. STEFANIK, New York
MATT GAETZ, Florida
KELLY ARMSTRONG, North Dakota
W. GREGORY STEUBE, Florida
DAN BISHOP, North Carolina
KAT CAMMACK, Florida
HARRIET HAGEMAN, Wyoming
WARREN DAVIDSON, Ohio
RUSSELL FRY, South Carolina

STACEY PLASKETT, Virgin Islands, *Ranking Member*
STEPHEN LYNCH, Massachusetts
LINDA SANCHEZ, California
DEBBIE WASSERMAN SCHULTZ, Florida
GERRY CONNOLLY, Virginia
JOHN GARAMENDI, California
SYLVIA GARCIA, Texas
DAN GOLDMAN, New York
JASMINE CROCKETT, Texas

CHRISTOPHER HIXON, *Majority Staff Director*
CAROLINE NABITY, *Chief Counsel for Oversight*
AARON HILLER, *Minority Staff Director & Chief of Staff*
CHRISTINA CALCE, *Minority Chief Oversight Counsel*

(II)

# C O N T E N T S

WEDNESDAY, MAY 22, 2024

OPENING STATEMENTS

Page

The Honorable Jim Jordan, Chair of the Select Subcommittee on the Weaponization of the Federal Government from the State of Ohio .................. 1

The Honorable Stacey Plaskett, Ranking Member of the Select Subcommittee on the Weaponization of the Federal Government from the Virgin Islands ... 3

WITNESSES

Ryan M. Cleckner, former Army Ranger, Co-Founder, Gun University LLC

Oral Testimony ............................................................................................. 7

Prepared Testimony ..................................................................................... 10

Andrew Graham, former Deputy Assistant Director (DAD), Enforcement Programs Services, ATF

Oral Testimony ............................................................................................. 13

Prepared Testimony ..................................................................................... 15

Kelly Sampson, Senior Counsel, Brady United

Oral Testimony ............................................................................................. 20

Prepared Testimony ..................................................................................... 22

The Hon. Bud Cummins, Attorney, representing the Bryan Malinowski's family

Oral Testimony ............................................................................................. 28

Prepared Testimony ..................................................................................... 31

LETTERS, STATEMENTS, ETC. SUBMITTED FOR THE HEARING

All materials submitted for the record by the Select Subcommittee on the Weaponization of the Federal Government are listed below ............................ 69

A search warrant from the United States District Court, Eastern District of Arkansas, submitted by the Honorable Dan Goldman, of the Select Subcommittee on the Weaponization of the Federal Government from the State of New York, for the record

Materials submitted by the Honorable Stacey Plaskett, Ranking Member of the Select Subcommittee on the Weaponization of the Federal Government from the Virgin Islands, for the record

A letter to the Honorable Jim Jordan, Chair of the Select Subcommittee on the Weaponization of the Federal Government from the State of Ohio, May 21, 2024, from the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, for the record

An affidavit from the United States District Court, Eastern District of Arkansas, Mar. 24, 2024

A letter to Detroit Gun Factory, LLC, May 5, 2022, from the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives

A letter to Detroit Gun Factory, LLC, Apr. 14, 2023, from the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives

IV

Page

Materials submitted by the Honorable Stacey Plaskett, Ranking Member
of the Select Subcommittee on the Weaponization of the Federal Govern-
ment from the Virgin Islands, for the record—Continued
    A letter to the Honorable Jim Jordan, Chair of the Select Subcommittee
    on the Weaponization of the Federal Government from the State
    of Ohio, and the Honorable Stacey Plaskett, Ranking Member of
    the Select Subcommittee on the Weaponization of the Federal Gov-
    ernment from the Virgin Islands, May 23, 2024, from the National
    Fraternal Order of Police
    A report entitled, "Report of Firearms Compliance Inspection," U.S. De-
    partment of Justice, Bureau of Alcohol, Tobacco, Firearms and Explo-
    sives
An executive summary entitled, "97Percent Annual Gun Owner Survey,"
Oct. 2023, Research Findings Executive Summary, submitted by the Honor-
able Jamine Crockett, a Member of the Select Subcommittee on the
Weaponization of the Federal Government from the State of Texas, for
the record

APPENDIX

A statement from the Honorable Sylvia Garcia, a Member of the Select
Subcommittee on the Weaponization of the Federal Government from the
State of Texas, for the record
A statement from the Honorable Gerry Connolly, a Member of the Select
Subcommittee on the Weaponization of the Federal Government from the
State of Virginia, for the record

QUESTIONS AND RESPONSES FOR THE RECORD

Questions and responses from Kelly Sampson, Senior Counsel, Brady United,
submitted by the Honorable Sylvia Garcia, a Member of the Select Sub-
committee on the Weaponization of the Federal Government from the State
of Texas, for the record

# HEARING ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT

---

**Wednesday, May 22, 2024**

HOUSE OF REPRESENTATIVES

SELECT SUBCOMMITTEE ON THE WEAPONIZATION OF THE
FEDERAL GOVERNMENT

COMMITTEE ON THE JUDICIARY
*Washington, DC*

The Committee met, pursuant to notice, at 10:07 a.m., in Room 2141, Rayburn House Office Building, the Hon. Jim Jordan [Chair of the Subcommittee] presiding.

*Members present:* Representatives Jordan, Issa, Gaetz, Armstrong, Steube, Bishop, Cammack, Hageman, Davidson, Plaskett, Lynch, Wasserman Schultz, Connolly, Goldman, and Crockett.

*Also present:* Representative Hill.

Chair JORDAN. The Subcommittee will come to order.

Without objection, the Chair is authorized to declare a recess at any time. We welcome everyone to today's Hearing on the Weaponization of the ATF.

The Chair now recognizes the gentleman from North Dakota to lead us in the Pledge of Allegiance.

ALL. I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation, under God, indivisible, with liberty and justice for all.

Chair JORDAN. I thank the gentleman from North Dakota.

Without objection, the gentleman from Arkansas, Mr. Hill will be permitted to participate in today's hearing for the purposes of introducing a witness, which we will get to in just a few minutes.

The Chair now recognizes himself for an opening statement.

In June 2021, just a few months after taking office, President Biden directed the Justice Department to adopt a zero-tolerance policy to revoke firearms—excuse me, Federal firearms licenses from those who committed, quote, "willful violations of the law."

That same month ATF updated its internal best practices guide to State, quote,

> ATF will, absent extraordinary circumstances, initiate proceedings to revoke the license of any dealer that has committed a willful regulatory violation of the Gun Control Act for specified violations.

These willful violations now include purposefully broad classifications like, quote, "falsifying documents" and "failing to maintain

(1)

2

records needed for successful firearms tracing" and would essentially allow the ATF to revoke the licenses of FFLs for simple technical and nonmaterial paperwork violations.

The ATF is zealously doing just that. The year after the zero-tolerance policy went into effect ATF revoked over 90 licenses, more than any year since 2006. Last year that number jumped to 157 FFL revocations. The year before zero tolerance went into effect there were just 40 revocations.

To be sure, the Gun Control Act authorizes the ATF to inspect FFLs to ensure they are compliant with record keeping requirements and all other applicable laws and regulations. That is so the government can ensure that there are no illegal firearms transfers occurring, not for revoking licenses for simple paperwork violations.

We have talked to some of the affected FFLs. We have even talked to some who beat the ATF in court and were able to keep their license. They told us it cost over $150,000 in fees to keep their license. There is no way the average small business can afford that much in legal and consulting fees and ATF knows this.

The data shows this brazen scheme is working. The number of voluntary business closures post inspection has risen sharply from 24 in 2021, to 69 in 2022, and to 80 last year. This is exactly what the left wants.

Democrats and Joe Biden have been trying to take guns away from Americans for years. If they can't take the FFLs away, they are going to limit the number—if they can't take the guns away, they're going to limit the number of places where law-abiding Americans can go purchase their firearms.

Today we'll examine the actions by ATF that led to the untimely and unnecessary death of Bryan Malinowski. At this time, I want to offer my condolences to the Members of Mr. Malinowski's family.

Some of them are here with us today. We're also joined by Congressman Hill, who I mentioned earlier, who represents Mr. Malinowski and his family and has sought justice on their behalf.

In the early morning hours of March 19, 2024, armed ATF agents arrived at the Malinowski family home in at least 10 vehicles to execute a search warrant. According to the warrant, the ATF alleged that Mr. Malinowski was selling firearms without a license.

Footage from the Malinowski's doorbell camera shows ATF agents approaching the house with riot shields and subsequently disabling the camera to prevent their conduct from being recorded.

On hearing the commotion and fearful of a home intrusion, Mr. Malinowski awoke and prepared to defend his family. Mr. Malinowski encountered what he and his wife believed to be home intruders. An exchange of gunfire ensued. Mr. Malinowski was shot in the head, and he died from his wounds two days later.

The circumstances of Mr. Malinowski's death raise questions about whether the ATF followed proper protocol during the execution of this search warrant. DOJ policy and President Biden's Executive Order 14074 requires ATF agents including those who conducted the search warrant on the Malinowski family home to wear active body-worn cameras during the execution of that warrant.

3

The department, however, has since confirmed to the Malinowski family that ATF agents were not wearing body cameras during the raid, a clear violation of the department policy.

It is also unclear whether ATF agents complied with Justice Department policy on no-knock entries. In explaining the rationale for this policy, Deputy Attorney General Lisa Monaco noted that, quote,

> Because of the risk posed to both law enforcement and civilians during the execution of no-knock warrants it is important that this authority be exercised in only the most compelling circumstances.

Furthermore, Ms. Monaco directed the use of no-knock entries should be restricted to instances in which an agent has reasonable grounds to believe that at the time of the warrant—that the warrant is sought that knocking and announcing the agents' presence would create an imminent threat of physical violence to the agent or to another person.

It's not clear if the raid was a no-knock encounter because, in part, the ATF agents disabled the Malinowski's home camera. ATF has yet to explain why it resorted to a risky predawn entry of Mr. Malinowski's home when it could have peacefully executed the warrant while he was away from his residence. I think that's a huge question.

The ATF wanted Mr. Malinowski to be home when they executed the search warrant. We know ATF abandoned a previous attempt to execute the search warrant when they learned Mr. Malinowski wasn't home. They were actually primed and ready to go the week before but didn't go because he wasn't there.

Why did they need him to be in the home as this was a search warrant and not an arrest warrant? In fact, there were numerous other dangerous options—less dangerous options available to the ATF.

The ATF knew his pattern of life. They could have chosen to wait for Mr. Malinowski to leave for work and safely approached him after he had exited his home.

The ATF could have conducted the raid after Mr. Malinowski left for work and had other agents meet him at his work where he was not allowed to carry a firearm.

The ATF could have waited until he was gone and asked Ms. Malinowski to call him back after the house was secure. ATF agents could have given Mr. Malinowski more time to answer the door during the knock and announce, so he knew it was the police.

Since the ATF chose to ignore their own policy, not wear body cameras, we will never know if they gave him the 10 seconds or 60 seconds or whatever to answer the door, and tomorrow in front of the Full Judiciary Committee Director Dettelbach will have a chance to explain the actions of the ATF.

Today we look forward to hearing from our witnesses. I want to thank them all for being here.

I now yield back and now recognize the Ranking Member for an opening statement.

Ms. PLASKETT. Thank you to the Chair. Good morning and thank you to the witnesses and others that are here and joining us at this hearing.

4

Last week after Trump insider and convicted criminal Steve Bannon demanded that Chair Jordan do more to protect Donald Trump and this Committee answered the call. It's no accident that last week this Committee called as a witness a former defense attorney for Donald Trump in the classified documents case, Rudy Giuliani's former lawyer and the attorney who has written and filed Chair Jordan's amicus briefs to the Supreme Court to support Donald Trump's many indictments.

Republicans rolled their eyes and snickered when I noted as the Ranking Democrat on the Subcommittee that the plain goal of that hearing was to influence the New York hush money trial against Donald Trump.

Just so the public is clear how closely this Committee is trying to link Donald J. Trump's criminal and civil matters and use this Committee to act as outside defense Special Counsel, two days ago Robert Costello, a Republican witness from last week's hearing, was called by Donald Trump as a witness for the defense in that very trial and used his same manic rambling testimony that he gave in this Subcommittee.

Thankfully, now maybe the Chair and GOP Members won't continue to be blasted by *Fox News* and other MAGA news outlets and blogs for not doing enough with the Committee to support the former President.

Costello got to try out his testimony. Defense counsel thought it was good enough to appear as a witness on the stand last week. I know the American people don't believe that this is an appropriate use of the $20 million allocated to this Committee holding six full hearings to bolster disproven lies that the government is colluding with social media companies to target conservatives, calling in an antisemitic anti-vax racist conspiracy theorist who claims a worm ate part of his brain as a witness.

Others just spread the widely debunked fringe claims about the Deep State or have personnel grievances from appropriate firing from their former employers that the Committee offers them time to air here.

This is what Republicans have made of the Committee process, but I guess it goes along with their inability to effectively legislate in this Congress as well.

People often wonder with my courtroom litigation background having been a prosecuting assistant district attorney if I enjoy these hearings.

I have to tell you every time I get a notice of a hearing for this Committee my stomach hurts because I'm disturbed by the use of this legislative time to prop up a failed individual, one individual— a loser in elections, a disastrous dictatorial wannabe in governing, a perennially bankrupt false revenue inflating con artist in business, and a cheater in marriage even. That's who the Republicans want us to spend our time on, supporting Donald Trump rather than the American people.

Today we're going a step further. We are somehow having a hearing to protect the gun lobby, to prop up Donald Trump's pro-death agenda when more than 100 Americans die of gun violence every day.

5

We have colleagues who have lost friends, classmates, and mass shooters. Some of us in this Congress see the scourge of illegal guns coming across State and city lines to ravage communities with gun violence and death of youths.

These deaths happen everywhere, haunting every corner of the American experience, and without a robust Federal law enforcement, an ATF and FBI, Americans will die at a faster rate.

I know that the Virgin Islands, my home, our Federal law enforcement play a critical role in combating the scourge of drugs and guns trafficking. Without these agencies or with more guns available to bad people my region where I live and all of America will be even more dangerous.

Families of gun violence victims have their lives ripped apart and turned upside down in a moment. None of that is helped or made less common occurrence when we attack and undermine the ATF and the FBI.

Republicans on this Committee simply—it's not a matter of caring about those mass victims. Families in Uvalde identified their children by shoes because they could not identify them by the faces that they have looked at every day.

It's easy to become desensitized in politics, but if that doesn't hurt you, if you don't feel anything for that, God help us all. There have already been 27 deaths from school shootings this year alone.

Almost 4,000 children and teens are shot and killed every year, 15,000 more injured. Guns are the number one cause of death and children between the age of 1–18—the first cause of death—guns. Not car accidents, suffocation, drowning, poisoning, and cancer. Number one, guns, an entirely preventable death if guns were in fact well regulated.

Instead of addressing this real problem and instead of listening to three-quarters of gun owners—gun owners—three quarters that support common sense gun safety laws. We're continuing with this.

They brought us here right after Police Week in furtherance of a mission to defund and dismantle the agency trying to save our children, save Americans from gun violence.

The ATF is a central agency dedicated to stopping the source of gun violence. Its agents ensure the background check laws are followed. They keep guns out of the hands of criminals.

They investigate gun crimes. They prevent mass shootings, school shootings. They support local law enforcement and gun tracing and enforcement efforts. They do the vital work we so desperately need.

You're going to hear today about ATF overreach and especially about the death of Mr. Malinowski. That is a tragic loss of life.

Every loss of life is tragic. Our sympathies, all of us, I believe, go out to the family. While an investigation is ongoing into it's inappropriate to draw conclusions before the results of an investigation or release.

We do know from affidavits from the court that it was alleged that Mr. Malinowski was a mass-gun trafficker, and we know that some of the guns he sold were used to commit crimes.

We know that ATF agents were serving a legitimate search warrant. Beyond that, we await the results of an investigation, and this Committee shouldn't seek to influence that.

6

Let's not be mistaken. Republicans are not here today because they're concerned about the tragic loss of life during a police raid. You know why I know that?

Because they have not uttered a word about a Florida deputy shooting and killing Senior Airman Roger Fortsman in his apartment just a week ago. You know why I know that? Because they don't say anything—they don't say the name Breonna Taylor who, in 2020, was shot and killed in her home through an inappropriate police raid.

They don't want to talk about the gun violence impacting communities or how across the country a Black American is shot and wounded every 11 minutes.

They don't want to talk about the interstate gun trafficking that's fueling violence in Illinois where on an average someone is killed every six hours with a gun and where Black individuals are 38 times more likely than White individuals to die by gun homicide, triple the national average.

So, while homicides dropped by 13 percent in Chicago last year that doesn't mean that people aren't still dying. Those victims deserve to be more than statistics. We don't talk about that. They don't want to talk about that.

They don't want to talk about other kinds of police raids. They want to talk about this police raid on Mr. Malinowski because it fits their narrative about how to dismantle the ATF. That's what this is about.

Don't let them fool you. They don't care, and when they do care it's not about every American. It's only about a specific type of American that they're concerned about those deaths because I don't hear those other names being called by them.

Ms. Sampson, Mr. Graham—I want to thank our witnesses for being there today. Ms. Sampson, your expertise and past experience in gun violence prevention spaces is truly impressive. I'm confident it will be invaluable as we examine those issues here today.

Mr. Graham, I'd also like to thank you for your more than 37 years of public service at the ATF. I guess I will be enlightened as to why you've begun getting paid by the very gun lobby fighting ATF's work.

I want to thank the other witnesses. I would ask all four of you today in your testimony answers to remember something. As we engage in this hearing in the three or so hours we'll be sitting here before us more than a dozen Americans will lose their lives to gun violence.

It's a somber but necessary reminder of the gravity of what we have discussed here today and what's really at stake.

I yield back.

Chair JORDAN. The gentlelady yields back.

Without objection, all the opening statements will be included in the record. I will now recognize the gentleman from Arkansas to introduce one of our witnesses.

Mr. HILL. I thank the Chair, I thank the Ranking Member, for the invitation today to appear before the Committee to introduce my constituent and my friend Bud Cummins.

Bud Cummins is a prominent central Arkansas attorney. He's a former U.S. attorney and former counsel to former Governor Mike

Huckabee. He's joined today, Mr. Chair, by the widow of Bryan Malinowski, Maer, and we're glad to have her here to be witness to this event today.

Mr. Cummins is representing the Malinowski family who are still seeking answers from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, after ATF agents raided their family home in the early hours of March 19th.

This predawn raid resulted in a deadly shootout, in which, ATF agents shot and ultimately fatally wounded Bryan Malinowski—as I said, a friend and constituent of mine—in his own home, and Maer Malinowski is a widow at the hands of gun violence by her own government.

Nobody knows more about this case than Bud Cummins. I'm glad he's here to answer the Committee's questions and help get answers for the family and the American public.

Thank you, Chair Jordan, for your leadership in holding this hearing and I hope through your efforts we can obtain well deserved answers to what led to the tragic death of Bryan Malinowski. Bryan's widow, family, and the public deserve a full accounting from the ATF. I thank the Chair and I yield back.

Chair JORDAN. I thank the gentleman. I thank you for your work in bringing this terrible situation to our attention. Thank you very much.

We also have Mr. Andrew Graham. Mr. Graham is the founder and CEO of Graham Industry Advisors, a veteran-owned consulting firm that advises the firearms industry on compliance with the Gun Control Act and the Safe Explosives Act.

He previously served as the ATF Deputy Assistant Director of Field Operations and Deputy Assistant Director of Enforcement Programs and Services.

Mr. Ryan Cleckner is an attorney who specializes in Federal firearms law and the Bureau of Alcohol, Tobacco, Firearms, and Explosives compliance. He previously served our country in the U.S. Army where he was a ranger and sniper instructor assigned to the First Ranger Battalion. We thank you for that service as well.

Ms. Kelly Simpson is the Director of Racial Justice and a Senior Counsel at Brady. Her work focuses on racial justice and reducing gun violence.

We welcome our witnesses and thank them for appearing today. We will begin by swearing you in. Would you please rise and raise your right hand?

Do you swear or affirm under penalty of perjury that the testimony you're about to give is true and correct to the best of your knowledge, information, and belief, so help you God?

Let the record show that each of the witnesses answered in the affirmative. Thank you. Please be seated. Please know that your written testimony will be entered into the record in its entirety.

Accordingly, we ask that you summarize your testimony. We will start with Mr. Cleckner, and we will move right down the aisle.

Mr. Cleckner, you're recognized for five minutes, more or less.

### STATEMENT OF RYAN M. CLECKNER

Mr. CLECKNER. Good morning, Chair Jordan, Ranking Member Plaskett, and the Members of the Subcommittee. I'm Ryan

8

Cleckner. I'm an attorney specializing in Federal firearms law and the Bureau of Alcohol, Tobacco, Firearms, and Explosives compliance.

I am actively involved in the firearms industry, and I help Federal firearms licenses, or FFLs, to stay compliant with Federal laws and ATF rules and regulations either through online training at RocketFFL, or most recently through free ATF-compliant software I made, FFLSafe.

I'm also a former Firearms Industry Executive, a university lecturer, and a Special Operations Sniper. I'm here today because I'm concerned with what I see as the overreach of the ATF when it comes to their enforcement actions over FFLs and the current administration's zero tolerance policy when it comes to licensee inspections.

The Gun Control Act of 1968 is the main body of law concerning standard firearms and the Federal firearms licensing system and, specifically, the GCA allows the ATF to revoke an FFL's license for a willful violation of the law.

Originally, the GCA had no such willfulness standard but Congress in 1986 amended the GCA to specifically include the willfulness requirement to, quote, "ensure that licenses are not revoked for inadvertent errors or technical mistakes."

The Senate notes on that matter reference *Rich* v. *U.S.*, where the ATF was required to reissue a license absent a showing of a willful violation because willful at that time was found to mean purposeful and intentional behavior.

Now, the addition of willful standard by Congress is significant because an FFL's compliance obligations are largely clerical and technical in nature, and in some instances a mere typo could be considered a violation of the Gun Control Act.

By requiring willfulness Congress clearly raised the standard for revocation to only include situations in which a licensee purposefully and intentionally violates the law. The administration's current zero tolerance policy flies in the face of Congress' intent and it's causing harm to otherwise law-abiding FFLs, and it's wasting ATF's limited resources.

I have a client, Point Blank Firearms, an FFL in Michigan, that is a perfect example of the harm caused by the zero-tolerance policy and overreach by the ATF. The ATF is currently trying to revoke their license based on an inspection that started on July 26th of last year, and in April of this year the Acting Director of Industry Operations for the Detroit field division provided my client with a notice of revocation.

We elected to have a hearing on the matter and have yet to be provided with a date. My clients, the owners of Point Blank, are here with me now while their employees are back home unsure about their jobs and one of the owners, a first-generation Arab American, also owns a second FFL business with another partner who is being denied his due process because they have to have their inspection on hold until this inspection is finalized.

In this matter the ATF falsely claimed that my client had 308 missing firearm transaction forms. In reality, my client has zero missing forms. Every single one has been located, matches the FBI background check numbers, and bears the customers' signature.

9

The ATF also falsely claimed that they made errors by transferring firearms more than 30 days after the background check. That also is completely untrue. Those were probably transferred the exact same day the background check happened.

Now, to be fair, the ATF inspectors weren't aware of the facts during the inspection. However, when we presented all this information and facts to the ATF, and asked them to reconsider this revocation they denied that and are pushing forward.

I'm going to share a few facts about my client that are relevant to understanding what type of FFL the ATF is spending all this time, energy, and money trying to shut down.

In over the 12,000 firearms acquired by Point Blank not a single firearm has ever been lost or stolen. Point Blank has 100 percent accountability of the 4473s, over 11,000 of them.

Point Blank has never transferred a firearm to someone who failed a background check. They've never failed to make, submit, or keep a multiple sales report and not once in the approximately 300 ATF trace requests had they failed to give timely and accurate information.

In summary, Point Blank has never engaged in any activity, even accidentally, that would have any negative impact on public safety. They take their role very seriously.

I think ATF's zero tolerance policy is severely misguided and is wasting ATF's limited resources and this overzealous policy is harming the ATF's relationship with retailers.

ATF should focus its resources on trigger pullers on the street and not shutting down honest, hard-working, and law-abiding gun stores.

Thanks for the opportunity to speak today. I look forward to answering your questions.

[The prepared statement of Mr. Cleckner follows:]

10

TESTIMONY OF RYAN M. CLECKNER

BEFORE THE HOUSE COMMITTEE ON THE JUDICIARY,
SUBCOMMITTEE ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT

MAY 22, 2024

"HEARING ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT"

Good morning Chairman Jordan, Ranking Member Plaskett, and members of the Subcommittee. I am Ryan Cleckner, an attorney specializing in federal firearms law and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) compliance.

I am actively involved in the firearms industry and I help Federal Firearms Licensees (FFLs) to stay compliant with federal laws and ATF rules and regulations through online training at RocketFFL and, most recently, I co-founded a software company, FFLSafe, that provides free ATF compliance software for all FFLs to help keep them compliant. I am also a former firearms industry executive, university lecturer and special operations sniper.

I am here today because I am concerned with, what I see as, the over-reach of the ATF when it comes to their enforcement actions over FFLs and the current administration's "zero tolerance" policy when it comes to licensee inspections.

The Gun Control Act of 1968 (GCA) is the main body of law concerning standard firearms and the Federal Firearms Licensing system. Specifically, the GCA allows the ATF to revoke an FFL's license for a "willful" violation of the law.[1]

Originally, the GCA had no such "willfulness" standard. Congress, in 1986, amended the GCA to specifically include the willfulness requirement "to ensure that licenses are not revoked for inadvertent errors or technical mistakes."[2]

The Senate notes on the matter referenced Rich v. United States, 383 F. Supp. 797 (SD. Ohio 1974) wherein the ATF was required to "reissue [a] license absent a showing of willful violation" because willful was found to mean "purposeful, intentional behavior,"

---

[1] 18 U.S.C. § 923(e)

[2] 96th Congress, Senate Committee on the Judiciary, S.914 Report

11

The addition of a "willful" standard by Congress was significant because an FFL's compliance obligations are largely clerical and technical in nature and, in some instances, a mere typo could be considered a violation of the GCA. By requiring "willfulness," Congress clearly raised the standard for revocation to only include situations in which a licensee purposefully and intentionally violates the law.

The Administration's current "zero tolerance" policy flies in the face of Congress's intent, it is causing harm to otherwise law-abiding FFLs, and it is wasting ATF's limited resources.

I have a client, Point Blank Firearms, an FFL in Michigan, that is a perfect example of the harm caused by this "zero tolerance" policy and over-reach by the ATF.

The ATF is currently trying to revoke their license based on an inspection that started on July 26th of last year. On April 9th of this year, the acting Director of Industry Operations (DIO) for the Detroit Field Division provided my client with a Notice of Revocation (NOR). We elected to have a hearing on this matter and we have yet to be provided with a hearing date.

My clients, the owners of Point Blank, are here with me now while their employees are back home unsure of their jobs. And, one of the owners, a first generation Arab-American, also owns a second FFL business with another partner who is being denied his due process because they have had their ATF inspection ongoing for almost a year now pending the outcome of this company's revocation proceeding.

In this matter, the ATF falsely claimed that my client had 308 missing firearm transaction forms (4473s). In reality, my client has 0 missing 4473s - every single one has been located, matches the FBI background check numbers, and bears the customers' signature.

The ATF also falsely claimed that my client transferred a firearm to a customer more than 30 days after successfully passing their background check. In reality, my client transferred the firearm on the very same day the background check was passed - well within the 30 days allowed in accordance with the law and ATF rules and regulations.

To be fair, the ATF inspectors were not aware of the facts during the inspection and the decision by the ATF to issue the Notice of Revocation was based on their misunderstanding of the situation. However, we showed the ATF that its revocation decision is based on erroneous information. We showed ATF that there were, in fact, no missing forms nor late transfers. There is clearly no public safety issue. No firearms were transferred without a 4473, without a background check, nor to a prohibited person. Despite the

12

information we provided to ATF that the revocation was based on factually incorrect assumptions the ATF responded by dismissing the new information and continuing to pursue revocation.

I'm going to share a few facts about my client that are relevant to understand what type of FFL the ATF is spending all of this time, energy, and money trying to shut down:

- In the over 12,000 firearms acquired by Point Blank, not a single firearm has ever been lost or stolen
- Point Blank has 100% 4473 accountability - over 11,500 of them.
- Point Blank has never transferred a firearm to someone who failed a background check.
- Point Blank has never failed to make, submit, nor properly store a multiple handgun sales form.
- Not once, in the approximately 300 trace requests received by the ATF, has Point Blank failed to provide accurate and timely information.

In summary, Point Blank has never engaged in any activity, even accidentally, that would have any negative impact on public safety. Point Blank takes its role as an FFL seriously and views itself as the front line helping to prevent the criminal acquisition of firearms.

Point Blank has been living with the threat of being shut down for 10 months. Just this week ATF falsely accused them of failing to respond to a trace request. Thankfully, Point Blank keeps good records and was able to show that they complied and that the ATF was mistaken, again.

ATF's "zero-tolerance" policy is misguided and wasting the ATF's limited resources. This overzealous policy is harming ATF's relationship with retailers upon which ATF relies to provide information on suspicious activity.

ATF should focus its resources on taking "trigger pullers" off the street - not shutting down honest, hard working and law-abiding gun stores. Congress never intended for ATF to shut down FFLs for minor clerical errors that are not "willful violations."

Thank you for the opportunity to speak here today. I'm willing to answer any questions you may have.

Ryan Cleckner

13

Chair JORDAN. Mr. Graham, you're recognized for five minutes. Hit that microphone if you could, Mr. Graham, so everyone can hear you. Go right ahead.

## STATEMENT OF ANDREW GRAHAM

Mr. GRAHAM. Thank you, Chair.

Good morning again, Chair Jordan, Ranking Member Plaskett, and distinguished Members of the Select Subcommittee. My name is Andrew Graham and I appreciate the opportunity today to appear before you and testify about an issue which has impacted my career as a former ATF employee as well as one that truly hits home.

For 37 years I have proudly served in the Bureau of Alcohol, Tobacco, and Firearms, and I am a veteran of the United States Air Force National Guard.

As the Deputy Assistant Director I served in the capacity over ATF's regulatory enforcement as well as Deputy Assistant Director over the enforcement program services—that is tracing, etc.

During this time, I've worked alongside some of the most talented men and women that I've known who've done a yeoman's work in providing safer communities, enforcing the laws and regulations to uphold the Constitution.

I've developed strong relationships with our agents, field investigators, better known as IOIs, as well as directors of industry operations at all 25 field divisions.

Some of you find it surprising that the agents and the IOIs develop a rapport with FFLs or better known as retailers, but that relationship is critical as FFLs are often the first line of defense in linking—in keeping firearms out of the hands of prohibited people. They share tips with ATF of suspected traffickers and/or potential straw purchasers.

I can tell you from personal experience now as a consultant that members of the firearms industry do not want firearms to go into the wrong hands and I put a lot of emphasis on that. That is a standing. We do not want firearms to be in the hands of prohibitive persons.

In fact, the firearms industry is one of the most heavily regulated industries. Firearm retailers spend countless hours ensuring that they're up to speed on current laws and regulations.

FFLs are human and the best of the retailers they do make mistakes. That was part of my job for 37 years is identifying these errors, working to help that they aren't repeated, ensure that the proper training was deployed, and to provide an opportunity for an FFL to get back on track.

In the summer of 2021, President Biden announced a comprehensive strategy to prevent and respond to gun crimes and ensure public safety which included directing the ATF to revoke Federal firearm dealers under a zero tolerance policy if they violate the law— willfully violate on the following counts: (1) Transferring a firearm to a prohibited person; (2) failing to run a background check; (3) falsifying records such as transaction forms—those are the ATF Form 4473s; failing to respond to a trace request within 24 hours; and (4) refusing to permit ATF to conduct an onsite inspection during normal business hours.

14

Revocation is the loss of a Federal firearms licensee license and closes the business entirely. So, this is a big deal. It's not just the loss of a license, but it's a loss of one's livelihood.

As stated by ATF in 2014, when detailing the Federal firearms revocation process, willfulness is not defined by the regulation but is defined by case law to mean the intentional disregard of a known legal duty or plain indifference of the licensee's legal obligation.

In the case of an FFL who has willfully violated the law, has shown an intentional disregard for the legal requirements or has knowingly participated in criminal activity, revocation may be the only viable option.

The problem is the breadth of the zero-tolerance policy is much larger than just the rogue gun dealers. It was initially—it was supposedly carried out to address willful violations being redefined on a case-by-case basis.

With numerous enforcement complexities it strained the relationship between the regulator and the industry. This is putting FFLs who should never have been caught up in this new policy and damaged the cooperative trust built between the agency as well as industry members.

It's become so rampant that FFLs facing revocations that never would have faced them now are pressured into shutting down their businesses and depleting funds that they, quite frankly, don't have.

In December 2022, I made the tough decision to retire from civil service and in my time since leaving ATF I have continued to do what I've enjoyed while I was there with ATF, working with members of the firearms industry to ensure regulatory compliance, and in the event that FFLs are ensnared in this new policy I help them to navigate the process to help preserve their livelihood and their law-abiding businesses.

Thank you for your time. I look forward to answering your questions as well.

[The prepared statement of Mr. Graham follows:]

15

**Written Testimony of Andrew Graham**
**Founder and CEO of Graham Industry Advisor, LLC**
**Former ATF Deputy Assistant Director**
**Submitted to the U.S. House of Representatives**
**Committee on the Judiciary**
**Select Subcommittee on the Weaponization of the**
**Federal Government**
**"Hearing on the Weaponization of the Federal**
**Government"**
**May 22, 2024**

Chairman Jordan, Ranking Member Plaskett, and
distinguished members of the Select Subcommittee on the
Weaponization of the Federal Government, my name is
Andrew Graham, and I appreciate the opportunity to
appear before you today to testify on an issue that
impacted my career and truly hits home.

For 37 years, I proudly served in the Bureau of Alcohol,
Tobacco, Firearms, and Explosives (ATF) in a variety of
capacities and was a veteran of the USAF – National
Guard. I was the Deputy Assistant Director of Field
Operations over ATF's Regulatory Inspection Program
and the Deputy Assistant Director of Enforcement
Programs and Services.

16

-2-

During that time, I worked alongside of some of the most talented men and women I know, who have done yeoman's work to provide for safer communities by enforcing the laws and regulations on the books to uphold the Constitution of the United States.

I developed strong relationships not only with ATF Special Agents, Industry Operations Investigators (IOIs), and Directors of Industry Operations (DIOs) but also with members of the firearm industry.

Some may find it surprising that ATF agents and IOIs both develop a rapport with firearm retailers. That relationship is critical as FFLs are often the first line of defense in keeping firearms out of the wrong hands by sharing tips with ATF on suspected illegal gun trafficking and straw purchasing of firearms.

I can tell you from my experience, including now as a consultant, that members of the firearm industry do not want firearms to land in the wrong hands. They strive to remain compliant with the myriad of federal laws and regulations.

17

-3-

In fact, as one of the most regulated industries, firearm retailers spend countless hours ensuring they are up to speed on current laws and regulations. But we are all human and even the best of retailers occasionally make mistakes. That was part of my job for 37 years with ATF to identify errors made, to help ensure they aren't repeated, to educate retailers, and to give them the opportunity to get back into compliance.

In the summer of 2021, President Biden announced a "Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety," which included directing ATF "to revoke the licenses of dealers the first time, under a Zero Tolerance Policy, that they violate federal law by willfully 1) transferring a firearm to a prohibited person, 2) failing to run a required background check, 3) falsifying records, such as a firearms transaction form, 4) failing to respond to an ATF tracing request, or 5) refusing to permit ATF to conduct an inspection in violation of the law."[1]

---

[1] "Fact Sheet: Biden-Harris Administration Announces Comprehensive Strategy to Prevent and Respond to Gun Crime and Ensure Public Safety," The White House, 23 June 2021, http://www.whitehouse.gov/briefing-room/statements-releases/2021/06/23/fact-sheet-biden-harris-administration-announces-comprehensive-strategy-to-prevent-and-respond-to-gun-crime-and-ensure-public-safety/.

18

-4-

Revocation is the loss of a federal firearms license, and closes the business entirely, so this is a big deal. It's not just the loss of a license, but the loss of livelihood. For "willful" violations, however, this is necessary. As stated by ATF in 2014 when detailing the federal firearms license revocation process, "Willfulness is not defined in the regulations but is defined by case law to mean the intentional disregard of a known legal duty or plain indifference to a licensee's legal obligations.

In the case of an FFL who has willfully violated the law, has shown an intentional disregard for regulatory requirements, or has knowingly participated in criminal acts, revocation often becomes the only viable option."[2]

The problem is the breadth of the "Zero Tolerance" policy is much larger than the "rogue gun dealers" that this policy was supposedly carried out to address. With "willful" violations being redefined on an individual case-by-case basis, with enforcement complexities. It strained our relationships with FFLs who should have never been caught up in this new policy and damaged the cooperative trust that we have built.

---

[2] "Fact Sheet: FEDERAL FIREARMS LICENSE REVOCATION PROCESS." Bureau of Alcohol Tobacco, Firearms and Explosives, May 2014, http ᵃᵃ⁰⁰ᵃ ᵃᶠ⁻ᵗᵒ Tlh, 1113ᵒ ᵗʰᵛⁿⁿˡᵗˢˡ,

19

-5-

It has become so rampant that FFLs facing revocations that never would have faced them until now are either being pressured to shut down or deplete funds they don't have, to prove their innocence and justify keeping their doors open.

When I took the Oath of Office and joined the ATF, I never imagined that fighting to disrupt violent crime for safer communities entailed weaponizing a federal agency to lay the hammer down on the law-abiding, and it certainly wasn't how I envisioned my last chapter with the agency I've worked with for more than three decades of ending.

In December 2022, I made the tough decision to retire from civil service. In my time since leaving ATF, I have continued to do what I enjoyed while there—working with members of the firearms industry to ensure regulatory compliance—and in the event that FFLs are ensnared in this new policy, helping them to navigate the process to help preserve their livelihood and law-abiding business.

I look forward to answering your questions.

20

Chair JORDAN. Thank you, Mr. Graham.
Ms. Sampson, you're recognized for five minutes.

**STATEMENT OF KELLY SAMPSON**

Ms. SAMPSON. Chair Jordan, Ranking Member Plaskett, and distinguished Members of the Select Subcommittee, thank you for inviting me to testify today.

I'm Kelly Sampson, Senior Counsel and Director of Racial Justice at Brady, the oldest national gun violence organization in America.

Gun violence is a public health epidemic, causing more than 44,000 deaths each year—44,000 deaths and many more who live with injury and trauma. Since 2020, gun violence has been the top cause of death for American children and teens, which is why thousands of kids and their parents plead for Congress to protect them.

Despite our country's love of freedom gun violence is a reason why many Americans no longer feel free to go to school, a July 4th parade, the movies, concerts, the grocery store, and places of worship.

Gun violence is why many of your own constituents, gun owners and nongun owners alike, are desperate for you and your colleagues to pass common sense gun laws and ensure those laws are properly implemented.

With tens of thousands dead and many more injured Congress should be focused on ending our gun violence epidemic and equipping the Bureau of Alcohol, Tobacco, Firearms, and Explosives, or ATF, to meet its mandate and to enforce the Nation's gun laws. Just days ago, Congress celebrated Police Week where members gave countless speeches in support of law enforcement.

ATF is not only law enforcement in and of itself, but also a critical ally of State and local law enforcement agencies across the country. ATF is the only Federal law enforcement agency which has specific jurisdiction over firearms and gun industry oversight.

It should also be noted that guns are the leading cause of death for police officers killed in the line of duty. Guns don't grow on trees. Almost all firearms are sourced from illegal markets, manufactured, imported, distributed and sold by Federal firearms licensees, or FFLs.

Generally, manufacturers and importers sell to distributors who sell to dealers who then sell to the public. Dealers are the first line of defense against gun trafficking and most take this responsibility very seriously.

In fact, the large majority of gun dealers won't sell a single crime gun in a given year. A small number of dealers' negligent practices filter guns directly into the criminal market.

According to the last available data, nearly 70 percent of crime guns were traced back to just over one percent of licensed dealers.

So, even though the portion of the gun industry most responsible for supplying crime guns is miniscule, ATF nonetheless struggles to meet its mandate.

ATF only has the resources to inspect about eight percent of active FFLs annually, falling far short of its own internal goal of inspecting each FFL every three years.

21

To reach that goal ATF would need to more than double its current compliance staff. In fact, over 2,000 active gun dealers have gone for more than a decade without inspection.

ATF struggles to meet its mandates because it's been under resourced and deprived of a confirmed director for decades. Indeed, just this year Congress voted to once again reduce ATF's budget despite the gun violence epidemic.

These obstructions erode ATF's oversight capacity, forcing hard-working law enforcement agents to regulate a behemoth industry with their arms tied behind their backs.

Undermining ATF doesn't just hinder the agency but it also harms local law enforcement across the country. ATF plays an essential role in supporting State and local law enforcement nation-wide including in your districts.

When an incidence of gun violence occurs, ATF helps local and State law enforcement partners by generating investigative leads and information on guns recovered in crimes by tracing them to their last known retail purchaser. ATF also trains officers to better understand advanced firearms technology.

These services strengthen State and local law enforcement, providing them with information, coordination, and education necessary to enforce existing laws and prevent future gun crimes.

Congress must listen to their constituents and recognize that the American people are begging for gun violence prevention policies. Americans, gun owners, and nongun owners want to be safe. Federal oversight for the firearm industry does not hinder any law-abiding citizen's Second Amendment right.

Instead of attacking ATF you should be building up the agency and supporting its efforts to end gun violence. In the shadow of Police Week, we must remember that ATF agents are law enforcement, too, and they play an important role in protecting the public and other law enforcement officers all over the country from gun violence.

Thank you, and I look forward to your questions.

[The prepared statement of Ms. Sampson follows:]

22



Kelly Sampson, Senior Counsel and Director of Racial Justice at Brady
Before the Select Subcommittee on the Weaponization of the Federal Government
May 22, 2024

### Introduction

Chairman Jordan, Ranking Member Plaskett, and Distinguished Subcommittee members, I thank you for the opportunity to highlight gun violence, which indisputably threatens Americans each and every day.

Founded in 1974, Brady works across Congress, courts, and communities to end America's gun violence epidemic. Our organization carries the name of Jim Brady, who was shot and severely injured in the assassination attempt on President Reagan's life. Jim and his wife, Sarah, led the fight to pass the landmark Brady Bill 30 years ago.

Gun violence is a public health epidemic, leading to more than 44,000 deaths annually. Since 2020, gun violence has been the top cause of death for American children and teens; which is why each year thousands of kids *and their parents* plead for Congress to protect them. Despite our country's love of freedom, gun violence is the reason why many Americans no longer feel free to go to school, a July 4th parade, the movies, concerts, the grocery store, and places of worship. Gun violence is why many of your own constituents, gun owners and non-gun owners alike, are desperate for you and your colleagues to pass common sense gun laws and to ensure those laws are properly implemented. Gun violence is a crisis, and we cannot continue to disregard the threat it poses.

### ATF is Essential to Combating Gun Violence

ATF is the only federal agency authorized to regulate firearms and the gun industry. In our current system, the United States cannot enforce gun laws and prevent violence without the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). ATF's mandate includes licensing and overseeing federally licensed firearms dealers (FFLs), who serve as the first line of defense between Americans and gun traffickers. In regulating FFLs, ATF can prevent gun trafficking, and the violence it leads to.

23

### a. Oversight of the Gun Industry

Those who oppose passing any new firearms legislation often say that the country should "enforce the laws on the books." Taking this argument in good faith, anyone who demands robust enforcement of current law should be advocating for ATF to have all the resources it needs. Instead, many of the same proponents for enforcing current gun laws are seeking to "defund" or even abolish ATF. Given the role of some gun industry actors in perpetuating gun violence, this is a mistake.

Almost all firearms in circulation are sourced from the lawful market. Generally, manufacturers and importers sell to distributors, who sell to dealers, who sell to the public. Dealers should screen for signs of gun trafficking, such as straw purchases, and most do so thoroughly. In fact, the large majority of gun dealers will not have a single crime gun traced to them in any given year. Rather, it is a small number of dealers whose negligent practices disproportionately filter guns directly into the criminal market: according to the last available data, nearly 70% of firearms that are traced to crime were sourced from just over 1% of licensed dealers.[1]

Even though the portion of the gun industry disproportionately responsible for supplying crime guns is exceedingly small, the ATF nonetheless struggles to meet its own oversight goals because it has been systematically underfunded, under-resourced, and unfairly demonized for decades. Indeed, just this year, Congress voted to reduce ATF's budget, despite epidemic gun violence.

These obstructions erode ATF's oversight capacity, forcing hardworking law enforcement agents to regulate a behemoth industry with their arms tied behind their backs. This negatively affects State and local law enforcement investigations, which are left to pick up the pieces as irresponsible, negligent, or unlawful industry actors skirt accountability and contribute to the influx of guns into illegal activity and gun violence.

### b. Assisting State and Local Law Enforcement

ATF also plays an essential role in supporting State and local law enforcement by generating investigative leads and information on guns recovered in crimes and facilitating important trainings for officers to better understand advancing firearm technology. These services strengthen State and local law enforcement, providing them with information, coordination, and education necessary to enforce existing laws and prevent future gun crimes.

ATF operates twenty-five Crime Gun Intelligence Centers (CGICs) across the nation;[2] these Centers serve as intelligence hubs that gather and analyze data and information from numerous levels of law enforcement in order to generate information necessary to track down investigative leads. CGICs amalgamate processes and techniques to generate information webs, including the National Integrated

---

[1] ATF, *Commerce in Firearms in the United States* 23 (2000).
[2] ATF, *Fact Sheet - Crime Gun Intelligence Centers (CGIC)* (June 2023), www.atf.gov/resource-center/fact-sheet/fact-sheet-crime-gun-intelligence-centers-cgic.

24

Ballistic Information Network[3] (NIBIN) and the National Tracing Center[4] (NTC). NIBIN uses ballistic imaging technology to analyze the unique marking on recovered shell casings, identifying matches between the casings and specific firearms. These matches can be used to generate links between firearms used in different crime scenes. For example, in 2022, Texas law enforcement officers, in collaboration with NIBIN, were able to link two seemingly unrelated gun violence incidents. By analyzing unique aspects of bullet casings, NIBIN and investigators were able to connect a 29-year old to both a fatal shooting of a 62-year old and an accidental shooting in a Walmart parking lot.[5]

While NIBIN focuses on connections in ballistics, the National Tracing Center (NTC) focuses on the path of firearms. The NTC utilizes the eTrace program,[6] through which it shares trace information with state and local law enforcement agencies that have opted-in. When state and local authorities recover crime guns in their respective jurisdictions, they send the make, model, and serial number to ATF, which uses that information to trace the chain of custody of that firearm from its manufacturer or importer to its last known retail sale. These gun traces are critical for law enforcement agencies to investigate and solve firearm-related crimes as they allow them to develop investigative leads and tie firearms to a suspect. The number of crime gun traces conducted by ATF has steadily grown over the last several years. In 2022, the NTC processed *over 500,000* firearm trace requests for guns recovered in the United States,[7] up from just under 340,000 in 2017.[7] Without these types of investigative leads, State and local law enforcement would be greatly hindered in being able to solve firearm-related crimes.

ATF also provides law enforcement agencies with essential training on evolving firearm technology and investigative tactics. Law enforcement professionals must be able to collaborate with other agencies and remain up to date on evolving firearm technologies in order to effectively prevent and solve firearm related crime. ATF provides numerous training programs to State and local law enforcement that allow them to develop necessary investigative skills to solve complex crimes. First launched in 1999, the National Firearms Examiner Academy[9] (NFEA) offers a year-long training program educating law enforcement of numerous jurisdictions on firearm forensics. The NFEA also offers individualized courses on Serial Number Restoration[10] and Toolmark Examination, Comparison,

[3] ATF, *National Integrated Ballistic Information Network (NIBIN)*, www.atf.gov/firearms/national-integrated-ballistic-information-network-nibin.

[4] ATF, *National Tracing Center*, www.atf.gov/firearms/national-tracing-center.

[5] Maggie Prosser, *How ATF Ballistic Database Helps Texas Police Solve Gun Violence Cases*. Officer.com (Nov. 28, 2022), www.officer.com/investigations/forensics/firearms-identification/news/21288339/how-atf-ballistic-database-helps-texas-police-solve-gun-violence-cases.

[6] *See* ATF, *Fact Sheet - eTrace: Internet-based Firearms Tracing and Analysis* (Apr. 2023), www.atf.gov/resource-center/fact-sheet/fact-sheet-etrace-internet-based-firearms-tracing-and-analysis.

[7] *See* ATF, *Top Calibers Recovered and Traced in the United States and Territories - CY 2022*, www.atf.gov/resource-center/docs/report/top-calibers-recovered-and-traced-united-states-and-territories-cy-2022.

[8] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns, Volume Two, Part III: Crime Guns Recovered and Traced within the United States and Its Territories* 1 (Mar. 27, 2024).

[9] ATF, *Firearms-Related Training for Law Enforcement*, www.atf.gov/careers/firearms-related-training-law-enforcement.

[10] ATF, *Serial Number Restoration Training (Course ID FRMS-CS-0022)*, www.atf.gov/firearms/serial-number-restoration-training-course-id-frms-cs-0022

25

and Identification.[11] Additionally, ATF offers education for law enforcement users of NIBIN, training them on how to perform acquisitions and correlations in the system.[12] Together, these programs provide Federal, State, and local law enforcement with the skills to engage in investigative firearm forensics. Additionally, the Project Safe Neighborhoods Enforcement Training course provides a jurisdiction's law enforcement agency and justice system with a multidisciplinary approach[13] to combat violent crimes. This program facilitates a coordinated effort in investigating, prosecuting, and preventing firearm trafficking and gun violence incidents. In running these education programs, ATF is able to increase information-sharing and coordination between various law enforcement agencies. This cross-jurisdiction collaboration reduces the ability for gun traffickers and other bad actors to operate, reducing instances of gun violence and saving billions of taxpayer dollars.[14]

ATF serves as an essential partner to law enforcement agencies across the country and beyond. Yet, with limited resources, the Bureau is unable to fulfill its duty to State and local law enforcement efficiently and to its maximum capacity. For example, ATF classifies "routine" traces as taking seven to ten days to complete.[15] Yet, in 2022, it was reported that non-expedited traces take an average of twelve to fourteen days to complete.[16] These additional days matter when law enforcement is investigating violent crimes. The longer that perpetrators of violent crimes are not held accountable for their actions, the more lives are at risk.

### 1. c. Implementing and Enforcing the Law

In 2022, Congress passed the Bipartisan Safer Communities Act (BSCA), the first landmark gun violence prevention law enacted in nearly 30 years. Included in BSCA was a definition change about those who should be considered "engaged in the business" of dealing firearms, and as a consequence, should be licensed as an FFL.[17] As ATF has sole federal jurisdictional authority over licensure and the firearms industry, it finalized a rule to provide the public and the industry clarity about what this definitional change meant.

Prior to the passage of BSCA, the Gun Control Act of 1968 (GCA) required those engaged in the business of firearms to obtain a federal firearms license and follow all attendant responsibilities, such as conducting Brady background checks. Although the Brady background check system has prevented over-

---

[11] ATF, *Toolmark Identification and Comparison Training* (Course ID FRMS-CS-0027), www.atf.gov/firearms/toolmark-identification-and-comparison-training-course-id-frms-cs-0027.
[12] ATF, *NIBIN Training Outline and Guidelines*, at www.atf.gov/firearms/nibin-training-outline-and-guidelines.
[13] The program is "a collaborative effort among the U.S. Department of Justice, the International Association of Chiefs of Police (IACP), the National District Attorney's Association, the National Crime Prevention Council and ATF." ATF, *Project Safe Neighborhoods Enforcement Training (PSN 3-day Program)*, www.atf.gov/firearms/project-safe-neighborhoods-enforcement-training-psn-3-day-program.
[14] *See* Mark Follman et al., *The True Cost of Gun Violence in America*, Mother Jones (Apr. 15, 2015), www.motherjones.com/politics/2015/04/true-cost-of-gun-violence-in-america.
[15] *See* ATF, *National Tracing Center*, www.atf.gov/firearms/national-tracing-center ("Traces classified as 'Routine' are completed within seven to ten days on average.")
[16] *See, e.g.*, ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns, Volume Two, Part III: Crime Guns Recovered and Traced within the United States and Its Territories* 1 (Mar. 27, 2024).
[17] *See* 18 USC § 921(a)(21)(C).

26

four million prohibited firearms transfers since 1993, the narrow definition of "engaged in the business" included in the Firearm Owners Protection Act of 1986 (FOPA) had allowed unlicensed dealers to circumvent the background check process.[18] threatening to public safety. Prior to the enactment of BSCA, one in five firearms sold in America were sold without a background check — resulting in millions of firearms potentially ending up in the hands of prohibited persons.[19]

These unregulated sales are far more than a mere loophole; unlicensed dealers are a deadly public safety threat. A recent ATF analysis has found that "unlicensed dealers were associated with the largest number of trafficked firearms (68,388) and averaged 20 trafficked firearms per investigation."[20] And contrary to mischaracterizations, many of the individuals engaged in regular unlicensed gun sales were not hobbyists or one-off sellers, but repeated players in the firearms market. An amicus brief filed by several gun violence prevention organizations[21] illustrates several instances of unlicensed individuals engaging in persistent gun sales to deadly effect.[22] In one instance, an individual bought numerous guns from FFLs and immediately resold them, without completing background checks, to his "customers," who were prohibited purchasers.[23] The man's customers went on to commit several shootings, including one that killed a 2-year-old.[24] That is just one example of many situations in which unlicensed dealers have sold firearms to individuals who took innocent lives. That is why Congress passed BSCA and expanded the "engaged in the business" definition.

BSCA expanded the definition of "engaging in the business" of dealing firearms to apply to "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business *to predominantly earn a profit* through the repetitive purchase and resale of firearms."[25] Under the new definition, individuals who currently serve as unlicensed dealers now will be required to register as an FFL and conduct background checks on all sales and transfers they facilitate. This will greatly reduce the ability for gun traffickers and prohibited persons to circumvent the background check system and to divert firearms into illegal activity.

In order to provide additional clarification on what this new definition means to everyday Americans, the Justice Department announced on August 31, 2023 that it had submitted a notice of proposed rulemaking that would clarify the circumstances in which a person is "engaged in the

---

[18] The Firearm Owners Protection Act (Pub. L. 99-308) included a four-part test for determining if an individual was engaged in the business, most notably that the person was engaged with "with the principal objective of livelihood and profit."

[19] See Matthew Miller et al., Firearm Acquisition Without Background Checks, 166 Annals of Internal Med. 233 (2017). This statistic does account for ghost guns and ghost gun kits sales, discussed in the following pages.

[20] ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms Trafficking Investigations, Volume Three, Part XI: Summary and Conclusions* 2 (May 21, 2024).

[21] Amici are: Brady Center to Prevent Gun Violence; March for Our Lives; Giffords Law Center to Prevent Gun Violence; and Everytown for Gun Safety.

[22] Brief for Brady Center et al. as Amici Curiae Supporting Defendants, Texas v. ATF, No. 24-cv-89 (N.D. Tex., May 14, 2024) (ECF No. 27-1).

[23] *Id.*

[24] *Id.*

[25] Bipartisan Safer Communities Act, Pub. L. 117-159, sec. 12002, 136 Stat. 1313, 1324 (2022) (codified at 18 U.S.C. § 921(a)(21)(C)).

27

business" of dealing in firearms. The rule was finalized on April 10 of this year, providing the public and the firearms industry with needed clarity about the changes authorized by Congress in BSCA.

### Conclusion

Gun violence is an epidemic, and the constant deluge of gun violence threatens each and every resident and visitor in the United States. As the sole federal agency authorized to regulate firearms and the gun industry, ATF serves an essential function to law enforcement agencies nationwide and the American people. Yet, ATF faces repeated defunding and even threats of disbandment that cripple its effectiveness.

As you and your colleagues proclaimed in these very halls during Police Week just days ago, it is vital that we support law enforcement in their efforts to prevent and solve violent crime. If we truly support State and local law enforcement, then we must ensure they have access to the information and resources they need to complete their jobs and secure public safety. Therefore, Congress must fully fund the Bureau of Alcohol, Tobacco, Firearms, and Explosives so that they can continue to partner with other law enforcement agencies and prevent violent crime.

With proper funding, ATF provides appropriate oversight over the firearm industry — enforcing the nation's gun laws, preventing firearm trafficking, and holding the individuals who break the law accountable for their actions. However, when ATF is under-resourced and hindered from completing its mandate, State and local law enforcement agencies are left to flounder independently and the firearm industry operates without a proper accountability system

Polls show that gun violence prevention policies are overwhelmingly popular with the American people. Every day, gun violence impacts more and more of your constituents; and everyday more and more Americans are asking for commonsense measures to end gun violence. It's never too late to save American lives. Use your power and take action to prevent gun violence today.

Chair JORDAN. Thank you, Ms. Sampson.

Mr. Cummins, you're recognized.

## STATEMENT OF BUD CUMMINS

Mr. CUMMINS. Thank you, Mr. Chair, Ranking Member Plaskett, and thank you, Representative French Hill, for the introduction.

Representative Hill has been very engaged and concerned about the death of Bryan Malinowski in his district and we really appreciate his help bringing attention to this tragedy.

My name is Bud Cummins. I'm an attorney for Bryan Malinowski's family. I'm a former United States Attorney from the Eastern District of Arkansas.

I want to tell you a little bit, Mr. Chair, about Bryan Malinowski. Until two months ago Bryan was the Executive Director of the Bill and Hillary Clinton National Airport in Little Rock. He is 53 years old.

He and his wife, who's present with us today, Maer, celebrated their 25th Anniversary last December and he had many, many good friends. He grew up in Pennsylvania with his brother and his two sisters and he wanted to be a fighter pilot, but he didn't have the eyesight.

So instead, he went and got his certified—became a certified flight instructor, got a college degree, and went into the airport management industry and he had several stops along the way in Pennsylvania, Florida, but in El Paso, Texas, is where he met his wife Maer and, as I said, they've been married 25 years.

He found his way to Little Rock and eventually was named the Executive Director of our airport. By all accounts he's very good in his profession.

Our airport is one of nine—I've heard a few different numbers—less than 12 in the country that's debt free and that maybe that's a concept that's strange here in Congress but I think that represents some good management.

Bryan was also a lifelong collector. As a child he started collecting coins. He had various hobbies. He was that guy. I've been to their home and seen books this thick about coin collecting, collecting currencies, and other—about card playing. He studies card playing, and he tried his hand at competitive card tournaments.

About six years ago Bryan's father gave him his gun collection and that sparked interest—a new interest, a collection interest in Bryan, since then he has become also a gun collector and at gun shows he found other people who shared his enthusiasm and his interest in not only guns, but in coins, and other artifacts that you'll find at a gun show.

He'd set up a table on weekends occasionally and he'd display some of his guns and he'd display his coins, and he would buy, sell, and trade with other collectors. It is legal to buy, sell, and trade firearms without a Federal firearms license if you're a collector or a hobbyist.

At some point ATF suspected that Bryan Malinowski may have crossed a very murky line, and he was no longer a hobbyist. Because of that, ATF concluded that he was required to buy a $200 FFL—Federal firearms license—before he sold any more guns.

29

One thing is certain. His family and his friends and all his work colleagues would all guarantee you if they were here today that he loved his career and he loved being in the airport management business, and if anybody had ever suggested to him that his weekend hobby was in any way threatening that he would have immediately been hands off.

Nobody told him. Instead, ATF launched a criminal investigation into Bryan. They researched his background. They put a tracker on his car. They put tails on him and surveilled him, and soon they obtained a search warrant to search his home.

By the time they obtained the warrant they knew a lot about Bryan. They knew he worked in a secure environment at the airport.

They knew he had lived a law-abiding life with absolutely no criminal history, and they knew he lived at home with his wife and his two dogs, and they kept a very regular schedule.

Despite all this knowledge, ATF hatched a plan to execute the warrant by force and on March 19th at 6:01 a.m., over one hour before sunup, 10 carloads of ATF agents, and Little Rock Police Department officers came to the Malinowski home to execute the search warrant.

They wore full tactical SWAT gear, and they approached the door at 6:02:42 a.m. That's about one hour and 15 minutes before sunup that day.

They had a piece of tape ready, and they covered up his doorbell camera so if he had time to wonder who was at the door—I think people get a doorbell camera to see who's at the front door, but they took away his ability to do that.

Moments later Ms. Malinowski heard a loud crash as their front door caved in and fearing for his wife's safety, Bryan jumped up at the sound of a crash, found a pistol, loaded a magazine in it, and left the bedroom to investigate.

He warned his wife to stay behind him in the bedroom, but she stubbornly followed him through the doorway. It appears to us that ATF also killed the electricity to the home, making it difficult for Bryan to see in the predawn hours.

Ms. Malinowski saw only darkness as she peered down toward the front entryway and could see shadowy outlines of presumed home invaders standing in her front hallway. That's what Bryan saw, too. There was gunfire and Bryan was fatally wounded.

His wife was standing just a few inches from him when he received a fatal wound to his head. A mere—we know—we don't know all the details of what happened at the front door because they covered up the Ring camera, and because they didn't wear body cameras in spite of a three-year-old policy initiated by the President of the United States that mandated that they wear body cameras when executing search warrants.

We do know this. We know 57 seconds elapsed from the time they covered up the lens of the camera to the time Mr. Malinowski was dead. So, something less than 57 seconds is the time it took them to knock, if they knocked, but we don't know if they knocked—forced entry on the front door and for Mr. Malinowski to emerge—to wake up, find a gun, and come from the bedroom.

30

That means they couldn't have been at the front door more than 20–30 seconds. Although, her husband had just been shot in the forehead right in front of her, the agents dragged Ms. Malinowski into the front yard. She was barefoot, wearing minimal night clothing and the temperature was 32 degrees.

They locked her in the back seat of a car where she was detained for four or five hours. She begged to be allowed to check on her husband, but they refused those requests and kept her locked in the car in her nightgown.

She also had not been to the restroom yet since she'd just gotten out of bed and they refused her request to go to the neighbor's and use the restroom and then, finally, took her to a nearby fire station, made her walk through in her nightclothes in front of the firemen and use the restroom with a female police officer present in the room while she went to the restroom.

Ms. Malinowski does not have the answers to many of her questions and there are a lot of questions. We give Federal law enforcement awesome powers. We have given—and when I was a United States attorney, I was responsible for the use of those powers.

It's a huge problem if those powers fall into the wrong hands. Everyone—I've been involved in public controversy for many years.

I've never been involved in anything that more Arkansans have come to me to express their concern and they all ask the same question, why, and I don't have an answer for that.

We don't have an answer to that question, and we hope this Committee will pursue this and find the answer why, and if there's not an answer we hope that you'll find the problem and fix it.

Thank you.

[The prepared statement of Mr. Cummins follows:]

31

**Proposed testimony of Bud Cummins**

**Select Committee on Weaponization of the Federal Government**

**May 22, 2024, 10:00 am, Rayburn 2141**

\*\*\*

My name is Bud Cummins. I am an attorney and a former United States Attorney.

Thank you for inviting me here today to tell you about Bryan Malinowski.

Until two months ago, Bryan Malinowski was the Executive Director of the Bill and Hillary Clinton National Airport in Little Rock. He was 53 years old. He and his wife celebrated their 25th anniversary last December and he had many good friends.

Bryan grew up in Pennsylvania with his brother and two sisters and attended a summer camp where he learned to shoot and safely handle firearms.

After he saw Top Gun, Bryan wanted to fly fighter jets, but he couldn't see well enough so instead he became a certified flight instructor and obtained a degree in airport management.

He then worked at different airports including a stop in El Paso, where he met his wife, Maer Malinowski. In 2019 Bryan became the Executive Director of the airport in Little Rock.

Bryan was an avid collector who pursued various hobbies and collections and read books about coins, old currencies, and card-playing strategies.

About four years ago, Bryan's father gave him his gun collection and it sparked a new interest in Bryan. At gun shows, he found other enthusiasts and collectors who shared his interests. On some weekends he would set up a table at a gun show to display his coin and gun collections.

It is legal to buy, trade, and sell guns without a Federal Firearms License if you are a collector or hobbyist.

At some point, ATF decided that Bryan Malinowski had crossed a murky line and he was no longer a hobbyist. Because of that, ATF concluded he was

32

required to purchase a $200 Federal Firearms License before he sold any more guns. I call it a "murky" line because there is no bright line test-it's subjective.

One thing seems certain. Bryan received no warning. His family, his friends, and his work colleagues would all guarantee you he loved his career and would have never knowingly jeopardized it over a weekend hobby.

ATF tailed Bryan in his car. They put a tracker on his car. And they obtained a warrant to search his home.

On March 19, at 6:01 am, over one hour before sunup, ten carloads of ATF agents and Little Rock PD officers came to the Malinowski home to execute their search warrant.

At 6:02:46 am ATF agents in full SWAT gear approached the front door. They had a piece of tape ready to cover the camera lens of the doorbell camera.

Next, Mrs. Malinowski heard only a loud crash as her front door caved in.

Her husband Bryan woke up to the sound of the crash; found a pistol, loaded a magazine, and left the bedroom to investigate.

Bryan warned his wife to stay behind in the bedroom, but Maer stubbornly followed him down the hallway.

ATF apparently killed electricity to the home. The front room was usually well-lit at night. But Maer saw only darkness as she peered down towards the front entryway. She could only see shadowy outlines of presumed home invaders standing in her front hallway. That's what Bryan saw too.

Bryan fired a few shots at the intruders' feet apparently to drive them back out the front door. ATF shot Bryan in the head. His wife was standing inches away from him.

A mere fifty-seven seconds elapsed from the time agents covered the doorbell camera until gunshots erupted and Bryan was fatally wounded (6:02:46 to 6:03:43).

Agents immediately dragged Mrs. Malinowski into the front yard. She was barefoot wearing minimal night clothing, and the temperature was 34 degrees. They locked her in the back seat of a car and detained her there for four or five

33

hours, refusing her many requests to check on her husband, get some clothes on, or even use the neighbor's bathroom.

Even though policies have been in place at both ATF and the Little Rock Police Department for the past three years <u>requiring</u> the use of body-worn cameras when executing any search warrant, DOJ now says no body cameras were used.

There are so many unanswered questions.

- Why wasn't Bryan Malinowski warned that he might be in violation of ATF's regulation?
- How did a perceived gun show violation rise to the level of justifying a search warrant application?
- What exigent circumstances justified the aggressive tactics of a pre-dawn search warrant execution using a SWAT team and forced entry?
- Did ATF consider other options to execute the search warrant?
- Did the officers attempt to knock on the door or somehow announce themselves as law enforcement officers?
- If they knocked and announced, how long did they wait before forcibly entering? Ten seconds? Twenty seconds?
- Why wasn't anyone on the scene using a body-worn camera?
- Did ATF instruct LRPD to take off their body cams?

We give federal law enforcement awesome powers in the name of law and order, but it's a huge problem if those powers fall into the wrong hands.

The shooting death of Bryan Malinowski is the result of an outrageous and unjustifiable abuse of power. His family, including those present today, his wife Maer, and his sisters Lee and Lynn, deserve to know why this happened.

In fact, for two months, Bryan's family along with people all over Arkansas have asked me one question: "Why?"

Right now, I don't have an answer to that question. I hope this committee will help find the answer or if there isn't an answer, I hope this committee will find the problem and fix it.

34

**Proposed testimony of Bud Cummins**

**Select Committee on Weaponization of the Federal Government**

**May 22, 2024, 10:00 am, Rayburn 2141**

★★★

My name is Bud Cummins. I am an attorney and a former United States Attorney.

Thank you for inviting me here today to tell you about Bryan Malinowski.

Until two months ago, Bryan Malinowski was the Executive Director of the Bill and Hillary Clinton National Airport in Little Rock. He was 53 years old. He and his wife celebrated their 25th anniversary last December and he had many good friends.

Bryan grew up in Pennsylvania with his brother and two sisters and attended a summer camp where he learned to shoot and safely handle firearms.

Bryan tried to enlist in the Air Force, but he couldn't see well enough so instead he became a certified flight instructor and obtained a business management degree.

He then entered the field of airport management. He worked at different airports including a stop in El Paso, where he met his wife, Maer Malinowski. In 2019 Bryan became the Executive Director of the airport in Little Rock.

Bryan was an avid collector who pursued various hobbies and collections and read books about coins, old currencies, and card-playing strategies.

About four years ago, Bryan's father gave him his gun collection and it sparked a new interest in Bryan. At gun shows, he found other enthusiasts and collectors who shared his interests. On some weekends he would set up a table at a gun show to display his coin and gun collections.

It is legal to buy, trade, and sell guns without a Federal Firearms License if you are a collector or hobbyist.

At some point, ATF decided that Bryan Malinowski had crossed a murky line, and he was no longer a hobbyist. Because of that, ATF concluded he was

1

35

required to purchase a $200 Federal Firearms License before he sold any more guns. I call it a "murky" line because there is no bright line test-it's entirely subjective.

One thing seems certain. Bryan received no warning. His family, his friends, and his work colleagues would all guarantee you he loved his career and would have never knowingly jeopardized it over a weekend hobby.

ATF tailed Bryan in his car. They put a tracker on his car. And they obtained a warrant to search his home:

On March 19, at 6:01 am, over one hour before sunup, ten carloads of ATF agents and Little Rock PD officers came to the Malinowski home to execute their search warrant.

At 6:02:46 am ATF agents in full SWAT gear approached the front door. They had a piece of tape ready to cover the camera lens of the doorbell camera.

Next, Mrs. Malinowski heard only a loud crash as her front door caved in.

Her husband Bryan rose to the sound of the crash, found a pistol, loaded a magazine, and left the bedroom to investigate.

Bryan warned his wife to stay behind in the bedroom, but Maer stubbornly followed him.

ATF apparently killed electricity to the home. The front room was usually well-lit at night. But Maer saw only darkness as she peered down towards the front entryway. She could only see shadowy outlines of presumed home invaders standing in her front hallway. That's what Bryan saw too.

Bryan fired a few shots at the intruders' feet evidently to drive them back out the front door. ATF shot Bryan in the head. His wife was standing inches away from him.

A mere fifty-seven seconds elapsed from the time agents covered the doorbell camera until gunshots erupted and Bryan was fatally wounded (6:02:46 to 6:03:43).

Agents immediately dragged Mrs. Malinowski into the front yard. She was barefoot wearing minimal night clothing, and the temperature was 32 degrees.

Proposed testimony of Bud Cummins

36

They locked her in the back seat of a car and detained her there for four or five hours, refusing her many requests to check on her husband or to get some clothes. She was subjected to an interview while in detention.

After her repeated requests to use a bathroom, instead of letting her walk into a neighbor's home to use the restroom, law enforcement officials finally transported Mrs. Malinowski to a fire station, forcing her to walk in front of several firefighters while barely dressed in her nightclothes. She was only allowed to use the toilet while in the presence of a female officer.

In addition to seeking information about her husband, Mrs. Malinowski had repeatedly inquired about the welfare of their two beloved dogs. She had been assured the dogs were fine. But on the way to the fire station, several blocks from her home, she spotted one of her dogs darting across the street. The officer detaining her allowed her to collect her pet.

During the entire time of her detention, none of the law enforcement officials on the scene endeavored to answer any of Mrs. Malinowski's questions about her husband's condition. In fact, they disingenuously told her she needed to go to the hospital to ask him for the gun-safe combination. They failed to tell her that a significant portion of her husband's brain matter was distributed over a broad area of the walls and ceiling of her home.

ATF did not permit Mrs. Malinowski to re-enter her home until some fourteen hours after the raid began.

Even though policies have been in place at both ATF and the Little Rock Police Department for the past three years requiring the use of body-worn cameras when executing any search warrant, DOJ says no body cameras were used on March 19.

There are so many unanswered questions.

- Why wasn't Bryan Malinowski warned that he might be in violation of ATF's regulation?
- How did a perceived gun show violation rise to the level of justifying a search warrant application?

3

37

- What exigent circumstances justified the aggressive tactics of a pre-dawn search warrant execution using a SWAT team and forced entry?
- Did ATF consider other options to execute the search warrant?
- Did the officers attempt to knock on the door or somehow announce themselves as law enforcement officers?
- If they knocked and announced, how long did they wait before forcibly entering? Ten seconds? Twenty seconds?
- Why wasn't anyone on the scene using a body-worn camera?
- Did ATF instruct LRPD to take off their body cams?

We give federal law enforcement awesome powers in the name of law and order, but it's a huge problem if those powers fall into the wrong hands.

The shooting death of Bryan Malinowski is the result of an outrageous and unjustifiable abuse of power. His family, including those present today, his wife Maer, and his sisters Lee and Lynn, deserve to know why this happened.

In fact, for two months, Bryan's family along with people all over Arkansas have asked me one question: "Why?"

Right now, I don't have an answer to that question. I hope this committee will help find the answer or if there isn't an answer, I hope this committee will find the problem- and fix it.

38

Chair JORDAN. Thank you, Mr. Cummins. That was well said, and so wrong.

The gentleman from—we will now proceed with five-minute questioning. The gentleman from North Dakota is recognized for five minutes.

Mr. ARMSTRONG. Early morning hours riot shields, probably a no-knock warrant but either way a full-on Tommy tactical assault on a residential dwelling.

Mr. Cummins, you said it in your opening statement, but where did Mr. Malinowski work?

Mr. CUMMINS. He was the Executive Director of the Little Rock Airport.

Mr. ARMSTRONG. Do you know if firearms are permitted at the Hillary Clinton National Airport?

Mr. CUMMINS. To my knowledge it's like every other airport. They do not allow you to carry firearms in the airport.

Mr. ARMSTRONG. To your knowledge, had Mr. Malinowski ever been accused of bringing firearms to work?

Mr. CUMMINS. Not to my knowledge. I'm not aware of him being accused of any misconduct at his job.

Mr. ARMSTRONG. Would it stand to reason that if Mr. Malinowski had been driving into work or driving home from work, he would not have brought a gun with him, given that it's a gun-free zone?

Mr. CUMMINS. I think that's a fair assumption.

Mr. ARMSTRONG. Do you think that in the process of executing their search warrant they would have—the FBI or the ATF would have been able to get a copy of Mr. Malinowski's work schedule?

Mr. CUMMINS. I think his work schedule was well known to the ATF.

Mr. ARMSTRONG. I want to be, clear, because we're talking ATF and because we're talking firearms, and we're doing all these things and this is basically a licensing dispute.

Mr. CUMMINS. Yes, sir, and it's an alleged violation that the definition is subjective, and it's been actually litigated quite a bit here recently, and it's become apparent that it's almost—every person in this room could read it and come up with a different interpretation.

Mr. ARMSTRONG. Mr. Graham, during your tenure at the ATF were you ever involved in planning and execution of search warrants?

Mr. GRAHAM. Congressman, I have not.

Mr. ARMSTRONG. Mr. Cummins, as your time as a U.S. Attorney did you have a chance to review search warrants?

Mr. CUMMINS. Yes, sir.

Mr. ARMSTRONG. When do you use no-knock warrants? Let me stop. What's the most dangerous kind of warrant to execute?

Mr. CUMMINS. A no-knock warrant. When you kick the door in and wake people up out of their beds when they may have a gun nearby.

Mr. ARMSTRONG. When's the worst time to execute that?

Mr. CUMMINS. Probably at 6 a.m.

Mr. ARMSTRONG. If you're in charge as a U.S. attorney or ATF supervisor or any of those things, what's your number one concern when determining whether or not to execute a no-knock warrant?

Mr. CUMMINS. Safety of the officer and safety of the public.

Mr. ARMSTRONG. Was there anything—you talked earlier about tracking devices and can you go through a little bit of this of what they were doing prior to the night the warrant was issued?

Mr. CUMMINS. They had followed Mr. Malinowski around town and surveilled him on numerous occasions. They ran agents in to do undercover buys at gun shows. They had taken pictures of him at the gun show.

It's breathtaking the amount of resources for an agency that claims budgetary constraints that they put this many resources on a gun show case.

Mr. ARMSTRONG. I can think of 500 different ways in which this warrant could have been executed to protect the law enforcement officer and protect the victim in this case. I don't know what else you'd call them.

What is the stated reason for executing the no-knock warrant?

Mr. CUMMINS. I think in case law you would look for exigent circumstances. They might be at risk of escape. They might be the destruction of evidence. They might be a danger to some other party that's in the house.

Of all the exigent circumstances I'm aware of that have ever been discussed in any case none of them existed here and that was well known.

Mr. ARMSTRONG. Likelihood of the evidence being—I mean, surveillance—

Mr. CUMMINS. You can flush drugs.

Mr. ARMSTRONG. Yes, all the difference—used a lot—utilized a lot in drug cases. They know somebody had delivered it at midnight. They know it's getting farmed out the next day. So, with all this information and all the things you know about the case, have they stated any exigent circumstance for utilizing the known or utilizing this type of enforcement of the warrant?

Mr. CUMMINS. To my knowledge, DOJ has released the affidavit that supported the search warrant and has called me and Senator Tom Cotton to tell us that there were no body cameras used that day and that's the only statement they've made about this case.

Mr. ARMSTRONG. We need to just take a step back here and recognize if this was anything else other than ATF and firearms people would be apoplectic about how this warrant was set up but because it involves something that has a political reason—but there's a person dead.

Somebody is dead because the ATF decided to execute a warrant in the most unprofessional, irresponsible, and dangerous way and I think that oftentimes law enforcement have a very difficult job. The number one concern is the safety of the officer.

The reality of this was executed for reasons that make no procedural sense. They make no safety sense, and somebody is dead because they decided they wanted to go into a house at 1 a.m., of a known gun owner for the purpose of making—I can't think of anything else—other than a political statement.

Thank you for representing the family. Thank you for being here today. The ATF has a history of doing these things with warrants and it has to stop.

With that, I yield back.

Mr. GOLDMAN. Mr. Chair, I have a unanimous consent motion.

40

Chair JORDAN. The gentleman is recognized.

The gentleman yields back. The gentleman is recognized.

Mr. GOLDMAN. I'd like to introduce the search warrant affidavit and search warrant, which is not a no-knock warrant.

Mr. ARMSTRONG. Was it still at 1 a.m., with—

Mr. GOLDMAN. I don't know how many people in—6 a.m., in Tommy tactical gear.

Chair JORDAN. Without objection. The Chair now recognizes the gentlelady from Florida.

Ms. WASSERMAN SCHULTZ. Thank you, Mr. Chair.

I'm repulsed to hear my colleagues' calls to destroy the one agency that actually provides for firearm safety. I vividly recall the tragic events that unfolded on February 14, 2018, at Marjory Stoneman Douglas High School in Parkland, Florida, in my home county.

That day our Nation witnessed one of the deadliest school shootings in American history where 17 innocent lives were brutally taken and countless others irrevocably changed. The horror of it still resonates across our community.

In case my Republican colleagues forgot, these victims were students and educators with dreams and aspirations snuffed out by an AR–15, which is a battlefield rifle.

One was Alyssa Alhadeff, a 14-year-old soccer star, another Scott Beigel, a teacher who died protecting his students. My colleagues will and are citing what they claim are injustices today, but none of them will mention Scott or Alyssa's name, nor will they mention the tens of thousands of others just like them who are shot and die from firearms each year.

My colleagues also won't share how Stoneman Douglas students huddled in classes or sent tearful desperate texts to loved ones while every school parent was knotted in panic awaiting news about whether their child was alive or dead that day.

My colleagues are not here to talk about those real-life but grim gun realities. They want to bury those realities and ignore the fact that the U.S. gun homicide rate is 26 times that of other high-income countries.

Instead, they brought us here to do the bidding of the gun lobby and for that they should be ashamed of themselves.

Ms. Sampson, I want us to clear up the ridiculous assertion that gun dealers' licenses are revoked over minor clerical errors or typos.

Isn't it true that clerical errors can often be serious problems that cause guns to fall into a criminal's hands and that a typo could be an attempt to falsify business records?

Ms. SAMPSON. That is true, and as you noted, when discussing the zero-tolerance policy there are five enumerated actions that will qualify and it would be something like falsifying a record which you cannot do accidentally. You can't by a typo falsify a record. It has to be a willful and deliberate violation.

Ms. WASSERMAN SCHULTZ. Like, for example, it could include not running a background check on a purchaser when legally required to or include selling that firearm to a violent felon, correct?

Ms. SAMPSON. Correct.

41

Ms. WASSERMAN SCHULTZ. It's fair to say then that clerical errors includes very dangerous situations where firearm dealers shirk their duties and sell guns to criminals?

Ms. SAMPSON. That's not only true, but they're not clerical errors when you look at what they actually are. These are deliberate and willful wrongdoings.

Ms. WASSERMAN SCHULTZ. One such group of criminals that I'm concerned about getting their hands on guns are domestic abusers. Every month an average of 70 women are shot and killed by an intimate partner. That's more than two per day in the United States.

Yet, today we sit here so gun lobby lackeys can try to block background checks that would prevent these abusers from getting guns in the first place. We're here so Republicans can protect gun traffickers who skirt the rules and let guns fall into criminal hands.

To pretend that noncompliant dealers are the victims when we are losing thousands of our mothers, sisters, and daughters to abusers who get their hands on guns sure seems like that's why we're really here.

Ms. Sampson, how much more is an abused woman likely to die if her male abuser has a gun?

Ms. SAMPSON. The exact statistic just left my mind, but I believe it's four times that—

Ms. WASSERMAN SCHULTZ. I think it's five times.

Ms. SAMPSON. Five times more likely.

Ms. WASSERMAN SCHULTZ. Why is that?

Ms. SAMPSON. It's because having a firearm in that situation makes it more likely for it to escalate quickly, and contrary to some of the statements around it being an equalizer for women, even if a woman has a firearm she can quickly be disarmed, and that gun can be turned against her.

Ms. WASSERMAN SCHULTZ. Right. Yet, I've heard my Republican colleagues say that the solution to this is for women to have guns, too. Tell me, Ms. Sampson, does a woman having a gun in the home make her safer against an intimate partner?

Ms. SAMPSON. Absolutely not.

Ms. WASSERMAN SCHULTZ. In general, isn't it true that adding more guns to a violent situation actually increases fatality rates?

Ms. SAMPSON. That's correct.

Ms. WASSERMAN SCHULTZ. Before I yield back, I want to make it clear that we have far too many loopholes in our system. For example, my Jamie's Law legislation named for Fred Guttenberg's daughter who was murdered at Parkland would prohibit anyone from purchasing ammunition who is already barred from buying a gun.

It's a common-sense layer of protection but Federal law doesn't require a background check to prevent prohibited purchasers from acquiring ammunition. Jamie's Law closes this ammo loophole.

Why do we need it? Nearly 40,000 people die from guns in the U.S. every year. That's four people every hour whose dreams are snatched away by a gun and a bullet, each one leaving a trail of sorrow and pain for friends and family to navigate over an entire lifetime.

Now, it's only elected Republicans that are chained to the gun lobby and Republicans are really good at saying that we don't need

more laws—we just need to enforce the ones that are already on the books.

Well, it's already illegal for prohibited purchasers to purchase ammunition, but we don't enforce it. So, I think that all my colleagues I would expect would join me in co-sponsoring Jamie's Law, bringing it to the floor immediately so that we can actually enforce a law already on the books instead of adding a new one.

Thank you. Practice what you preach. I yield back the balance of my time.

Chair JORDAN. The gentlelady yields back.

Mr. Cummins, what was Bryan Malinowski's principal livelihood?

Mr. CUMMINS. He was the highest paid city employee in the city of Little Rock as the Executive Director of the Little Rock Airport, and it's a matter of public record I think he made about $260,000 a year.

Chair JORDAN. So, it wasn't selling guns?

Mr. CUMMINS. No, sir. This was collecting guns was a hobby.

Chair JORDAN. The law at the time says if your principal livelihood is not in selling firearms you do not need an FFL. Is that accurate?

Mr. CUMMINS. That's my understanding to the best you can have an understanding.

Chair JORDAN. So, what was the crime? What did he do wrong?

Mr. CUMMINS. You'd have to ask ATF. They decided that he committed—maybe had committed a crime even though—

Chair JORDAN. Now, the standard has changed but the new rule didn't take effect until this past Monday. Is that right?

Mr. CUMMINS. That's correct.

Chair JORDAN. Even under the new standard there was a question of whether he was in violation of the law. Is that accurate?

Mr. CUMMINS. A huge question.

Chair JORDAN. Huge question. Under the old standard it was pretty simple—is your principal livelihood selling firearms.

Mr. CUMMINS. That's correct.

Chair JORDAN. For Bryan Malinowski it wasn't?

Mr. CUMMINS. Obviously not.

Chair JORDAN. It wasn't, and yet at 6:02, March 19th, 10 cars pull up to his home and to the gentlelady behind your's home, come up to the door in tactical gear and put a tape across the doorbell camera, so no one can see what's going to go on.

Mr. CUMMINS. Correct.

Chair JORDAN. Now, that's scary to me.

Mr. CUMMINS. Probably scary to everyone.

Chair JORDAN. Now, if the guy had done—if he had for sure done something wrong, a crime, OK. They do that and then 57 seconds later gunshots erupt and Bryan Malinowski is no longer with us, a good man by your—you knew the guy. Served your community. Highest paid city official in Little Rock. What the heck do you think's going on here?

Mr. CUMMINS. That's the question on the lips of every person in Arkansas that's contacted me and that's a large number of people.

Chair JORDAN. Isn't it true that a week before these same agents were there in the Wal-Mart parking lot close by the Malinowski

43

home, going to go execute the search warrant and then decided not to because Bryan Malinowski wasn't home? Why was this so critical that he'd be home?

Mr. CUMMINS. I don't know, Mr. Chair. It was a search warrant. In fact, they could have waited until nobody was home and come—they wanted to kick the door down. They could have come at noon and kicked the door down, when Maer and Bryan were both gone.

Chair JORDAN. Searched and found whatever they were looking for.

Mr. CUMMINS. Exactly.

Chair JORDAN. Anything they wanted on Mr. Malinowski—if they wanted his phone or anything they could have served that warrant. They could have got a warrant for that. I'm sure the judge would have given it to them, and they could have done that at the airport—at his principal livelihood at the airport, correct?

Mr. CUMMINS. Correct.

Chair JORDAN. Then, to add insult to injury—this is the part that just—I know infuriates Mr. Hill as your Member of Congress and I would bet any American—to add insult to injury, the way they treated his spouse, Ms. Malinowski, sitting behind you, the way they treated her at a moment that may be the most high-anxiety moment in any individual's life. Their spouse has just been shot. That to me is unbelievable what she had to go through.

Mr. CUMMINS. It makes me very angry.

Chair JORDAN. Well, it should. It should make all of us angry. I think it makes the Democrats—there's no—there's no explanation for that. That to me—and if you—and I keep coming back to was this done for some kind of—we have seen this from other agencies, frankly—intimidation.

We had the FBI—Mr. Houck, come in, arrest him in front of his wife and children. Same thing. Predawn raid, seven kids there, and take him away. When his attorney said, we'll be happy to work with you, you would have been happy to work with these guys if they had contacted you or any—

Mr. CUMMINS. Absolutely.

Chair JORDAN. That's the part that gets us. That's the part that—what was his principal livelihood? It was not selling firearms. I can't figure out what the crime is.

By the way, any of the guns—any of the firearms that Mr. Malinowski sold as part of his hobby—excuse me—any of them ever be used—were any of them ever used in a crime?

Mr. CUMMINS. The affidavit alleges that they were—they were found in crimes, but the crimes were three traffic stops where there was marijuana and a firearm in the car. So, that was a crime. Two other ones but they were never fired in the commission of a crime.

Chair JORDAN. The guns themselves were never used in a crime.

Mr. CUMMINS. They were never used in the commission of a crime according to the affidavit.

Chair JORDAN. Yes. You asked it in your testimony. You said the right thing. Why? Why did they do it? Why did this happen? That's what we're going to try to find out and tomorrow Mr. Dettelbach will be sitting right where you guys are sitting, and we're going to ask him questions about this.

44

He's probably going to say ongoing investigation, but we're going to push him as hard as we can. We're trying to figure out why they would behave in this way and why they didn't wear body cams.

It's almost like, what are they trying to hide? Cover up the doorbell and no body cams. What are they trying to hide? We'll get to those questions tomorrow. I see my time has expired.

I will now recognize the gentleman from Massachusetts, Mr. Lynch.

Mr. LYNCH. Thank you, Mr. Chair.

So, as a Member of the House Oversight Committee, I strongly supported the independent investigations years ago of operations conducted by the ATF and that included Operation Fast and Furious and Operation Wide Receiver by the Department of Justice.

I also believe that under the circumstances surrounding the death of Mr. Malinowski, we should also institute a full and independent review.

However, like Ms. Sampson, I do not agree with the ad hominem attacks on our ATF agents and law enforcement personnel. I was here in 2002, when President George Bush—George W. Bush, excuse me—reestablished the ATF within the Department of Justice and he did that for all the right reasons, I believe.

We had a mission to protect communities from violent criminals, criminal organizations, and also we needed to get at the problem of the illegal use and trafficking of firearms.

To this end the ATF regularly, to my experience, works with local and State law enforcement agencies nationwide to reduce gun violence, a national crisis that's affected each of our communities.

In my own district which includes part of the city of Boston the ATF Boston field division recently partnered with the Boston Police Department, the Suffolk County Sheriff's Office, the Suffolk County District Attorney's Office, and the U.S. Attorney's Office on a new initiative to combat the flow of illegal guns and the incidence of violent crimes using those guns.

In particular, the Boston Firearm Intelligence Review Shooting and Trafficking program or the Boston First program was developed to deploy State of the art ShotSpotter technology or tracking tech—ballistics tracking technology is another term—to assist a law enforcement agency in reviewing shooting incidents and firearms trace data to take illegal guns and violent criminals off the street and also to respond more quickly to those incidents of gun violence.

The ATF Boston field division also participates in several critical multi-agency task forces within our State and our city. A perfect example of what that collaboration can do is we had a shootout at my local park.

So, I grew up in the housing projects. We have a park across the street. We have got—it's heavily, heavily used, the second most heavily used park in the city, and we had a shootout between two rival gangs and it was during a couple of lacrosse games—a lacrosse tournament and a basketball tournament—and it ended up in a situation where moms and dads had to lay on top of the bodies of their kids to prevent them from being shot.

45

There were only 60 shots fired. It only lasted a couple of minutes but that couple of minutes felt like a couple of hours to those parents trying to protect their kids.

So, we were able to with the help of the ATF and Boston police, the FBI, the DEA, who I asked to get involved as well, and also police departments from Boston, the city of Brockton, Quincy, Stoughton, to begin to attack that problem and bring in some of that technology to reduce the likelihood of that happening again.

I'm very thankful. I'm thankful for my ATF agents and law enforcement personnel for the job that they do. It's not easy.

Ms. Sampson, if you could talk a little bit about last week we had—you wouldn't believe it, but we had law enforcement officers' National Police Week where we show appreciation.

Now, we're going after them. Could you further discuss the extent to which ATF supports local law enforcement in preventing gun violence and gun trafficking?

Ms. SAMPSON. Thank you.

There are a variety of forms that this takes. First, we have to think about the context that were, in which, is epidemic gun violence.

So, we have over 44,000 people killed each year and that doesn't account for all the shootings that happen where people are injured or where there's just shots fired.

So, local law enforcement agencies are trying to respond in that environment and ATF is the only Federal agency that can help them understand, first, where are the guns coming from. They can't figure that out without ATF.

So, every time a gun incident happens ATF is the one who tells them where the gun came from, can help them identify suspects, and follow those leads along.

ATF also helps law enforcement understand firearms technology so that they can better understand what's going on in their communities, and then in terms of preventing gun violence in the first place because gun violence is the number one cause of death for police officers ATF's work around regulating the industry and preventing guns from being trafficked into communities stops gun violence before it starts, which is a huge help to local law enforcement.

Mr. ISSA. [Presiding.] I thank the gentlelady. I'm sorry—

Mr. LYNCH. Mr. Chair, just so you know, the previous witness had, like, eight minutes and so, you could extend the courtesy—

Mr. ISSA. I would ask unanimous consent the gentlelady have an additional minute. I was not trying to short—I gave her an extra 55 seconds.

Mr. LYNCH. I don't think you were here. I don't think you were here, Mr. Chair. Thank you.

Mr. ISSA. If you could wrap up in one minute, please.

Ms. SAMPSON. Sorry. Yes. So, to just put a finer point on it, local law enforcement agencies could not do their work without ATF.

Mr. LYNCH. Thank you for your courtesy, Mr. Chair. I yield.

Mr. ISSA. I might recall the time the gentleman and I were in the outback of Pakistan and the gentleman was hurt in a sniper fire. So, we go back a long way on gun safety.

46

The gentleman is correct that we do need the Alcohol, Tobacco, and Fire. We definitely do need ATF.

Mr. Graham, thank you for your decades of service. You, obviously, stayed there because of your dedication to the very mission that we're talking about today of making sure that guns are not in the hands of people who are not entitled to have them or may misuse them. Is that correct?

Mr. GRAHAM. That's correct, Chair.

Mr. ISSA. So, in that dedication in 37 years you've seen some zigs and zags. Can you talk about what you've seen or saw that might have changed in the last few years that concerns you?

Mr. GRAHAM. Certainly. From a field investigator perspective all the way through the first and second level of supervision I've personally conducted field inspections to where errors were disclosed on an 4473. That is the transaction record that individuals buy—complete when they buy firearms through a Federal firearms licensee.

What concerns me is with the zero-tolerance policy ATF has had a long-standing administrative action policy that did address licensees' level of compliance or the level of violations in compliance with the code of Federal regulation and through the inspections they were given an opportunity. Those violations that weren't directly linked to public safety; those were corrected.

Mr. ISSA. So, let me just interrupt you briefly. So, what you're saying is that in the past your job was to get maximum compliance knowing that mistakes are made, but that changed in 2021, didn't it?

Mr. GRAHAM. Most certainly. It put a lot of focus where there was minimal latitude allowed with the zero-tolerance policy. However, there was the exception of presenting extraordinary circumstances. However, those were to be discussed during a held hearing at the various division levels.

Mr. ISSA. Is that necessary? In other words, prior to 2021 do you believe that compliance with a clear threat of both the cost that comes with going to court and the possibility of losing that valuable license was sufficient to get a vast majority of people to make every effort to comply?

Mr. GRAHAM. Providing that the violations, Chair, did not have a direct nexus to criminal activity the FFLs were provided an opportunity to remediate.

Basically, it's the investigator's job to ensure that the records that are executed are fully compliant simply because it's those records that criminal enforcement uses to trace a firearm to the last known legal possessor, and if those records are inaccurate, it could, perhaps, affect how a warrant is served, who the individual is that may be, perhaps, looked at.

So, prior to 2021 there were opportunities using the administrative action program to address violations that were found at a Federal firearms licensee given the previous inspection history considered in the entire process.

Mr. ISSA. Let me just give a couple of quick questions and you may be not the only one that wants to answer it. Certainly, during the Obama Administration Operation Fast and Furious went

counter to everything you normally did, allowing more than 2,000 weapons to end up in the cartels' hands.

That was a deviation from any sensible thing that you saw during most of your 37 years. That was, quite frankly, not what happened during the next four years after President Obama.

The question is should your agency be able to operate substantially the same without regard to who happens to be in the White House and should your mission be more consistent and, in fact, looking at what happened with Fast and Furious, what happened in the Obama Administration as an attack on guns and particularly on their ability to collect money, which was a separate program, versus the four-years of President Trump and the eight years of President Bush before that, and now President Obama—President Biden.

Do you see kind of a back and forth that reeks in general of politics rather than your being able to do your job in a consistent way? You can comment on any of these Administrations you feel appropriate.

Mr. GRAHAM. Quite frankly, Chair, I have no comment to make on Fast and Furious. That was a criminal enforcement endeavor.

As far as their regulatory perspective is concerned, you have both ATF agents and industry operation investigators that are dedicated to upholding the United States Code, as well as a Code of Federal Regulations.

When there are changes it not only affects how the investigators deploy their onsite inspections—compliance inspections—of a Federal firearms licensee but on the industry member themselves.

There is a lot of back and forth, there's a lot of confusion, and going back to the zero-tolerance policy did create confusion as to last year or a few years prior, I may have been inspected.

However, I wasn't cited for whatever that Code of Federal Regulations citation was. However, this year during the current inspection because of this new directive they are being pursued for revocation.

Mr. ISSA. OK. I want just a yes or no from anyone—hopefully, everyone very quickly. In what happened that the Chair was talking about a few minutes ago should this Committee seek to mandate body cams anytime potential lethal force is being used in any ATF operation? Yes or no.

Mr. CLECKNER. Yes.

Mr. GRAHAM. Yes.

Ms. SAMPSON. Yes.

Mr. CUMMINS. Yes.

Mr. ISSA. Thank you. That was a yes, ma'am?

Ms. SAMPSON. Yes.

Mr. ISSA. I got four yeses. I'll take it. We now go to the gentleman from Virginia, Mr. Connolly.

That is hard to get but I will take yes for an answer. Mr. Connolly?

Mr. CONNOLLY. I say yes too, Mr. Chair.

Mr. Cummins, I just want to clarify something in your testimony. You heard my colleague from New York entered into the record the actual warrant which was not a no-knock warrant.

48

Is it still your testimony that what occurred—the tragedy that occurred with Mr. Malinowski and his family was a no-knock warrant?

Mr. CUMMINS. Because body cameras weren't worn, and the doorbell camera was covered up we don't know what happened at the front door.

I would say based on what we do know that 57 seconds I described minus the time to allow for Mr. Malinowski to respond to the crash in the door and whatever time it took them to knock on the door, if they knocked after they covered up the door—we know that it was 20 or 30 seconds, and my answer is there's a distinction without a difference. All you hear is a crash.

Mr. CONNOLLY. All right. For the record—

Mr. CUMMINS. What do you know?

Mr. CONNOLLY. For the record, you're a lawyer.

Mr. CUMMINS. Yes.

Mr. CONNOLLY. The warrant filed was not a no-knock warrant.

Mr. CUMMINS. Not on its face. No, sir.

Mr. CONNOLLY. That's right. Thank you. Just wanted to clarify that.

Ms. Sampson, Mr. Cummins described really a horror that should not occur to any American citizen or American resident. Is there, however, distinctions in the solution?

The solution before us today is abolish the agency because they engaged in behavior that was brutal or violent or beyond acceptable norms. Do you believe that's the solution?

Ms. SAMPSON. Absolutely not.

Mr. CONNOLLY. So, the very same people who condemned those who called for that solution with the Minneapolis Police Department after the George Floyd tragedy have a different solution today for ATF.

For some reason this particular police force ought to be abolished and no other, even if they also engage in violent behavior, brutal brutality, and violation of the law. Do you note the irony?

Ms. SAMPSON. I do, and with respect to the ongoing investigation that's not what my area of expertise is. We, of course, believe in accountability because we live in a democracy. So, there should be accountability and investigation.

Mr. CONNOLLY. Right. The solution isn't to abolish the agency.

Ms. SAMPSON. Exactly.

Mr. CONNOLLY. In fact, the agency has some very important missions, as Chair Issa just indicated. He said, "no, we need ATF." I agree with him. Reform it? Yes. Abolish it? Very different kind of answer.

What would happen if we abolished the ATF? What kinds of consequences might flow from that?

Ms. SAMPSON. There will be consequences for all Americans. First and foremost, we would lose the only Federal agency responsible for making sure that firearms are not trafficked into our streets.

Mr. CONNOLLY. Ah, maybe that's why some people don't like the ATF, that particular charge—that they don't want regulation of arms of any kind, and they don't like the Federal agency that has

49

that mission, which may be why for so many years they have blocked the confirmation of an ATF director.

Ms. SAMPSON. That could be. All I know is that ATF is the only Federal agency that we had and we're dealing with epidemic gun violence.

Mr. CONNOLLY. Well, let's look at that. So, if we abolish it would that make it easier for criminal cartels to traffic firearms in this country?

Ms. SAMPSON. Yes.

Mr. CONNOLLY. If we abolish it would that, in fact, strengthen Mexican cartels engaged in human trafficking, drug trafficking, and arms trafficking?

Ms. SAMPSON. Yes.

Mr. CONNOLLY. Would we expect more assault weapons to be funneled to the Black market if some of my colleagues succeeded in abolishing the ATF?

Ms. SAMPSON. Yes.

Mr. CONNOLLY. Could it affect violent crime in the United States?

Ms. SAMPSON. Absolutely.

Mr. CONNOLLY. How so?

Ms. SAMPSON. Well, ATF right now, as I said, they are responsible for regulating the industry and so we know that most—almost every gun starts out in the legal market, and it's funneled from the legal market, which are FFLs who are regulated by ATF, into the illegal market.

So, if ATF is no longer there then that channel, which is already larger than it should be, would overwhelmingly increase and we would have more guns and more gun violence.

Mr. CONNOLLY. So, if we abolish ATF as the Chair of the Select Committee, not Mr. Issa, want to do and that is supported by an agency that gave him an A+ rating in Gun Owners of America that actually sells merchandise calling for abolish the ATF—if we did that it's your testimony—I don't want to put words in your mouth—that it would actually make Americans less safe and would remove the only Federal agency charged with trying to protect them from firearm violence and trafficking in America?

Ms. SAMPSON. Yes, that is true.

Mr. CONNOLLY. Thank you. I yield back.

Mr. ISSA. I thank the gentleman.

We now go to the gentleman from Florida, Mr. Gaetz, for five minutes.

Mr. GAETZ. Mr. Cleckner, what is the ATF's zero tolerance policy?

Mr. CLECKNER. It is a change in how they used to enforce violations of the law against FFLs to no longer allow them to fix errors or to improve their compliance. It has no tolerance for these typos and wants to revoke their licenses.

Mr. GAETZ. Give me a flavor of the type of errors that might have previously resulted in the ATF working with a license holder and now would result in the agency trying to revoke that license.

Mr. CLECKNER. I'd love to give you the examples that fly in the face of what the zero-tolerance policy says it is, which is prohibited persons and background checks and things like that.

50

The problem is my client did none of those things that are even stated in the zero-tolerance policy and they're still falling subject to getting revoked. We can talk about a typo, or an abbreviation of somebody's name when they shouldn't have done that.

We can talk about accidentally listing United States as the country instead of paying attention to the box saying county. Things like that.

Mr. GAETZ. Ms. Sampson gave testimony that these are essential—that these are necessary regulations to enforce at the finest point. Do you have a response to that testimony?

Mr. CLECKNER. Some are essential, I agree—the background check requirements, the identification requirements, and making sure we know who the purchaser is, that they're not a prohibited person.

That's not what this exact case I'm dealing with has to do with at all. There are no prohibited persons involved here. There were no missing background checks. There was no missing anything that would actually affect public safety.

Mr. GAETZ. In the case I'm aware of in my district, the error wasn't even made by the license holder. The error was made by the Florida Department of Law Enforcement because they were charged with a certain feature of the background check.

So, if a license holder has to rely on a State entity to do some portion of the check and they make an error that certainly shouldn't result in the license holder experiencing a revocation action, should it?

Mr. CLECKNER. We agree it should not.

Mr. GAETZ. Yet, that's the circumstance and I'm wondering just how you hear that testimony, Mr. Cummins, as you deal with representing a family that's dealt with such loss at the hands of such a grave error. Does the hypocrisy not ring pretty loud?

Mr. CUMMINS. I've been on all sides of this. I've been a United States Attorney. I've prosecuted more gun crimes than probably many prosecutors in the country. It was the number one priority in the Bush Administration to prosecute gun crime. Not administrative gun crime, real gun crime.

People that are out committing crimes with guns, and we prosecuted a whole bunch of them. I've also been a defense attorney and I've been with families and people that are in prison.

I've been to prisons and met with people. Anybody that thinks that the guns that are being sold in private sales are driving the level of crime we're seeing in our community, on the list of things that are driving the level of crime we see in our community private gun sales is way down at the bottom and there's a great number of other things that aren't being discussed here at all that have to be driving it more than—

Mr. GAETZ. I want you to be able to respond specifically to Ms. Sampson's testimony that guns make their way from the legal marketplace to the illegal marketplace, because it seems to me hearing that testimony that then you wouldn't attack the people who are trying to legally engage in the legal transfer of firearms, right?

You would go after the people engaging in illegal conduct. What's your reaction to that testimony?

51

Mr. CUMMINS. I agree with that. I think gun crimes are committed by people, not guns, and we need to focus on the people that are committing the crimes, and we need to be asking ourselves, why is this person a criminal—what's their background.

I know the answers to a lot of those questions because I've been living it for 35 years. It doesn't really have much to do with where they acquired the firearm.

Mr. GAETZ. Everything we know about the law for someone to be a criminal they have to have the intent to commit a crime. That's the mens rea, right?

Mr. CUMMINS. Correct.

Mr. GAETZ. Do you worry as you look at some of the ways in which these laws are being weaponized against people that we're getting away from someone actually wanting to commit a crime and, indeed, people are experiencing this really, really harsh regulatory action when they want to be legally compliant?

Mr. CUMMINS. I would suggest that the tactics that were used in the Malinowski search would be incompetent and reckless if it was a very serious crime. It's even much more offensive because this is not a serious crime that they suspected. It's probably the lowest level crime that would ever be drug into a United States Attorney's office.

Mr. GAETZ. So why did this happen? Is this just to send a message? Is this someone's incompetence? Do you wonder about that?

Mr. CUMMINS. I wonder about it, and that's probably a question for this Committee to answer, not me. I'm certainly concerned about it, and it makes this tragedy even harder to take to think that it might be politically motivated or for some other reason.

Mr. GAETZ. Thank you. I see I'm out of time. I yield back.

Mr. STEUBE. [Presiding.] The gentleman's time has expired. I now recognize Ms. Plaskett for five minutes.

Ms. PLASKETT. Thank you very much.

First, I want to say it's very interesting that we keep talking about the fact that there were no body cams on the ATF officers that were there to execute that warrant.

What's very interesting—and I'd like to admit and submit into the record a letter that's been sent from ATF to Mr. Jim Jordan dated May 21, 2024, from the Bureau of Alcohol, Tobacco, and Firearms and Explosives.

Mr. STEUBE. Without objection.

Ms. PLASKETT. Thank you. In that letter, it reminds this Congress that in 2021, the department directed its law enforcement components including ATF to develop plans for a phased implementation of body worn cameras.

The very thing that they're trying to do, which is to eliminate the ATF, is the reason that they don't have body cams, because they didn't give them the funding for it. Congress has specifically stated in its appropriations that they don't want to fund ATF.

They don't want to give them the money to be able to operate. They don't want to give Mr. Cleckner's clients sufficient ATF officers to be able to quickly do the kind of paperwork that they need.

That's why they're taking so long. They don't want to give them the funding to be able to have body cams and so ATF has only a third of its individuals who are wearing body cams, and I have spe-

52

cifically requested from Congress the funding so that everyone can wear those body cams and my colleagues have denied that.

They're the ones who have said they don't need that money. Let's get rid of ATF. They have legislation to abolish the ATF, the Elimination of the ATF Act—Abolish the ATF Act and eliminate this woke, weaponized agency—everything's woke when you don't like it—eliminate it and that way these are the reasons.

So, they want to have it both ways. They want to say that they don't have body cams and that's the reason they're—we feel sorry for people who haven't had the body cams.

They're the reason they don't have them. Point it right back at yourself why those body cams weren't on them and see if that continues to work for you.

We're also talking about another thing that was discussed, which I found very interesting was that individuals who are doing this as hobbies.

One of the reasons that we changed the rule to the engaged in business rule is because an individual who can have as his primary income a large income can then sell a lot of firearms and not be considered a firearms dealer because their primary income is more than the firearms income that they're doing, even if it's voluminous the amount of firearm sales that they're making if their primary income level is higher.

So, a couple years ago in 2022 President Biden signed the bipartisan Safer Communities Act which has as one of its rules, a rule with regard to no longer can an individual hide the fact that they are by all accounts, by a common law person's account, an actual firearms dealer and not a hobbyist.

One of the ways I would look at determining if, in fact, a person is a hobbyist as opposed to a firearms dealer is—Ms. Sampson, in your opinion is someone who buys and then almost immediately resells at least 150 firearms in a three-year period a hobbyist or an unlicensed gun dealer?

Ms. SAMPSON. If that is what a person was doing then they would be more likely to be an unlicensed gun dealer.

Ms. PLASKETT. Is it concerning to you if someone sells 150 firearms and conducts no background check on the individuals who are purchasing those firearms?

Ms. SAMPSON. Yes, because ATF data shows that those unlicensed and unbackground-checked sales usually end up going to prohibited purchasers.

Ms. PLASKETT. I'd like to submit for the record the actual search warrant—the unsealed application for a search warrant and the affidavit and other information therein which on page 28 states that as of February 27, 2024, approximately six firearms are known to have been recovered in the commission of crimes. Those are related to the firearms that Mr. Malinowski purchased and then sold.

Mr. CUMMINS. Mr. Chair, could I—

Ms. PLASKETT. No, I'm speaking. It's my time.

Mr. CUMMINS. OK. I'm sorry.

Ms. PLASKETT. OK. Thank you. Then, in your opinion, Ms. Sampson, would ATF be justified in being concerned when someone sells a firearm to an individual who has been convicted of robbery and is prohibited from owning a gun?

53

Ms. SAMPSON. Yes, because selling to a prohibited purchaser is a violation of the law.

Ms. PLASKETT. In your opinion, would ATF be justified in being concerned—

Chair JORDAN. [Presiding.] The time of the gentlelady—the time of the gentlelady—

Ms. PLASKETT. —when selling a firearm that lands in the hands of a 15-year-old member of the Norteno criminal street gang?

Ms. SAMPSON. Yes.

Ms. PLASKETT. Thank you. I yield back.

Chair JORDAN. The gentlelady yields back.

Mr. Cummins, I think Mr. Steube will give you a chance to respond.

Mr. STEUBE. Mr. Cummins, did you want to respond to that?

Mr. CUMMINS. I just wanted to quickly say—

Ms. PLASKETT. Is this his time now?

Chair JORDAN. Yes, it's his time.

Ms. PLASKETT. OK.

Mr. CUMMINS. The Ranking Member made a misstatement that's been repeated in the press and I'd just like to correct it.

That affidavit refers to approximately—I think it's 142 but call it 150 guns—that Mr. Malinowski purchased over four years, which I can tell you—I could name a lot of people in Arkansas that have bought 150 firearms in four years. It only documents six, I believe, sales of any firearms in that affidavit, not 150. It only—it documents that he purchased 150 guns, but it only documents that he sold about six.

Chair JORDAN. Which you're allowed to do in America, right?

Mr. CUMMINS. As far as I know.

Chair JORDAN. The gentleman is recognized.

Mr. STEUBE. This whole case is outrageous to me and, Ms. Malinowski, I feel like we owe you an apology on behalf of the American government today because ATF isn't going to give you that apology.

So, we'll do it today on behalf of our government who just—I'm kind of uniquely situated. I have a military background, but my father's a retired sheriff, did 20 years on the SWAT team, executed countless search warrants.

My brother's 10 years on the SWAT team, still on the force, executed countless search warrants and you have conversations with them. I have a military background so I kind of understand clearing a room and that sort of thing, and when they execute a search warrant, they would wait until the individual wasn't at their home where they knew that there was a firearm present to avoid a situation where one of their officers were injured.

Your testimony is and it's in the record that they followed Mr. Malinowski. They knew where he worked. Mr. Gaetz made a very good point that he worked at an airport, a secure environment where it would have been very easy to go in and execute a search warrant, and if they were going to arrest him or question him do that there were there were no weapons involved. It would have been peaceful.

Did ATF ever serve him with an administrative cease and desist letter?

54

Mr. CUMMINS. No, sir.

Mr. STEUBE. Did he have any—

Mr. CUMMINS. Not to my knowledge.

Mr. STEUBE. Did he have any knowledge or understanding that he was being investigated for any type of crime?

Mr. CUMMINS. Well, obviously, he's not available for me to ask that question to but to the best of my knowledge and based on our investigation the answer is no.

Mr. STEUBE. You and his wife, obviously.

Mr. CUMMINS. Yes, sir.

Mr. STEUBE. Since Malinowski did not receive a cease-and-desist letter did he ever get any other—well, I just asked that.

In the ATF search warrant application agents indicate that they talked to him on February 8th, just over a month prior to the raid. The agents indicate that he attempted to elude them.

Is there any indication that Mr. Malinowski was ever aware that the people following him were law enforcement officers?

Mr. CUMMINS. No. That portion of the affidavit is comical.

Mr. STEUBE. Would you like to expand?

Mr. CUMMINS. Maybe more—maybe embarrassed. It's an irrelevant portion in the affidavit where they talk about traffic and try to follow him. It sounds like somebody that isn't a very good driver to me.

I'm familiar with the area that they're describing, and everybody is in jeopardy when they make that transition. It has nothing to do with this case.

Mr. STEUBE. Again, it was, like, 6:00 in the morning. So, he doesn't know he's being investigated. There's no, like, letter that's sent that you need to cease and desist of what you're doing or we would like to have a conversation with you.

It sits hard with me because I would react the exact same way. If somebody beat my door in at 6:00 in the morning, I can guarantee you myself and my wife would be approaching the door with a firearm.

So, it's not—and you would think that the ATF agents would also conclude that that's a reasonable response to your door getting beaten in at 6:00 a.m., when you don't know you're being investigated. Does ATF typically have body cams? Does the Little Rock Police Department typically have body cameras?

Mr. CUMMINS. Interestingly, according to my understanding Little Rock police does wear body cams, but they didn't have them on that morning and so they were under the supervision of ATF, and you have to ask ATF why Little Rock didn't have theirs on.

Mr. STEUBE. Little Rock typically does have body cams and, again, my experience with my family they have body cams and if they would have turned them off in the execution of a search warrant that would be a very big problem for any law enforcement agent that is involved in an execution of a search warrant with no body cameras—

Mr. CUMMINS. That's one of the specific times they'd be required to have them on.

Mr. STEUBE. Did ATF ever have an opportunity to serve this search warrant at a time when it would have been less dangerous?

Mr. CUMMINS. Probably a thousand opportunities that we could sit here and speak.

Mr. STEUBE. I've only got—I'm just outraged. Mr. Goldman said that it was a no-knock—it was not a no-knock warrant and you stated that there was, like, 47 seconds or something.

So, if they did knock at 6:00 in the morning it's reasonable that the Malinowskis didn't hear that because you wouldn't be approaching—if somebody knocked on my door at 6:00 in the morning, I wouldn't assume that it's a bad guy because they wouldn't knock.

If you hear a door beaten in at 6:00 in the morning, there was such a short period of time between the door getting kicked in and knocked in, and then Mr. Malinowski being shot that it's reasonable to believe that they didn't hear the knock if there was a knock, which I'm looking forward to the Judiciary Committee asking all these questions.

I hope that the Chair is going to ask for and I know they have asked for every officer that was present that day because I would love for this Committee with the oversight authority that we have over the ATF to depose every single one of those officers that were present that day and get a sworn deposition from every single one of those people.

Again, Ms. Malinowski, I'm sorry for your loss and the loss of your family to a clear abuse of the rule of law, in my opinion.

I yield back.

Chair JORDAN. The gentleman yields back.

The Chair now recognizes—the gentleman from New York is recognized.

Mr. GOLDMAN. Thank you, Mr. Chair.

First, I want to express my condolences to Ms. Malinowski. I'm terribly sorry for your loss and for what you had to endure that day.

I do want to get into some of the details because I think they're very important. It was actually the search warrant affidavit, without going into great detail, demonstrates that Mr. Malinowski did purchase 142 guns from 2019 to February 27, 2024.

He resold at least nine because we have the six plus the three to the undercover firearm. He also had at various times at various gun shows 12 or 13 firearms on the table to be sold and he offered one witness, who was the one convicted of robbery and therefore was a prohibited person, many more firearms than what he purchased.

Many of these firearms were purchased just days before they were sold. So, whether or not you want to assert, Mr. Cummins, that this was a hobby of his you agree that there's certainly probable cause to believe that he was selling guns to individuals without a license and without performing a background check because he didn't have a license?

Mr. CUMMINS. There's no allegation that he knowingly sold a gun to anyone that was prohibited—

Mr. GOLDMAN. That's not what probable cause—

Mr. CUMMINS. —and under ATF's interpretation of—

Mr. GOLDMAN. You don't have to—you don't have to do that. I just said that he—

56

Mr. CUMMINS. I'm just answering your question.

Mr. GOLDMAN. Selling without a license. Like, there's certainly probable cause that he was in the business of selling without a license.

Mr. CUMMINS. Under ATF's interpretation of a vague, vague regulation.

Mr. GOLDMAN. Not yours. So, you would say that if you purchase 142 firearms within a four-year span as a former U.S. attorney and you have evidence of nine sales within that period of time plus many other more weapons offered for sale, you would say as you, not the ATF—as you as a former U.S. attorney that there is no probable cause to believe that this person is in the business of selling guns without a license?

Mr. CUMMINS. I would agree that this could be probable cause.

Mr. GOLDMAN. Thank you. So, we have probable cause. The Little Rock police are there with the ATF. They go in and the one fact that doesn't ever seem to be mentioned here, and that the Chair's letter does not mention is that an ATF agent was shot. Is that correct, Mr. Cummins?

Mr. CUMMINS. That's correct.

Mr. GOLDMAN. OK. So, an ATF agent was shot and then in response fired back at Mr. Malinowski. Is that accurate?

Mr. CUMMINS. That is accurate and it's also a tragedy.

Mr. GOLDMAN. It is a tragedy. I agree. I agree. You also agree, I assume—I was an Assistant U.S. Attorney for 10 years, secured many, many search warrants, oversaw the execution of them and arrest warrants. They're routinely done at 6 a.m. Is that right?

Mr. CUMMINS. A lot of warrants are executed at 6 a.m. Whether I agree with that as a tactic is another discussion. Yes, that's not uncommon.

Mr. GOLDMAN. Yes. No, OK, I want to understand that we're making a big deal out of the 6 a.m. here, but that is the standard time that law enforcement executes arrest warrants and executes search warrants.

So, I certainly am sorry that this is a tragedy that Mr. Malinowski died. I'm also sorry that Mr. Malinowski shot an ATF agent during a search, and I think if he were truly not in the business of selling firearms the way to respond to a search warrant is to allow your house to be searched and to cooperate.

It is insane to me that we are sitting here criticizing the ATF because they retaliated with deadly force after someone shot an agent. That is what happened here. This was not an out of the ordinary execution of a search warrant. This is a standard operating procedure.

Mr. Cummins acknowledges that there was probable cause to do it and now there is an investigation of this incident. Is that right, Mr. Cummins?

Mr. CUMMINS. There has been an investigation that's been handed over to the local prosecutor.

Mr. GOLDMAN. So, the local prosecutor is investigating it, and as a prosecutor that none of the witnesses or the relevant people involved are allowed to discuss this publicly while an investigation is going on, correct?

Mr. CUMMINS. I don't know what the policy of ATF is on that.

57

Mr. GOLDMAN. Well, was it your policy as a prosecutor? It certainly was mine. Witnesses do not talk to the public while there's an investigation going on.

One last question. As a U.S. Attorney did you ever send a notification to a target of yours who's selling a hundred—who is buying 140 guns, selling at least nine of them, that, hey, you're under investigation—just a heads up?

Mr. CUMMINS. I hope I would have, yes.

Chair JORDAN. The gentleman's time—

Mr. GOLDMAN. You would have? You would have reached out and said, hey, by the way I'm investigating—

Chair JORDAN. The question was asked, and the question asked and answered.

Mr. GOLDMAN. —so you can go ahead and destroy all and hide all the evidence? You would have done that? You notified the targets that you would—

Mr. CUMMINS. I have.

Chair JORDAN. The time of the gentleman has expired.

Mr. GOLDMAN. I yield back.

Chair JORDAN. The gentleman from—the gentleman yields back. The gentleman from North Carolina is recognized for five minutes.

Mr. BISHOP. Mr. Cummins, with some economies of time do you wish to respond to the last barrage?

Mr. CUMMINS. Well, only to say that nobody disputes that when a law enforcement is fired on that they have a right to fire back.

The point is that everything that created that situation was incompetent, unnecessary, and reckless and it defied the law because as a former assistant—the Fourth Amendment cases that allow either a no-knock or what I would call a tap and go type entry with no real waiting for someone to come to the door are only justified by exigent circumstances that do not exist in this case.

So, in my opinion as a former U.S. Attorney this was a completely illegal search because of the forced entry and the lack of time they gave the occupants of a fairly large home to get up at 6:00 in the morning.

The law requires them to wait for enough time—for a reasonable amount of time for someone to come to the door and admit them in.

Chair JORDAN. Fifty seconds is not a reasonable—

Mr. GOLDMAN. I assume the local prosecutor—

Mr. BISHOP. Whoa, whoa, whoa. My time. My time. My time. You've had plenty.

Mr. Cummins, I appreciate that very effective rebuttal. Here is what's interesting to me as this hearing evolves, I hear Mr. Goldman defending the practice that he says is engaged in every day, and earlier on the Ranking Member invoked the Breonna Taylor episode and I've just been sitting here reviewing it.

Mr. Goldman said earlier on, well, this wasn't a no-knock warrant. OK. What's the difference in the situation if they knock and they blow in 20 seconds or it's a no-knock? In fact, in the Breonna Taylor case that wasn't a no-knock warrant. They said they knocked and waited 45 seconds and they went in.

58

Here's something that's interesting. In the Breonna Taylor thing, she was killed on March 13, 2020, in that—it was execution of a search warrant just like this one.

Ms. PLASKETT. Breonna was murdered. Murdered.

Chair JORDAN. The time belongs to the gentleman.

Mr. BISHOP. The police officer—the first police officer was fired June 20th. In September 2020, Louisville entered into a $12 million settlement with the family.

Have you been made any overtures by the Department of Justice to settle liability against the government on behalf of Mr. Malinowski's family?

Mr. CUMMINS. No, sir.

Mr. BISHOP. In September, also, one of the police officers was indicted for willful endangerment or wanton endangerment and a second officer was fired in January 2021. A third officer was retired in April 2021.

Oh, I left out in October 2020, grand jury testimony was leaked. Later in 2021, DOJ indicted four officers and even now is retrying one who—for the hung jury. I don't understand the difference. I don't understand my colleagues' reaction that this—

Ms. PLASKETT. If you would yield, I could share the difference with you.

Mr. BISHOP. No, you've talked for a long time. I'm going to talk during my time.

Ms. PLASKETT. OK. Then, I will tell you—

Mr. BISHOP. Maybe, you can provide context for your egregious double standard. No one that I recall on the Republican side when the Breonna—by the way, you said this was interfering in the process to have this hearing.

The first time Congress had a hearing was in June 2020, over the Breonna Taylor episode. There was no concern about interfering. The concern was about the use of this kind of tactic to enter unnecessarily and jeopardize people's lives. Now, suddenly that seems to be of no concern whatsoever.

Can you account for that difference, Mr. Cummins?

Mr. CUMMINS. The facts are very similar, although that was a drug investigation and under the case law they are allowed to go in faster because of the potential for destruction of evidence.

Mr. BISHOP. Yes. So, in this case we're talking about conduct that the law would say is malum prohibitum, not malum in se.

In other words, the reason they entered this residence and jeopardized this entire family including Ms. Malinowski, who has no allegations against her, and shot this man dead is because he didn't have the proper license for the business, they say he was engaged in, and it's even disputed about whether he was engaged in that business.

Mr. CUMMINS. Correct.

Mr. BISHOP. In that case Breonna Taylor's boyfriend was without any contradiction engaging in illicit drug activity and receiving and dealing. He was a drug dealer, and he was carrying it on in her place of residence.

I can't account for the gross disparity except that Americans hear a lot and I hear a lot about concern about double standard of jus-

59

tice. Is there a double standard of justice here, Mr. Cummins, in those two episodes?

Mr. CUMMINS. There appears to be and that causes a loss of trust in government and in these agencies.

Mr. BISHOP. Mr. Cleckner, the only place I see reaction besides a hearing like this exposing stuff is that Attorney Generals across the Nation have sued over the two rules—the engaging in the business rule, that's an issue here, I guess, really, and the pistol brace rule.

Why is that the only recourse that people have, to have State Attorneys general file litigation?

Mr. CLECKNER. I don't understand your question, Congressman. Are you saying that they should be—

Mr. BISHOP. My time has expired anyway. I wanted to get one more. I've run out.

Chair JORDAN. Well, we can give you a chance if you want to rephrase the question.

Mr. BISHOP. Yes, if I can—thank you, Mr. Chair. If I can rephrase the question. Here's what I'm saying.

Congress doesn't seem to be able to do anything to press back against this overreach, at least it hasn't, including under Republican leadership.

The only thing that seems to be available to people for the government to do to provide recourse, is I see State Attorney Generals out filing lawsuits in great numbers, 21 States—in one case, 24.

Is that the only recourse that people have—can expect from their government in response to these kinds of abuses?

Mr. CLECKNER. It apparently is the only one they have but it's not what they should expect. We should expect that the administrative agency is reined in a little bit here.

Mr. BISHOP. Thank you, Mr. Chair.

Chair JORDAN. We're trying. We're trying.

The Chair recognizes the gentlelady from Texas for five minutes.

Ms. CROCKETT. Thank you so much, Mr. Chair, and the vigorous back and forth regarding Breonna Taylor.

First, I do appreciate you being here and your answering of the questions. I do want to make sure that before we go down this road, I clarify some things that were different in the Breonna Taylor case.

Second, the officers were considered to have botched what took place on that day because they fired blindly into a home, meaning that they initiated some sort of deadly force, and the only information that they had was allegedly that this was the place of some sort of drug activity.

At that point in time, you ended up having her boyfriend who returned fire believing that someone was breaking in. It is very different when you are returning fire versus initiating fire and there was no need to do so.

In addition to that, no-knock warrants and knock warrants are basically a couple of seconds of difference, if I'm going to be honest.

One of the things that I worked on in the State legislature was actually making sure that we could reform no-knock warrants because it is a risk not only to the people in the homes, especially

60

in a State like Texas where everyone is allowed to have a gun, but it's also a huge risk to law enforcement.

So, being able to do this effectively—this is dangerous work that law enforcement engage in every single day and I do want to be clear that I am always sorry for the loss of life. I don't care about the race.

I don't care about any of those things and, honestly, I believe in the criminal justice system. I believe that if someone is accused of something they should have their day in court.

So, I do want to say that I take issue with anyone losing their life, period, even if it's somebody that's accused of a crime and I believe that they should go through due process and have an opportunity.

In this particular set of circumstances, we know that if somebody shoots at me—in fact, some would argue that last week I had a colleague that decided she wanted to shoot at me—I'm going to shoot back and that's what happened here.

What's more frustrating for me in this hearing and what seems to be a pattern, is that we continue to attempt to litigate pending cases. We saw that one of the witnesses in the Trump trial.

He came and testified before us last week and then he went and testified this week in front of the judiciary, and then we know that this is still a pending case and I do want to afford an opportunity for those that will be granted access to discovery, video, whatever video doesn't exist, as well as any statements, depositions, all those things, some folk that have access to all the information and, ultimately, if this needs to go to court having a jury that will make a decision based on the facts and the evidence.

So, with that, I want to make sure that we move onto something else, which is the reality that—in fact, let me do this before I run out of time.

Mr. Chair, I ask unanimous consent to enter into the record "97Percent's Annual Gun Owner Survey," October 2023 report which details these and other statistics pertaining to gun owners' views on commonsense gun control policies and I'm going to go back up to what those views are.

Chair JORDAN. Without objection.

Ms. CROCKETT. Thank you so much.

The 97Percent, a bipartisan group of gun owners and nongun owners which conducts research on gun safety policies, found that with regarding to commonsense gun policies 86 percent of gun owners, well over the simple majority, support keeping guns out of the hands of violent criminals.

Seventy percent of gun owners say that they wish we would enact some kind of gun reform. Sixty-six percent of gun owners, for instance, think guns should be restricted on school grounds and 67 percent think that they should be restricted in government buildings, and I will tell you that I fall into those categories because I am a licensed gun owner.

Yet, despite the majority of Americans and the majority of gun owners, Republicans last week passed a bill out of the House that eliminates States' ability to regulate firearms on private property, government buildings, playgrounds, and gun-free school zones.

If that's not hypocrisy I honestly don't know what is, and it doesn't end there. As the party self-proclaiming itself as law enforcement's biggest advocate and supporter Republicans on this very Committee have introduced legislation to abolish the law enforcement agency entirely.

Ms. Sampson, I have a few yes or no questions. I may only get to one. Yes or no, are you familiar with the role of ATF?

Ms. SAMPSON. Yes.

Ms. CROCKETT. To your understanding the ATF is in fact law enforcement, correct?

Ms. SAMPSON. Yes.

Ms. CROCKETT. Does ATF duties include preventing incidents, investigating cases, and recommending prosecution for issues of violent crimes and weapons for gangs and career criminals?

Ms. SAMPSON. Yes.

Ms. CROCKETT. Narcotic traffickers?

Ms. SAMPSON. Yes.

Ms. CROCKETT. Domestic and international arms traffickers?

Ms. SAMPSON. Yes.

Ms. CROCKETT. Armed human traffickers?

Ms. SAMPSON. Yes.

Ms. CROCKETT. Terrorists?

Ms. SAMPSON. Yes.

Ms. CROCKETT. With that, I will yield.

Chair JORDAN. Bryan Malinowski was none of those. The gentlelady yields back.

The gentlelady from Florida is recognized.

Ms. CAMMACK. Thank you, Mr. Chair.

I am first and foremost very, very sorry, Ms. Malinowski. As the wife of a SWAT medic, from one wife to another, I am deeply apologetic, and I can't even begin to understand the pain and suffering that you and your family are going through.

My husband, as I said, who is a SWAT medic, when we heard about this case, he was so thoroughly disgusted and heartbroken. That is truly, I believe, not a reflection on the good men and women in law enforcement that intend to do their jobs the best they can and we're so very sorry.

Mr. Chair, I'm also deeply disappointed that the discussion today has been centered around ways to restrict constitutional rights to law-abiding citizens instead of the mental health crisis that we face in this country, which is a massive driver of crime in this country.

Also, very little has been talked about when we're discussing the overgrown, overly aggressive, and woefully inadequate Administrative State.

So, with that, I'm going to jump right into Mr. Cleckner. Thank you for returning back to Congress to provide testimony.

In a March 10, 2023, Judiciary Subcommittee on the Administrative State you addressed the ATF stabilizing rule—brace rule. In your testimony you said, quote,

> This rule effectively gives the ATF the power to determine who is a felon by the stroke of a bureaucrat's pen. This is not an appropriate enforcement of law. It is tyranny.

I agree with you.

What is sad is that in this rule, we are seeing a microcosm of what is happening at other Federal agencies. The American people are under assault by the Biden Administration's regulatory regime from all corners of the Federal Government.

That is why I introduced the REINS Act. As many of you know, the bill would address regulatory overreach by requiring every new major rule proposed by Federal agencies be approved by Congress before going into effect.

This is the reassertion of Article 1 authority that is how the Founding Fathers intended, not unelected, nameless, faceless bureaucrats arbitrarily dictating law. After all, we know that Americans pay $2 trillion a year, in additional compliance costs—economic loss—for this aggressive regulatory regime.

The stabilizing brace rule and ATF's zero tolerance policy are prime examples of regulations that not only impose compliance costs on firearm retailers but infringe on Americans' basic Second Amendment rights.

So, I'm going to go down the line and I'm going to come right back to you. Mr. Cummins, yes or no, should Federal agencies be able to shift criminal statutes and rewrite law?

Mr. CUMMINS. No.

Ms. CAMMACK. Thank you. Ms. Sampson?

Ms. SAMPSON. That's not what happened here. They're enforcing a Congressional rule.

Ms. CAMMACK. I did not ask that. I asked for a yes or no. Should Federal agencies be arbitrarily able to write law?

Ms. SAMPSON. No, and that's not what happened here.

Ms. CAMMACK. Thank you. Mr. Graham?

Mr. GRAHAM. No, Congresswoman.

Ms. CAMMACK. Mr. Cleckner?

Mr. CLECKNER. No.

Ms. CAMMACK. Thank you.

Mr. Cleckner, my understanding is that this rule disregards ATF's own approval of stabilizing braces in 2012, correct?

Mr. CLECKNER. This current zero tolerance policy rule? I'm not sure what you're asking.

Ms. CAMMACK. Regarding how they classified the pistol braces as an accessory, therefore, not subject to full ATF regulatory standards.

Mr. CLECKNER. Right.

Ms. CAMMACK. So, in the time since they approved them in 2012 to today ATF has done a full 180 on the issue and has chosen to impose erroneous regulations on firearm accessories that were originally intended for disabled veterans, correct?

Mr. CLECKNER. Uh-huh. That's true, and on which people relied on their opinion when they were acting and they're now in trouble for.

Ms. CAMMACK. Absolutely. The owners of these firearms would now be committing a felony if they did not register, surrender, or destroy the accessory?

Mr. CLECKNER. Correct, which means their right to even possess a firearm for the rest of their life is now gone.

Ms. CAMMACK. Exactly. Did Congress ever approve this legislatively?

63

Mr. CLECKNER. No, ma'am.

Ms. CAMMACK. Can you quickly outline the specific penalties for failing to register a pistol brace under this rule?

Mr. CLECKNER. Quickly, yes. Felony.

Ms. CAMMACK. Financial as well?

Mr. CLECKNER. Oh, for sure. Defending yourself, financial costs, losing the right to protect yourself or have firearms in the future. All those things.

Ms. CAMMACK. Right. So, now that this rule is being litigated in the Fifth Circuit Court of Appeals considering the rule has criminal implications, can you speak to the risks associated with circumventing the legislative process in this case?

Mr. CLECKNER. The risks now, going forward, are even companies don't know what they're supposed to do because it changes back and forth so many times.

I think people are afraid, as someone said earlier, about what they're supposed to do, what they're going to get in trouble with, whose guidance they're supposed to follow. It's all unclear.

Ms. CAMMACK. I appreciate that, and I know my time is expiring. I have a list of questions for you, Mr. Graham, that I will submit for the record.

I think it is clear that what we are seeing today, particularly, under the ATF is a gross overreach, a weaponization of the Federal Government in its true form. It's something that I think Republicans, Democrats, and all Americans should be equally concerned about.

With that, I yield.

Chair JORDAN. The gentlelady yields back.

The gentlelady from Wyoming is recognized.

Ms. HAGEMAN. I'm going to continue with that same line of questioning.

Mr. Cleckner, this Subcommittee's last hearing, in fact, was on the Biden Administration's use of lawfare against political opponents and we have seen that play out in a variety of ways including in the case that's been ongoing in New York City as well as what's been happening in Georgia and Florida, etc.

Each and every ATF rule subjects more Americans to legal compliance which, if ignored, even unknowingly, imposes criminal and monetary penalties as well as additional fees and legal costs.

Mr. Cleckner, do you think that the rulemaking agenda is an attempt to employ lawfare against Americans who stand for the Second Amendment?

Mr. CLECKNER. I do.

Ms. HAGEMAN. OK. If so, what does that say about where we stand when the Biden Administration considers its citizens who believe in and adhere to the Constitution as its political enemies?

Mr. CLECKNER. That is scary if that's their motivation and it's very difficult to comply with for sure.

Ms. HAGEMAN. In December 2023, the ATF Little Rock field office received a case referral for Mr. Malinowski. In the same month it opened its investigation and spent the next several months surveilling his activities including tailing him and placing trackers on his car.

64

I find this absolutely frightening that we have agencies who are willing to go to this extent with a law-abiding citizen. The ATF knew his movements, his schedule, where he was, and when he was there and, therefore, the ATF knew when he was home and when he wasn't, meaning that the ATF decided to execute the search warrant when he was home even though they knew that he would have firearms in the home.

In fact, Mr. Cummins, you have uncovered the fact that the ATF team members gathered to execute the search warrant the week before the raid, but then changed their plan when they learned that Mr. Malinowski would not be home. In other words, they wanted him there and they wanted him there bad.

Mr. Graham, is this standard operating procedure for the ATF to ensure that the target is there when they executed this kind of a search warrant or can they do it without the target being in the home?

Mr. GRAHAM. Madam Congresswoman, unfortunately, I have no firsthand knowledge of the warrant process and/or how they are executed.

Ms. HAGEMAN. Well, Mr. Cummins, what about you? Do you think that this would be standard operating procedure to wait until the gentleman was there at 1:00 in the morning, knowing that he had guns, versus just going ahead and executing the search warrant when he wasn't there?

Mr. CUMMINS. Well, clearly, it's a search warrant. He didn't need to be there. I think they definitely wanted him there and I think that this does happen in Federal law enforcement quite a bit.

They want the target there because they want to surprise them, and this is part of the reason they go at 6:00 in the morning. They want to surprise them. They want them in their night clothes. They want their hair to stand up.

They want them scared, angry, shocked, and then they want to violate their Fifth Amendment right to not incriminate themselves before they remember they have a Sixth Amendment right to call their lawyer.

So, it's a trifecta. They want to violate three constitutional rights—the Fourth, Fifth and Sixth—all in one scoop and in this case, it didn't work out for them.

Ms. HAGEMAN. Well, and it seems to me that the overarching issue here is that the government should have standards in place to ensure the safety of all citizens in the conduct of its investigations and actions even when criminal activity is suspected.

In the case of execution of a search warrant for Mr. Malinowski the ATF appears to have deviated from this premise and standards which are in place and, in fact, ended up executing Mr. Malinowski himself.

Mr. CUMMINS. That's exactly right.

Ms. HAGEMAN. The Constitution secures our rights by placing limits on the Federal Government's power even when Americans— an American citizen is suspected of being engaged in unlawful behavior.

As you just indicated, the Fourth Amendment secures citizens against unreasonable search and seizure. The Fifth Amendment ensures due process.

65

The Sixth Amendment guarantees—has certain rights for criminal defendants and the Eighth Amendment provides against and protects us against cruel and unusual punishment.

Mr. Cummins, is it fair to say that a responsible execution of a search warrant is one of the primary mechanisms that we have in place to guarantee an American's rights in criminal proceedings?

Mr. CUMMINS. I can't imagine what the British were doing to people that would be worse than what happened to Bryan Malinowski on March 19th that would have brought about the Fourth Amendment to the Constitution.

Ms. HAGEMAN. Mr. Graham, do you have any recommendations of how to address the situation we're describing today to ensure that this does not happen again? What kind of reforms should Congress take up to make sure that we can protect Mr. Malinowski and other people like him?

Mr. GRAHAM. Madam Congresswoman, once again, having limited exposure to the warrant process and/or the execution, I would defer to Congress creating whatever laws, regulations, they deem appropriate to be delegated to the appropriate enforcement agency.

Ms. HAGEMAN. Mr. Cleckner, what about you? What recommendations would you have?

Mr. CLECKNER. I agree with Mr. Graham. I think Congress' oversight here is really important. I think what you asked me earlier about the Administrative overreach is these Administrative agencies specifically going against what Congress has put into place like the Gun Control Act or like the willfulness requirement.

Ms. HAGEMAN. Between the bump stocks and the pistol braces and those things what we have is agencies who are intentionally adopting vague rules and regulations to criminalize lawful and unconstitutional conduct. It needs to end.

I appreciate you all being here. I am sorry for your loss as well, Ms. Malinowski. We have to expose these types of activities so that we can prevent them from happening in the future.

With that, I yield back.

Chair JORDAN. The gentlelady yields back.

I would just let the witnesses know we have just a few more minutes. Mr. Davidson, I don't know if Mr. Fry will be able to join us, and then a couple of comments or minutes with Ms. Plaskett, the Ranking Member, and myself and then we'll be done. So, if you need a break, obviously, let us know but we should be done here in the next 1five minutes is sort of the goal.

The gentleman from Ohio is recognized.

Mr. DAVIDSON. I thank the Chair and thank our witnesses and, Ms. Malinowski, please accept my sincere apologies and deepest sympathies.

This is something that was avoidable and I'm encouraged, frankly, because I hear colleagues that were once highly concerned about warrant practices and held hearings when they were in the majority about criminal justice reform may actually be willing to do it instead of politicizing it.

I felt as a guy who was not part of the Judiciary Committee—I'm on Financial Services and Foreign Affairs—and only on this because we have seen abuses of the Fourth Amendment that creep into your financial privacy.

We have seen weaponized government go after every kind of nook and cranny they can for what have historically been viewed as law-abiding citizens. Restraints against general warrants—so John Adams said, "general warrants swept up whoever might have been present in the square on certain days."

These kinds of things that went on are part of what led to the revolution. So, it was an abuse of privacy. If you look at it, part of the concern for warrants is that they don't take the least risky means possible, which does expose officers to risk.

It exposes not just people that maybe you do have probable cause to suspect a crime, but it exposes their family members and others to unnecessary risk, and maybe there is a way that we should look at the intent of the Fourth Amendment, that it would minimize the risk here.

It seems that there was a much less invasive way to solve the crime that was alleged here, and you would think that because of the Biden Administration's focus on this crime that this was the big crime wave that's sweeping the country, that apparently the only reason we have guns on the street are because people like Mr. Malinowski that—but for Mr. Malinowski and people like that the streets would be safe in Washington, DC.

People wouldn't be getting carjacked and robbed at gunpoint. Chicago wouldn't see massive waves of murders. It's pistol braces. It must be the pistol braces because they're going after the pistol braces.

There is no basis in terms of the crime that the Biden Administration is going after, and I think that's why the public is so concerned. You're targeting people in part, because of political ideology.

President Biden's recent Executive Order concerning firearms dealers was described by the White House themselves as getting, quote, "as close to universal background checks as possible without additional legislation."

I do not recall Congress voting on universal background checks. On the contrary, this is a bureaucrat at an agency passing pseudo laws—fake laws—and they're using them to effectively force defendants to spend their treasure defending against a crime that hasn't even become crime in the normal way by law.

So, Mr. Cleckner, what steps can be taken to defund and defeat these fake laws originating at the ATF in particular?

Mr. CLECKNER. I think Congress needs to hold them accountable.

Mr. DAVIDSON. To point that out one of the main ways we do that is with appropriations. So, it's not just whether they're funded, but what can they do with the funds and part of that is timely.

We're going back into appropriations. Having passed on holding accountable the agency this time, hopefully, we'll find the resolve to do that this time in the next path.

Mr. Cummins, I just wanted to close out with you because you're highlighting an important case. You've had a background where you are familiar with the warrant process and I think not just here in this case you pointed out, look, it is a practice.

Is it good practice to knock at 6 a.m., and come in and—you would think that—El Chapo maybe no-knock warrants. There's a time and a place. How do they weigh the right time and place for

67

those kinds of tactics versus maybe less intrusive, less risky tactics?

Mr. CUMMINS. Well, we have given great deference to law enforcement to choose their tactics and we are concerned about law enforcement officers' safety and so that's a good reason to do that.

I do believe we have over militarized our law enforcement. I have great concerns about that. I think we do that this way too often, and we need to take a hard look at it.

In this particular case, I don't think they did it lawfully at all and there's zero justification. Even that said, law enforcement does this kind of thing quite a bit.

Mr. DAVIDSON. You point out that there's surveillance for a while. It wasn't like an exigent circumstance—there wasn't evidence that was going to be flushed down the toilet or disposed of.

There was evidence that would be physically present onsite and there were lots of periods of time where Mr. Malinowski was in a place where he could have been detained and questioned, could have been brought to the residence or could have been caught as he's walking into or about to walk out of a home.

So, there were lots of less invasive means and I just hope that we can find a way in statute or in practice to be able to say let's do it that way more often and let's not violate the civil liberties of our citizens.

With that I yield back.

Chair JORDAN. The gentleman yields back.

The Ranking Member is recognized for closing comments or questions.

Ms. PLASKETT. I just want to thank the witnesses for being here.

Ms. Malinowski, I see the pain that you are still in, and I pray that there's resolution for you and your family, and I thank you that I see that you have a support system with you. Thank you to those who are there with you providing that support to you in this time.

I have nothing at this time further. I would, however, request and introduce for the record the Demand of two letters sent to Point Blank Firearms.

Being on the Demand two letter program for two years in a row means that a business sold 25 or more firearms than a business here that were connected to a crime.

Chair JORDAN. Without objection.

Ms. PLASKETT. Thank you.

Then, I would also remind my colleagues about that appropriations process, that removing funding from ATF individuals on this Committee who pass or want to have laws passed such as the elimination of ATF, and the abolition of ATF is not the way to support regulating guns in this country—that we need to do this comprehensively. A step in the right direction was the bipartisan gun legislation that was passed in 2022.

There's more work to be done, and with that, I yield back.

Chair JORDAN. Mr. Cummins, when government changes the rules without a vote of Congress is that the weaponization of government?

68

When you have these agencies unilaterally change the law without a vote of the Legislative body, would you call that the weaponization of government?

Mr. CUMMINS. It seems that way to me.

Chair JORDAN. Mr. Cleckner, would you agree?

Mr. CLECKNER. I do.

Chair JORDAN. Mr. Graham?

Mr. GRAHAM. Chair, that's a department doing what they're directed to do, sir.

Chair JORDAN. OK. Let me say this. So, when the ATF unilaterally changed the definition of what a pistol brace and how that worked, and overnight made law-abiding citizens then felons—you either have to turn the gun in or you're a felon—is that the weaponization of government, Mr. Cleckner?

Mr. CLECKNER. It sure is, especially when we don't know that every American that had one of those got the message.

Chair JORDAN. Exactly. The same thing seems to be happening— seems to have happened in the case of Mr. Malinowski.

The ATF decided to change the definition of what an FFL—what a licensee was from principal livelihood to someone who's earning a profit, but it's even worse because they didn't have the definition changed and enacted when this terrible incident happened with Mr. Malinowski.

That, to me, is the weaponization of government, unilaterally making changes without it going through the Legislative Branch of government the way our system is supposed to work—the checks and balances how they're supposed to work—and in the case we're talking about so much today they hadn't even fully made that change.

They didn't even follow their own rule, for goodness sake, and we have an American who's no longer with us because of that.

Mr. Cummins, a response?

Mr. CUMMINS. I agree with everything you said.

Chair JORDAN. Let me ask you one other question. Was the Little Rock police involved in the raid on the Malinowski home?

Mr. CUMMINS. We know they were present. We don't know exactly what their role was. There were 10 carloads of agents at the house.

Chair JORDAN. We have seen the video of all the carloads coming from the Wal-Mart parking lot to the Malinowski neighborhood. We have seen that video.

Were the Little Rock police officers wearing body cams on the morning of this raid on the Malinowski home?

Mr. CUMMINS. According to what we have been told nobody had body cams on even though Little Rock police are equipped with body cams.

Chair JORDAN. That was my next question. They're supposed to wear them, the Little Rock—

Mr. CUMMINS. It's my understanding. I'm not 100 percent sure about that.

Chair JORDAN. Do you believe that the ATF told Little Rock police officers not to have their body cams on or not to have them engaged?

69

Mr. CUMMINS. When the local PD is supporting a Federal agency typically they're taking orders from the Federal agency. So, I would presume—I don't know—that ATF instructed them to not wear it.

Chair JORDAN. That would be a logical presumption. As a guy who is a former U.S. Attorney the way it works Federal law enforcement—

Mr. CUMMINS. That's consistent with my understanding of how those relationships work.

Chair JORDAN. Again, we're back to the question you asked in your opening statement a couple hours ago. Why?

Why would ATF tell Little Rock, don't follow your own rules? We're not going to follow our rules. We don't want you following your rules. We don't want any video footage of what we're about to do at the Malinowski home, an upstanding citizen by all accounts—your whole testimony—highest paid official in Little Rock municipal government.

Why would they do that?

Mr. CUMMINS. We have no idea.

Chair JORDAN. Yes, but we got to find the answer to that because this is the weaponization of government if I've ever seen it.

We thank you all for being here today, for your testimony, and I got to say something official here before we close our hearing.

That concludes today's hearing. We thank our witnesses for appearing before the Subcommittee today. Without objection, all Members will have five legislative days to submit additional written questions for the witnesses or additional materials for the record.

Without objection, the hearing is adjourned.

[Whereupon, at 12:20 p.m., the Subcommittee was adjourned.]

All materials submitted for the record by Members of the Select Subcommittee on the Weaponization of the Federal Government can be found at: *https://docs.house.gov/Committee/Calendar/ByEvent.aspx?EventID=117338.*

○

# EXHIBIT D
# House Judiciary Hearing (May 23, 2024)

# OVERSIGHT OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

## HEARING

BEFORE THE

## COMMITTEE ON THE JUDICIARY

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTEENTH CONGRESS

SECOND SESSION

THURSDAY, MAY 23, 2024

**Serial No. 118–81**

Printed for the use of the Committee on the Judiciary



Available via: *http://judiciary.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

55–811                 WASHINGTON : 2024

## COMMITTEE ON THE JUDICIARY

JIM JORDAN, Ohio, *Chair*

DARRELL ISSA, California
MATT GAETZ, Florida
ANDY BIGGS, Arizona
TOM McCLINTOCK, California
TOM TIFFANY, Wisconsin
THOMAS MASSIE, Kentucky
CHIP ROY, Texas
DAN BISHOP, North Carolina
VICTORIA SPARTZ, Indiana
SCOTT FITZGERALD, Wisconsin
CLIFF BENTZ, Oregon
BEN CLINE, Virginia
KELLY ARMSTRONG, North Dakota
LANCE GOODEN, Texas
JEFF VAN DREW, New Jersey
TROY NEHLS, Texas
BARRY MOORE, Alabama
KEVIN KILEY, California
HARRIET HAGEMAN, Wyoming
NATHANIEL MORAN, Texas
LAUREL LEE, Florida
WESLEY HUNT, Texas
RUSSELL FRY, South Carolina
Vacancy

JERROLD NADLER, New York, *Ranking Member*
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, Jr., Georgia
ADAM SCHIFF, California
ERIC SWALWELL, California
TED LIEU, California
PRAMILA JAYAPAL, Washington
J. LUIS CORREA, California
JOE NEGUSE, Colorado
LUCY McBATH, Georgia
MADELEINE DEAN, Pennsylvania
VERONICA ESCOBAR, Texas
DEBORAH ROSS, North Carolina
CORI BUSH, Missouri
GLENN IVEY, Maryland
BECCA BALINT, Vermont

CHRISTOPHER HIXON, *Majority Staff Director*
AARON HILLER, *Minority Staff Director & Chief of Staff*

―――――

# C O N T E N T S

---

THURSDAY, MAY 23, 2024

OPENING STATEMENTS

| | Page |
|---|---|
| The Honorable Jim Jordan, Chair of the Committee on the Judiciary from the State of Ohio | 1 |
| The Honorable Jerrold Nadler, Ranking Member of the Committee on the Judiciary from the State of New York | 3 |

WITNESSES

| | |
|---|---|
| The Hon. Steven Dettelbach, Director, The Bureau of Alcohol, Tobacco, Firearms, and Explosives | |
| Oral Testimony | 6 |
| Prepared Testimony | 8 |

LETTERS, STATEMENTS, ETC. SUBMITTED FOR THE HEARING

| | |
|---|---|
| All materials submitted for the record by the Committee on the Judiciary are listed below | 76 |

Materials submitted by the Honorable Jerrold Nadler, Ranking Member of the Committee on the Judiciary from the State of New York, for the record

A letter to the Honorable Jerrold Nadler, Ranking Member of the Committee on the Judiciary from the State of New York, May, 22, 2024, from the Carlos Felipe Uriarte, Assistant Attorney General, U.S. Department of Justice, Office of Legislative Affairs, for the record

An article entitled, "House Republicans want to defund the police," Mar. 7, 2024, The Washington Post

A letter to the Honorable Jim Jordan, Chair of the Select Subcommittee on the Weaponization from the State of Ohio, and the Honorable Stacey E. Plaskett, Ranking Member of the Select Subcommittee on the Weaponization, May 23, 2024, from the National Fraternal Order of Police

An article entitled, "Are Guns the Leading Cause of Death for Children in the U.S.?" Apr. 3, 2023, Snopes, submitted by the Honorable Troy Nehls, a Member of the Committee on the Judiciary from the State of Texas, for the record

A letter regarding Bryan Malinowski, to the Honorable Jim Jordan, Chair of the Committee on the Judiciary from the State of Ohio, May 21, 2024, from the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, submitted by the Honorable Mary Gay Scanlon, a Member of the Committee on the Judiciary from the State of Pennsylvania, for the record

Materials submitted by the Honorable Becca Balint, a Member of the Committee on the Judiciary from the State of Vermont, for the record

An article entitled, "Milwaukee sees decline in homicides in 2023, but numbers still not back to pre-pandemic levels," Jan. 3, 2024, WPR

Crime statistics from the Milwaukee Police Department, May 22, 2024

Materials submitted by the Honorable Madeleine Dean, a Member of the Committee on the Judiciary from the State of Pennsylvania, for the record

A list of fallen ATF agents entitled, "Fallen Agents."

IV

Page

Materials submitted by the Honorable Madeleine Dean, a Member of the
Committee on the Judiciary from the State of Pennsylvania, for the
record—Continued
    An article entitled, "US stats show violent crime dramatically falling,
        so why is there a rising clash with perception?" Mar. 22, 2024,
        ABC News
    An article entitled, "Germantown shooting: 3-year-old shoots herself in
        the eye with father's gun in Philadelphia home, police say," Apr.
        6, 2024, 6ABC
A copy of the search warrant for Bryan Malinowski, the United States Dis-
    trict Court, Eastern District of Arkansas, submitted by the Honorable
    Glenn Ivey, a Member of the Committee on the Judiciary from the State
    of Maryland, for the record
Materials submitted by the Honorable Lucy McBath, a Member of the Com-
    mittee on the Judiciary from the State of Georgia, for the record
    An article entitled, "Firearms overtook auto accidents as the leading
        cause of death in children," Apr. 22, 2022, NPR
    An article entitled, "Firearms Now No. 1 Cause Of Death For U.S.
        Children—While Drug Poisoning Enters Top 5," Oct. 5, 2023, Forbes
A letter in support of HR 3269, to the Honorable Scott Fitzgerald, a Member
    of the Committee on the Judiciary from the State of Wisconsin, Apr. 17,
    2024, from Earl Griffith, ELG Consultants, LLC, submitted by the Honor-
    able Scott Fitzgerald, a Member of the Committee on the Judiciary from
    the State of Wisconsin, for the record

### QUESTIONS AND RESPONSES FOR THE RECORD

Questions to the Hon. Steven Dettelbach, Director, The Bureau of Alcohol,
    Tobacco, Firearms, and Explosives, submitted the Honorable by Ben Cline
    from the State of Virginia, the Honorable Lance Gooden from the State
    of Texas, and the Honorable Troy Nehls from the State of Texas, Members
    of the Committee on the Judiciary, for the record
    No response at the time of publication

# OVERSIGHT OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES

**Thursday, May 23, 2024**

HOUSE OF REPRESENTATIVES

COMMITTEE ON THE JUDICIARY

*Washington, DC*

The Committee met, pursuant to notice, at 10:09 a.m., in Room 2141, Rayburn House Office Building, the Hon. Jim Jordan [Chair of the Committee] presiding.

*Members present:* Representatives Jordan, Issa, Gaetz, Biggs, McClintock, Tiffany, Massie, Roy, Bishop, Spartz, Fitzgerald, Bentz, Cline, Armstrong, Van Drew, Nehls, Moore, Hageman, Lee, Hunt, Fry, Nadler, Johnson, Swalwell, Jayapal, Correa, Scanlon, Neguse, McBath, Dean, Ross, Bush, Ivey, and Balint.

Chair JORDAN. The Committee will come to order. Without objection, the Chair is authorized to declare a recess at any time.

We welcome everyone to today's hearing on Oversight of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

The Chair now recognizes the gentleman from Arizona to lead us in the Pledge of Allegiance.

ALL. I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation, under God, indivisible, with liberty and justice for all.

Chair JORDAN. We will begin the hearing with opening statements. The Chair recognizes himself.

The government is not supposed to change the rules without a vote of Congress. The Executive Branch executes the laws; the Legislative Branch passes the laws, but when you bypass that format, which is exactly what the ATF has done, you get all kinds of bad things.

First, it was the pistol brace rule. November 26, 2012, the ATF told the inventor of the pistol brace, quote, "he would not be subject to the National Firearms Act," but last year they changed the rule. After 12 years changed the rule. By the way, the pistol brace was put together to help disabled veterans be able to shoot, be able to practice and shoot at the range. Now, with the rule change if you don't turn it in, get rid of it, you become a felon.

Then, there was a policy change that the ATF enacted. The ATF now says if a Federal firearms licensee makes a mistake on the form, even if it is a clerical mistake, well, that now equals a, quote, "willful falsifying of records" and they could lose their license. In fact, 157 FFLs lost their license last year in this gotcha game that

2

the ATF is playing with people who are in the business of selling firearms.

The pressure to deal with what—the ATF comes out and finds you made some mistake on a form, many people just voluntarily giving up their FFL: 24 in 2021, 69 in 2022. Eighty people last year gave up their license versus dealing with the hassle from the agency that is supposed to help them comply, not put them out of business.

Finally, there is the new definition of who actually needs a Federal firearms license. Since 1968, the definition said it had to be your principal livelihood, your principal livelihood in the business of selling firearms. You needed that. If you were doing that, you needed an FFL. This past Monday a new definition was put in place. It said, "if you are earning a profit." The ATF can't really define what that means. You sell one gun to your cousin, made $10, made $50 on the sale of a gun, two guns to someone, or 10 guns. In fact, they couldn't even tell the court how it works, this new definition.

When you make up the rules as you go, bad things happen. You lose your livelihood for a clerical error, you become a felon for a pistol brace they told you was legal for 12 years, and you might even get shot. That is what happened to Bryan Malinowski just two months ago. We have Bryan's widow with us today. She was here with us yesterday. Heard some powerful testimony from U.S. Attorney Bud Cummins who represents the Malinowski family. In fact, I am going to read from Mr. Cummins' testimony that he gave in this room yesterday.

It is legal to buy, trade, and sell guns without a Federal firearms license if you are a collector or hobbyist, but at some point the ATF decided that Bryan Malinowski had crossed a murky line and he was no longer a hobbyist. Because of that, the ATF concluded he was required to purchase a $200 Federal firearms license before he sold anymore guns.

I call it murky because there is no bright line test. It is truly subjective. One thing seems certain: Bryan Malinowski received no warning. His family, his friends, and his work colleagues would all guarantee you he loved his career and he would have never knowingly jeopardized it over a weekend hobby.

His real job, his main job, and his only job was he ran the Bill and Hillary Clinton Airport in Little Rock, Arkansas, highest paid official in the municipal government, made $260,000 a year. On March 19th at 6:01 a.m., over one hour before sunup 10 carloads of the ATF agents and Little Rock Police Department officers came to the Malinowski home to execute their search warrant. Not an arrest warrant. Search warrant.

At 6:02:46 a.m., the ATF agents in full SWAT gear approached the front door. They had a piece of tape ready to cover the camera lens of the doorbell camera, which they did. Next, Ms. Malinowski heard only a loud crash as her front door caved in. Her husband Bryan woke up to the sound of the crush, found a pistol, loaded a magazine, and left the bedroom to investigate.

Bryan warned his wife to stay behind in the bedroom, but Maer stubbornly followed him down the hallway. The ATF apparently killed electricity to the home. The front room was usually well lit at night, but Ms. Malinowski saw only darkness as she peered down toward the front entryway. She could only see shadowy outlines of presumed home invaders standing in her front hallway. That is what Bryan saw too.

Bryan fired a few shots at the intruders' feet to drive them back out of the front door. The ATF shot Bryan in the head. His wife was standing inches away from him. A mere 57 seconds. Fifty-seven seconds elapsed from

3

the time agents covered the doorbell camera until gunshots erupted and Bryan was fatally wounded. 6:02:46 to 6:03:43 a.m.

Agents immediately dragged Ms. Malinowski into the front yard. She was barefoot wearing minimal night clothing and the temperature was 34 degrees. They locked her in the back seat of a car and detained her there for four hours, refusing her many requests to check on her husband, her husband she had just seen shot, wouldn't allow her to get clothes, or even use the neighbor's bathroom.

Even though policies have been in place at both the ATF and the Little Rock Police Department for the past three years requiring the use of body-worn cameras when executing any search warrant, the Department of Justice tells us that no body cameras were used.

If this isn't the weaponization of government, I don't know what is. I don't know what is.

Mr. Dettelbach, we are going to have questions about this and a host of other things the ATF has done under your watch. A host of other things. We appreciate you being here today. We appreciate you taking our questions, but there are going to be tough questions from folks on our side. We have a video I would like to show which—just so—it is a minute-and-a-half, but it first shows the ATF agents assembling in the Walmart parking lot a week before March 19th when they were going to execute this search warrant, again pre-dawn hours a week before, but decided not to because they realized Mr. Malinowski wasn't home. Then, it shows what happened a week later as they approached the Malinowski home. So, let's run the video.

[Video played.]

Chair JORDAN. The Chair now recognizes the Ranking Member for an opening statement.

Mr. NADLER. Thank you, Mr. Chair. Mr. Chair, we last conducted an oversight hearing of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, or the ATF, just over one year ago. Since that time a few things have changed, and a great many things have stayed the same. Let's begin with what has changed.

Last month the Attorney General signed an ATF final rule clarifying who was, quote, "engaged in the business," of selling firearms and who must therefore obtain a license to sell firearms and conduct the necessary background checks. This rule implements a change in this definition made by Congress when we passed the Bipartisan Safer Communities Act, the first significant piece of gun violence prevention legislation in nearly 30 years.

Prior to the passage of the BSCA a person was, quote, "engaged in the business," of selling firearms if they did so, quote, "with the principal objective of livelihood and profit." Under the new law a person is engaged in the business of selling firearms if they do so, quote, "to predominantly earn a profit."

In finalizing this new rule ATF has adhered to its directive from Congress and has ensured that the ATF regulations are consistent with the definitions we updated through this historic legislation that makes Americans safer.

Importantly, the new definition and the new rule ensure that more gun sales, including those at gun shows or through the internet, include a background check, a life-saving tool that keeps guns out of dangerous hands. These changes are the only significant expansion of the Federal background check system since it was established in the Brady Handgun Violence Prevention Act in 1993.

4

The Department of Justice estimates that there are over 20,000 unlicensed sellers who were taking advantage of ambiguity in the law and who will now have to obtain a license and conduct background checks.

Yesterday, in a related hearing Republicans argued that this new rule is being used to target individuals who are merely selling a gun from their personal collection or who occasionally buy and sell guns as part of a hobby. This is false. The rule, quote,

> Expressly recognizes that individuals who purchase firearms for the enhancement of a personal collection or a legitimate lobby are permitted by the Gun Control Act to occasionally buy and sell firearms for those purposes or occasionally resell to a licensee or to a family member for lawful purposes without the need to obtain a license.

The final rule also states that, quote,

> Nothing in this rule shall be construed as precluding a person from lawfully acquiring a firearm for self-protection or other lawful personal use.

The law and the rule do not impose any new requirements on those who are merely selling a firearm to a neighbor, a friend, or a family member, or those who collect and occasionally sell firearms as part of their hobby.

Rather than targeting innocent lobbyist sellers this rule will permit—I am sorry, will prevent illegal gun sellers from profiting off gun trafficking. This comes at a critical time given that the ATF's National Firearms Commerce and Trafficking Assessment revealed that unlicensed gun sales were contributing more and more to the flow of firearms into the black market and unsurprisingly becoming a leading source of crime guns.

The second new development since we last heard from the ATF Director Dettelbach is that Republicans used their control of the House to enact significant cuts to several critical law enforcement agencies including the Department of Justice, the FBI, and the ATF. We knew this was coming because Republicans have been forthright in their determination to defund, intimidate, and hamstring the agency so that it can no longer effectively do its job and protect Americans from violent crime.

Republicans' own messaging documents actually celebrate the seven-percent cut to the ATF, the law enforcement agency responsible for protecting communities from gun violence, stopping gun trafficking, and ensuring lawful and responsible gun ownership.

This brings me to what is still as true today as it was over a year ago when we last conducted an oversight hearing of the ATF. The ATF is still the primary Federal agency tasked with keeping guns out of the wrong hands and it is still doing that important work even with the budget cuts forced through by House Republicans. The ATF is still providing vital resources that help State and local law enforcements solve crimes and prevent gun violence.

The ATF is still the only agency in the country that is able to trace crime guns helping law enforcement determine how a gun came to be owned and used in a violent crime.

The ATF is also still the only agency that provides local, State, Tribal, and Federal law enforcement with ballistic imaging analysis, a critical tool that could help solve crime and prevent further gun violence. It provides this assistance at no cost to its law enforcement partners.

5

Despite the significant value that the ATF provides to State and local law enforcement, Republicans have defunded the agency and they repeatedly seek to unravel its regulations through litigation, Congressional Review Act resolutions, and frivolous investigations, even when the ATF is merely following the law as directed by Congress. Some Republicans have even introduced a bill to abolish the ATF altogether.

The majority says that it stands with law enforcement, so why does it seek to abolish the only law enforcement agency with the capability of tracing crime guns? The majority says that they support State and local police, so why do they attempt to starve the agency that provides State and local police officers with so many critical resources to solving crime including homicides, gun trafficking, and organized crime? Why do they oppose commonsense protections like background checks and red flag laws favored by State and local police agencies nationwide?

The answer lies in another part of the ATF's responsibilities: Making sure that gun dealers follow the law by conducting background checks, refusing to sell to those who are not allowed to have firearms, and keeping records so that crime guns can be traced. The overwhelming majority of gun sellers have no problem following these laws, but when gun dealers willfully refuse to follow them, it is the ATF's responsibility to revoke their license to sell.

Republicans' priorities are clear: They would prefer to keep every gun store in the country open, even those that willfully violate the law, rather than to let the ATF save lives simply by enforcing the law.

This brings me to the final thing that is still the same since our last oversight hearing. It is still the case that we are losing more than 100 Americans to gun violence every single day. Even without counting suicides we have already lost more 6,000 Americans to shooting so far this year. That includes 88 young children, 454 teens, and 30 law enforcement officers who were killed by gunfire just this year.

Democrats have put forth a range of solutions to prevent gun violence, to support law enforcement, and to solve crimes, but since they took control of the House our Republican colleagues have not advanced a single bill that would make Americans safer from gun violence. Instead, they have continued to push for unfettered access to assault weapons, concealable rifles, and ghost guns, and to abolish the very agency tasked with preventing gun crimes.

As Republicans continue to seek freedom from gun regulations, we will continue to seek communities free from gun violence.

Director Dettelbach, thank you for appearing here today to talk about the important work that the ATF does to keep Americans safe. I look forward to your testimony and I yield back the balance of my time.

Chair JORDAN. The gentleman yields back.

The 1.4 billion in 2022, 1.6 billion in 2023, and 1.75 billion 2024. Hardly a cut to their budget.

Without objections, all other opening statements will be included in the record.

We will now introduce today's witness. Mr. Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

6

He was sworn in on July 13, 2022. We welcome our witness and thank him for appearing today.

We will begin by swearing you in. Would you please rise and raise your right hand?

Do you swear or affirm under penalty of perjury that the testimony you are about to give is true, correct to the best of your knowledge, information, and belief, so help you God?

Mr. DETTELBACH. I do.

Chair JORDAN. Let the record reflect that the witness has answered in the affirmative.

Thank you. You can be seated.

Please know your written testimony will be entered into the record in its entirety. Accordingly, we ask that you summarize your testimony. Director Dettelbach, you may begin.

### STATEMENT OF THE HON. STEVEN DETTELBACH

Mr. DETTELBACH. Chair Jordan, Ranking Member Nadler, the Members of the Committee, when I testified last year I said it was my great honor to lead the dedicated employees of the ATF. This year I'll repeat that statement and add that agents run toward gunfire to protect strangers, and our staff works day and night to support our mission. Their work in the last year has been nothing short of spectacular.

As I stated last year, the level of violent crime in America is unacceptable, however due to the hard work of these heroes and our partners we have made significant progress in making communities safer. Last year our Nation had one of the steepest single year declines in violent crime in its history. Murders down nearly 13 percent across 175 cities. This doesn't happen by accident. It is the result of hard and very dangerous work.

In 2022, Federal weapons convictions hit a record high according to recent reporting. In 2023, the ATF's criminal enforcement efforts were up again. We indicted even more cases and increased convictions by 8.5 percent and the cases that we do make an impact because we focus on removing the most violent offenders from our streets. This progress tells us the strategies are working. It is not the time to let up now.

The ATF's data-driven support helps law enforcement lock up the trigger pullers and stop the flow of illegal guns to them from trafficking. We must go after both the shooters and the criminals. Both. That is the only way we will continue to drive down firearms crime.

Firearms trafficking is not a victimless crime. Those who illegally arm violent people: Gang members and drug dealers, they are responsible for the violence that follows. A recent ATF report shows that 60 percent of trafficked firearms go to convicted felons, prohibited people, and thousands of these trafficked guns are used in murders and shootings. Further, the most common type of firearms trafficking now is dealing firearms for profit without a license.

In Midland-Odessa, Texas, for example, in 2019 a man who couldn't pass a background check from a licensed dealer instead went and got a gun from an illegally unlicensed firearm dealer. The result, a deal in a parking lot, a mass shooting. Seven dead, twenty-five shot, three police officers, and a seventeen-month-old child.

7

These types of crimes prompted Congress to pass the Bipartisan Safer Communities Act two years ago. The law provided new tools to hold firearms traffickers accountable. Since then, the Department of Justice led by the ATF and prosecutors has charged nearly 500 defendants under those new provisions.

Motivated by cases like the murders in Midland-Odessa Congress also included a specific provision expanding who must obtain a Federal license to deal firearms and therefore crucially who must conduct background checks before selling those guns.

Last month, the ATF used the authority Congress delegated to it to issue a final rule on being, quote, "engaged in the business of firearms dealing." This rule helps to identify those who must be licensed under Congress' law and is designed to raise compliance with the statute Congress wrote.

Even with our progress the toll of gun violence remains crushing. More than 40,000 people died from gun violence last year. Another 36,000 suffered grievous wounds or wounds from gun violence. Those are not just numbers. We all know—we agree those are really people. They're parents, they're brothers, they're sisters, and they're children. In fact, the leading cause of death for American children is gun violence. Not cars, not cancer, and Guns. That is unacceptable.

We're reminded too often. It was two years ago tomorrow, in fact, that a shooter opened fire at Robb Elementary School in Uvalde, Texas murdering 19 kids, two teachers, and shooting 17 others. We know there's been so many other tragedies like this.

Last, but not certainly least, as we commemorated Police Week last week, we're reminded that all too often victims of firearms violence carry the badge. Last year, 49 brave officers were killed in the line of duty by gunfire. This year, that number is already at 22 including four officers in North Carolina—went to the funeral—gunned down while executing a warrant at the home of a firearms violator.

We have to support law enforcement together including giving law enforcement the resources we need to protect Americans. Again, now is not the time to let up. We know what works. The data are supporting it. It's time to double and triple down together on our efforts to save more lives.

Mr. Chair, Mr. Ranking Member, and the Members of the Committee, I look forward to your questions.

[The prepared statement of the Hon. Dettelbach follows:]

8

 **Department of Justice**

---

STATEMENT OF

STEVEN DETTELBACH
DIRECTOR
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES


BEFORE THE

COMMITTEE ON THE JUDICIARY
U.S. HOUSE OF REPRESENTATIVES


FOR A HEARING ENTITLED

OVERSIGHT OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS
AND EXPLOSIVES


PRESENTED

MAY 23, 2024

9

Statement for the Record of Steven Dettelbach
Director
Bureau of Alcohol, Tobacco, Firearms and Explosives
U.S. Department of Justice

Before the Committee on the Judiciary
U.S. House of Representatives

At a Hearing Entitled
Oversight of the Bureau of Alcohol, Tobacco, Firearms and Explosives

Presented
May 23, 2024

Good morning, Chairman Jordan, Ranking Member Nadler, and members of this Committee. Thank you for inviting me to testify before you today. When I testified before you a year ago, I said that it is my great honor to represent the dedicated employees of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) who work tirelessly to protect the American people from violent crime. That is truer today than ever. Each day, across the country, ATF employees are making a real impact in the fight against violent crime. They act with great courage, perseverance, professionalism, and integrity, and I am extremely proud of, and humbled by, their service and commitment.

Last year, the United States saw one of the steepest declines in violent crime in our history. The extraordinary efforts made by ATF, our law enforcement partners, and this Administration's comprehensive violent crime reduction policies resulted in double digit drops in violent crime rates — including gun violence rates in many cities in 2023. Murders were down nearly 13% among 175 cities, down, for instance, 11.5% in New York, 15.5% in Los Angeles, 12.7% in Chicago, and, 20% in Baltimore. I have visited these places and worked with our law enforcement partners there. They believe, and I agree, that this progress tells us that our strategies are working, and that it is not time to let up; it is time to double and triple down on these efforts so that this decline continues. At ATF, that means ramping up our efforts using evidence-based, data-driven crime strategies to (1) identify and disrupt the trigger pullers who drive violence within our communities, and (2) stop the flow of firearms to the illicit market, where they far too often end up in the hands of those same trigger pullers or other individuals the law says cannot have them.

This is an especially important point to make today, the day before the two-year anniversary of the Robb Elementary School mass shooting in Uvalde, Texas, which claimed the lives of 19 children and two teachers and injured 17 others. In the wake of that tragedy, Congress passed the Bipartisan Safer Communities Act (BSCA), Among other goals, that law contained specific provisions aimed at helping law enforcement, including ATF, prevent the illegal movement of firearms into the hands of prohibited individuals. These bipartisan, common-sense efforts make a real difference, as they provide the invaluable law enforcement tools necessary to help identify, disrupt, and dismantle the root causes of gun crime.

2

10

Every day, together with our federal, state, local, Tribal, and territorial law enforcement partners, ATF seeks to use these legal tools supplied by Congress to keep our communities safe from gun crime. Together with our law enforcement partners, ATF does this, including by:

*Enforcing the New Criminal Provisions in the Bipartisan Safer Communities Act.* In June of 2022, Congress passed the BSCA, which gave ATF new criminal statutes—straw purchasing, 18 U.S.C. § 932, and firearms trafficking, 18 U.S.C. § 933—to protect the public from gun crime by holding those accused of supplying illicit weapons accountable. Since the BSCA's enactment, the Department of Justice has charged over 480 defendants under BSCA's new straw purchasing and firearms trafficking provisions. At ATF, these new tools are allowing our special agents to go after the criminals who flood our streets with weapons and put guns in the hands of individuals who are prohibited by law from having them. Just last month, for example, ATF used the BSCA to help:

- Bring straw purchasing charges against three Texas men for their alleged role in purchasing firearms and transporting them to a Mexican drug cartel.[1]

- Secure an 84-month prison sentence for an Ohio man who pleaded guilty to being engaged in the business of dealing in firearms without a license and firearms trafficking after selling over 35 firearms.[2]

- Obtain a 23-year prison sentence for an Iowa man, who was charged, together with ten other members of a criminal street gang involved in the distribution of fentanyl, straw purchasing, firearms trafficking, and possession of machineguns, for his role in an investigation that involved 92 firearms.[3]

*"Engaged in the Business" Rulemaking.* In enacting the BSCA, Congress also chose to expand the category of people who must obtain a license and, therefore, conduct background checks before selling firearms. Decades ago, in the 1960s, Congress decided that anyone engaged in the business of dealing firearms for profit was required to get a federal license. In the 1990s,

---

[1] *See* USAO S.D. Tex. Press Release, *Three Indicted for Providing Firearms to Cartel del Noreste*, (April 30, 2024) *available at* www.justice.gov/usao-sdtx/pr/three-indicted-providing-firearms-cartel-del-noreste.
[2] *See* USAO N.D. Ohio Press Release, *Local Men Sentenced to Imprisonment for Illegal Trafficking In Firearms*, (April 19, 2024) *available at* www.justice.gov/usao-ndoh/pr/local-men-sentenced-imprisonment-illegal-trafficking-firearms.
[3] *See* USAO S.D. Iowa Press Release, *Defendants Charged in Joint Federal, State, and Local Investigation of Firearms Trafficking and Drug Distribution*, (July 21, 2023) *available at* www.justice.gov/usao-sdia/pr/defendants-charged-joint-federal-state-and-local-investigation-firearms-trafficking. *See also* USAO S.D. Iowa Press Release, *OMB Gang Member Sentenced on Firearms Trafficking and Fentanyl Distribution Charges to 276 Months in Federal Prison* (April 8, 2024) *available at* www.justice.gov/usao-sdia/pr/omb-gang-member-sentenced-firearms-trafficking-and-fentanyl-distribution-charges-276.

3

11

Congress added a crucial requirement that those federal licensees run background checks when they sell guns, a system that has since prevented millions of felons and other prohibited people from buying a gun. In the BSCA, Congress expanded the category of people who must obtain a license and conduct background checks before selling firearms by making changes to the definition of "engaged in the business" as a dealer in firearms.

Illicit unlicensed dealing, firearms trafficking, and straw purchasing are not victimless crimes. If you illegally help arm violent people, then you too are responsible for the violence that far too often follows. Unfortunately, the data, and our common sense, tell us that there is a large and growing illicit market in firearms that are being sold by people who are in fact engaged in the business of dealing firearms, but doing so without a license. From 2021 to 2023, federal prosecutions for unlicensed firearms dealing increased by 52%. A recent ATF study, in fact, confirmed that, even before the BSCA expanded the definition of "engaged in the business," unlicensed dealing was skyrocketing as a factor contributing to the illicit flow of firearms. This public safety issue, resulting in cases like the 2019 mass shooting in Midland-Odessa that killed seven and injured 17 more, including three police officers, was one of the reasons Congress passed the BSCA.

Just last month, ATF used the authority delegated under the Gun Control Act (GCA), as amended by the BSCA, to issue a Final Rule with a regulatory "Definition of 'Engaged in the Business.'" This Final Rule was promulgated pursuant to the full notice-and-comment provisions of the Administrative Procedure Act. The Department of Justice issued the Final Rule after carefully considering and addressing almost 388,000 public comments. Even before this Final Rule went into effect, the Department of Justice and ATF were sued to block the enforcement of this critical regulation. Therefore, while I am limited in what I can say regarding the Final Rule during the pendency of those lawsuits, I encourage you to read the Final Rule for a full understanding of its contents.[4] To be clear, as I said when it was announced, the Final Rule does not:

- Infringe on the Second Amendment rights of the many law-abiding licensed firearms dealers and individuals who already play by the rules. These dealers already run legally required background checks. They already keep transaction records. They already sell firearms with serial numbers to help police in your districts trace crime guns and catch criminals. And they already work with the ATF to identify and report suspicious activity.

- Require universal background checks. Only Congress can require that every person who transfers or sells a gun needs a license. Rather, the Final Rule explains that the law does not say – and it has never said – that you are allowed to engage in the business of dealing firearms without a license so long as you do it at a gun show, on the internet, or through some other new or non-traditional media.

Rather, this Final Rule:

---

[4] *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 FR 28968 (Apr. 19, 2024).

4

12

- Takes a practical approach aimed at identifying under current law, specific, identifiable actions, like purchasing credit card processing services to repetitively accept payment for firearms, that are likely to indicate that someone is in the business of selling guns with the intent to profit.

- Plainly identifies other circumstances, like occasional transfers to family members, that do not so indicate.

- Provides common sense clarity to make sure that true hobbyists and collectors can enhance or liquidate their personal collections without fear of violating the law.

*Domestic and International Firearms Trafficking.* Firearms violence is far too often facilitated by the ease with which criminals can obtain weapons from unlawful commerce, including those engaged in illicit dealing without a license, firearms trafficking, and straw purchasing. In fact, between 2017 and 2021, 60% of trafficked firearms went into the hands of previously convicted felons or other prohibited people. And thousands of those illicit firearms were used to commit crimes, such as murder, drug trafficking, aggravated assault, and home invasions.[5]

That is why ATF is focused on identifying, disrupting, and dismantling domestic and international firearms trafficking networks. Those include not only domestic networks, but also networks that transport firearms illegally from the United States to Mexico. Cross-border firearms trafficking does not occur only at the border any longer. Nor is it limited to cases with scores of firearms being illegally transported at once. Rather, the problem is often diffuse, with firearms trafficking many times involving the smuggling of only a few weapons at a time, from sources that penetrate far away from the border, into the interior of the United States. Accordingly, ATF uses every tool available to address international and domestic firearms trafficking, including Operation Southbound.

Operation Southbound, established in 2020, is ATF's signature initiative focused on degrading transnational crime organizations (TCOs) and the Mexican cartels' weapons trafficking capabilities. This operational initiative employs a whole-of-government effort that consists of nine interagency Firearms Trafficking Task Forces (FTTFs) deployed in eight cities along the Southwest Border with the sole focus on interdicting illegal firearms trafficking and then making cases. It aims to use these operations to stem the trafficking of firearms from the United States to Mexico. In addition to ATF, these task forces include participants from Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), Customs and Border Protection (CBP), and state and local law enforcement, as well as prosecutors in the pertinent United States Attorney's Offices and the Department of Justice's Criminal Division.

---

[5] *See* National Firearms Commerce and Trafficking Assessment (NFCTA), *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume.

13

This whole-of-government approach has proven effective, the data shows. Since 2020, Operation Southbound has resulted in a 40% increase in investigations of firearms trafficking into Mexico and a related 11% increase in firearm seizures.[6] In 2023 alone, over 2,600 firearms destined for Mexico were seized—representing a 65.8% increase over 2022—while over 115,000 rounds of ammunition were also seized in 2023—representing a 19% increase from 2022.[7]

As these numbers indicate, in the last few months Operation Southbound has seen many successes. In March 2024, in Texas, five individuals were charged for attempting to traffic more than 100 military-grade firearms to a drug cartel in Mexico.[8] Also, in March 2024, in California, 28 defendants associated with a criminal organization with ties to Mexico were charged for their involvement in drug and firearms trafficking that included over 936 pounds of meth, 5 pounds of fentanyl, and 50 firearms.[9] These are just examples of the incredible and dangerous work ATF and our law enforcement partners are doing to stop southbound firearm trafficking.

*Enhanced Regulatory Enforcement Initiative (EREI).* ATF's core mission is to protect the public from violent crime, including crimes involving the use of firearms. Part of that mission includes ensuring that the provisions of the GCA are followed, to help stem the flow of firearms into the black market and to prohibited persons. There is an important regulatory aspect to that effort. FFLs are often ATF's first line of defense against illegal gun trafficking and are often a source of critical information that helps law enforcement across the country identify straw purchases and disrupt illegal trafficking schemes. However, a small number of FFLs that willfully violate the law must be held accountable, because they increase the risk that guns will fall into the hands of violent criminals.[10] This sadly became evident, for example, in August 2023, when the

---

[6] See Dept. of State Fact Sheet, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023) *available at* https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/#:~:text=DOJ%27s%20Operation%20Southbound%2C%20led%20by,the%20number%-20of%20firearms%20seized.

[7] *See* U.S. Embassy Mexico, *Fact Sheet: Biden-Harris Administration's Ongoing Efforts to Stem Firearms Trafficking to Mexico* (June 14, 2023), *available at* https://mx.usembassy.gov/fact-sheet-biden-harris-administrations-ongoing-efforts-to-stem-firearms-trafficking-to-mexico/.

[8] USAO W.D. Tex. Press Release, *Five Arrested in South Texas for Allegedly Trafficking Military Grade Firearms to Mexican Drug Cartel,* (March 25, 2024) *available at* https://www.justice.gov/usao-wdtx/pr/five-arrested-south-texas-allegedly-trafficking-military-grade-firearms-mexican-drug.

[9] USAO E.D. Cal. Press Release, *"Operation SLO Ride" Dismantles Major Drug Trafficking Organization in Tulare County,* (March 14, 2024) *available at* https://www.justice.gov/usao-edca/pr/operation-slo-ride-dismantles-major-drug-trafficking-organization-tulare-county.

[10] USAO D. Ariz. Press Release, *FFL Owner Sentenced to Prison for Illegally Providing a Firearm to Essa Williams, Alleged Shooter of Phoenix Police Department Officer Tyler Moldovan,* (Aug. 10, 2023) *available at* https://www.justice.gov/usao-az/pr/ffl-owner-sentenced-prison-illegally-providing-firearm-essa-williams-alleged-shooter.

14

owner of an Arizona FFL was sentenced to prison for illegally selling a firearm to a prohibited person. The next day, this individual shot a Phoenix Police Officer using a different weapon.[11]

The EREI is an effort to enforce existing provisions of the GCA. It is focused on violations that pose an inherent public safety risk, such as transferring a firearm to a prohibited person, not allowing ATF to conduct an inspection or failing to conduct a background check. These violations, when willful, are not mere "paperwork" violations. They put the American people at risk by allowing firearms to enter the illicit market.

FFLs are afforded robust due process protections throughout the inspection and revocation process, as they have been in the past. FFLs have the right to an administrative hearing, and they also can appeal a final license revocation for *de novo* review in federal court. Moreover, ATF strives for transparency with respect to its inspections process so the public can see for themselves how ATF enforces the inspection requirements established by Congress. For example, between July 2021 and December 2023, ATF has revoked the licenses of just 250 FFLs under this Policy, which amounts to less than 1.5% of the over 16,000 FFLs inspected during this period. And, these revocations are for good cause, since each violation was found to be willful. For example, in 2022, an FFL was revoked under the Policy after ATF found dozens of willful violations that included failure to conduct a background check prior to transferring a firearm on 12 occasions and transferring a firearm to a person who the FFL knew or had reasonable cause to believe was federally prohibited from possessing firearms on more than one occasion.[12] Violations such as these, when found to be willful, directly place the public at significant risk, which is why ATF must act.

\*      \*      \*

Of course, the efforts mentioned above are not exhaustive; they are just some of the examples of what we are doing at ATF to drive violent crime down. And despite our relative successes, we know, all too well, that there is still much more to do. Too many lives are being lost to gun violence every single day. Last year, more than 40,000 people died from gun violence in our country. And another 36,000 suffered gunshot wounds, often with life-changing injuries. These are not just numbers. They are our family members, friends, neighbors, and, most tragically, our children. Indeed, gun violence is now the leading cause of death for America's children.

Just last week, our nation commemorated Police Week and honored our fallen officers. We know that, far too often, the victims of gun violence are members of law enforcement. By some counts, in 2023, 378 law enforcement officers were shot in the line of duty, 46 of whom died from

---

[11] USAO D. Ariz. Press Release, *FFL Owner Sentenced to Prison for Illegally Providing a Firearm to Essa Williams, Alleged Shooter of Phoenix Police Department Officer Tyler Moldovan*, (Aug. 10, 2023) *available at* https://www.justice.gov/usao-az/pr/ffl-owner-sentenced-prison-illegally-providing-firearm-essa-williams-alleged-shooter.

[12] *See* ATF Final Notice of Denial of Application, Revocation Suspension and/or Fine of Firearms License for The Gun Shop (May 10, 2022), *available at* www.atf.gov/docs/undefined/garywilliamgibbs84fci-24948508pdf/download.

15

their injuries.[13] In 2024, this horrific trendline is reportedly up, with already 136 officers shot, including the tragic loss of four law enforcement officers, including a Deputy U.S. Marshal, in North Carolina as they approached a suspect wanted for illegally possessing a firearm.[14] At ATF, we respond to every call for assistance when an officer is shot or shot at. We support our partners in their time of need. Just last week, after the tragic death of an officer in Euclid, Ohio, one of our federal law enforcement partners called me to emphasize what incredibly dedicated partners ATF have been in an investigation there.

Last week, I participated in Police Week activities, and I know many of you did as well. And, earlier this month, I attended Deputy U.S. Marshal Weeks' funeral. And last month, I held the first-ever Survivors of Gun Violence Summit at ATF HQ, with families of victims of gun violence from across the Nation.

These sobering events underline why I am here today. ATF is a small agency with a huge mission: to protect the American people from violent crime. It's what drives us at ATF. It's why we do everything we can to enforce the laws Congress has passed. It's why brave ATF agents run toward gunfire to protect strangers. It's why ATF inspectors work tirelessly to educate the FEL communities on the importance of the laws governing the transfer of firearms. And it's why ATF scientists perfect technologies and techniques to squeeze every ounce of evidence to help law enforcement solve crimes; it's why our analysts spend hours scouring data sets to generate actionable intelligence; and it's why our professional staff work tirelessly to support every aspect of this small agency's outsized mission.

Violent crime rates, while still unacceptably high, were down last year. For our part, ATF criminal enforcement efforts were up"—with over 4.5% more defendants indicted and 8.5% more defendants convicted between 2022 and 2023. But these cases are not just statistics, they have a direct impact on public safety. ATF is the only federal law enforcement agency whose sole focus is to work with police and other partners to protect Americans from violent crime—whether it's by indicting 45 Minneapolis gang members involved in murder and drug trafficking or 7 Sinaloa Cartel Members for fentanyl and firearms trafficking, our enforcement efforts are having a very real effect on violent crime.

Although great strides were made last year, we must do more. While violent crime is down, it is not the time for celebration. Nor is it the time to curtail or defund efforts that are working. Rather, it is the time to come together, to double and triple down on successful strategies to protect the American people. Although we may have many differences, my hope is we can all agree that the level of gun crime remains wholly unacceptable in our country. Together we can, and we must, do more.

All our efforts are designed to reduce violent crime and make our communities safer using the tools Congress has given us. Mr. Chairman, Mr. Ranking Member, and Members of the Committee, thank you again for inviting me to testify today. I look forward to any questions you may have about ATF and our mission,

---

[13] *See* Fraternal Order of Police Press Release, *378 Officers Shot in the Line of Duty in 2023* (Jan. 02, 2024), *available at* https://fop.net/2024/01/378-officers-shot-in-the-line-of-duty-in-2023/.

[14] *See* Fraternal Order of Police, *Monthly Update: Officers Shot and Killed* (May 1, 2024), *available at* https://fop.net/2024/05/fop-monthly-update-shot-and-killed-3/.

16

Chair JORDAN. I will now proceed under the five-minute rule. The Chair recognizes the gentleman from Alabama, Mr. Moore.

Mr. MOORE. Thank you, Mr. Chair. I will yield to the gentleman from Kentucky, Mr. Massie.

Mr. MASSIE. Thank you, Mr. Moore.

Mr. Dettelbach, in February, Chair Biggs and I sent you a letter concerning the pipe bombs that were discovered in January 6th—these were pipe bombs from over three years ago—and the investigation surrounding it. After months without a response, a day before yesterday, your department finally gave us a nonresponse. To be clear, the response was wholly inadequate and borders or showing contempt for Congress.

To quote from the letter,

> This investigation remains ongoing. Accordingly, pursuant to long-standing Department of Justice policy, ATF cannot provide details.

It goes on.

This is about the safety of Congress. These bombs were a couple blocks from here, yet you refuse to answer questions about them. If you don't have contempt for us, I will give you an opportunity to respond to some of my questions here today. Are you willing to answer those questions today?

Mr. DETTELBACH. I'm going to try within the rules which long-standing rules—I've been in five administrations at the Department of Justice, Democrat and Republican, and long-standing policy of the Department of Justice in both types of the Administration, on both sides, has been we do not comment on pending investigations.

Mr. MASSIE. Right. That is a policy. That has not been through some kind of rulemaking. That is a policy. You can say that to the media, but you can't say it to Congress. We created your department.

How many of the ATF personnel were on the Capitol premises on January 6, 2021?

Mr. DETTELBACH. Again, I don't believe I can answer specific questions about the investigation. I know that this may not relate to the investigation. So, I know that there were—I wasn't here during that period. That predated my time on January 6th, the January 6th attacks. So, I know there were some of the ATF agents who were called to help protect the Members of Congress. I don't know how many.

Mr. MASSIE. Well, that is not an acceptable answer. We have asked you this months ago and you just send us a letter saying you can't answer that, yet according to a FOIA report obtained by Judicial Watch there were 19 people here. So, for you to say you don't know or you can't tell us is ludicrous. These are subject to FOIA reports.

Mr. DETTELBACH. Congress, I am happy to also get back to you with information. If I don't remember all the numbers at the tip of my fingers, I'm sorry about that.

Mr. MASSIE. Are you willing to confirm that the pipe bombs planted at the Capitol Hill Club and the DNC on January 6th couldn't have gone off with a 60-minute kitchen timer if they were placed the day before?

17

Mr. DETTELBACH. Respectfully, Congressman, I do believe that this does go into the area of the investigation, which is—the ATF is supporting. The FBI is leading that investigation and I cannot comment on that.

Mr. MASSIE. We are three years into it. Who was the on-scene Incident Commander for the ATF on January 6th?

Mr. DETTELBACH. Again, if you're asking about the scene of the investigation at the headquarters, again—

Mr. MASSIE. You are not going to tell us who the Incident Commander was?

Mr. DETTELBACH. I don't know. I'm telling you if that relates to the scene not here at the Capitol Building where we were protecting Congresspeople from attack, but to the other investigation scene, we can try to get back to you. I will tell you if it relates to a pending investigation, we won't be able to comment.

Mr. MASSIE. Does the ATF provide training to U.S. Capitol Police on explosive detection, detonation, disarming, or simulation training exercises with U.S. Capitol Police?

Mr. DETTELBACH. We provide the National Center for Explosives Training and Research in Huntsville, Alabama—provides training to numerous different law enforcement agencies. I would not be surprised if Capitol Police were one of them. I don't know the training regimen. People are going down there all the time to get training.

Mr. MASSIE. Were the two pipe bombs on January 6th part of a training exercise?

Mr. DETTELBACH. I cannot comment on a pending investigation, but if—

Mr. MASSIE. OK.

Mr. DETTELBACH. In general, I would say—

Mr. MASSIE. Well, then [inaudible]—

Mr. DETTELBACH. In general, I would say to that I think if law enforcement knows if something is part of some sort of a law enforcement exercise, they wouldn't be conducting that long of an investigation, in general, but I don't—

Mr. MASSIE. In my last remaining seconds, I want to show you a video of something that you said on 60 Minutes.

[Video played.]

Mr. MASSIE. Are you aware it is illegal for you to create a registry of gun owners in the United States?

Mr. DETTELBACH. I am.

Mr. MASSIE. Are you insinuating here that somebody can't buy a firearm with cash?

Mr. DETTELBACH. No.

Mr. MASSIE. So, why would a dealer—why should a dealer call you if somebody is going through a background check and tell you that somebody is using cash?

Mr. DETTELBACH. We run a program called "Don't Lie For the Other Guy," along with the National Shooting Sports Foundation. There are indicia of straw purchasing matters where there are warning signs where people can contact us. Firearms dealers who are law-abiding business owners, and the majority are—I want to say that again here—they frequently contact us, especially on the Southwest border because cartels are using straw purchases to arm

18

themselves with the kind of weaponry that results in death and destruction, and danger to Americans and law enforcement.

Mr. MASSIE. We are concerned because banks are keeping these records and giving them to the government without a legal process, and I yield back.

Chair JORDAN. The gentleman yields back.

The Chair now recognizes the Ranking Member for five minutes.

Mr. NADLER. Thank you, Mr. Chair. If Republicans were to succeed in their effort to abolish the ATF, how would that affect public safety, particularly gun violence in this country?

Mr. DETTELBACH. Protecting Americans from violent crime, including firearms violence, was, is, and will always continue to be the ATF's top priority, and we work in partnership with State and local law enforcement officials to do that. We investigate the most dangerous, worst of the worst, the people who are out there, trigger pullers, and terrorizing our communities. As I said in my opening statement, the results speak for themselves. Working with our State and local partners we do a dangerous job, we do it well, and we catch a lot of very violent people.

The tools we make available to local law enforcement, the crime gun intelligence which enables them to identify who those people are better than ever before so we can focus limited law enforcement resources on catching them is working. It is driving down violent crime in our cities. That's why everywhere I go in the country, Congressman, everywhere I go: Red State, Blue State, city, and rural, they ask for more of the ATF resources.

Mr. NADLER. If the Republicans were to succeed in their effort to abolish the ATF, how would that affect public safety?

Mr. DETTELBACH. Well, all of that would go away.

Mr. NADLER. OK.

Mr. DETTELBACH. All of that would go away. Our State and local partners who are asking for more the ATF, they would be robbed of any of the ATF. All the cases that we do, all the gangs we prosecute, the RICOs, the VICARs, and the cartel cases, all the things we do would disappear.

Mr. NADLER. Thank you. While some House Republicans have sought to abolish the ATF, others have sought to defund it or to reduce its effectiveness through dramatic budget cuts. In fact, House Republicans have actually bragged about cutting the ATF by seven percent this year. I understand that the ATF has done an admirable job despite these budget cuts. For example, the agency has been able to dramatically reduced, processing times of certain firearm transfer applications under the National Firearms Act. Can you describe the impact these cuts have had on the agency and how slashing funding for the ATF reduces your ability to protect Americans from gun violence?

Mr. DETTELBACH. Yes. So, the ATF is an agency that is not a large agency with an outsized mission protecting people from violent crime, and we have a very focused effective strategy to do that, but you—sometimes less is more. In law enforcement less is not more. You can't get public safety on the cheap. The fact of the matter is that, pursuant to the cuts passed by Congress, we have canceled already two classes of special agents this year. Those are

19

each 24-agent classes. I fear there will be more cancellations moving forward.

We have obviously cut people in all job categories. Lab technicians who run DNA tests to try to catch mass killers like happened in Goshen, California. We are doing our best with what you give us. We will continue to work to do that, but there's no doubt that the cuts that have been imposed will have a direct impact on public safety and the ATF's mission to fight violent crime. No doubt.

Mr. NADLER. Thank you. Last week we heard a great deal from Republicans about the need to support State and local law enforcement. Can you tell us how the ATF works with and supports State and local law enforcement?

Mr. DETTELBACH. There is no better partner in Federal law enforcement for State and local police, sheriffs, State police than the ATF. We stand shoulder to shoulder with local law enforcement doing the most violent cases that they do.

Everywhere I go, as I said, Congressman, every Chief I talk to, every sheriff I talk to, it doesn't matter, urban, rural, North, South, Midwest, and East Coast, they all say the same thing.

Mr. NADLER. Thank you.

Mr. DETTELBACH. You guys are doing great. Please send more agents.

Mr. NADLER. Can you explain what a ghost gun or personally manufactured firearm is, and why such firearms pose a danger to the American public?

Mr. DETTELBACH. The ATF's legal responsibility is to implement the laws that Congress passes. Congress passed the Gun Control Act. The Gun Control Act talks about the need for those engaged in the business of selling firearms to have a license. It also talks about anything that is, quote, "readily convertible to being an operable firearm" falling under the definition of firearm.

So, people who are producing kits that they send out so that people can—then you're engaged in the business of doing it. I'm not talking about an individual hobbyist making a firearm for himself at home. That's allowed. The people who are selling these kits for money and saying, "oh, this is not readily convertible to being a firearm because it's not put together." We evaluate those and the rule that we promulgated on privately made firearms addresses that.

Congressman, the number of privately made firearms, which are untraceable, un-serialized firearms that are used in crimes in a five-year period went up 1,000—I'm going to say 1,000 percent, 10 times, by a multiple of 10, year over year. There's a reason for that. The reason for that is felons and violent people. They know they're going to do something bad. They don't want the firearm to be traced to them. It's a cold weapon. It's untraceable and it's very dangerous in the wrong hands.

Mr. NADLER. Thank you.

Mr. Chair, I ask unanimous consent to enter into the record a May 22nd letter from Assistant Attorney General Carlos Uriarte to me that explains the risk that un-serialized firearms or ghost guns pose to the public, their proliferation among guns found at crime scenes, and the numerous efforts of the Department of Justice to

reduce violence caused by ghost guns and other firearms and to promote public safety.

I also ask unanimous consent to enter into the record a March 7th *Washington Post* article titled, "House Republicans want to Defund the Police," which outlines how Republican cuts to the FBI and ATF will harm the important work of State and local law enforcement.

Chair JORDAN. Without objection.

Mr. NADLER. Thank you. I yield back.

Chair JORDAN. Mr. Dettelbach, what were you trying to hide? When the raid on March 19th on Mr. Malinowski's house disabled the doorbell camera, cut electricity to the house, and you didn't wear body cameras what were you guys trying to hide?

Mr. DETTELBACH. Mr. Chair, we're not trying to hide things. In fact, after—

Chair JORDAN. Sure, seems like it.

Mr. DETTELBACH. After the—

Chair JORDAN. You guys cut electricity to the house?

Mr. DETTELBACH. After the—

Chair JORDAN. Well, that is not the question.

Mr. DETTELBACH. I'm trying to answer. After the—OK. If there's no question, that's fine. I'm sorry.

Chair JORDAN. No, that is a question. Did you?

Mr. DETTELBACH. After the incident we, along with the Little Rock Police, called for an independent investigation to be done by the Arkansas State Police and the local prosecutor.

Chair JORDAN. Oh, I asked—

Mr. DETTELBACH. That's not trying to hide anything.

Chair JORDAN. I asked three questions. Why did you put the tape on the doorbell camera? Why did you cut the lights? Why didn't you wear the body cams? What are you trying to hide?

Mr. DETTELBACH. Mr. Chair, the reason that we called for the investigation is we're not trying to hide anything. The reason I'm not going to talk about what's going on in that investigation is to respect its independence and out of fairness. There's a reason for the Department of Justice policy that's existed for so many decades about not commenting on pending matters. It's not fair to people and it risks the perception that people are trying to influence—

Chair JORDAN. Well, how about this one? Why did you ignore the rules? Because don't the rules say you should only use a no-knock entrance into a property if it is the only way—if it is the absolute best way to do it? I could read from Ms. Monaco's directive,

> Limit the circumstances in which agents may seek to enter a dwelling pursuant to a warrant without complying with the knock and announce rule because of the risks posed to both law enforcement and civilians.

So, you want to limit this. Why did you guys do it all in 57 seconds?

Mr. DETTELBACH. Respectfully, with respect to what I said before is that we are not trying to hide anything. An independent agency is investigating it and we, pursuant to long-standing policy, are not going to comment.

Chair JORDAN. Director, the Department of Justice has already told us you guys weren't wearing cameras. I am just asking, why?

Mr. DETTELBACH. For the cameras, our body-worn camera policy—I can talk about that, even—I think I can answer the question without talking about this case.

Chair JORDAN. You can talk about some things relative to the investigation, but not others. We want all the answers to what is going on here.

Mr. DETTELBACH. I will tell you with respect to the body-worn camera policy the Department of Justice announced that policy. When it was announced, as we have communicated to your staff and you, it was announced that it would be phased implementation. The ATF is implementing that policy. We've implemented it in just under a third of our field divisions. We have not received three separate requests for program funding from Congress to do so, but we are still doing it.

I watched a hearing a couple of weeks ago where your fellow Chair—

Chair JORDAN. Did the Little Rock police officers who accompanied you on this raid—did they wear body cams?

Mr. DETTELBACH. Again, not commenting on this specific case, but in general the Department of Justice written policy allows local law enforcement on these types of operations, short-term operations to follow their own guidelines and policies, if they wish in body-worn cameras. What I wanted to say is—

Chair JORDAN. Well, the policy was to wear them. They weren't wearing them that day. We want to know, why? Did you tell them not to wear them?

Mr. DETTELBACH. Mr. Chair, again, it is simply unfair at this point while there's a pending investigation—

Chair JORDAN. It is a simple question. We just want to know why they weren't following the rules. Their rules say wear body cameras. Your rules say wear body cameras. You weren't wearing body cameras. I go back to my original question: What were you trying to hide? We saw the video where you walked up, you put the tape on the doorbell, we know there were no lights on the foyer, and we have Ms. Malinowski who can testify to that, and we know you weren't wearing body cameras. What were you hiding?

Mr. DETTELBACH. Again, Mr. Chair, we're not hiding anything. With respect to the body-worn camera policy, the people there—

Chair JORDAN. Why, on the 12th, did you not go and search the home? You were all circled up ready to go, but you—a week before on the 12th of March you don't go. You went on the 19th. Why did you decide not to go on the 12th?

Mr. DETTELBACH. Mr. Chair, these operations—and by the way, we do about 11,000 operations each year. They're very dangerous operations. The ATF doesn't do anything that is not dangerous. Well, that's not quite true, but many of them are very, very dangerous. Those operations are handled by people with decades of law enforcement experience. They plan them—

Chair JORDAN. You have got to admit—

Mr. DETTELBACH. —they look at things, and—

Chair JORDAN. Director, you have got to admit this is a little unique. You got a citizen, the highest paid official in the municipal government, Little Rock, Arkansas, making $260,000 a year running the airport, no criminal background history, nothing, and he

22

is dead at a pre-dawn raid when it sure looks like you could have served this search warrant when he wasn't there, but you decided not to. You decided to wait until he was home when you did it on March 19th. As a result, Mr. Malinowski is no longer with us.

Mr. DETTELBACH. Well, first, let me just say this, Mr. Chair. Obviously, any time that there's a loss of life that is a profound incident. Of course, on behalf of just myself, the ATF, and all law enforcement we are very sorry when those things happen. Also, an agent was shot that day. I'm sure you are sorry that occurred also.

Chair JORDAN. Of course.

Mr. DETTELBACH. Of course.

Chair JORDAN. All the more reason to follow the no-knock warrant—not to have a no-knock warrant take place and follow the rules.

Mr. DETTELBACH. Mr. Chair, as somebody who has worked with law enforcement for decades there's a great temptation when a horrible incident happens to prejudge. Sometimes people even try to use it to advance agendas. The cops who are in the field and the family whose—

Chair JORDAN. I just want the answers. My time is expired.

The Chair now recognizes the gentleman from Georgia, Mr. Johnson, for five minutes.

Mr. JOHNSON. Thank you, Mr. Chair.

Mr. Dettelbach, thank you for your service. Many of my colleagues and I have been strong proponents and supporters of the use of body cameras and funding for those cameras. So, in some ways it's rather surprising to read that Chair Jordan recently criticized you; he just did it today, about body cameras and what happened to them, and why they were not being worn. Meanwhile, House Republican Appropriations Committee Chair Hal Rogers just last month criticized your budget request for its department-wide emphasis on equipping Federal agents with body cameras.

Is there anything in response that you would like to say to Chair Jordan who supports the use of body cameras versus Chair Rogers, who want to defund the use of body cameras?

Mr. DETTELBACH. Well, it's not my position to get in the middle of two Chairs, but I will say this: Anybody, Chair Jordan or anybody—we've been implementing this policy for several years. Anybody who wants to support it I welcome to the effort and—

Mr. JOHNSON. We need to fund it. Let me just move on because there has been allegations that this gentleman who we—the Chair just discussed, Mr. Malinowski, suggesting that he was just a hobbyist. We call him an unlicensed gun dealer, but they say he was a hobbyist and a firearms enthusiast. In your opinion, is someone who buys and then almost immediately resells at least 150 firearms over a three-year period a hobbyist or an unlicensed gun dealer? Are they a hobbyist or an unlicensed gun dealer?

Mr. DETTELBACH. My opinion, your opinion, and others' opinions are not what counts. What counts is the Federal judge's opinion who reviewed the search warrant affidavit here and found probable cause that two separate Federal laws had been violated relating to unlawful firearms acquisition and dealing.

In that affidavit, which is public, some of the things that are set forth are that Mr. Malinowski had not obtained a license, that he

23

obtained about 150 firearms in the period prior to this incident, that he sold a good number of them, some one day after he had obtained them, that one of those firearms was found on the person of a 15-year-old Norteno gang member in California. Another was sold in the back seat of a car in Little Rock to a convicted robber. Others were found on a drug dealer in California, a kilo of marijuana, other drugs in the back, baggie, and scales consistent with distribution.

So, respectfully, these are not victimless crimes and it is up to Congress and the judge to make that determination. Those agents were present pursuant to the terms of a Federally judicially approved warrant. The time they were there was approved.

Mr. JOHNSON. Let me ask you this—

Mr. DETTELBACH. The day they were there was approved.

Mr. JOHNSON. Let me ask you this: Do you have any idea how many unlicensed gun dealers just like Mr. Malinowski are operating in this country selling multiple, tens of hundreds of firearms yearly?

Mr. DETTELBACH. I don't.

Mr. JOHNSON. Any idea?

Mr. DETTELBACH. We can get back to you with—we recently published a National Firearms Trafficking Report that talked about the fact that the percentage of people who are trafficking in this manner has now grown to be the number one way that people are unlawfully dealing firearms. So, 40 percent of all our criminal trafficking cases deal with the notion of people dealing—engaged in the business of dealing without a license. That has grown over time. It's growing.

Mr. JOHNSON. OK. Let me get this question in. Prior to your confirmation in 2022, there had been a seven-year lapse between confirmed ATF directors to the time when you were confirmed. During that seven-year period the crime rate and violent crime rate in the country went up and was going up. Then COVID hit which caused it to recede for a second. Then you were appointed. It is not a mere coincidence, that your appointment and confirmation has resulted in a decrease in crime and violent crime?

Mr. DETTELBACH. To me it's the men and women out in the field who are doing the work. I have the privilege to lead them, and I give all the credit to the brave ATF agents and police officers who are risking their lives. Thank you. Thank you for saying this, but it really is them who's doing the work.

Mr. JOHNSON. Well, without leadership it is hard to get things done, and I thank you for your leadership.

Mr. DETTELBACH. Thank you.

Mr. JOHNSON. With that, I yield back.

Chair JORDAN. The gentleman yields back.

The gentleman from Texas is recognized.

Mr. NEHLS. Thank you, Mr. Chair.

I believe with us today—Ms. Malinowski, if you are out there, would you please stand? I would like to recognize you, Ms. Malinowski. First, name is Maer.

Director, would you like to stand up and look at her and apologize?

24

Mr. DETTELBACH. I've already said, of course, whenever these things happen, it's a tragedy.

Mr. NEHLS. Yes.

Mr. DETTELBACH. Of course, we're sorry. Everybody is sorry that this occurred.

Mr. NEHLS. Yes, look at her. Don't look at me.

Mr. DETTELBACH. It doesn't mean that—I'm trying to also speak into the microphone. It doesn't mean that we can adjudicate this here today. There's an investigation going on. Of course, everybody feels bad. I'm sure that a Federal agent was shot, not shot at, shot that day. Those things are hard facts for all of us.

Mr. NEHLS. OK. All right. Thank you, Maer.

First, I want to enter something into the record. Your testimony, you say guns are the leading cause of death for children in the U.S. Not according to *Snopes*. It is a far-left publication. It is traffic crashes.

Could I have that entered into the record?

Mr. ISSA. [Presiding] Without objection.

Mr. NEHLS. Thank you so very much.

I was a sheriff, eight years, in law enforcement 30, conducted a lot of search warrants. My agency and I would not allow for no-knocks. Just didn't allow it, because what we have seen over the past several years. When you have these SWAT teams looking like ninjas coming to doors at 6:00 in the morning, it just could cause some problems. You stated in your testimony just a few minutes ago 11,000 of these a year. Very dangerous. Very dangerous. Done with very experienced agents, right? What policies do you have when you are going to execute search warrants, arrest warrants to mitigate risk? Mitigate risk.

Mr. DETTELBACH. Yes, so, Congressman, first, we do a very, very thorough job of training, which is of course, as you know as a Chair, very important. Second, we have operations planning. We have review of—

Mr. NEHLS. Thank you. Executing a search warrant pre-dawn, early in the morning, knowing people are going to be in bed, how does that mitigate risk, especially when you do it and it is a no-knock?

Mr. DETTELBACH. So, Congressman, as a former sworn sheriff, I assume you would agree with me that police are entitled to due process also.

Mr. NEHLS. Well, I tell you what it appears to me is what I have seen from the Federal Government, whether it is the ATF or the FBI doing search warrants or arrest warrants on J6ers, going in there with flash-bangs, with the big BearCats—I had a BearCat; I know what it is—and having agents come out looking like they are ninja turtles for combat, I think not only are you scaring the hell out of the entire neighborhood, but when you kick down or break down a door, and you don't even announce who you are, what do you think is going to happen? This was Mr. Malinowski there trying to protect his family. He didn't know. If you had called him, sir, had a casual conversation—were you aware that he had no criminal history?

Mr. DETTELBACH. Sheriff—

25

Mr. NEHLS. I just want to ask a question. Are you aware, did you know the gentleman had no criminal history, no prior—

Mr. DETTELBACH. Am I aware sitting here?

Mr. NEHLS. Yes, were you aware of it?

Mr. DETTELBACH. In firearms trafficking cases and people who are dealing without a license and buying 150 firearms—

Mr. NEHLS. I am sure there are a lot of bad hombres out there.

Mr. DETTELBACH. —they would not have a criminal—

Mr. NEHLS. I am trying to focus on Mr. Malinowski. Were you personally aware that he didn't have a criminal history?

Mr. DETTELBACH. Again, I'm trying to answer the question directly.

Mr. NEHLS. Well, obviously it is quite clear you weren't. It is quite clear you weren't. I want to talk about mitigating risk. Were you aware—were your agents wearing body cameras that day?

Mr. DETTELBACH. Again, I've tried to say this. I'd like the chance to answer this. The entire field division that covers Arkansas had not yet been phased in—

Mr. NEHLS. You have a budget. Try to convince the American people you don't have the do-re-mi to put body cameras on your agents that are conducting 11,000 warrants? These dangerous by— you have got 11,000 of them out there and you had a budget last year of $1.672 billion with a "B." You are telling me "I am sorry, folks, I can't provide this transparency to American people. I can't because I don't have the budget to do so." The American people— there is a problem right now with law enforcement out there. I have the picture and the image of every law enforcement officer that has been killed in the past 3½ years and there are way too many. There are way too many on my wall.

Mr. DETTELBACH. We agree.

Mr. NEHLS. So, we have body-worn cameras. Why do we do that? Because there is a lack of trust between the police and the communities they serve. So, when you provide these cameras there is no "he said, she said." It is all on record. You didn't have your body cameras on that day? I am telling you it stinks to high heaven. I highly, highly recommend you cooperate with this Committee and you try to explain, other than this I don't have the money to do so and I am phasing it in. Buddy, you got to get your priorities—reshuffle your priorities and get your priorities in order. I highly recommend you get body cameras on every one of those individuals that are serving these warrants, because it seems like there is a cover up here. I yield back.

Chair JORDAN. [Presiding] The gentleman yields back.

The gentleman from California, Mr. Correa, is recognized for five minutes.

Mr. CORREA. Thank you, Mr. Chair. Thank you for holding this most important hearing.

Director Dettelbach, thank you for being here today.

Ms. Malinowski, I just want to say prayers are with you, with your family in this very difficult moment. I hope beyond the heated debate that we are having here today we actually come up with better public policies to minimize the loss of life in these public safety enforcement actions.

I also, Mr. Dettelbach, would like to know what it is going to take to get those body cameras out in the field? How fast can we do it?

Mr. DETTELBACH. We have them across a third of the United States having received no program increase at all. We take them—we take that money, and we balance it with stopping gangs that are killing people, stopping cartels, as Chair Rogers point out with, that are the most dangerous organizations in the world, going after trigger pullers, homicide cases, and carjackings. So, we have made programmatic requests that are open to the public; 13 in 2023, 37.8 million—

Mr. CORREA. How fast can we get them out to the other two-thirds that don't have body cameras?

Mr. DETTELBACH. Right. I'm saying we have a pending request for a programmatic increase of $37.8 million. It's the same request we made last year that was not given—

Mr. CORREA. How long do you think it is going to take to implement? How long will this take to implement?

Mr. DETTELBACH. Currently, with what we have now, without anything else, we will be implemented across the country by end of 2026. If there's more resources, we can try to speed that up. It's not just—

Mr. CORREA. I, as a Member of Congress, hope I am speaking for a few folks here, hope that we can expedite body cams being worn by our agents out there. This is an important issue. Love to work with you, however, we can make sure that happens.

If I may, I am going to ask you my first question, which is how do you guys work with State, local, international agencies to protect your public?

Mr. DETTELBACH. Congressman—

Mr. CORREA. You were out in Orange County recently, my part of the town.

Mr. DETTELBACH. I was. We have to recognize—worked with the Orange County Violent Crime Task Force, which is a great example of how we work shoulder to shoulder with a variety of local police departments. What we do is target the worst of the worst. There was a case out there I remember hearing about. It was a series of Hobbs Act robberies that resulted in the death and murder of clerks at 7-Elevens, I believe. That's a case where we partner with local law enforcement.

The ATF has a little bit of a different way of doing this. If the most appropriate punishment is in the State court and it's murder, that's fine with us. We're not looking for necessarily only Federal cases. We look to do the case—

Mr. CORREA. Director, let me interrupt you. I have got a couple more questions here.

Mr. DETTELBACH. Sure. Of course.

Mr. CORREA. August 22nd, I sent you a letter requesting your help, your partnership specifically on a gun buyback program, voluntary gun buyback program that we implemented in my district. Didn't get the support there. It is important because this is a program where citizens voluntarily show up, free market. Here is 200 bucks. Here is a weapon I had at home that I haven't touched in 40 years. Have you been working on those or what is it that we

can do to get you to work with us on those very successful programs?

Mr. DETTELBACH. So, with those programs—and I think of course, we value public safety, and we value State and local agencies' determinations of what protects them.

With respect to gun buyback programs, that's usually a decision and a program run by the State and local agencies, not the Federal agencies.

Mr. CORREA. They need your help in executing those.

Mr. DETTELBACH. Well, sometimes agencies can and do apply for Byrne grant money that can support their comprehensive plans, but the ATF does not get involved in the actual operation of gun buyback programs. That is done by State and local authorities.

Mr. CORREA. We will talk some more later, but I do think these are important programs. You get guns off the street, guns that people don't want anymore. They would rather have $100–$200 in their hand as opposed to a weapon. Cost-effective. Nobody gets hurt. We do need your help. It is local, but we need the ATF's database to make sure when those guns are brought back, we can run them through a database to see if they have been involved in any crimes, to make sure that those are guns that we can take off the street without destroying evidence. Go ahead, sir. I have got a few seconds.

Mr. DETTELBACH. No, Congressman, thank you. We will work with you. I commit to you that we will get back to you and your staff on that.

Mr. CORREA. Thank you.

Mr. Chair, I yield the rest of my time.

Mr. ISSA. [Presiding] I thank the gentleman. I recognize myself now.

Director, you accused a dead man of a crime of illegally selling in the backseat a weapon. Would I hear that correctly?

Mr. DETTELBACH. Respectfully, what I did was talked about the public search warrant affidavit that was filed and approved by the judge.

Mr. ISSA. No, no, I understand, you are standing by your search warrant. You are standing by the fact that in the search warrant, you are alleging that he had committed a crime. Is that correct?

Mr. DETTELBACH. Chair, respectfully, I was making the point that a Federal magistrate—

Mr. ISSA. No, no, you are not being respectful. Answer the question. The question is, did you allege that he had committed a Felony, a crime, in your affidavit?

Mr. DETTELBACH. The judge did find that.

Mr. ISSA. OK, I will take that as the judge found it because you alleged it. So, you alleged a crime, but you didn't seek to arrest him, did you?

Mr. DETTELBACH. Again?

Mr. ISSA. Did you have an arrest warrant for Mr. Malinowski—

Mr. DETTELBACH. My understanding—

Mr. ISSA. That is a yes or no, Director.

Mr. DETTELBACH. My understanding is that there was not an arrest warrant. I don't have the full investigative file, but that is my understanding.

Mr. ISSA. You came here, you knew we were going to ask, you saw yesterday. Now, you are playing one of the games that the Chair and I didn't like during Fast and Furious, we don't like it now. If you want to be back here again because you can't seem to know what you should know, what Ms. Malinowski deserves to know.

If some group of ten carloads of people showed up and kicked in a door in the dark of night, and somebody came and shot at them, we wouldn't be talking about somebody getting shot in the toe, we would be talking exclusively about a planned murder of somebody, who may or may not be armed, but who had every right to have weapons in their home, an expectation they had weapons in their home, an expectation that they might use it.

All of that you don't have to be ATF to know. So, let's get back on track here again. If you had a belief that he had committed a crime, and if your intent was to arrest him, then that would explain why a week earlier, you have called off an already authorized search because you were only going to search for the weapons, you weren't going to search for him. Isn't that correct?·

Mr. DETTELBACH. Respectfully, Mr. Chair, I am not able and will not, it is not fair to do this during the pendency of a criminal investigation.

Mr. ISSA. No, no, look, it is always—I am sorry, but the DOJ and you guys, it is always, you can go on forever. Hunter Biden is over, why didn't you do a no-knock on him at his home with the Vice President?

Mr. DETTELBACH. To be clear, this isn't our investigation. We and the Little Rock Police asked for an outside investigation be conducted by the Arkansas State Police. It is their investigation. The District Attorney is going to review that.

Mr. ISSA. I hope they appropriately find that in spite of qualified immunity, that you blew it badly enough that, in fact, criminal charges should be considered.

Mr. DETTELBACH. I hope they just find whatever the truth is.

Mr. ISSA. What is the—what is the penalty for the crime alleged on the affidavit, for selling a weapon not as a licensed dealer? What is the penalty?

Mr. DETTELBACH. Oh, my Lord, Mr. Chair, I believe it is a 10-year felony. There are two different crimes. Those might be a five-year and a 10-year felony.

Mr. ISSA. OK.

Mr. DETTELBACH. I want to get back to you to make sure. There is a series of statutes that run all in a row there. I want to make sure I am not mixing up the statutes.

Mr. ISSA. It is five years, or it is 10 years. It is not a death penalty, is that correct?

Mr. DETTELBACH. There is not a death penalty for that statute, no.

Mr. ISSA. OK, so Mr. Malinowski was not in any danger of being executed for what he is alleged to have done and no longer can defend himself because he is dead. He was killed doing what any normal citizen does when people enter their home in the dark of night and they don't know who they are.

29

If you had body cameras, maybe Ms. Malinowski didn't hear right. Maybe you said "Police," and identified yourself. Maybe he said, "I don't care," and maybe he fired the shots. I don't believe that, and I don't think you do either.

I believe he had every real belief that he was defending his wife and family. He fired warning shots. A ricochet hit a police officer or an ATF agent, and you killed him. Those are the facts.

I have been investigating ATF for many years, and the ATF agents have, rightfully so, and with great trepidation I am sure, come forth and been our whistleblowers.

We have consistently seen there are two ATFs: The one we need and want and deserve, and the one that plays fast and loose, like ten cars going in deliberately with a warrant that did not entitle an arrest. When in fact if you wanted to arrest him, it would have been reasonable to arrest him at work and simultaneously go into his home.

If you had done that, he would be alive today and we would be talking about other things, including whether you acted legally.

With that, I yield back and recognize Ms. Scanlon for five minutes.

Ms. SCANLON. Thank you, Chair. Thank you, Director, for your testimony here today.

The Ranking Member mentioned that every single day 120 Americans are shot and killed, and more than 200 are wounded with gunfire. Those numbers are statistics; everyone is an American with a family, neighbors, and friends.

Yesterday morning at 8:30 a.m., a gunman killed two people and injured three others are a small, family owned business in Chester, Pennsylvania, right down the street from my office. Five people were shot, their coworkers and community were traumatized, just for showing up at work in the morning.

This unrelenting, unnecessary daily toll of gun violence is hitting families in every corner of every community across our country. Yesterday, it happened in Chester, a post-industrial city that straddles Interstate 95, which is known in law enforcement as the Iron Pipeline because it is the route that gun traffickers regularly use to smuggle weapons from States with weak gun laws to States with stricter ones.

The senseless violence is outrageous, but it is not inevitable. There are things we can do. This violence is enabled by lawmakers who choose to do nothing, who block legislation in the wake of tragedy after tragedy, while the American people are crying out for real action.

Whenever Democrats try to explore how Congress can act to stem this uniquely American carnage, our Republican colleagues say the solution is to enforce the laws that are already on the books. Here we are once again in a hearing in which Republicans are attacking the ATF, the law enforcement agency charged with primary responsibility for enforcing gun safety laws across our country.

It comes while our Republican colleagues have bills to abolish the ATF and have succeeded in getting cuts to its budget.

So, Director Dettelbach, I want to turn our focus to what might be real solutions and your agency's role in helping to implement

30

them. You spoke in your testimony about a 1,000 percent increase in ghost guns linked to crimes over the past five years.

Whenever I speak to our local law enforcement, including last night, they talk to me about how worried they are about the rapid proliferation of ghost guns. Ghost gun recoveries increased by over 400 percent in Philadelphia between 2019–2021.

Our Delaware County Police busted a gun trafficker who was building and testing ghost guns in an apartment across the street from our county courthouse. Our Montgomery County Police recently busted a whole ghost gun trafficking ring.

These fully functioning, untraceable firearms can be bought without a background check. They can be ordered online, and in less than an hour become a firearm as deadly as any sold by a gun dealer. That is why they have become, as you noted, the weapon of choice for people who might be otherwise barred from purchasing a gun for criminals.

So, am I correct that ghost guns look like regular guns and shoot like regular guns and kill like regular guns?

Mr. DETTELBACH. You are.

Ms. SCANLON. OK. Now, can you explain why they are posing such a danger to the American public, and why the ATF determined it was necessary to issue a rule amending the definition of frame or receiver to ensure that ghost guns are treated like other equally lethal firearms under our laws?

Mr. DETTELBACH. Congresswoman, the reason is as you said, under our laws. Under the Gun Control Act, Congress specifically provided that items that were readily convertible to being operable firearms should be treated as firearms. The market was out there producing items that were readily convertible, and they were being sold without background checks.

I actually, I did myself, I took one of these kits and put the gun together. My spouse will tell you I don't—I am not that handy around the house. It was very easy for me to make a firearm, take it to the range, and fire it.

These are firearms that shoot and would kill, like firearms that are sold in the traditional manner. Congress anticipated that problem. The market changed, and we issued a rule to make sure that Congress's statute was appropriately enforced.

Ms. SCANLON. We appreciate that, given the constant innovation that we see from gun manufacturers and those who seek to evade the existing laws. If we were to wait for Congress to catch up all the time, we would be in a lot of trouble.

Chair, I would ask unanimous consent to enter into the record a letter from the ATF's Acting Deputy Assistant Director for Public and Governmental Affairs, in which he responded to your letter regarding the execution of the search warrant on Mr. Malinowski's residence and about the ATF's compliance with DOJ's body-worn camera policy.

Chair JORDAN. [Presiding] Without objection.

Ms. SCANLON. OK. Just so you are aware of which letter it is, it is the one from May 21st, that responded to your request, which you referenced earlier.

Chair JORDAN. Without objection.

Ms. SCANLON. Thank you. It discusses the funding necessary.

Chair JORDAN. Got it.

Ms. SCANLON. Got it. I yield back.

Chair JORDAN. The gentlelady yields back. The gentleman from Florida is recognized.

Mr. GAETZ. Thank you, Mr. Chair.

So, the ATF has a final rule. I think the comments and the rule itself accumulate to about 466 pages that define who is engaged in the business of firearms dealing.

So, how many firearms does someone have to see to be engaged in the business of firearm dealing?

Mr. DETTELBACH. Congressman, as you know, that matter is being litigated in several courts. So, sticking to what is already in the public record, the rule itself is 16 pages, skipping lines. There is about, as you say, over 400 pages of explanation.

Mr. GAETZ. Yes.

Mr. DETTELBACH. So, there are factors that are conduct-based, not numerical-based but conduct-based. There is also, we received many comments. One of the comments that we received was from I think Senator Cornyn, who expressed a view that there was no numerical threshold. Others had a different view.

Mr. GAETZ. Yes, yes, in the House Judiciary Committee we probably won't look to Senator Cornyn as the oracle of all things gun rights. So, you are saying there really is no number.

Mr. DETTELBACH. I am saying that Congress—our job is to implement the statute that Congress writes.

Mr. GAETZ. Yes, yes, no, but just like for a regular person—

Mr. DETTELBACH. Congress didn't put—

Mr. GAETZ. For a regular person that one or another acquires guns, and they are trying to figure out how many of these guns do I sell before I have to register as a dealer. What you are saying is there is no bright line there.

Mr. DETTELBACH. I am saying that there is now more information than ever in the form of that rule for specific conduct-based—

Mr. GAETZ. No, just for a regular person, more information than ever is probably less helpful than if you sell three guns, you are not a dealer, and if you sell four guns, then you are a dealer, right. This rule that you guys have drafted, it is currently enjoined, right? It has no effect?

Mr. DETTELBACH. There are three cases that I know of, maybe more going on now. One of the judges has issued equitable relief.

Mr. GAETZ. So, in Texas, a judge has stopped the implementation of this law for three reasons.

First, that there is no minimum requirement. The court has found, this court in Texas, that you are just giving effect and life to Congress' statutes.

Second, you have in fact exceeded your authority. Because Congress would have never allowed some sort of sliding scale where 16 pages of single spaced whatever determines whether or not you are a firearm dealer, not how many guns you sell.

Third, that the court in Texas said that this would not have an effect, and it is that actual profit is not a requirement of the statute, only the predominant intent for profit.

How do you understand that ruling?

32

Mr. DETTELBACH. Again, that is in litigation. The Department of Justice's position on each and every one of these matters is public, it is laid out in many, many pages of briefing. So, I would ask people to look at our briefs that we filed in the court. I would commend your attention to that.

Mr. GAETZ. If just someone is just trying to figure out whether or not they have to get a Federal license or be subject to your guys breaking their doors down and potentially killing them, you would think that you would want that to be easily understandable.

Here, even if someone isn't turning a profit but they might want to turn a profit, they could be subject to this regulation, and the court found that troubling.

The third reason the court identified is that your rule doesn't just give meaning to Congress' statute, but that "arbitrarily eviscerates the safe harbor provision." So, there is a safe harbor provision in this law that says if you are just engaged in the occasional sale or exchange or purchase of a firearm for a personal collection or a hobby, that this wouldn't, this regulatory structure wouldn't affect you.

What the court is saying here in blocking your rule is that you have eviscerated the safe harbor that exists for the hobbyist. Do you have a reaction to that ruling?

Mr. DETTELBACH. Again, yes. Our position is not that, but it is under litigation. We have filed extensively—

Mr. GAETZ. Here we are; make your argument. They are sitting here in court trying to figure out what Congress means. What we are saying is there should definitely be a bright line in terms of guns. You shouldn't have to have this pondering question about profit motive, and you shouldn't eviscerate the safe harbor. That is what we are saying.

So, what is your argument as to why the safe harbor should be eviscerated?

Mr. DETTELBACH. Our argument is to look at the statute that Congress wrote. The statute that Congress wrote, and I just want to make clear that people understand this, there was an earlier comment about the word "livelihood." That is not in the law anymore that Congress wrote. Congress took that out of the law, it doesn't exist anymore.

So, we start with that statute. That is where things always begin and end—

Mr. GAETZ. I know you started with the statute, but what this court is saying is that you have exceeded the statute. You have done it in a way that eviscerates the safe harbor, that blurs the lines, and that creates no discernable way for people to comply with law.

The reason I think you guys are doing that is you want to make it more difficult for people to engage in the legal, lawful, and constitutionally contemplated manner to transfer firearms. You are trying to criminalize an entire enterprise. That is why you see us trying to curtail some of your funding and your authority.

I see my time is expired, Mr. Chair, I yield back.

Chair JORDAN. The gentleman yields back. The gentlelady from Georgia is recognized.

Ms. MCBATH. Thank you, Chair.

33

Thank you, Director Dettelbach, thank you for coming before the Judiciary Committee again. I really appreciate it. I know that the work that you do really saves lives, I know that. It protects our communities and helps many of us sleep a little bit better at night, and me in particular.

I for one, as well as many of my colleagues here, we do truly understand that the ATF plays a pivotal role in preventing gun violence by removing gun traffickers from our neighborhoods, ensuring that only lawful and abiding gun owners can purchase firearms, and assisting law enforcement at every level in solving gun crimes.

This Committee has many field hearings on victims of violent crimes. Well, it is the ATF's job to do so, to do that very thing, to bring our perpetrators to—that are violent crimes, to bring them to justice.

The most logical thing for us to do today is find ways to support you, to support the ATF's mission to reduce violent gun crimes. We should not defund, or we should not abolish the ATF, the very agency that is actually eliminating any semblance of need for a victims of violent crime hearing anywhere in this country.

Today, we need to hear from you, Director, if you can just tell us, and we need to find out from you, how we can actually assist you and support the ATF and its mission to reduce illegal firearm use and purchases, eliminate firearm threats, and protect our families, friends, and fellow Americans.

Director Dettelbach, the Bipartisan Safer Communities Act, the most significant gun safety legislation that we have had in almost 30 years, has made tremendous progress. I have been monitoring the progress of this package of work in eliminating gun violence as a public health crisis.

The initiatives that have been set forth in this law include parts of my plan for the implementation of extreme risk protection orders, those programs. Also, laws that ensure that firearms are not in the hands of those in court who have been found through the due process to be a danger to themselves or to the community.

Then, also, funding for community violence interventions in that package of work as well, and working to close the gun show loophole.

My colleagues, Director Dettelbach, have touched on how the ATF cuts have affected State and local law enforcement. Would you like to expand on that for us? Because this is really important, critical information that the country really needs to hear.

Mr. DETTELBACH. Protecting Americans from violent crime is at the core of everything we do at the ATF. That means that so many of our strategies and resources depend on supporting local law enforcement. Sheriffs' departments, police departments, and State police, I go and meet with those folks everywhere I go all the time.

The things that we do help them to close homicide cases, arrest gang members, get carjackers in Philadelphia off the street. Stop the outbound flow of firearms through our nine trafficking strike forces on the border to the cartels that present a danger to public safety in all those towns for all those sheriffs across the border.

We do all those things every day. On top of it, our CGICs and our Crime Gun Intelligence Centers, which are being put up all

34

over the country, are places where local, State, and Federal agents sit together, often with prosecutors, and evaluate violent crime cases in real time, so that the next morning we can be out on the streets investigating the most violent people.

Budget cuts make all that less and harder. Everybody wants a CGIC. We can't give everybody a CGIC because we don't have enough money for that. If we cut more money, we are cutting those Crime Gun Intelligence Centers that lead to operations that day, the next day, or the next week that get violent criminals off the street.

Ms. McBath. So, am I correct in understanding that you need full support and funding of the ATF?

Mr. Dettelbach. Yes, not just me, the agents who are out there risking their lives need and deserve that support.

Ms. McBath. Might I say, being a mother who lost her son to gun violence, I will tell you that law enforcement worked very hard on our behalf. I know they do this work every single day. I am just really grateful for the ATF. I am grateful for the law enforcement.

I am grateful for those that are on the front lines every single day doing everything that you express. Because it is vital, it is necessary, and this is a public health crisis. Thank you for the work that you are doing and all the agents and people that work with you to keep our communities safe.

I yield back.

Chair Jordan. The gentlelady yields back. The gentleman from Arizona is recognized.

Mr. Biggs. Thank you. Director, have you ever been a cop?

Mr. Dettelbach. Excuse me?

Mr. Biggs. Have you ever been a cop?

Mr. Dettelbach. I have not been a police officer. I was a prosecutor.

Mr. Biggs. Yes, so you don't have decades of law enforcement experience, but you said you worked with law enforcement, right? That is fair to say, right?

Mr. Dettelbach. I was a prosecutor for over 20 years in five different offices.

Mr. Biggs. You worked with law enforcement, you weren't law enforcement. So, is it common for the ATF to turn off the power to a location prior to executing a search warrant?

Mr. Dettelbach. Is it common for us to do that?

Mr. Biggs. Yes.

Mr. Dettelbach. I do not believe it is a common thing that we do.

Mr. Biggs. You are the Director. You either know it is common or you don't know whether it is common.

Mr. Dettelbach. I thought I answered the question, I am sorry.

Mr. Biggs. Is it common?

Mr. Dettelbach. My understanding is it is not common. I want to be very careful to say I am not commenting on any case. Because I am not sure, until the facts come in—

Mr. Biggs. Did I ask you about a specific case, sir? I did not, did I? I asked you about policy. You just said it is not common.

Next, does the ATF use RF frequency jamming technology to prevent the internet and cellphones from working—

Mr. DETTELBACH. Sir, sir, I am sorry.

Mr. BIGGS. Does the ATF use RF frequency jamming technology to prevent the internet and cellphones from working during the execution of a search warrant?

Mr. DETTELBACH. Again, I am not going to sit here, and I guess I maybe should have said this before, and comment on that tactics that we use when we go into dangerous places, because it provides a blueprint for criminals to hurt us.

Mr. BIGGS. So, let's get this straight then. You told us you won't answer anything specifically about a case. Now, you are saying you are not going to tell us generically.

Mr. DETTELBACH. We could—maybe we can contact your staff in a private setting and have a conversation instead of broadcasting for all the criminals what—

Mr. BIGGS. Does the ATF use dynamic entry as their means for entry during the execution of a search warrant?

Mr. DETTELBACH. Again—

Mr. BIGGS. Does the ATF still use dynamic entry as their means for entry during the execution of a search warrant?

Mr. DETTELBACH. Again, I don't think it is appropriate. We can communicate with you on these kinds of training issues. I just don't want to give a public blueprint for people tomorrow and the next day who are going to be facing law enforcement through the door to know how we are coming, what we are doing.

Mr. BIGGS. Do you assess pattern of life as part of risk assessment conducted prior to executing a search warrant? Can you answer that one?

Mr. DETTELBACH. I think that is far enough afield that I could say depending on the case, we can assess pattern of life at times, of course. Depends on the case, right? Some cases it is appropriate, some cases it is not.

These are careers—I don't do this, right. The career law enforcement people, as you pointed out, do this with decades of experience. I don't armchair quarterback them either.

Mr. BIGGS. Here is the deal: You are the Director, and I would expect that you would know what the policy is. It looks to me, you have convinced me that maybe Mr. Nehls was right. I am not sure that I thought he was right.

You didn't want to tell us specifically about the Malinowski case. I got that. I think it is wrong, I think it is a false narrative. Then when we start asking you, I start asking you about policies, generic policies, now all of the sudden you don't want to answer those.

So, when you coordinate with local law enforcement prior—you do coordinate with local law enforcement prior to the execution of a search warrant.

Mr. DETTELBACH. In most cases, yes. Certainly, most of our cases we are doing shoulder to shoulder with law enforcement and local—

Mr. BIGGS. These are yes-or-no questions. Thank you for answering yes. Is it the ATF's practice to instruct law enforcement partners to turn off their body cameras when participating in search warrants with the ATF?

Mr. DETTELBACH. The ATF's written policies that are in our MOUs is that if a local law enforcement agency has a body-worn

camera policy and we are going on one of these short-term operations, they are entitled to follow their own policy if they wish. That is in black and white.

Mr. BIGGS. Can you tell us the difference on how the ATF would handle a search warrant on a violent felon versus an individual who allegedly sold a few firearms without a license? Is there a distinction in your mind? Is that in your ATF's approach?

Mr. DETTELBACH. In every case, we do risk assessment, and it is dependent on all the facts and circumstances of any particular matter. So, in every case we do it, but you can't boil it down to one or two things. It is a risk assessment that experts who are risking their lives conduct.

Mr. BIGGS. How does the ATF balance the need for operational security and the need for safety to the public?

Mr. DETTELBACH. We have to do—you are asking about balancing. I think you said operational security. We have to keep the public safe, that is obviously paramount. Police officers are entitled to go home alive at the end of their shift also. We also have to make sure that we are doing that as well, you have to do both.

Mr. BIGGS. So, you didn't answer the question. The question presupposed exactly what you just said. We know that you have to balance it. How do you balance it? That is the question, how do you balance it?

Mr. DETTELBACH. The answer is both are paramount, and we have to do both in each operation. I will tell you this: There is no such thing for a police officer as no risk. They sign up, we sign up, and the agents sign up to risk their lives. They often go into very dangerous situations to do that.

So, there is no way to mitigate all their risk, sometimes very dangerous risk, from any operation.

Mr. BIGGS. We understand that, and we appreciate that. Now, I have to say that you didn't Mr. Massie's and my letter, our letters to you. I am hoping that you said you are going to give us additional responses to the questions I have asked you today. I would anticipate that you would give more fulsome answers than you gave us regarding the bomb, pipe bombing issue.

Chair JORDAN. The gentleman yields back. The gentlelady from Washington is recognized.

Ms. JAYAPAL. Thank you, Mr. Chair.

Director Dettelbach, thank you for being here. One major cause of migration into the United States is instability and violence in parts of Central America, which is partly fueled by the flow of firearms from the United States into Mexico, Central America, and the Caribbean.

The ATF reported than more than half of crime guns recovered in Central America, 70 percent of crime guns in Mexico, and 80 percent of crime guns in Caribbean countries are sourced from the United States, fueling instability and migration.

My Republican colleagues have refused to support commonsense gun safety legislation that would fight the flow of American guns across the Southern border and help address the root causes of migration. Instead, House Republicans have continued to criticize the Bureau, undermine resources to allow officers to do their jobs, and oppose commonsense gun safety legislation at almost every turn.

37

Could you describe any recent or current trends that the ATF has found regarding the flow of firearms from the United States into Mexico and Central America?

Mr. DETTELBACH. So, the ATF's job obviously includes firearms trafficking. One of the types of firearms we are seeing, right, there is domestic firearms trafficking that goes to California, New York, and places all over the country. There is also Southbound firearms trafficking.

It is accurate to say, and we shouldn't be reticent to say it, it is the truth, that our firearms that are going across the border Southbound are helping to arm the cartels.

Ms. JAYAPAL. That is right.

Mr. DETTELBACH. So, what do see? We have nine task forces that are Southbound task forces set up along the border. They work with State and local law enforcement, they work with the DHS.

We have the opposite problem, right. Other people are trying to stop things from coming North, we are focused on stopping firearms trafficking going South. They are related sometimes.

Congresswoman, what we see is that criminal organizations, including the cartels, are using our freedoms against us.

So, they are developing straw purchasing networks, for instance, where they are going into firearms stores and sending somebody in there without a record, paying them a small amount of money, and getting them to buy large, military-grade weapons, 1950s that can be easily converted to machine guns down South. Paying in cash and doing it over and over and over again.

So, what are we doing? We are working with firearms licensees across the Southwest border and now increasingly elsewhere. Because the cartels adapt, right? One of the things you asked about trends, they are going elsewhere now, not just on the Southwest border. They are going to other States to try to arm themselves.

So, these are disturbing trends. These are very sophisticated and vicious organizations. The ATF and our partners are doing everything we can. Interdictions, Southbound interdictions, are up in double digits year over year. We are very proud of that.

We should not fool ourselves that the problem is solved. These are very wealthy, aggressive, and violent entities.

Ms. JAYAPAL. Thank you. When you were here last year, we discussed your partnership with State and local law enforcement to implement the Stop Illegal Trafficking in Firearms Act, which Congress included in the 2022 Bipartisan Safer Communities Act.

You have spoken about some elements, but could you provide any other additional update on your extensive efforts to implement that legislation?

Mr. DETTELBACH. Yes. So, there were two separate criminal statutes that Congress created. One of them was a straw purchasing statute, first ever. The other is a trafficking statute. Both have been exceedingly useful, both in individual cases of firearms trafficking, and in larger organizational efforts with respect to cartels and criminal organizations all over the country.

So, these are tools that we continue to use. We continue to work with the U.S. Attorneys community in appropriate cases to get appropriate punishments in those matters. There are new statutes.

38

Again, as I said, what I explain to everybody and what we explain to judges is that firearms trafficking is not a victimless crime. We don't see the victim in front of us, but so often the firearms, 60 percent of those trafficked firearms are going to felons and prohibited people. They are using to hurt innocent, law-abiding Americans.

That is what we have to do to implement, we have to make people understand that the distributors are also responsible if they are breaking the law.

Ms. JAYAPAL. Just quickly, many of the guns recovered from crime scenes South of the border are bought legally in the United States. How can we stop that from happening, and what resources do you need from Congress?

Mr. DETTELBACH. Well, when a firearm is purchased legally in the United States and it crosses the border, that is a little bit different, right. That is a situation where those whose full-time job it is to police the border are probably the lead. At the ATF, what we do is try to focus on illegal activity, the black market in firearms.

Now, it is a little bit ambiguous, Congresswoman, because of course something can look like a legal sale, but it is really a straw purchaser.

Ms. JAYAPAL. Right.

Mr. DETTELBACH. This why when somebody walks into a store who doesn't even know really what to ask for, plunks down $12,552 in cash and they are 20 miles from the border, and there is somebody waiting outside in the parking lot for them that dropped them off, that we depend on so many firearms dealers to figure out a way to pick up the phone and help us. They do quite often.

Then what happens is the cartels look for the one that won't do that, right. So, we have to get the word out to a minority of dealers, the majority are trying to do the right thing. The minority of dealers, because the enemy, the cartels, are seeking them out to try to find weak links.

Ms. JAYAPAL. Thank you. I yield back, Mr. Chair.

Chair JORDAN. The gentlelady yields back. The gentleman from California is recognized for five minutes.

Mr. MCCLINTOCK. Mr. Dettelbach, I am just curious, have you expressed remorse to Mr. Malinowski's widow and family?

Mr. DETTELBACH. I am sorry?

Mr. MCCLINTOCK. Have you expressed remorse to Mr. Malinowski's widow—

Mr. DETTELBACH. I will now, and I have before this morning, yes.

Mr. MCCLINTOCK. What have you said to them?

Mr. DETTELBACH. Well, I said it here in open forum, but what I said was of course—

Mr. MCCLINTOCK. What have you said to them personally? Have you talked to them personally?

Mr. DETTELBACH. I am sorry?

Mr. MCCLINTOCK. Have you talked to them personally, have you expressed your sympathy to them personally?

Mr. IVEY. Would the gentleman yield?

Mr. MCCLINTOCK. Do you just make public statements and issue press releases?

Mr. IVEY. Would the gentleman yield?

39

Mr. McCLINTOCK. No. Answer the question, please.

Mr. DETTELBACH. Yes.

Mr. IVEY. He just did it.

Mr. McCLINTOCK. All right, thank you. Did you know about this raid in advance?

Mr. DETTELBACH. We do 11,000 operations a year, and I believe—

Mr. McCLINTOCK. Did you know about this one?

Mr. DETTELBACH. That—and it would be—

Mr. McCLINTOCK. Did you know about this one, Mr. Dettelbach, yes or no?

Mr. DETTELBACH. I believe the first when I heard about this matter was after the fact.

Mr. McCLINTOCK. Who have you disciplined, what have you done?

Mr. DETTELBACH. Sorry? What have we done—

Mr. McCLINTOCK. What have you done in response to this?

Mr. DETTELBACH. We went together with the Little Rock Police, who were also present, we went, and we requested an outside agency to do an independent investigation. We fully cooperated with that investigation. That investigation, my understanding is the file has now been turned over.

Mr. McCLINTOCK. I think this Committee is going to want to look into this matter in much greater detail. I need to press on.

Let me just ask you a general question: What do you think is the purpose of the Second Amendment?

Mr. DETTELBACH. Like all the amendments, the purpose of the Second Amendment is to protect fundamental rights of Americans.

Mr. McCLINTOCK. You believe that a fundamental right of America includes the right to bear arms?

Mr. DETTELBACH. I believe that all the rights in the Bill of Rights are important and fundamental rights, including the Second Amendment.

Mr. McCLINTOCK. Right. In the second half of 2021, only 34 inspections lead to a firearms dealer having their license revoked. However, the number of qualifying violations dramatically increased to 252 in 2022, and jumped again to 407 in 2023.

Now, either there has been an exponential increase in crooked firearms dealers since Biden took over, or there has been an exponential increase in zealotry by your agency. I assume you would say it is the latter.

Mr. DETTELBACH. The laws that Congress has passed and have been in effect say that willful violators of the Gun Control Act are subject to, they may have their licenses revoked.

Mr. McCLINTOCK. We have seen an exponential increase, I mean just off the charts, since you took office. That seems to coincide with a dramatic reduction in people willing to legally expose themselves to predawn raids on their homes. The number of voluntary business closures post-inspection has risen sharply, from 24 in 2021, to 69 in 2022, and to 80 in 2023.

Now, this tells me that this is a deliberate policy to drive firearms dealers out of the business, not only with a reign of legal terror, but in the case of Mr. Malinowski, the actual reign of physical terror as well.

40

Now, I know you are not going to agree with that, but can you at least see how that appears to others?

Mr. DETTELBACH. Respectfully, I disagree. The enhanced enforcement policy, which is publicly available, the terms of it, State very clearly that we are not talking about paperwork violations. We are talking about willful violations that impact on public safety, like refusing to run a background check, selling to a felon, not responding—

Mr. MCCLINTOCK. That is not—what we are seeing—

Mr. DETTELBACH. Sorry.

Mr. MCCLINTOCK. Is an exponential increase in actions against dealers, followed by an exponential increase in dealers just saying this isn't worth the legal exposure, I am out of here. What is involved in getting a Federal firearms license?

Mr. DETTELBACH. There is a process to get a license, right. You fill out an application. You pay a $200 fee. There is a compliance inspection, or not a compliance inspection, an application inspection that goes on.

Like, just like inspections in the process, for a revocation for a compliance matter, there is ample due process. There are hearings that go on—

Mr. MCCLINTOCK. OK, no, I understand—

Mr. DETTELBACH. In our own hearings—sorry.

Mr. MCCLINTOCK. It is a fairly lengthy process. Now, your agency's rule says, "that even a single transaction or offer to engage in a transaction"—or offer to engage in a transaction—"with combined with other evidence may be sufficient to require a license as a FFL." What does that mean?

Mr. DETTELBACH. That is, that is one sentence out of a 16-page rule.

Mr. MCCLINTOCK. Well, what does that say?

Mr. DETTELBACH. The rule says—this is a matter before the courts. Our positions on all these things are, and pages and pages of briefs that it would take far too long and I know you have time limits. I refer to those briefs. That is not a secret.

What I would say to you is it says in black and white, things that might lead to a determination under the totality of circumstances that somebody is engaged in the business, and things that don't.

Mr. MCCLINTOCK. So, if somebody admires my gun collection and I say you want to buy it, would that require an FFL?

Mr. DETTELBACH. There is a specific provision that Congress has passed that says that people who are bona fide collectors can liquidate their collections without becoming a licensee.

Mr. MCCLINTOCK. That is not what this rule—

Mr. DETTELBACH. Of course, you would have—and I think that is what you described. You would have to look at, obviously, the whole—

Mr. MCCLINTOCK. That is not what your new rule says.

Mr. DETTELBACH. Respectfully, I disagree. It says in black and white that this is allowed.

Chair JORDAN. The gentleman yields back.

Director, you have been at it, we have been at it an hour and 45 minutes. It is just, recognize that if you need a break, just let

41

us know and we will be happy to take a break. If not, if you are willing, we will keep going.

Before I recognize the gentleman from California, you were getting ready to say you had an outside investigation and you turned it over to, and you didn't say who that it has been turned over to.

Mr. DETTELBACH. Oh, they, I believe they publicly announced, the Arkansas State Police, that they turned over their investigative file to the 6th District Prosecutor's Office. It is Pulaski County, Arkansas, the State prosecutors.

I believe this is all public. I haven't had contact with them because I want to make sure that it is independent, right?

Chair JORDAN. Yes.

Mr. DETTELBACH. I believe that they are reviewing it.

Chair JORDAN. OK.

Mr. DETTELBACH. That part, I think we know they are reviewing it.

Chair JORDAN. The gentleman from California is recognized.

Mr. SWALWELL. Director, welcome. I want to thank you and the brave men and women in law enforcement who serve your agency every day. I have got some questions for you in a moment.

There is something that is imminent and I am concerned about, because it just put a target on the back of everybody in law enforcement at the Federal level and the local level. That is a statement that one of our colleagues made earlier this week.

We have jurisdiction over the FBI, as well as the ATF. Marjorie Taylor Greene of Georgia said, "The Biden DOJ and FBI were planning to assassinate Pres Trump and gave the green light." Does everyone get it yet? What are Republicans going to do about it?

This is quite a concerning statement from an elected Member of Congress, because this false statement creates the pretext for violence.

It suggests to Americans, who by the way are armed to the teeth, we are the country where the most dangerous people have access to the most dangerous weapons, and it suggests to them that their own government and the people who wear the badge are out to assassinate the former President.

I just want to first clear up this falsity. The FBI this week has issued a statement to do that.

First and foremost, the search at Mar-a-Lago, the former President was not there. That was intentional. So, if there was an effort to assassinate the former President, they went at a time when he was not there.

Second, the former President was actually treated better than most people during a raid because the FBI didn't go in with their raid jackets, they wore polo shirts to show a little bit of respect for the former President and not make it a raid-like environment.

Third, standard use-of-force procedures were followed during that search, as they were followed in every search.

Fourth, the same search procedures and use-of-force policy that was used to retrieve documents at President Biden's Delaware residence.

This is a pretext for violence. I will yield to any of my colleagues who will join me in condemning it. I will yield to any colleague who will condemn the suggestion by Marjorie Taylor Greene that the

42

FBI was out to assassinate former President Trump. Please, condemn it. Because if you don't, you are encouraging it.

Mr. McCLINTOCK. Of course—

Mr. SWALWELL. You are consigning it. Mr. McClintock, please.

Mr. McCLINTOCK. Of course we do. What a ridiculous question.

Mr. SWALWELL. What a ridiculous statement that she made.

Mr. McCLINTOCK. I agree with you.

Mr. SWALWELL. Thank you.

Mr. McCLINTOCK. I don't think there is anyone here who agrees with it.

Mr. SWALWELL. Thank you.

Mr. McCLINTOCK. Both sides have a lunatic fringe in their movement, ours and yours. Frankly, I find yours far more frightening because—

Mr. SWALWELL. I have never heard somebody suggest that we were trying to—that the FBI was trying to assassinate a former President. I do appreciate, Mr. McClintock, that you will be condemning it. I would welcome anyone else who would condemn that. We will make this clear when the Attorney General testifies.

Mr. McCLINTOCK. I would also, however, condemn the instructions—

Mr. SWALWELL. Reclaiming my time—reclaiming my time—

Mr. McCLINTOCK. In such an operation—

Mr. SWALWELL. Reclaiming my time—

Mr. McCLINTOCK. On conducting such an operation at all.

Mr. SWALWELL. Director—reclaiming my time. Director, the former President stated last week at an NRA convention that every single Biden attack on gun owners and manufacturers will be terminated on my first week in office, perhaps my first day.

I have a seven-year-old, a five-year-old, and a two-year-old. What does this mean for parents in America as it relates to whether our kids are going to be sheltering in place and hiding under their desks for the rest of their time at school, if this was to happen?

Mr. DETTELBACH. Congressman, I can't and won't get involved in electoral politics. What I said in my opening statement, though, I think hopefully people from all sides of questions can agree on, which is we see progress being made. We see violent crime going down.

We have a strategy that appears to be working. My hope is that we can all come together, and maybe there are policy disagreements on different things. We can all come together, though, on the fact that we are driving down violent crime all over this country and double down on the strategies that are working.

That is my hope. The things that are working, let's stick with. Because the numbers show that real lives are being saved.

Mr. SWALWELL. Thank you. I yield back.

Chair JORDAN. The gentleman yields back. The gentleman from Wisconsin is recognized.

Mr. TIFFANY. Thank you, Mr. Chair.

Is violent crime going down?

Mr. DETTELBACH. Excuse me?

Mr. TIFFANY. Is violent crime going down?

Mr. DETTELBACH. According to the data I have seen, violent crime is going down, yes.

43

Mr. TIFFANY. That is not what Director Wray told us a number of months ago when he was here before us.

Mr. DETTELBACH. What I have seen in recent numbers, violent crime is going down. There is in the 175 cities covered by the major city chiefs, there are double-digit reductions in violent crime. I was in Baltimore at the turn of the year, a 19 percent reduction in homicides, LA down 13 percent.

Mr. TIFFANY. So, when we had a hearing up in New York City just, what is that, about a year ago, we heard from city counselors and others that they said that the police are not charging crime now because a district attorney would not prosecute that crime.

Here, let me give you an example from a city in our State. Here was a statement from the District Attorney in Milwaukee County. This is a number of years ago, but he still continues to be the District Attorney.

> Is there going to be an individual I divert or I put into a treatment program who is going to go out and kill somebody? You bet.

This the same guy who let off the Waukesha Christmas killer, who drove a vehicle through, killing six people just a couple years ago in a Christmas parade up in Wisconsin.

Are you sure violent crime is going down?

Mr. DETTELBACH. I believe the numbers bear out that violent crime is going down. I think last year saw the most precipitous drop in violent crime—

Mr. TIFFANY. You cited Minneapolis here in your testimony, whether it is indicting 45 Minneapolis gang members involved in murder and drug trafficking. We just had a—they have a district attorney in Minneapolis also that does not prosecute crime.

She will go after the cops, as she is doing right now with a cop who was doing his job and she is going after him now. Are you sure those indicted 45 Minneapolis gang members are actually going to be charged with a crime? Are you sure of that?

Mr. DETTELBACH. I was there to announce the indictment myself, along with the U.S. Attorney, along with the Chief of Police, along with the Sheriff. They are already indicted, and I hope they go to jail for a long time.

Mr. TIFFANY. I think you said that there is more activity with the cartels. You said, you commented about this Sinaloa Cartel. Is there more activity going on down by the Southern border as—

Mr. DETTELBACH. What we see is the flow of firearms. Our job is, right, to stop firearms trafficking, which goes from the United States to Mexico. We have seen an increase in our number of seizures.

Now, that increase could be due to the fact that we are spending a lot of time and resources trying to stop that. Yes, we see a continuing problem.

Mr. TIFFANY. Yes. Director Wray would echo that a number of months ago, or I should say you are echoing what he said. He said, "we are seeing a significant increase going on related to the Southern border." So, you would basically agree with his comment, his general comment, in regard to that?

Mr. DETTELBACH. Yes, with Southbound traffic, it is a continuing threat.

Mr. TIFFANY. You think the open border contributes to this?

Mr. DETTELBACH. So, I am not in charge of the agency that controls the border. With respect to Southbound traffic, that is things going—

Mr. TIFFANY. So, have you shared that with the Attorney General?

Mr. DETTELBACH. Well, I think everybody under—go ahead, I am sorry.

Mr. TIFFANY. Have you shared it with the Department of Homeland Security?

Mr. DETTELBACH. We work together on all these task forces with the Department of Homeland Security, these Southbound task forces. They have agents and officers sitting with us, doing that interdiction for Southbound firearms trafficking.

Mr. TIFFANY. So, they know this problem is getting worse.

Mr. DETTELBACH. Well, they are—part of the fact of why the seizures are up, that we are interdicting more weapons than ever, double-digit increases last year in terms of Southbound seizures.

Mr. TIFFANY. So, Mr. Chair, besides human trafficking, besides the terrorists that are coming across the border, we see another example here where the open Southern border is making it potentially more deadly for Americans.

We see these guns that are continuing to flow both ways across the border. Plus, you have a border patrol that can no longer do their job as babysitters.

Mr. DETTELBACH. It is very rare—I am sorry.

Mr. TIFFANY. I am going to close up here.

Mr. DETTELBACH. Sure.

Mr. TIFFANY. If you have a—what would be your recommendation if somebody lied on their 4473 form, they dumped their pistol in a garbage can and it was in a school zone, what would be your recommendation for charging that person?

Mr. DETTELBACH. I think that echoes the fact of a publicly reported case, so I am not going to comment on a pending matter. I think that question is aimed at that.

Mr. TIFFANY. So, it is an example of somebody that did something like that, and I am sure it has happened before. What would you recommend they be charged with?

Mr. DETTELBACH. If a person out there intentionally lies on a 4473 form—

Mr. TIFFANY. Yup.

Mr. DETTELBACH. They can be charged with the crime of lying on a 4473 form.

Mr. TIFFANY. Dumped a pistol in a garbage can. So, those are the facts of the case.

Mr. DETTELBACH. Again, I am not going to comment on specific facts. If somebody lies on a 4473, that was part of the charges in the case that we discussed earlier that was a subject of so much discussion. That is public.

Not commenting on the specifics, that is a crime.

Mr. TIFFANY. Mr. Chair, I am going to close real quickly. A dual system of justice in America. *Hunter Biden* vs. the *Bryan Malinowski*. I yield back.

Chair JORDAN. The gentleman yields back. The gentleman from Colorado is recognized.

45

Ms. BALINT. Mr. Chair?

Chair JORDAN. I am sorry, the gentlelady from Vermont has unanimous consent?

Ms. BALINT. Yes. I ask unanimous consent to enter into the record "Milwaukee Sees Decline in Homicides in 2023." This is *WPR*.

Chair JORDAN. Without objection. The gentleman from Colorado is recognized for five minutes.

Mr. NEGUSE. I thank the Chair. I also want to thank the gentlewoman from Vermont for providing this Committee and obviously those who are watching it with some sense of a real semblance of the actual facts on the ground with respect to the comments made by my colleague from Wisconsin.

Director, I first want to say thank you for your service to our country. You have spent your career in law enforcement, obviously a former Federal prosecutor. I am grateful for the work that you and your agency does each and every day to keep communities across my district in Colorado, Rocky Mountain West, and the entire country safe.

You have more patience than I. I think it is awfully rich, and I am not asking you to opine on this or to respond, but it is awfully rich for some of my colleagues on the other side of the aisle to lecture you, who have spent your career in law enforcement leading one of the premier domestic law enforcement agencies now. To lecture you about crime and gun trafficking, when they have worked vociferously over the last 17 months to defund the very agency that you lead that is charged with addressing gun trafficking. With its— charged with keeping us safe. I think it is shameful.

How much did President Biden's Fiscal Year 2024 budget request identify for the ATF? What was the total sum?

Mr. DETTELBACH. I believe that the number that I am very familiar with is the amount of the cut, which was $47.5 million, which was the real salary and expenses cut, which is causing us not to hire agents, which is causing us not to be able to be out there with our State and local partners arresting carjackers and violent criminals.

The request is three or four steps, it was a significant increase for the ATF funding. Not only was the increase not granted, but the ATF's budget was cut, and that is having these kinds of effects on our ability to fight violent crime that I am talking about.

Mr. NEGUSE. Well, you beat me to it, and thank you, Mr. Director, because I think you have provided the requisite clarity. Forty-seven-million-dollar cut. Three billion dollars less than what the President ultimately requested, $1.9 billion was the President's request in terms of funding for the ATF. Ultimately it was about $1.6 billion, which meant in real dollars a $47 million cut.

Mr. DETTELBACH. Went from 1.675 to about 1.625.

Mr. NEGUSE. Correct.

Mr. DETTELBACH. By the way, that happened halfway through the year because Congress hadn't passed the budget. So, we had to effectuate the entire $47 million cut in six months.

Which was also, if Congress delays in passing these measures, I understand they are difficult. They are, for people running organizations, and many of you have run businesses, that is very, very

46

difficult to effectuate a whole cut after somebody is giving you the higher budget for half the year and says he would make it all up in a half year.

Mr. NEGUSE. Well, I would like to hear any of my colleagues defend the propriety of pursuing that kind of cut to one of our Nation's lead law enforcement agencies. The cognitive dissonance is astounding to me.

I have listened for years to my colleagues on the other side claim that folks in our party don't support law enforcement, which of course couldn't be further from the truth. Yet, simultaneously they now pursue significant a cut to the operations of the ATF.

I am grateful, by the way, Director, this is outside of your bailiwick, so to speak, but they just released a budget a month ago that proposes severe cuts to local law enforcement as well, rural sheriffs, rural police departments in my district. COPS grant program, which I am sure you are familiar with, given your time as a prosecutor years ago. A program that is integral to enabling local law enforcement to do their jobs, to hire more officers. I think it is shameful.

I am grateful for what, as I said, you are doing, and I wish I had more time to be able to spend or perhaps engage in a colloquy here around some of the regulations that the ATF has promulgated, which I support, to address some of the mass violence, mass shootings that we have tragically had in communities across the country, including in my community in Boulder, Colorado.

I would just say that the sum of my remarks is that I am grateful for the work that you do. I am grateful for the work that the law enforcement officers in your agency do each and every day. You certainly will have our support. I would hope that it would be on a bipartisan basis. Hope springs eternal. We will keep working toward that.

I yield back.

Chair JORDAN. The gentleman yields back.

What is your budget this year?

Mr. DETTELBACH. The budget, I believe, is $1.625 billion, was the most recent budget that was passed.

Chair JORDAN. The gentleman from Kentucky is recognized.

Mr. MASSIE. I thank the Chair.

Now, I am troubled here by your new rule defining what a firearms dealer is, or engaged in the business of selling firearms. Isn't the purpose of it or won't the result be that more people will be defined as being engaged in the business of selling firearms?

Mr. DETTELBACH. The purpose of the rules is to effectuate Congress' definition. Congress expanded the definition two years ago in the Bipartisan Safer Communities Act. So, and—

Mr. MASSIE. What is the result going to be?

Mr. DETTELBACH. The result is going to be, I hope, increased compliance with Congress' statute.

Mr. MASSIE. The result is going to be subjecting more American citizens to the treatment that Mr. Malinowski, unfortunately, received from our Federal Government, which is you want to get more warrants to serve these no-knock regs on people who have not been convicted of anything, yet may be convicted on their doorstep today.

47

I want to address something in your rule here. I did find one thing that I think is sort of helpful. I hope the other side of the aisle will read this. I want to give you time to look at this. I want to give you time to look at this.

The Department, that would be the ATF, correct, in your rule?

Mr. DETTELBACH. I don't know what you are—is this from the—

Mr. MASSIE. Yes. This is from the rule.

Mr. DETTELBACH. The Department refers to the Department of Justice.

Mr. MASSIE. OK.

> The Department also notes that the term "gun show loophole" is a misnomer and that there is no statutory exemption under the Gun Control Act for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue.

I hope the other side of the aisle, this is the one useful thing that I found in a 16-page rule and hundreds of pages of explanation is to show people that there is no gun show loophole.

Do you agree with the Department and with your own rule here?

Mr. DETTELBACH. I agree that Congress never said, and has never said, and hasn't said now, didn't say before this, "that somebody who is engaged in the business"—those are the words there—"can do that without a license depending on where they sit."

People have encouraged the perception, and we have seen an increased level of noncompliance among people who are either intentionally or otherwise breaking Congress' statute.

Mr. MASSIE. The only people encouraging this perception are the left side of the aisle and the media. There is no gun show loophole. I am glad you finally admitted that.

Now, I want to get to something else.

Mr. DETTELBACH. I have said that publicly. There never was.

Mr. MASSIE. OK. Thank you. I want to get to something else in your opening statement. Maybe you would want to read it back because it is written down.

Can you tell me the fact that you were expressing or claimed that there are more—that firearms are the leading cause of death for children? What were your specific words in your testimony?

Mr. DETTELBACH. I would have to look at my testimony. It is children and youth.

Mr. MASSIE. Can you look at it?

Mr. DETTELBACH. It is in my longer statement that is in the record.

Mr. MASSIE. OK.

Mr. DETTELBACH. Obviously, I am summarizing the statement, as the Chair asked me to do. So, it is in my longer statement which has been entered into the record. I don't have it in front of me.

Mr. MASSIE. Can you define a child and youth?

Mr. DETTELBACH. Child and youth, there is a statistical study that is the source of that. We can get that to you. I don't know the specific cite sitting here. We will be glad to get that to you.

Mr. MASSIE. Yes. The statistical study according to news reports and *Snopes*, as Mr. Nehls referred to, excludes infants under the age of one and includes 18- and 19-year-olds.

Is that true?

Mr. DETTELBACH. I don't know. Honestly—

48

Mr. MASSIE. You don't know your own statistics?

Mr. DETTELBACH. No, I don't know. Honestly—

Mr. MASSIE. Why was that in your testimony to Congress?

Mr. DETTELBACH. —any killing of children is unacceptable.

Mr. MASSIE. Any killing of any person is unacceptable except in self-defense. Are you including if a 17-, 18-, or 19-year-old gang member came to a person's door and tried to attack them that this was self-defense? Are you including that in your statistics?

Mr. DETTELBACH. Congressman, firearms violence is a huge ender of lives of children.

Mr. MASSIE. Yes, yes. No, I am going—I am not going to let you make your public service statement. I want you to defend your sworn testimony. Are you claiming that 18- and 19-year-olds are children in your statistics?

Mr. DETTELBACH. Again, you have my statement, Congressman.

Mr. MASSIE. Yes, I have it. I am asking you to explain it.

Here is my other question. How many 18-year-olds who have committed a gun crime have you suggested to be prosecuted as a minor?

Mr. DETTELBACH. We are a law enforcement agency. We are not the prosecutors.

Mr. MASSIE. OK.

Mr. DETTELBACH. In the Federal system—

Mr. MASSIE. How many have you gone after, OK, 18-year-olds?

Mr. DETTELBACH. Respectfully, we investigate crimes shoulder-to-shoulder with both the law enforcement—

Mr. MASSIE. OK. Are 18-year-olds children or are they adults?

Mr. DETTELBACH. Each State has its, own under the gun laws as to when juveniles are prosecuted, Federal gun laws.

Mr. MASSIE. Rules. Federal laws.

Mr. DETTELBACH. As you may know, Federal laws with respect to the prosecution of juveniles are exceedingly difficult. You are correct that prosecution of juveniles, if you are applying this as adults, is rare in the Federal system.

Mr. MASSIE. Here is the reality.

Mr. DETTELBACH. Juvenile crime—

Mr. MASSIE. Reclaiming my time.

Mr. DETTELBACH. Juvenile crime is an increasing problem.

Chair JORDAN. The time belongs to the gentleman from California.

Mr. MASSIE. Reclaiming my time, look, you are including in your statistics, whether you know it or not, 18- and 19-year-olds. You would never claim that those are minors in the context of gun prosecutions.

The only way you can get the number of deaths attributable to firearms above other causes is by excluding under the age of one, and including 18- and 19-year-olds, particularly gang members, and including self-defense.

So, with that, I yield back.

Chair JORDAN. The gentleman yields back.

The gentlelady from Pennsylvania is recognized.

Ms. DEAN. I thank you, Mr. Chair.

Director Dettelbach, thank you for being here. Thank you, and I believe about 5,000 of your members, full-time employees of the

ATF. Just to put that number into some perspective. There are more than 6,500 sworn police officers serving just the city of Philadelphia, my home city. Would it be fair to call the ATF a relatively small but mighty law enforcement agency, Director?

Mr. DETTELBACH. The people, those 5,000-plus people who work at the ATF are incredible people. They are doing a mammoth job with very few resources. It is a dangerous job. Every single day it is a dangerous job for them out there because of the types of cases that we often see. They are doing a great job at it.

Ms. DEAN. I agree with you. As you note in your testimony, the ATF is, in fact, the only Federal law enforcement agency with the sole focus of working with police and partners in State and local law enforcement to protect Americans from violent crime. Correct?

Mr. DETTELBACH. We are the Federal agency with the sole focus on violent crime.

Ms. DEAN. I want to say to those of you in the room or who are watching on TV, if you are experiencing whiplash, I am sure it is not lost on anyone in this room, anyone who cares about the issues around the police and law enforcement.

We are just one week removed from National Police Week. I sat over on the regal Senate side as we honored the fallen police officers. It is whiplash in this hearing. One week we honor fallen police officers, the next we want to defund law enforcement like you.

From rooting out cartels fueling the fentanyl crisis to curbing gun violence, the number one killer of American children: Gun violence. That is what people on the other side of the aisle ought to be outraged about. The number one killer of our children in this country: Gun violence. Progress has been made even though our Republican colleagues attempt to discredit and defund you.

I want to turn to the Bipartisan Safer Communities Act. I am so proud that we were finally able to do something, some small things around gun violence.

We are weeks away from the second anniversary of this great act: June 25th. I was heartened to see that last month the ATF finalized a rule implementing the landmark legislation.

Part of the rule overlaps with my bill, the Fire Sale Loophole Closing Act, which would prevent FFLs who have had their licenses revoked or denied from selling old business inventory guns without background checks.

Some Republican lawmakers have raised concern that the final rule goes too far.

Could you tell us, why is this rule necessary? Why do we need to know what happens to those inventoried guns?

Mr. DETTELBACH. So, again, of course as you know, the rule is under litigation. So, I am limited to the public record and what I can say.

The text of the rule speaks for itself and should be looked at, and, also, the explanation, the hundreds of pages of explanation and the response to comments.

With respect to that one part of the law that Congress passed as part of the Gun Control Act, if a dealer who is a licensed firearms dealer loses their license, right, the notion that this somehow, for the person who loses their license can then not follow the Gun Con-

50

trol Act, right, is inconsistent with the structure of the Gun Control Act in many cases.

Ms. DEAN. Inconceivable.

Mr. DETTELBACH. So, that is the idea that everybody is playing by the same set of rules.

There are so many dealers and collectors who are following the law out there. Part of the Bipartisan Safer Communities Act and part of our enforcement is to make sure that those who obey the law aren't being treated at a competitive disadvantage to people who are out there ignoring the law. Right? It is only fair.

There are so many people who are obeying the Gun Control Act, who are obeying the Bipartisan Safer Communities Act. Those who are out there ignoring it, just from a plain old business perspective we have to have a fair marketplace where everybody obeys Congress' statutes.

Ms. DEAN. I couldn't agree more. It is also common sense that if you lost your license you can't just get rid of your inventory without following the law.

Mr. DETTELBACH. Including background checks.

Ms. DEAN. Exactly. What challenges have you had, how had the ATF faced implementing the Bipartisan Safer Communities Act? Litigation is clearly part of it, but what else?

Mr. DETTELBACH. I think when Congress gave us our new tools, which we are very grateful for, Congress didn't appropriate extra moneys for us to enforce those particular new tools.

We did get a million dollars a year to work with the National Shooting Sports Foundation on the "Don't Lie for the Other Guy" campaign, which is an important collaborative effort we have with the industry. The 500 cases, defendants that we charged under the new statutes with our prosecutors and our partners, right, that is taking away from other priorities that we also still want to service.

So, again, when we at the ATF are choosing what to do, Congresswoman, we are choosing between very important things. We are choosing between body-worn cameras and cartels. We are choosing between gangs and carjackers. Those are very important things that we are trying to balance.

Ms. DEAN. I couldn't agree more. I honor all your agents.

I have a unanimous request, consent request, Mr. Chair.

Chair JORDAN. OK.

Ms. DEAN. (1) You spoke about the fallen ATF officers. What I would like to enter into the record is a listing, multiple page listing of the fallen ATF officers, Bureau of Alcohol, Tobacco, Firearms, and Explosives fallen agents over the years.

(2) I also have a unanimous consent request to enter this article from March of this year, *ABC News*, "U.S. stats show violent crime dramatically falling."

(3) I would like to also enter into the record an article around a child in Philadelphia just last month, a three-year-old child sadly picked up a firearm and died from a shot.

Chair JORDAN. Without objection.

Ms. DEAN. Thank you.

Chair JORDAN. The gentlelady yields back.

The gentleman from Texas is recognized.

Mr. ROY. I thank the Chair.

51

I thank the Director because the Director knows I was a prosecutor under project Safe Neighborhoods in the U.S. Attorney's Office, worked closely with the ATF in the Dallas—Ft. Worth metro area.

I share your sentiment about the patriotic Americans serving the ATF trying to stop violent criminals from moving drugs and using firearms against the law in ways that are undermining safety and security of the American people. I want to thank those men and women for what they do every day in that service.

Would the Director agree that there have been times where the ATF have not gotten it right? I realize that with respect to the case we have already discussed with respect to Mr. Malinowski that you say is an investigation. What about something like Fast and Furious?

Mr. DETTELBACH. Of course, like any agency, there are times where we don't get things right and can improve.

Mr. ROY. So, a couple of questions for you along these lines. I think it is really important for the American people to understand.

Do you, as the Director of the ATF, do you believe that the American people have a constitutional right, an individual right to keep and bear arms?

Mr. DETTELBACH. The Supreme Court has made it clear and I, yes, the American—the Second Amendment has been interpreted numerous times by the Supreme Court just as—there is more to it but yes. What you have said, yes.

Mr. ROY. OK. Director, you do believe that you interpret the Constitution that way?

Mr. DETTELBACH. I interpret all the laws the way that the Supreme Court says they are to be interpreted. When the Supreme Court speaks on something—

Mr. ROY. Would you have said that about Plessy?

Mr. DETTELBACH. Congressman, I work for a law enforcement agency. I am not a judge.

Mr. ROY. I know. I am just asking you—

Mr. DETTELBACH. I accept the rulings of the Court, including that one. I am not dodging your question.

Mr. ROY. You, as the Director of the ATF, believe there is an individual constitutional right to bear arms?

Mr. DETTELBACH. Yes. There is one. The Supreme Court has said it.

Mr. ROY. Along, and so, along those lines do you, as the Director of the ATF believe that the Federal Government should maintain a registry or otherwise track, catalog, keep records of the transactions of firearms conducted by the American people such that you would know what firearms I possess?

Mr. DETTELBACH. Congress has explicitly forbidden the ATF from keeping a registry. We do not.

Again, we obey the law. I don't make the law, we obey it.

Mr. ROY. Do you, as the Director, believe that the Federal Government should track ownership of firearms among the American people?

Mr. DETTELBACH. Congressman, we follow the law as you put it, as you pass it. You have said we cannot have a registry. We follow that provision and will continue to as long as it is the law.

52

Mr. ROY. As the Director of the ATF do you have a position on that? Should we track ownership of firearms?

Mr. DETTELBACH. I, as Director of the ATF, my position is if it is in the law, we follow it.

Mr. ROY. If I want to sell a gun that I currently own to a friend in Texas, do I need a license?

Mr. DETTELBACH. So, getting into the specifics of the rule, which is in litigation, so first,

Mr. ROY. This ought to be a really simple question.

Mr. DETTELBACH. I understand.

Well, so you look at the totality of the circumstances. If we are talking about an isolated sale from somebody who is not engaged in the business of dealing firearms, you don't need a license.

Mr. ROY. OK. All right. If I, a citizen of this country and I live in Texas, I have a weapon and I want to sell it to a fellow Texan on an isolated basis, do I need a license?

Mr. DETTELBACH. Again, if you are not engaged in the business of selling firearms, those are Congress' words—

Mr. ROY. If I, if I closed a sale for a firearm last year, OK, and I do that on some relevant website like *texasguntrader.com*, and I sell that weapon. I sell it for $500.

Then, I inherit a gun from my dad or from my uncle. I inherited it last month. It is, like, six months later. I sell it. I am selling it for another profit, I sell it for $500.

Then, less than a year later I have another weapon that I inherit or I have got, and I decide I don't need it anymore, and I sell it. Is that engaging in the business? Is that engaging in activity that means I need a license?

Mr. DETTELBACH. I think pursuant to the clear language of Congress in doing this, and to the things we have said in the rule, we have specifically mentioned inheritance as one of the things that is not indicative of engaging in the business.

Mr. ROY. What if I have just 12; I have 12, 15, or 20 weapons and I sell three over the course off a year?

Mr. DETTELBACH. Congressman, each—I am sorry. I am sorry, I didn't mean to interrupt.

Mr. ROY. No, I am just saying. If I have, I have about 15, let's assume I had 15 or 20 weapons and I wanted to sell three over the course of a year?

Mr. DETTELBACH. I think what I,—

Mr. ROY. I would like to make money from them.

Mr. DETTELBACH. —to what you are saying is that you look at the—it is very clear that you look at the totality of the circumstances. We can go through an endless series of hypotheticals. Hypotheticals aren't the way we address cases.

Mr. ROY. You understand—and I realize I am over my time—do you understand why the average citizen is sitting out there saying I have got 400 pages of rulemaking, might not understand what they are allowed to do under the law when the Director of the ATF can't look at a Member of Congress and tell me yes or no emphatically whether if I sell a weapon, or two weapons, or three weapons, or five, whether or not I need a license?

Do you think that is the way the law ought to be, the rules?

53

Mr. DETTELBACH. Respectfully, I believe that the rule that we have promulgated provides way more information and clarity than just the one or two sentences that Congress provided. We were seeing massive noncompliance.

Mr. ROY. In 400 pages? You can't even answer it. How can the average American know it?

Chair JORDAN. The time of the gentleman has expired.

Mr. DETTELBACH. We are in the business of knowing. We have looked at the whole case.

Chair JORDAN. The gentleman yields back. The gentlelady from—

Mr. DETTELBACH. We would determine based on it—I am sorry, Mr. Chair.

Chair JORDAN. The gentlelady from North Carolina is recognized for five minutes.

Ms. ROSS. Thank you, Mr. Chair.

Thank you, Director Dettelbach for being here the second time in over a year, and for your commitment to keeping our communities safe.

As requested by the Department of Justice, the ATF recently reported that over a five-year period from 2017–2021, 68,000 illegally trafficked firearms were distributed across the United States by unlicensed dealers.

The Iron Pipeline, which we discussed earlier, specifically refers to guns smuggled up the I–95 corridor from the Southern States to the Mid-Atlantic and New England. It runs directly through my home State of North Carolina, which is one of the top destinations for gun traffickers.

Now, we wouldn't know this information, which directly impacts public safety in my State, without the ATF's dedicated work to make data available to the public and to all of our law enforcement agencies. This data is a critical tool for local law enforcement to address gun trafficking.

I also want to highlight the implementation of the Bipartisan Safer Communities Act which, as we have heard, is one of the most significant steps Congress has taken to reduce gun violence in decades, giving law enforcement and prosecutors new means to hold gun traffickers accountable.

I also want to note that both of North Carolina's Republican Senators voted for the Bipartisan Safer Communities Act in the last Congress.

Building off this legislation is imperative. It will take continued bipartisan consensus to do so.

We have talked a little bit about the gun trafficking provisions in the Safe Communities Act, but I want to broaden that a little bit and ask you how gun trafficking intersects with drug trafficking, particularly fentanyl trafficking, and what the ATF is doing to reduce not just gun trafficking and gun violence, but the menace of fentanyl and other dangerous drugs?

Mr. DETTELBACH. I have been involved with prosecution since 1991. One thing that has stayed the same and, unfortunately, I am sure will stay the same, is that guns and drugs, illicit guns and drugs go together. Gangs, cartels, and individual dealers, they are armed often as a means of enforcing their business practices, their

54

unlawful criminal conduct, and punishing individuals who challenge them, intimidating witnesses, you name it.

So, these things go together.

With respect to fentanyl, that is also, as was true with crack, it is true with powder cocaine, true with heroin, true with opioids, and it is true with fentanyl. We work alone and together with our partners on cases that involve narcotics trafficking all the time for that reason. Armed drug trafficking organizations are part of what the ATF does.

Just earlier this month the ATF made a case that resulted in members of the Sinaloa Cartel going to jail for literally decades, I think one for life. We are routinely seeing fentanyl dealers and organizations that are armed to the teeth and that are threatening people's lives.

Ms. Ross. So, do you believe that the more we support efforts to stop gun trafficking, that will also help in our efforts to stop drug trafficking?

Mr. DETTELBACH. I know it.

Ms. Ross. I am going to ask you a fun question since I know it has been kind of a rough day.

If it was Christmas and you could be fully funded in the ways that you have requested, what would be your top three priorities? How would that make our communities safer?

Mr. DETTELBACH. Since it is Christmas, can I get an extra one or two?

Mr. Ross. Absolutely. You have 36 seconds.

Mr. DETTELBACH. Well, we are the violent crime agency, so I think what I would start with is we know a strategy that is working. The crime gun intelligence strategy working with State and local law enforcement is working. We have to scale it, right?

So, we have 60 crime gun intelligence centers or so. We have put out an extra ten in the last year. I would put our crime gun intelligence centers I would try to stand them up in numerous other places.

Second, would be, to support them we need better intel. Crime gun intelligence is driven by a couple things: The National Integrated Ballistic Information Network, or NIBIN; and crime gun tracing.

I would start, I would continue and ramp up our campaign to get sheriffs, to get chiefs, to get law enforcement officers all around the country to fully participate in the NIBIN and tracing, three tools that we provide them.

Gosh, it is so hard—and the third I would say I would double and triple down on our RICO/VCAR gang strategy. It is a very effective legal tool that puts into effect the crime gun intelligence.

The Minneapolis case is a great example. So, they have 15–20 shootings all around town. They look totally unconnected. Through the crime gun intelligence tools we provide, we are able to connect them together and show that it is the Highs, that is the name of the gang, one group that is responsible for all this. So, then we put together a RICO case which has extra teeth to make sure we are taking down the whole organization.

So, I think that would be my third.

Ms. Ross. Thank you for your service.

55

I yield back.

Chair JORDAN. I think it is interesting, too, that the Director didn't mention body cameras, even though he told us that they weren't wearing those because of budget cuts. That didn't make his Christmas list.

The time is now the gentleman from North Carolina.

Mr. DETTELBACH. I did ask for extra [inaudible].

Mr. BISHOP. Thank you, Mr. Chair.

In the Malinowski killing, did you say you are deferring to and waiting for this investigation from the Arkansas State Police?

Mr. DETTELBACH. The Arkansas State Police has referred the matter to the District Attorney's Office. It is my understanding from public—

Mr. BISHOP. You have been deferring until that to do, take any action yourself; is that right?

Mr. DETTELBACH. That would be our normal course of action if there is a pending criminal investigation. To make sure that we preserve the integrity of that investigation, we let it proceed, yes.

Mr. BISHOP. That is a criminal investigation only?

Mr. DETTELBACH. They will decide the scope. My understanding is they're investigating to see—

Mr. BISHOP. That is a criminal—that is a criminal—let's stay on my question. That is a criminal investigation?

Mr. DETTELBACH. It is an investigation to see whether Arkansas law was violated, is my understanding.

Mr. BISHOP. That is called a criminal investigation, right? You are a criminal law enforcement agency. Don't filibuster me. It's straightforward.

Mr. DETTELBACH. I am not filibustering. You know that State prosecutors have a variety of different—

Mr. BISHOP. All right, let me—stop. It is my time. The Arkansas State Police, in their press release on April 24–22 said,

> We do not have the authority to address methods and tactics used or whether agency protocols and policies were followed.

Have you seen that?

Mr. DETTELBACH. I have seen the press release that—

Mr. BISHOP. You have seen that?

Mr. DETTELBACH. Correct.

Mr. BISHOP. So, you are deferring action on questions of methods of tactics until you see what Arkansas does with the criminal investigation?

Mr. DETTELBACH. That is the normal, standard thing that we do. Because if you start interviewing witnesses, if you start talking to people in the middle of a criminal investigation, very quickly people start talking about the fact that the integrity of that investigation it is very important to respect the ongoing investigation.

Mr. BISHOP. Mr. Dettelbach, in the Breonna Taylor—did you watch yesterday's hearing by any chance?

Mr. DETTELBACH. I did not have a chance to watch all of yesterday's hearing. I watched a little bit.

Mr. BISHOP. Did you watch some of it?

Mr. DETTELBACH. I watched some of it.

Mr. BISHOP. Well, in the Louisville situation with Breonna Taylor, the Metropolitan Police Department there fired its first officer

56

within 90 days of the incident. They were doing that as a matter of their management responsibility.

By the way, the Justice Department, of which your agency is a component, has conducted a pattern and practice investigation and is pursuing enforcement action against the Louisville Police Department.

What is your excuse for not taking managerial action about the appropriateness of the tactics used in the Malinowski killing?

Mr. DETTELBACH. I think you would agree with me that police officers and agents are entitled to due process just like everybody else.

Mr. BISHOP. There is no doubt about that. That doesn't answer my question.

Mr. DETTELBACH. Well—

Mr. BISHOP. Don't you have management responsibility with respect to the way the agency is conducting such matters?

Mr. DETTELBACH. When we can, based on the review—and I don't think—I don't expect it to be a lengthy period of time—we would conduct abuse of force review, as we do in every matter like this that occurs. We will do that in this case as we do in every matter.

Mr. BISHOP. Well, what is soon enough? They acted in Louisville within three months. What is soon enough?

Mr. DETTELBACH. Respectfully, we will see that the investigation will end, and then we will commence our internal review, as we always do.

Mr. BISHOP. Concerning bodycams, you testified that the rollout within the ATF was incomplete.

Is it your testimony that the rollout has not extended to the ATF personnel in Arkansas, and that is the reason they didn't have bodycams?

Mr. DETTELBACH. The field division that covers Arkansas has not yet been implemented. That is correct.

Mr. BISHOP. What did you say the cost was of your, of your item there, something in the tens of millions? Was it 40 million, 45 million?

Mr. DETTELBACH. This isn't the downstream cost because there are huge data costs, as you know, with this. The initial implementation the request in the budget is $37.5 million.

Mr. BISHOP. Putting bodycams in. So, I understand your budget is—

Mr. DETTELBACH. Thirty-seven million.

Mr. BISHOP. So, I understand your budget—

Mr. DETTELBACH. Thirty-seven point eight.

Mr. BISHOP. Your budget is about 1.7 billion. So, if my calculator is right, that is about 2.6 percent of your budget. You couldn't find 2.6 percent of your budget to catch up with common practice among also resource-constrained city police departments all over the country?

Mr. DETTELBACH. Respectfully, our budget is not 1.7 billion, it is 1.625 billion.

Mr. BISHOP. Whatever.

Mr. DETTELBACH. The reason I know that is because that $45 million cut has resulted in not being able to hire agents.

Mr. BISHOP. Yes, but you are talking about something else.

Mr. DETTELBACH. Also, cutting—

Mr. BISHOP. I am talking about bodycams that are in common use among metropolitan police departments across this country. You are saying something that involves two or three percent of your budget prevented you from getting it done?

Mr. DETTELBACH. I am saying that we are in the process, as we said from the beginning, of implementing the policy in phases.

Mr. BISHOP. Let me ask you just for the record—

Mr. DETTELBACH. We continue—

Mr. BISHOP. Mr. Director, let me ask you this question. I understand there could be justifications for lots of things, about putting tape on, jamming signals, things like that in a certain set of circumstances. What can possibly justify deferring, as that video showed, deferring the execution of that search warrant until the person who justifies the use of such tactics, if there is a question of a risk of violence, was present in the home?

Mr. DETTELBACH. These are career law enforcement agents and police.

Mr. BISHOP. I didn't ask that. I asked you—

Mr. DETTELBACH. They make determinations—

Mr. BISHOP. I asked you what could possibly justify that?

Mr. DETTELBACH. In my experience, when an agent decides, when a cop decides to go through a door, when a cop decides to execute an operation, they are entitled, if they are correct, the warrant allowed that warrant to be executed on the day it was executed. We will see what the investigation says.

Congressman, armchair quarterbacking police officers who are risking their lives without evidence yet is not the way to go here.

Mr. BISHOP. That is about 5,000 words, and not one justification uttered, not one possible justification.

My time has expired.

Chair JORDAN. The gentleman yields back.

The gentleman from Maryland is recognized.

Mr. IVEY. Thank you, Mr. Chair.

Welcome, Director. Good to see you again.

I just want to run through a few things. Some would strike me as surprising, and some are just hypocritical. I will ask you some questions at the end, but I do want to deal with a couple of these at the time.

In comparison to the Breonna Taylor case, it struck me as quite a surprise. Breonna Taylor was a scenario where no shots were fired at the officers. I think one of the officers actually made a false statement. Well, Breonna Taylor, certainly, didn't fire any shots at any of the officers. It was the officer who was fired who lied in the affidavit. I think that was found pretty quickly.

In any event, the no knock issue I think is a pretty significant one. I believe that what is going to happen later today is that there will be a bill offered, the George Floyd Criminal Justice Act, that will help to address one of these issues.

So, I hear a lot of concern from my Republican colleagues about the no knock warrant being executed here. I would note that it is pretty routine the way this warrant was executed. Hopefully, you will be willing to support that provision when it is offered today.

58

Mr. Director, do you want to comment on that?

Mr. DETTELBACH. I just wanted to say that I just wanted to repeat again that because this is an ongoing investigation I am not commenting. There are numerous different things that I believe are out there that may not be shown to be the facts when the investigation happened.

So, I would just hope that we could all agree to wait until the facts come out and assess those facts, because I hear things that may well not even be correct as a factual matter as things that Members are talking about.

So, that is one of my hopes here today is just to try and get the facts out.

Chair JORDAN. Will the gentleman yield?

Mr. IVEY. That is a fair point. I will say this: I know an officer was shot in the execution—

Chair JORDAN. Will the gentleman yield?

Mr. IVEY. I don't have time; I am sorry—in the execution of the Malinowski warrant. How is that officer doing?

Mr. DETTELBACH. Thank you for asking.

My understanding is that he is recovering.

I can take a lot, and I understand that, but one thing I want to say is at one point during—people are heated—somebody said something about somebody got shot in the toe. When a police officer or an agent is shot at, it is a serious matter. When a police officer or an agent is actually shot, it is a serious matter.

I know that nobody here would try to minimize an officer being shot as not being a serious matter. I just want to make sure; I understand people are heated, maybe I got a little heated just now, but that is one thing that I just want to make sure that I know we all agree on that.

Mr. IVEY. I appreciate that.

Also, the funding issue which Mr. Neguse addressed with respect to paying for body cameras. I know we had; it was a very expensive thing when we did it in Prince George's County. It was one of the barriers to getting it done as quickly as we wanted.

I hope that is another one of those where my Republican colleagues, since you have expressed such strong desire and concern about body cameras not being present here, I hope you will be willing to step up now and provide the additional funding in the ATF budget so they can move forward with that expeditiously.

I also wanted to say this, too. We had another debate a few minutes ago about whether firearms are the leading cause of death for children. The issue, I guess, was do you count infants or 18- or 19-year-olds, or whatever.

I just want to reiterate that is not the first time we have done that one. My view then and now is that I think it is a ridiculous point to focus on from the standpoint of, whether it is first or second as a leading cause of death, isn't that enough? Why should we be OK with it?

Let's say it is the second leading cause of death if you include infants or something, why would that be OK? Why wouldn't we be concerned and want to try and find ways to bring those numbers down?

59

So, I appreciate the work that you are going on that front, and support the effort, but, yes, we have to find ways to protect our kids from these kinds of gun violence incidents.

With respect to the search warrant affidavit, I wanted to offer that in the record. I ask unanimous consent that this be offered.

Also, the search warrant return, I want to make sure that is in the record, too.

Chair JORDAN. Without objection.

Mr. IVEY. So, it is clear what was, in addition to an officer being shot, which did not happen in the Breonna Taylor case, the weapons that were recovered, but also the other types of conduct that supported the probable cause finding by the judge in that case and supported the entry.

Then, the last point I want to make, too. The execution of a search warrant while the people are in the house in the morning, my experience was that was standard operating procedure. It is actually unusual to do it any other way.

The reason for that is, it is safer for the officers to try and catch them by surprise, and also leads to better opportunities to seize weapons.

So, in this case there were many, many, many. Because they thought there were 150 weapons in the house, certainly security and protection for the officers would be a prime consideration.

With that, I yield back.

Chair JORDAN. The gentleman yields back.

The gentlelady from Indiana is recognized.

Ms. SPARTZ. Thank you.

Director Dettelbach, I wanted to followup on the subject that Representative Massie was asking about, January 6th type investigation. It has been over three years since it happened. What are you still investigating?

Mr. DETTELBACH. We are not the lead investigative agency. It is the FBI. My understanding is from a public report that there has been over a thousand interviews conducted.

They are investigating the incident—

Ms. SPARTZ. It seems like you have a roadmap in the FBI not to answer questions. Everyone can hear it. Every question that is ever on the investigation. It is very clever.

You guys are brilliant not to answer Congress because everything on the investigation, and then when the investigation ends, statute of limitations is over, no one gets punished, and you continue with this. This is happening all the time.

It seems like your agency should do better than that, investigate something over three years. It seems like you should come to some conclusion.

My question is related to these changes in your rule, and definition of what is engaged in business rule.

Do you think criminals just want to do something criminal? Are they going to read your 500 pages of definitions? Are they going to read your 500 pages of definition explanations?

Mr. DETTELBACH. I think that I don't know who will read it. I think that—

Ms. SPARTZ. Do you think criminals will be doing that?

60

Mr. DETTELBACH. I think that it will also, as I said at the beginning, hopefully increase compliance with the law among people who are—

Ms. SPARTZ. You understand that criminals are not going to be reading this. OK?

What is it going to do to law abiding citizens, like Brian Malinowski that potentially was just selling these guns? I don't know the whole circumstances, but he is dead because he was probably not realizing what you were doing in changes of this rule.

So, my question for you is going to be, do you understand how dangerous your definitions have become?

Mr. DETTELBACH. Respectfully, our definitions are based on the law that Congress passed.

Ms. SPARTZ. Do you understand that—

Mr. DETTELBACH. It is based on our observation and experience in the field.

Ms. SPARTZ. Your interpretation?

So, let's just go to your definitions. As a normal American,—

Mr. DETTELBACH. It is based on, its implementation—

Ms. SPARTZ. —I understand your definition—

Mr. DETTELBACH. Let me, it is implementing Congress' law.

Ms. SPARTZ. OK. OK, how are you going to implement it? I want to understand.

I am a gun owner, and I am going to decide occasionally, yes, occasionally, I can do maybe 100 times, maybe five times. I am not engaged predominantly for a profit. You know that I don't even have time to do a profit.

So, at which point as a regular American citizen, so I understand that you are not going to cutoff my electricity my house and try to storm the house with bunch of people that you don't even realize what is going on. So, I can be in situation like a lot of other Americans that don't even realize that now you are redefining who the dealer is.

So, I want to get understanding. Summarize me understanding how I can explain to my constituents what it means now and how I am predominantly to earn a profit in this? What is the definition of this?

Mr. DETTELBACH. The statute that Congress passed says that if you are engaged in the business of dealing firearms "predominantly for profit," right, that requires a license.

There are some exceptions then that Congress has asked. Respectfully, people may not read the statutes either. They should, though, if they are, if they are selling firearms. These aren't possessors, these are people who are reselling firearms repetitively for profit.

I don't think it is too much to ask for somebody who is selling firearms repetitively for profit to read the law.

Mrs. SPARTZ. What does "repetitively" mean.

What is "occasionally" or "repetitively"? If I understand, I have lots of guns and I decided I want to replace with something else. I have 50 guns I am going to sell this year. I just decided that I am, I don't know, maybe they will be for profit. Definitely, no one is going to sell it at a loss, right? With your rules, probably price they keep increasing.

61

So, like, I am going to become a dealer now? I have to register for that?

Mr. DETTELBACH. Again, I have tried to explain. I will continue to.

Ms. SPARTZ. I'm trying to explain. So, what do you do? What is really going to be your new definition, because it is so broad?

Mr. DETTELBACH. It is not a new definition. It implements Congress' definition. Congress changed the definition.

Ms. SPARTZ. Yes. You put 500 pages of explanation. So, can you summarize this normal plain language an American can understand?

Mr. DETTELBACH. I believe that our positions are, they are not secret, they are in court, and they are filed. The rules—

Ms. SPARTZ. Yes, but explain without reading 500 pages that are confusing.

Mr. DETTELBACH. The rule seeks by providing practical conduct-based things that normal people could,—

Ms. SPARTZ. Yes. With the claim—

Mr. DETTELBACH. —for instance, you, one of the things that can result in people, depending on all the circumstances, is you take credit cards for payment. That could be one of the signs that somebody is in business.

You read, one of the things that might be on the other side—

Ms. SPARTZ. Well, if I use a little ad and then I sell a gun and take a credit card I potentially will be a dealer?

Mr. DETTELBACH. One of the things that might be on the other side is if you are occasionally giving or gifting to family members. Right? We try to say things on both sides.

Ms. SPARTZ. My time has expired.

I shall tell you, you put American lives in danger in your ATF, life in danger by doing this because you are doing gun control and is a very clever way to make everyone a dealer and have a zero tolerance, and exercise gun control and Second Amendment rights.

You put your people in danger and American people.

I yield back.

Chair JORDAN. The gentlelady yields back.

The gentlelady from Georgia is recognized for a unanimous consent.

Ms. MCBATH. Thank you, Mr. Chair.

The followup on the discussions that we have had on the leading causes of death for children that have been spoken about by our colleague from Pennsylvania, and also Mr. Ivey, I would like to ask unanimous consent to enter into the record an article from April 2022, entitled, "Firearms were the leading cause of death in children in 2020."

Also, a second one will be unanimous consent to enter into the record an article from October titled, "Firearms now the number one cause of death for U.S. children, while drug poisoning enters top five."

Chair JORDAN. Without objection.

Ms. MCBATH. Thank you.

Chair JORDAN. The gentlelady from Vermont is recognized for five minutes.

Ms. BALINT. Thank you, Mr. Chair.

62

Thank you, Director, for being here. I know it has been a long day. Thank you for your time.

So, as I sit here and I am really struck by what I feel we should be talking about here is that we have a fairly simple mandate from the American people, which is to do all we can to stop gun violence. As my colleagues have said, we have this horrible situation in this country, parents, teachers having to see children being killed every day by gun violence.

The country is awash in illegal firearms. We have heard that. We have accidental shootings by and of children. We have increasing suicide rates. Of course, mass shootings continue across our Nation.

Public poll after public poll tells us the same thing: People want us in Congress to do something, to take action. More than half of Americans consistently support stricter gun laws.

Listening to some of my colleagues you would think that we were on a different planet. The majority is not evening approaching or discussing new public protections or stricter gun laws.

The ATF doesn't have the resources to expect firearms dealers, as directed by Congress right now, over 2,000 firearms dealers have not undergone any inspection in over 10 years. There are laws already on the books to help us stem the tide of this violence, but they aren't being enforced because oftentimes Republicans won't give them the money to do so.

Now, Director, I appreciate very much that you are here today. I would like to talk a little bit more specifically about the work that the ATF does.

You have got a big job. How does your agency carry out its mission with just over 5,000 employees?

Mr. DETTELBACH. It is very difficult.

Ms. BALINT. It is shockingly low given the charge.

Mr. DETTELBACH. First, the way we do it is, we have an incredible workforce. The people that, the career people, I am the only political appointee at the ATF. I am a single Schedule C person, just me. The people who are the career people get the credit here. These are agents. These are investigators, lab technicians, analysts, and staff. They do incredible and dangerous work every day.

The only way to make any progress on this is partnership with our State and local partners, which we are better than anybody else with respect to others.

Second, being smart about how we use the intelligence that we provided to identify the worst of the worst, to make sure that we are actually taking steps to do two things:

(1) Identify the worst of the worst, the trigger pullers and the shooters, and get them out of the community, put them where they belong, incarcerated mainly.

(2) Also, at the same time to do something to enforce the existing laws to cutoff the supply of guns to those same people. It is far too easy for killers, felons, gang members, rapists, domestic violence people to get firearms, even though the law, and everybody agrees, they shouldn't have them.

So, you have to do both of those two things. It is a two-part strategy. There are people who only want me to do one. There are other people who only want me to do the other one. The fact of the mat-

63

ter is you are not going to make progress unless you have a reasonable approach on both.

Ms. BALINT. So, to followup on that, how do you go about making those decisions about priorities?

Are there functions that you, unfortunately, have to de-prioritize due to the resource constraints that you have? What are those?

Mr. DETTELBACH. So, you make the decisions based on data as best the data, that you can find in real time. It is not always perfect.

There are, bluntly, there are areas of this country where I wish that we would have more agents. New York City is an example.

So, in New York City the New York City Police Department is 36,000 strong. I have about 30 people in New York City. It is, it is absolutely—and we punch way above our weight. That is the case everywhere.

So, we are making decisions about where the crime threat is. When I make an investment on the Southwest border, as we, as we have, not I, we have at the ATF, that means at the ATF that we can't startup a whole new division. That means we are pulling agents from some other place that we really care about.

So, we are constantly struggling to balance resources in the best way we can to face a lot of threats.

Ms. BALINT. Director, I am just about out of time. I think it is clear that without substantial funding we are not going to improve our statistics on gun violence, and we are not going to improve our public safety outcomes. We should be putting the money to work to help protect our kids.

I say that as a Member of Congress. I also say that as a former teacher and as a parent of two teenagers. We have to do something about this and not just talk about it.

Thank you.

Chair JORDAN. The gentlelady yields back.

Ms. BALINT. I yield back.

Chair JORDAN. The gentleman from North Dakota is recognized.

Mr. ARMSTRONG. We are conflating two issues here. A man is dead, and an officer was shot not because of rank-and-file law enforcement doing their job, but because somebody made a leadership decision to execute a warrant in the most dangerous way possible given the circumstances of that case.

We can sell 6:00 a.m., as and standard operating procedure. You can do that everywhere else.

I have represented three officers in officers-involved shootings. I spent 10 years dealing with search warrants. I know the facts of this case. I know where the guy works. I know that he was surveilled. I know that they chose to implement a warrant in a way that absolutely maximized the risk of harm both to the person being served the warrant on and to the officers serving the warrant.

I am going to move on. I am going to move on to something else.

Federal gun charges are what we call strict liability crimes, right? If you have a gun and you are a prohibited person, that is the crime. There doesn't need to be intent. There doesn't need to be any of those things. Right?

Mr. DETTELBACH. Disagree.

64

Mr. ARMSTRONG. So, if you are a felon in possession of a firearm you can intend, you can say I didn't know I was a felon?

Mr. DETTELBACH. No. There is an intent requirement in Congress' statute. You can read 922(g)(1). It is in the statute, Congressman.

Mr. ARMSTRONG. You said earlier that the ATF's responsibility is to implement the laws that Congress passed. Right?

Mr. DETTELBACH. Correct.

Mr. ARMSTRONG. When did the U.S. House pass a rule classifying a pistol brace as a short-barreled rifle?

Mr. DETTELBACH. That rulemaking is based on the National Firearms Act 1934.

Mr. ARMSTRONG. When did Congress pass a law? They didn't.

Mr. DETTELBACH. In 1934, Congress passed the National Firearms Act, which said that short-barrel rifles were unusually dangerous.

Mr. ARMSTRONG. I am not asking you about—

Mr. DETTELBACH. Congress' words.

Mr. ARMSTRONG. I am not asking you about short-barreled rifles. I know what short-barreled rifles are called by the National Firearms Act.

When did Congress pass a law saying pistol braces qualify? When did Congress pass that?

Mr. DETTELBACH. Congress passed; they are covered by the National—

Mr. ARMSTRONG. They did not pass the law. They didn't.

When did the President sign the law? He didn't.

The first pistol brace was sold in 2012. A guy walked into a gun store, bought it legally, walked out of the gun store with a pistol brace, with a pistol brace rifle. No need for $200, no need for a stamp.

Mr. DETTELBACH. Are you saying that there is a new brand of gun that didn't exist in 1968, but the Gun Control Act doesn't apply to it?

Mr. ARMSTRONG. I am saying in 2012, a guy in Dickinson, North Dakota walked into a firearms store and bought a gun legally. Correct? With a pistol brace. Didn't need to do a stamp, didn't need to do a $200, and didn't need to do a $200 registration.

Mr. DETTELBACH. Again, we look at—

Mr. ARMSTRONG. No. This is a factual question.

The first pistol brace was sold in 2012. Didn't the person who purchased it need stamp, and did he need the Federal Government's permission to buy that gun?

That is in 2012. That is not a hard question.

Mr. DETTELBACH. Respectfully, the 2012, the thing that has been talked about in this Committee previously, was never brought to market.

Mr. ARMSTRONG. OK. So, 2015?

Mr. DETTELBACH. It would depend on the actual design of the individual item. There were numerous different items being manufactured. It changed over time.

Mr. ARMSTRONG. You spent 20 years as a prosecutor. Twenty years as a prosecutor. You know the answers to these questions.

65

I am done asking them. I am just going to go with the numbers. From 2012–2023, the ATF estimates that there are 3–7 million pistol braces sold on the civilian market not requiring the $200 stamp from the NFA for a short-barreled rifle.

Now, the congressional Research Service says three are 10–40 million of those things purchased in the same period of time. Manufacturer sales estimates are significantly higher than the ATF's estimate, and those estimates exclude 2020–2022.

Now, the Deputy Chief of the ATF has stated that prior to June 1, 2023, the 250,162 registrations on retroactive purchases were received by the ATF.

Does that sound accurate?

Mr. DETTELBACH. I don't know who that person, I don't have a title like that. The number sounds like the number of people that during a certain period of time sought registration. The number does sound familiar, but I don't know the quote that you are making.

Mr. ARMSTRONG. Well, I have got a rancher in Southwest North Dakota who is hunting snow geese through a Federal wildlife refuge. The U.S. Forest and a U.S. agent comes out. He purchased that rifle legally in 2015. He is out shooting, shooting geese with a shotgun. U.S. Fish and Wildlife comes in his car and sees a gun in there with a pistol brace.

What is the penalty for him now? He bought the gun legally, 2015?

Mr. DETTELBACH. Well, again, it is—

Mr. ARMSTRONG. It's 5–10 years and a maximum $250,000 fine. You talk about costs; you talk about budget cuts. So, let's just assume the low-end number of the ATF number is on 3–7 million. Three million guns that were purchased legally without any extra requirement, the ATF has got 255,000 of those registered.

So, you are roughly saying 2.7 million people are now felons in possession of firearms for something they purchased legally?

Mr. DETTELBACH. I respectfully disagree with a lot of the characterizations in your question. The last Administration, Attorney General Barr issued guidance on this before the ATF even got to this. People were on notice for years and years and years that you can't take something and break it into two and then put it together and treat it differently than the person who buys it in one piece.

Mr. ARMSTRONG. I don't care—they bought a gun legally and you guys retroactively made it illegal in a different qualification.

Mr. DETTELBACH. Respectfully, I disagree. That is not what the facts reflect.

Chair JORDAN. The time of the gentleman has expired.

The gentlelady from Missouri is recognized.

Ms. BUSH. Thank you, Mr. Chair.

First, I want to start by offering my condolences to Ms. Malinowski, who I believe was here earlier.

St. Louis and I are here today seeking accountability for the gun violence epidemic in our country, and for all instances of potential law enforcement misconduct.

Director Dettelbach, thank you for being here today. Let me say that I support several of the ATF's recent efforts, including the

66

Both Guns Rule, the Stabilizing Brace Rule, and the efforts to stop gun trafficking.

As gun violence continues to shatter families and communities, thanks in part to weak gun laws in Republican-controlled States like mine, in Missouri, equitable and effective enforcement of our existing laws must be a top priority. There is a difference between the way the law is written and the way it is enforced, as communities like St. Louis know all too well.

So, taking on the gun violence epidemic requires asking hard questions about enforcement.

That is why the last time you were before this Committee I asked you about the good old boys' roundup. In the 1980s and 1990s the ATF agents organized shameful Whites only events which the former ATF Director John Magaw characterized as being racist in nature, anti-Black, and having discrimination, almost every year.

It may seem like old history, but there are legitimate and recent concerns about racial bias in the agency's enforcement operations, specifically in its use of sting operations.

For example, an *USA Today* investigation from 2014 found that 91 percent of people arrested in the ATF sting operations were Black or Latino.

When you were U.S. Attorney your office prosecuted these kinds of cases. Are you aware of these concerns regarding sting operations? If any, what steps have you taken to address?

Mr. DETTELBACH. At the ATF, we are very clear that we don't look at any of those kinds of factors and it is absolutely a necessity, Congressman, that law enforcement does not look at these kinds of factors. I would say there are comments that were made earlier that I thought somebody was perhaps implying that because somebody is wealthy or lives in a nice neighborhood, they should be treated differently than other people.

I know there are lots of people who are in communities where they economically struggle who are law-abiding citizens. We don't assume that because of where you live or how much you make, that you are any more or less likely to be a law-abiding citizen. That is a core value at the ATF, and it is very important for you to ask that question and it is very important for me to answer it.

Ms. BUSH. Thank you. I will say that sometimes looking at it, what you just said though, looking at it and seeing that we do understand that folks in marginalized communities are often over criminalized or criminalized period is an issue that we must also address and fight. I think you started to allude to that and so thank you.

These questions are essential because for the ATF to be effective today, it needs to fix the problems of yesterday including its troubled history of racist behavior and enforcement. My concern about enforcement does not extend only to questions of racism.

There needs to be accountability for all instances of potential misconduct by the ATF agents, and that is why I do support my Republican colleagues' efforts to get more information from the Federal and local law enforcement about the death of Bryan Malinowski.

I know there is evidence that Mr. Malinowski fired first on the agents, but the circumstances warrant more information about what happened that day. I say this because of my solidarity, I want to be clear, my solidarity, my pursuit for accountability, and my pursuit of accountability are not conditional.

I will say that I have been surprised to hear my Republican colleagues expressing concern about law enforcement shootings, lack of body cameras, and no-knock warrants. I am surprised because I, and many of my Democratic colleagues, have pushed for law enforcement accountability for years and Republicans have mocked us and fought against us at every step.

I am surprised because 2023 set another record for law enforcement killings in this country. Police have killed an average of three people per day. Police disproportionately kill Black people and there have only been nine days this year where police didn't kill someone. Yet, Republicans have refused to hold hearings about any of those deaths. My question is where have you been? Where have you been? Travon Martin and Mike Brown, we have been protesting for 10 years. We have been protesting. We were shot with rubber bullets. We have had dogs unleashed. We were hit with tear gas and rubber bullets.

George Floyd, we were out there for three months. Mike Brown, we were out there for 400 days. Where were you? Why didn't you care then because they are Black? I don't understand. All of a sudden, now we want to talk, but see the thing of this, when we took a knee, folks were mad and criticized us. When we were nonviolent, people still criticized us. All of a sudden, now the difference is it color? I say this. My solidarity is not conditional.

So, I ask them for the record that their solidarity is not conditional, that they are willing to support oversight and accountability for all deaths by law enforcement officers regardless of race, ethnicity, faith, location, or anything else that they will vote for real policy solutions that prevent police brutality—

Chair JORDAN. The time—

Ms. BUSH. —as well as programs that keep our communities safe including gun violence. Yes, I went over because someone else went over, too. I just want to hear that come from my Republican colleagues who care about police brutality, and it affects every person.

Chair JORDAN. Thank you, the time of the gentlelady has expired.

The gentleman from Wisconsin is recognized.

Mr. FITZGERALD. Thank you, Mr. Chair. Director, as you may know, I am the co-lead, alongside Congressman Stanton of Arizona on the bill exempting certain less than lethal projectile devices on the Gun Control Act definition of a firearm, tasers.

The ATF provided some comments on an earlier draft of the bill noting some concerns with the legislation. I am sure you are aware of the bill. Does the ATF still have the same concerns that we had on the earlier version?

Mr. DETTELBACH. Congressman, can I get back to you on that? I don't want to answer precipitously. I know this is an important issue for a lot of people, including some in law enforcement who have expressed views on it. So, can we get back to you on that be-

68

cause I don't know whether any changes in the bill have affected anything.

Mr. FITZGERALD. OK, so let me just—bear with me then and I will explain some of the arguments. Hopefully, as the Director, your understanding of the Gun Control Act will be strong enough to provide some context. The proposed definition of less than lethal device would be unworkable in the field I think is the issue.

Mr. DETTELBACH. Yes.

Mr. FITZGERALD. Because officers and agents cannot measure the projectile, velocity, field stops, and searches and seizures.

Mr. DETTELBACH. As opposed to centrally, but you are talking about out in the field. I understand.

Mr. FITZGERALD. So, the ATF doesn't currently task any of the firearm velocity in the field on any of the search and seizure stuff. Is that right or not?

Mr. DETTELBACH. To the best of my knowledge, that is correct. It is always hard because some of our operations aren't in Washington. We have operations, field operations that are centralized in other places. So, I want to be careful, but we have—I think you are right as a general matter, yes. I will check though and get back to you. If that is not correct, I will get back to you.

Mr. FITZGERALD. OK, OK. So, to be clear, the ATF right now though the concerns that this change would be unworkable in the field hinges on the idea that officers and agents would suddenly need to start measuring velocity and checking the internal workings, right? I am trying to get to the bottom because I think Congress is way beyond the ATF on this. I think there is a bipartisan group that certainly is starting to grow when it comes to this technology. The ATF still seems stuck in where we were 3–5 years ago.

Mr. DETTELBACH. I understand.

Mr. FITZGERALD. Obviously, you are getting the same feedback that we are because law enforcement wants more—

Mr. DETTELBACH. There are exceptions in the current law for law enforcement, but I understand your concern and we will get back to you, Congressman. I will commit to you that we will get back to you.

Mr. FITZGERALD. OK, very good. Very good. So, with the time that I have left, I just also wanted to submit for the record a letter from Mr. Earl Griffith who served in the ATF for more than 20 years retiring as a Division Chief of the ATF's Firearm and Ammunition Technology Division.

Mr. Griffith's letter, dated March 6, 2024, is in support of the bill, H.R. 3269, and suggests that the ATF already has the existing authority to revisit classification determinations if the manufacturer decides to modify a less lethal projectile device into a lethal configuration. That is what the manufacturers are doing. They are changing the technology to kind of match up with where the ATF is at and I think that is unnecessary. I think this thing could be cleaned up if we would just have somebody pay attention to where Congress is moving on this, how quickly we are moving on this.

Mr. DETTELBACH. Congressman, my understanding is that the statutory language that is at issue in a lot of these is to expel a projectile by means of an explosion. That is causing some of these classifications. Now, Mr. Griffith, obviously, is a well-respected,

69

long-time ATF employee. We will look at the letter and try to get back to your office of where things stand.

Mr. FITZGERALD. I am just telling Congress is way ahead of is where the ATF is on this, and that is why I wish it would take a deeper, longer look at where we are at, because otherwise, the input that you would have is simply not going to be taken seriously if the statute is written or if the changes are already made. So, I would encourage you to do that. I yield back.

Chair JORDAN. Will the gentleman yield for 30 seconds? Will the gentleman yield? Thank you.

Really quick, you mentioned earlier that we need to be focused on the facts, particularly relative to the Malinowski case. I just want to understand. Are you disputing that the ATF was not in Little Rock, Arkansas ready to execute a raid on the week before, on March 12, 2024?

Mr. DETTELBACH. I am neither disputing nor—

Chair JORDAN. We saw the video. We saw the video. Right?

Mr. DETTELBACH. There is a lot of—again, this is a slippery slope. I have to abide by our Department of Justice policy.

Chair JORDAN. Are you saying the ATF wasn't in Little Rock?

Mr. DETTELBACH. I am not saying any of that. I am saying until the investigation is completed, I am not disputing that fact or any other fact. I am trying to counsel because I hear a lot of things out there—

Chair JORDAN. You said earlier things were stated that were not fact.

Mr. DETTELBACH. There has been a lot of things said, Congressman—Mr. Chair, I am sorry.

Chair JORDAN. The gentleman from Virginia is recognized.

Mr. CLINE. The death of Bryan Malinowski is a tragedy, but unfortunately, it is not a surprise, given the cavalier attitude of the ATF over the years and the way that they play fast and loose with the law, with the facts, and with the lives of American citizens.

I want to ask you about the latest area in which the ATF is playing fast and loose and really taking actions that are going to endanger more lives in the future, if we don't see changes and that is the new attempts to have a universal registration check rule.

As you know, the Gun Control Act makes it unlawful for any person, say a licensed dealer, to engage in the business of dealing in firearms until he has filed an application with the ATF and received a license. The 1986 Act modified the DCA, adding a statutory definition of engaging in the business and then in 2022, Biden signed into law the BSCA which broadened the definition by eliminating principal objective and replacing it with a requirement to predominantly earn a profit.

I want to ask you because people who make occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or a hobby, or who sells all or part of his personal collection of firearms, that was a portion of OPA altered by the 1922 Act with the exclusion—

Mr. DETTELBACH. That language, I believe, this isn't litigation. Our position—and the rule speaks for itself. I believe you will find in black and white in the rule that language that you just said. In black and white in the rule, that language is there.

70

Mr. CLINE. Yes, that language remains, that exclusion remains, unaltered by the BSCA. So, these people who make occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby or who sell all or part of their personal collection of firearms are exempt from this 1922 Act modification. Yet, what we see—

Mr. DETTELBACH. For those activities.

Mr. CLINE. Right, for those activities.

Mr. DETTELBACH. They are doing a whole bunch of other things.

Mr. CLINE. Do you believe that a personal collection of firearms can be for self-defense?

Mr. DETTELBACH. So, I think again the provisions of the rules speak for itself. In this format, it is hard to get into a deep debate on this. We also have filed significant legal papers in courts that are hearing this and because it is pending litigation, nothing I say can or should contradict any of those things. The rule sets forth conduct-based factors which under the totality of circumstances, right, could give rise to somebody being engaged in the business or not. It gives examples. It gives examples.

Mr. CLINE. I am glad you said conduct because where did Congress make it a crime to merely intend to earn a profit off selling a privately owned firearm? Because that is what you are attempting to—

Mr. DETTELBACH. There clearly is an intent element of the statute that Congress—

Mr. CLINE. Solely intent? There is no action?

Mr. DETTELBACH. Again, as in many criminal statutes and many statutes that are regulatory, there is both an act and an intent. Sometimes those things differ from statute and regulation to other statutes and regulations. The text of the law and the text of the rule are always what controls.

Mr. CLINE. Didn't change and so your efforts to become mind readers over at the ATF and somehow determine intent based on no activity whatsoever on the part of our gun owner to earn a profit—

Mr. DETTELBACH. Congressman—

Mr. CLINE. It is playing fast and loose with the statute.

Mr. DETTELBACH. Congressman, not even talking about this statute, but in many, many, many regulatory functions and many administrative proceedings, many civil proceedings, people's intent is part of the determination that finders of fact make. They look at their words. They look at various different things that they are doing, and they can infer intent. I think the standard jury instruction in many cases talks about these things.

Mr. CLINE. Well, I just want to know when Congress authorized the ATF to require Americans who offer to sell one firearm to another family member, to get a Federal license, submit fingerprints, maintain gun registration paperwork, register as a business, and keep regular business hours open for the ATF inspections.

Mr. DETTELBACH. Congressman—

Mr. CLINE. You never did that.

Mr. DETTELBACH. Let me be clear. This is not—the rule cannot and is not and does not create a universal background check. We

could not do that. Only Congress could do that, and I want to be very clear here that the rule does not do that.

Mr. CLINE. I get what you are doing. The ATF is playing too cute by half. The American people see it. We see it, and we are not going to allow you to do that. I yield back.

Chair JORDAN. The gentleman yields back. The gentlelady from Wyoming is recognized.

Ms. HAGEMAN. A December 2021 ATF memo alerted the America people that the ATF was maintaining a digital, searchable, centralized registry of guns and gun owners in violation of various Federal prohibitions and contrary to what you testified to under oath today.

In response, Representative Michael Cloud and 52 House Members sent the ATF a letter dated November 22, 2021. The ATF responded to that letter stating that it had 920,664,765 records, 865,787,086 of which are in a digitalized format which Gun Owners of America has proved to be searchable. This was discovered shortly after the ATF was revealed to have processed over 54 million records in a single year.

What is the latest record count for the ATF's illegal digital, searchable, national gun registry?

Mr. DETTELBACH. Zero. We obey the law. None of our records—

Ms. HAGEMAN. According to your letter, you have over 865 million of these records are in digitalized format. You have admitted it.

Mr. DETTELBACH. Respectfully, we are—I think the ATF is the only customer of Adobe Acrobat that pays money to remove search functions—

Ms. HAGEMAN. Before the Commerce Justice Science Subcommittee of the Appropriations Committee in April of last year, you testified that the ATF pays Adobe Acrobat extra to have certain search functionality eliminated.

Mr. DETTELBACH. That is not correct.

Ms. HAGEMAN. Well, is the ATF's digital database of gun owner records capable of being opened by normal Adobe Acrobat and search by name?

Mr. DETTELBACH. Again, we pay—

Ms. HAGEMAN. This is a yes or no question. Is it?

Mr. DETTELBACH. We pay to have search functions limited. We don't pay Adobe Acrobat. I believe we pay somebody else.

Ms. HAGEMAN. If the ATF asked, could Adobe Acrobat re-enable name search functionality on the ATF's illegal gun registry?

Mr. DETTELBACH. It is not an illegal registry. We do not—

Ms. HAGEMAN. If the ATF asked—

Mr. DETTELBACH. We do not search in the method that you are suggesting. We cannot. These are records that are—we pay a public safety cost, which Congress balanced for this decision, which is—

Ms. HAGEMAN. If the ATF asked, could Adobe Acrobat re-enable name search functionality on the ATF's illegal gun registry?

Mr. DETTELBACH. I am not an expert in Adobe Acrobat coding. I do know that we do not keep a gun registry. I also know that—

Ms. HAGEMAN. You have records. You have admitted that you have over 920 million records, over 865 million of which are in digitalized format, correct?

72

Mr. DETTELBACH. If your answer is they somehow scanned in so that we literally don't have to have 950 million pieces of paper, that is a lot different from what you are implying with respect to having a gun registry. It is also true, Congressman, that we don't have any records of firearms purchases for people who are still in business, which is the vast majority of currently sold firearms. We have zero.

Ms. HAGEMAN. You also testified before that Subcommittee that the ATF's digital database of gun and gun owners is not capable of being searched by a personal identifier. Can the ATF's gun registry be searched by make, model, and serial number, enough searchability to create a list of say all AR–15 owners?

Mr. DETTELBACH. The answer to your question is we do not create, use search and around the registry—

Ms. HAGEMAN. You are not answering my question. You are not answering my question.

Mr. DETTELBACH. Your question had—respectfully, it was a technical question with five or six different parts, and I am trying not to erroneously, as you said I am under oath, I am trying not to erroneously misstate things of a technical nature. We do not keep a registry. We use these things for pending homicide investigations. It takes us a lot longer to find the name of the killer—

Ms. HAGEMAN. Mr. Dettelbach, you have mentioned gun running and gun violence associated with Mexican cartels and the crime association with that. In fact, you refer to the cartels as "the most dangerous organizations in the world."

How many conversations have you had with President Biden or Secretary Mayorkas demanding that they close the Southern border?

Mr. DETTELBACH. We do not—

Ms. HAGEMAN. How many discussions have you had with President Biden or Mayorkas about closing the Southern border?

Mr. DETTELBACH. The answer to your question is—

Ms. HAGEMAN. It's zero.

Mr. DETTELBACH. We work with DHS on border-related—

Ms. HAGEMAN. How many conversations have you had with them demanding that they close the Southern border? It is a simple question.

Mr. DETTELBACH. Again, may I answer?

Ms. HAGEMAN. How many conversations have you had demanding—

Mr. DETTELBACH. We discuss our border-related security issues with the DHS frequently.

Ms. HAGEMAN. Have you demanded that they close the Southern border?

Mr. DETTELBACH. I have had conversations with Secretary Mayorkas about our efforts—

Ms. HAGEMAN. Have you demanded that they close the Southern border?

Mr. DETTELBACH. I am in the ATF. It is not our jurisdiction to police the Southern border. That is for the DHS, Congresswoman.

Ms. HAGEMAN. You don't care about crime in this country if you are not trying to address what is going on at the Southern border.

Mr. DETTELBACH. Respectfully, I deeply disagree. I think it is very unfair.

Chair JORDAN. The gentlelady's time has expired. The gentleman from South Carolina is recognized.

Mr. FRY. Thank you, Chair. Director, here is what I find troubling. In 2021, there were five FFL licenses that were revoked, but in 2023, that number has jumped to 157, I believe. It is a dramatic increase, in my opinion, and I think we have echoed this on this side, a very stark indicator of the Biden Administration's aggressive overreach against FFLs. Here is what is worse, an increasing number of firearms dealers faced with severe and often disproportionate consequences for minor clerical errors have elected to shut down their operations rather than endure the extensive and costly process of defending their practice. This is like David versus Goliath except that Goliath, the U.S. Government, wins because all the resources are there, and you have a small business trying to defend themselves against the insurmountable resources of a Federal Government.

Let's take a look at the number of voluntary business closures, post-inspection, over the last couple of years. In 2021, there were 24; 2022, 69; and 2023, there were 80. This is the result of the ATF's zero tolerance policy and quite frankly, a very concerning trajectory of the ATF. This is all occurring under the guise of public safety, but the ATF is essentially working to dismantle a very lawful firearm industry.

Let me ask you something, and this was talked about earlier. Where can I find authorization from Congress that you would revoke somebody's FFL for a minor clerical error? Where is that in the statute?

Mr. DETTELBACH. The statute and the policy and our implementation deals with willful violations. By the way, it limits them further to violations that endanger public safety. The vast majority—one thing I think we agree on which I want to say because it is important. The vast majority of firearms licensees out there are following the law and following the rules.

Mr. FRY. Correct.

Mr. DETTELBACH. They are law-abiding businesses. That is why over 98, almost 99 percent of our inspections do not result in revocation. There is due process. People can request a hearing. In the hearings, Congressman, that we conduct, these are administrative hearings at the ATF. Half the time, we decide not to revoke because of something that the FFL presents to us. People have lawyers at some of those. They don't have lawyers at others. In many cases, we work with FFLs to try and cure any defects, if they are clerical defects, to make the FFL stronger in terms of a target for people who—not the FFL is doing some illegal, but others are taking advantage of weak controls. That can be a public safety threat as well, as you know. Even a law-abiding FFL, if they are not careful, can be taken advantage of by straw purchaser—

Mr. FRY. Director, here is my concern and I know we have got limited time, and I am very respectful of yours. The BSCA was passed in 2022. Based on that, there has been a slight modification to the rule, but

74

Even a single transaction or offer to engage in a transaction when combined with other evidence may be sufficient to require a license as an FFL.

So, you are inferring from that and again, I think this is where the minor clerical errors come in, Congress has made no law to this. There is a 2022 amendment, but I think you have largely ignored another statute, 18 U.S.C. 921(a)(21). Are you familiar with that statute?

Mr. DETTELBACH. I am familiar with all the code—

Mr. FRY. What does that say? Director, what does that statute say?

Mr. DETTELBACH. I believe it is the provision you are talking about for importers, which is the provision that you are referring to?

Mr. DETTELBACH. OK, so the engaged—

Mr. FRY. That term:

Engaged in business shall not include a person that makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or a hobby or who sells all or part of their personal collection or firearm.

Mr. DETTELBACH. That is quoted in the rule.

Mr. FRY. Right. The concern that I have though is that not the application of the ATF because you are taking a very heavy-handed approach. Again, you have to look at the disproportionality of this is that you have the heavy hand of government. You have the enforcement. You are creating these rules, which are beyond the scope of what Congress has implied or directed. You are using this to target people. Again, I am not talking about the bad actors. I am talking about lawful businesses who are trying to do the right thing and have minor clerical errors.

Let me ask you something really quick. I want to shift gears. Can you describe Spartan? What is Spartan?

Mr. DETTELBACH. Spartan is the name of the general case management system that exists at the ATF. It replaced an older system. The system had been in service for many, many years. It was no longer supported anymore by the technology out there, so we replaced it with a new case management system.

Mr. FRY. Now, the ATF administrative investigators are tasked with determining whether or not willfully did anything and according to a recent ATF revocation hearing, whether "in preparing the report of violations is the issue of willfulness, even a factor?" The ATF Director responded "I input data and Spartan does the figuring."

Are we allowing AI to determine whether or not something is willful or not?

Mr. DETTELBACH. I am so glad you asked—absolutely not. We, people, human beings review all these things at supervisory levels. You cannot revoke somebody without several levels of approval.

Chair JORDAN. The time of the gentleman has expired. The gentleman yields back. The gentleman from Texas is recognized.

Mr. HUNT. Thank you, Mr. Chair. We are almost done, sir. Thank you for being here for a second time. Thank you for your time. I really appreciate it.

Basic question, sir. You are an attorney, correct? It is my understanding.

Mr. DETTELBACH. Yes, I am, sir.

Mr. HUNT. Well, I am going to give you the benefit of the doubt knowing that you understand the Constitution, including our Bill of Rights, correct?

Mr. DETTELBACH. I hope so, sir.

Mr. HUNT. So, what is your interpretation of our Second Amendment? Do you think Americans have the right to bear arms, yes or no. Just give me your brief overall view of it.

Mr. DETTELBACH. Yes, and I think what we do is we look to what the Supreme Court has decided on this. The Supreme Court, Congressman, has been very clear on this. The law, the Second Amendment jurisprudence is lengthy and changing. As a lawyer, I don't get to decide this. The courts decided it and the courts have said, yes, is the answer to your question.

Mr. HUNT. OK, so we have these Second Amendment rights because we know how important it is for us to maintain our constitutional republic and a functioning republic because, again, as a gun owner myself, as a lawful gun owner myself, it is very important to me to be able to protect my home and also prevent tyrannical governments from infringing on our rights as human beings bestowed to us in our Constitution.

So, it is my humble opinion, sir, that the ATF is certainly infringing on a lot of these rules for law-abiding citizens and infringing on our Second Amendment rights for law-abiding citizens. I am not talking about trying to catch bad guys that have guns. I am talking about implementing a level of pain on people like me that, quite frankly, was not given—was not bestowed to us—that is bestowed to us via the Second Amendment.

Unfortunately, as bureaucrats attempting to infringe on our Second Amendment rights that some lawmakers of Congress, they see gun owner tragedies as an opportunity to slowly chip away at these rights. So, recently lawmakers used the heartbreaking Uvalde tragedy as an opportunity to pass red flag legislation. That is a fact.

I remember a time we were told that red flag laws were simply a conspiracy theory. I am old enough to remember that. They are not a conspiracy theory anymore, sir. Red flag laws are in bills, and they are in Biden's Executive Orders. If you don't know what red flags are, in short, red flag laws are a type of precrime enforcement where courts grant orders allowing for the seizure of firearms from someone who hasn't committed an actual crime.

When I think of red flag laws, I see the Safer Communities Act which President Biden signed into law in 2022. The Safer Communities Act includes a $750 million in funding for States to implement and improve red flag laws. Again, that is going after the good guys, not the bad guys. It hasn't stopped there, sir. Biden in 2023 announced an Executive Order on gun control with the goal of "increasing the effective use of red flag laws."

Biden also opened the Office of Gun Violence Prevention, led by Kamala Harris, which has further encouraged and entrenched red flag laws across the Nation. These are all the facts. I am still waiting for her to tell us what the root causes are of the border crisis, and you are going to try to tell me that Kamala Harris is going to tell us the root causes of gun violence. Good luck with that.

76

Finally, the ATF has expanded on its Safer Communities Act by issuing a new ruling that in practice will implement universal background checks. I am going to say the quiet part out loud because we are almost done. Whenever a gun tragedy occurs in this country, we always hear the left say we have to do something. We have to do more. Then once legislation is passed, my colleagues on the left then say we have to always do more and more and more.

I am going to warn the American people that we have to do more, what we have to do more really, really means. First, they come after the AR–15s. Then, they come after the sporting rifles. Then they come after your long guns. When homicides have not decreased because you take away all those weapons, and keep in mind, the AR–15 is responsible for six percent of homicides in this country, they are going to come after your hand guns and disarm our country, and disarm our rights and take away our Second Amendment rights that have been given to us by our Founding Fathers.

Rather than take away guns from law-abiding citizens, instead, we should be going after criminals, specifically criminals. The reason why I am talking about red flag laws is because the American public understands that we are going to start having mission creep here. You go after one thing, you go after another thing, and then there is always more. There is always going to be a fight. We are using tragedies to infringe on rights that have been to us by our Second Amendment. It is you, being head of the ATF, I need you to be cognizant and very aware of that because most of the people in Texas that are ranch owners, AR–15 owners like myself, combat veterans like myself, we don't need more laws. We implement the laws that we have on the books and go after the bad guys that have guns, not the good guys, and that is your job. Thanks for being here, sir. I yield back the rest of my time.

Chair JORDAN. The gentleman yields back. Director, thank you for being here. I apologize. We have got to run to votes and so we are going to sprint out of here. We appreciate you being here for 3½ hours and answering our questions. Thanks, again, sir.

That concludes today's hearing. Without objection, all Members will have five legislative days for additional written questions for the witness or additional materials for the record. Without objection, the hearing is adjourned.

[Whereupon, at 1:29 p.m., the Subcommittee was adjourned.]

All materials submitted for the record by Members of the Committee on the Judiciary can be found at: *https://docs.house.gov/ Committee/Calendar/ByEvent.aspx?EventID=117349.*

○