# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**MARIA DEL SOCORRO MALINOWSKI,**
*individually and as a personal representative*
*of the Estate of Bryan K. Malinowski,*
*deceased, and on behalf of the wrongful*
*death beneficiaries of Bryan K. Malinowski*                     **PLAINTIFF**

**v.**                     **Case No. 4:25-cv-00486-LPR**

**UNITED STATES OF AMERICA;**
**BUREAU OF ALCOHOL, TOBACCO,**
**FIREARMS AND EXPLOSIVES;**
**TIMOTHY BOLES; TROY DILLARD;**
**CLAYTON MERRILL; TYLER**
**COWART; MATTHEW SPRINKLES;**
**JAMES BASS; MICHAEL GIBBONS;**
**CHRIS GRIGGS; SHANNON HICKS; and**
**AMY NESS,** *individually*                     **DEFENDANTS**

## ORDER

This case arises from the Bureau of Alcohol, Tobacco, Firearms and Explosives' attempt to search—pursuant to a valid search warrant—the home of Bryan and Maria Malinowski.[1] Mr. Malinowski was suspected of dealing in firearms without a license and unlawful acquisition of firearms.[2] The search warrant authorized ATF to search for and seize (1) firearms, firearm parts or accessories, and ammunition; and (2) bank records, photos, cell phones, and other electronic devices showing the allegedly unlawful transactions.[3] All in all, a fairly routine search warrant for

---

[1] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 37–38. The warrant also permitted ATF to search two iPhones and other cellular and electronic devices. *See id.* at 33. A second search warrant (issued by the same Magistrate Judge on the same day) permitted ATF to search Mr. Malinowski's white 2022 Toyota Highlander and "[o]ther cellular and electronic devices located in the [vehicle]." *See id.* at 34–35, 39–40.

[2] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 37–38.

[3] *See id.* at 35–36.

a fairly routine (alleged) crime.  Yet, tragically, ATF's attempt to carry out this fairly routine search warrant ended in the death of Mr. Malinowski.

Why Mr. Malinowski is dead—and who is to blame for his death—is a subject of hot dispute among the parties.  Among other things, the parties dispute the propriety of ATF's knock-and-announce, the amount of time ATF agents waited before forcing their way into the Malinowski home, and what (if anything) ATF agents did upon entry to further announce themselves.  But everyone agrees that, when ATF agents forced their way into the house with guns drawn, Mr. Malinowski fired at least one shot that hit an ATF agent in the sole of his boot.[4]  And everyone agrees that at least one agent returned fire, shooting Mr. Malinowski in the head.[5]

The instant lawsuit is brought by Ms. Malinowski individually, as the personal representative of Mr. Malinowski's estate, and on behalf of the (alleged) wrongful death beneficiaries.[6]  The Complaint sets out 9 claims against the United States of America pursuant to

---

[4] *See* Compl. (Doc. 1) ¶ 188; United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 5.  To be specific, the Complaint alleges that Mr. Malinowski "fired his gun at the floor" rather than at the agents.  Compl. (Doc. 1) ¶ 188. But the Complaint also alleges that Mr. Malinowski fired at least once, hitting one of the agents in the foot.  *See id.*

[5] *See* Compl. (Doc. 1) ¶¶ 189–90; United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 5.  Everyone also agrees that, after the shooting of Mr. Malinowski, Ms. Malinowski was removed from the house and placed in a police vehicle, where she remained for a time.  *See* Compl. (Doc. 1) ¶¶ 194–222; United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 5.  But the parties dispute the length, nature, and legality of Ms. Malinowski's time in the police vehicle (and her subsequent time with the police).

[6] *See* Compl. (Doc. 1) ¶ 14.

the Federal Tort Claims Act[7] and 4 claims against certain ATF agents pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*.[8]

The FTCA is the traditional way a person seeks money damages from the federal government for a tort committed against him or her by federal officials acting within the scope of their government duties.[9]  With limited exceptions, the FTCA makes the United States liable for torts "in the same manner and to the same extent as a private individual under like circumstances . . . ."[10]  Generally, the FTCA is the exclusive damages remedy for a tort committed by government actors.[11]  Of course, "generally" is not "always."  Even the FTCA acknowledges that its exclusivity "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States . . . ."[12]

---

[7] State tort claims pursued under the FTCA—often colloquially described as FTCA claims—may only be maintained against the United States.  *See* 28 U.S.C. §§ 1346(b), 2679(a); *see also FDIC v. Meyer*, 510 U.S. 471, 476 (1994) ("[I]f a suit is 'cognizable' under § 1346(b) of the FTCA, . . . the federal agency cannot be sued 'in its own name . . . .'").  Accordingly, the Court dismisses all of Ms. Malinowski's FTCA claims against the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Additionally, because declarative and punitive damages are not available under the FTCA, the Court dismisses the portions of Ms. Malinowski's FTCA claims (if any) that seek declarative relief of punitive damages against the United States.  *See* 28 U.S.C. § 2674; *Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011) ("Congress passed the [FTCA], a limited waiver of the United States's sovereign immunity, to permit persons injured by federal-employee tortfeasors to sue the United States for *damages* in federal district court." (emphasis added)); *Carlson v. Green*, 446 U.S. 14, 22 (1980) ("[P]unitive damages in an FTCA suit are statutorily prohibited (citing 28 U.S.C. § 2674)).

[8] 403 U.S. 388 (1971).  *See* Compl. (Doc. 1) ¶¶ 287–403.  To be more precise about it, the Individual Defendants include 8 ATF Special Agents and 2 state law enforcement officers—Michael Gibbons and Chris Giggs—who were working with ATF as Task Force Officers (TFOs).  *See id.* ¶¶ 27–36.

[9] *See Mader*, 654 F.3d at 797 ("Congress passed the [FTCA], a limited waiver of the United States's sovereign immunity, to permit persons injured by federal-employee tortfeasors to sue the United States for damages in federal district court.").

[10] 28 U.S.C. § 2674.

[11] *See Martin v. United States*, 605 U.S. 395, 409 (2025) ("The FTCA is the 'supreme' federal law addressing the United States' liability for torts committed by its agents.  It supplies the 'exclusive remedy' for damages claims arising out of federal employees' official conduct."); 28 U.S.C. § 1346(b)(1).

[12] 28 U.S.C. § 2679(b)(2)(A).  There is a second exception to the FTCA's exclusivity, *see id.* § 2679(b)(2)(B), but that exception is not relevant to the case at bar.

That is another way of saying that the exclusivity of the FTCA does not prohibit an otherwise valid *Bivens* action against individual government actors.[13]

It is completely understandable why a plaintiff would want to make *Bivens* claims in addition to FTCA claims.[14] For one thing, *Bivens* claims are decided by a jury, whereas FTCA claims are decided by a judge.[15] Where a plaintiff has been injured (or allegedly injured) by government actors, lawyers tend to suspect that juries can be swayed by sympathy or emotion—at least to a greater extent than a judge can be. Perhaps more importantly, *Bivens* claims allow for the possibility of punitive damages, whereas FTCA claims do not.[16] That means a prevailing plaintiff can receive a significantly greater damages award under *Bivens* than under the FTCA. These are but a few of the weighty incentives that often lead plaintiffs to make *Bivens* claims in addition to FTCA claims.[17]

But there is a catch. Despite the attractiveness of *Bivens* claims, success on such claims is not nearly as common as success on FTCA claims. This is because the Supreme Court has narrowly cabined the circumstances in which a plaintiff can state a *Bivens* claim.[18] Actually, "narrowly cabined" is a significant understatement. Except in extraordinarily specific

---

[13] *See Carlson*, 446 U.S. at 20 (noting that the FTCA "contemplates that victims of . . . intentional wrongdoing . . . shall have an action under [the] FTCA against the United States as well as a *Bivens* action against the individual officials alleged to have infringed their constitutional rights").

[14] *See id.* at 21 ("Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States.").

[15] *See Hui v. Castaneda*, 559 U.S. 799, 805 (2010) ("Unlike . . . the FTCA, . . . *Bivens* cases may be tried before a jury, and liability is governed by uniform federal rules rather than the law of the state in which the violation occurred.").

[16] *See id.* ("Unlike the remedy under the FTCA, the court reasoned, a *Bivens* remedy is awarded against individual defendants and may include punitive damages.").

[17] *See Carlson*, 446 U.S. at 20–23 (discussing factors "suggesting that the *Bivens* remedy is more effective than the FTCA remedy").

[18] *See Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("[R]ecognizing a cause of action under *Bivens* is a disfavored judicial activity. When asked to imply a *Bivens* action, our watchword is caution. . . . [E]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy." (internal citations and quotations omitted) (second alteration in original)).

4

circumstances, the Supreme Court has essentially eliminated *Bivens* actions.[19]  Speaking very roughly, *Bivens* claims just don't survive these days unless the circumstances underlying the claims are nearly identical to the circumstances of the rare *Bivens* actions that have already been blessed by the Supreme Court.

The upshot of all this is threefold.  First, where federal actors cause injury by way of unconstitutional conduct, a plaintiff will often work very hard to try and squeeze his or her claims into the shape of a previously recognized *Bivens* action.  Second, in almost every case where this feat is attempted, it will fail.  Third, and consequently, the FTCA will nearly always be the only damages remedy available in cases like the one at bar.

The 4 *Bivens* claims in this case will be the subject of a subsequent order.  The instant Order will focus solely on Ms. Malinowski's 9 FTCA claims.  The 9 FTCA claims are as follows: wrongful death (Count V), assault and battery (Count VI), negligence (Count VII), intentional infliction of emotional distress (Count VIII), crime victim manslaughter and negligent homicide (Count IX), crime victim battery (Count X), crime victim aggravated assault (Count XI), crime victim criminal mischief (Count XII), and false imprisonment (Count XIII).  The Government seeks to dismiss each of Ms. Malinowski's FTCA claims.[20]  The Government contends that this Court lacks jurisdiction to hear any of the 9 claims.[21]  For the reasons discussed herein, the

---

[19] The Supreme Court has only recognized a *Bivens* action in three specific contexts.  *See Carlson*, 446 U.S. at 16–19; *Davis v. Passman*, 442 U.S. 228, 248–49 (1979); *Bivens*, 403 U.S. at 397.  And it has not applied *Bivens* to a new context in over 40 years.  *See Egbert*, 596 U.S. at 486.  The Court will provide a more detailed accounting of the Supreme Court's narrowing of *Bivens* in a subsequent order addressing Ms. Malinowski's *Bivens* claims.

[20] *See* United States' Mot. to Dismiss (Doc. 22).  In this Order, the Court uses the terms "United States," "United States of America," and "the Government" interchangeably.

[21] *See* FED. R. CIV. P. 12(b)(1); United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 2–3.  This Order concerns subject matter jurisdiction as opposed to personal jurisdiction.  When the Court uses the term "jurisdiction" in this Order, it is referring to subject matter jurisdiction.

Government's Motion is GRANTED as to the false imprisonment claim and DENIED as to the 8 other FTCA claims.

## I.    LEGAL STANDARD

Federal courts have limited jurisdiction.[22]  And they have no constitutional authority to act in excess of that jurisdiction.[23]  Jurisdiction is such an important concept that its absence can be raised either by a party or by the Court itself.[24]  Either way, the burden of establishing jurisdiction belongs to the party asserting jurisdiction.[25]

In this case, the Government raised the issue of jurisdiction by way of a 12(b)(1) motion.[26] Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal of a claim for lack of jurisdiction.[27]  A Rule 12(b)(1) motion to dismiss "may assert either a 'facial' or 'factual' attack on jurisdiction."[28]  "In a facial attack, 'a defendant asserts that the complaint fails to allege

---

[22] *See Dakota, Minnesota & E. R.R. Corp. v. Schieffer*, 715 F.3d 712, 712 (8th Cir. 2013) ("[F]ederal courts are courts of limited jurisdiction . . . .").

[23] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) ("The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." (internal citations omitted)); *see also City of Ocala v. Rojas*, 143 S. Ct. 764, 766 (2023) (Thomas, J., dissenting) ("Courts have no constitutional authority to pass on the merits of a case beyond their jurisdiction . . . .").

[24] *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 548 (2019) ("Unlike most arguments, challenges to . . . jurisdiction may be raised by the defendant 'at any point in the litigation,' and courts must consider them *sua sponte*." (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012))); *Krein v. Norris*, 250 F.3d 1184, 1187 (8th Cir. 2001) ("[J]urisdiction issues will be raised sua sponte by a federal court when there is an indication that jurisdiction is lacking, even if the parties concede the issue." (internal quotations omitted)).

[25] *See Jones v. United States*, 727 F.3d 844, 846 (8th Cir. 2013) ("The party seeking to invoke federal jurisdiction . . . carries the burden, which may not be shifted to another party.").

[26] *See* United States' Mot. to Dismiss (Doc. 22).

[27] *See* FED. R. CIV. P. 12(b)(1).

[28] *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018); *see also Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) ("'A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack" and a "factual attack"' on jurisdiction." (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990))).

sufficient facts to support . . . jurisdiction.'"[29]  When deciding a facial attack, "the court restricts itself to the face of the pleadings, and the [plaintiff] receives the same protections as it would defending against a motion brought under Rule 12(b)(6)."[30]  In other words, a court "accept[s] as true all facts alleged in the complaint" and "consider[s] only the materials that are necessarily embraced by the pleadings and exhibits attached to the complaint."[31]  Conversely, "[a] factual attack occurs when the defendant challenges the veracity of the facts underpinning . . . jurisdiction."[32]  Unlike a facial attack, a factual attack permits the court to "consider[] matters outside the pleadings, and the [plaintiff] does not have the benefit of 12(b)(6) safeguards."[33]  Put another way, on a factual attack, "no presumptive truthfulness attaches to the plaintiff's allegations,"[34]  and considering matters outside the pleadings "does not . . . convert the 12(b)(1) motion to one for summary judgment."[35]

---

[29] *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018) (quoting *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009)).

[30] *Carlsen*, 833 F.3d at 908 (internal quotations omitted) (quoting *Osborn*, 918 F.2d at 729 n.6)).

[31] *Id.* (internal quotations omitted) (first quoting *Trooien v. Mansour*, 608 F.3d 1020, 1026 (8th Cir. 2010); and then quoting *Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012)).  Because a 12(b)(1) facial attack gives a plaintiff "the same procedural safeguards as a Rule 12(b)(6) motion[,]" it follows that a court must apply the 12(b)(6) standard.  *See Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024).  Therefore, to survive a 12(b)(1) facial attack, the allegations in "a complaint must contain sufficient factual matter, accepted as true, to" establish jurisdiction.  *Cf. Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[32] *Davis*, 886 F.3d at 679 (internal quotations omitted) (quoting *Kerns*, 585 F.3d at 193).

[33] *Carlsen*, 833 F.3d at 908 (internal quotations omitted) (quoting *Osborn*, 918 F.2d at 729 n.6)); *see also Moss*, 895 F.3d at 1097 ("Where . . . a party brings a factual attack, a district court may look outside the pleadings to affidavits or other documents.").

[34] *Osborn*, 918 F.2d at 730 (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

[35] *Moss*, 895 F.3d at 1097 (internal quotations omitted) (quoting *Harris v. P.A.M. Transport, Inc.*, 339 F.3d 635, 637 n.4 (8th Cir. 2003)); *see also Harris*, 339 F.3d at 637 n.4 ("We have established that a district court 'has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1).' . . . This does not . . . convert the 12(b)(1) motion to one for summary judgment." (quoting *Osborn*, 918 F.2d at 728 n.4)).  In a factual attack, "the party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence."  *Moss*, 895 F.3d at 1097.

Other circuits have reached a different conclusion when addressing the question whether a Rule 12(b)(1) factual attack converts a dismissal motion to a Rule 56 summary judgment motion.  *See Osborn*, 918 F.2d at 729 (listing cases).  But the Eighth Circuit has made crystal clear that, whereas "Rule 12 requires that Rule 56 standards be applied to motions to dismiss for failure to state a claim under Rule 12(b)(6) when the court considers matters outside the

Factual attacks on jurisdiction are odd ducks in our generally trial-focused legal system. That's because, typically, a factual attack "enables the court to resolve a threshold jurisdictional issue without the need for trial . . . ."[36]  The Court is asked to make fact determinations up front and significantly before trial.  Indeed, the only scenario in which a court should refrain from resolving the jurisdictional question at this juncture is when "the issue 'is so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'"[37]

In the case at bar, the Government has mounted both a facial and factual attack on the Court's jurisdiction.[38]  The Court begins with the Government's facial attack.

## II.    FACIAL ATTACK ON JURISDICTION

As explained above, the 12(b)(1) facial attack standard affords Ms. Malinowski the same protections as a 12(b)(6) dismissal motion.[39]  So, for this portion of today's Order, the Court

---

pleadings[,] . . . Rule 12 does not prescribe . . . summary judgment treatment for challenges under 12(b)(1) to subject matter jurisdiction where a factual record is developed." *Id.* (internal citations omitted).

[36] *Moss*, 895 F.3d at 1097 (quoting *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 547 (8th Cir. 2018)).

[37] *Id.* (quoting *Heartwood Enters.*, 885 F.3d at 547); *Osborn*, 918 F.2d at 730 ("Once the evidence is submitted, the district court must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue.  The only exception is in instances when the jurisdictional issue is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" (internal citations omitted)).  Where the jurisdictional issue is inextricably bound up with the merits, a court should let the jurisdictional issue go to trial unless (1) there are no genuine disputes of material fact as to the jurisdictional issue, and (2) the defendant is entitled to judgment as a matter of law on the jurisdictional issue.  *See Moss*, 895 F.3d at 1097; *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 203 n.19 (1974).

[38] The briefing associated with the Government's 12(b)(1) Motion does not make clear whether the Government is mounting a facial attack, a factual attack, or both.  The Government's principal Brief indicates it is a factual attack: "This is a factual attack on subject matter jurisdiction."  United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 6.  But footnote 1 at the end of that same sentence states that, "[b]ecause the Plaintiff has extensively referenced, quoted, and argued from the Arkansas State Police audio statements of the federal agents involved, as well as the Little Rock Police Department patrol unit motor vehicle recording, the Court should be able to consider the complete version of those references [in the Complaint]."  *Id.* at 6 n.1.  This contention only makes sense for a facial attack.  And consistent with this contention, the Government's Reply Brief indicates that the Government's dismissal Motion is a facial attack.  *See* United States' Reply Br. in Supp. of Mot. to Dismiss (Doc. 41) at 8 ("For purposes of this motion, the United States accepts Plaintiff's facts as set forth in her Complaint.").  At the December 5, 2025 motion to dismiss hearing, the Government clarified that it is indeed mounting both a facial and factual attack on the Court's jurisdiction. *See* Dec. 5, 2025 Hr'g Tr. (rough) at 1:47:57–1:53:51 (discussing the multifaceted nature of the Government's 12(b)(1) motion).

[39] *See supra* pp. 6–7.

accepts all non-conclusory facts alleged in the Complaint as true, takes all reasonable inferences from those alleged facts in favor of Ms. Malinowski, does not consider record facts outside the Complaint (except for materials embraced by the Complaint), and determines whether the allegations plausibly suggest that the Court has jurisdiction.[40]

---

[40] *See Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768–69 (8th Cir. 2012).  A document is embraced by a complaint when, among other things, it is "incorporated by reference or integral to the claim . . . ." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012)).  In this case, the parties dispute which materials outside the Complaint can be considered for purposes of deciding the facial attack.  *Compare* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 6 n.1, *with* Dec. 5, 2025 Hr'g Tr. (rough) at 3:19:36–3:22:47.  The Court has thoroughly reviewed the parties' arguments and resolves this dispute as follows.

Exhibit A to the Complaint is the Order Granting Probate of [Mr. Malinowski's Will] and Appointment of Personal Representative.  *See* Ex. A (Probate Order) to Compl. (Doc. 1) at 73–76.  This exhibit will be considered fully.  Exhibit B to the Complaint is a letter from House Judiciary Chairman Jim Jordan to the Director of the ATF.  *See* Ex. B (House Judiciary Letter to ATF (April 22, 2024)) to Compl. (Doc. 1) at 77–81.  This exhibit will be considered to the extent that the Court accepts as true that Chairman Jordan wrote the letter provided.  But the Court does not treat Chairman Jordan's description of the events in question as allegations of fact, except to the extent the allegations are independently set forth in the body of the Complaint itself.  Exhibit C to the Complaint is a transcript of a hearing of the House Judiciary Select Subcommittee on the Weaponization of the Federal Government.  *See* Ex. C (House Judiciary Select Subcommittee Hearing (May 22, 2024)) to Compl. (Doc. 1) at 82–155.  This exhibit will be considered to the extent that the Court accepts as true that the hearing took place and unfolded as reflected in the transcript.  But the Court will not treat any statements in the transcript as allegations of fact, except (1) to the extent the allegations are independently set forth in the body of the Complaint itself, or (2) to the extent the statements constitute a statement against interest by any of the Individual Defendants or ATF.  Exhibit D to the Complaint is a transcript of a House Judiciary hearing.  *See* Ex. D (House Judiciary Hearing (May 22, 2024)) to Compl. (Doc. 1) at 156–236.  This exhibit will be considered in the same way Exhibit C will be considered.  As to all the foregoing documents, the Court notes that exhibits attached to a complaint are generally considered to be embraced by the complaint.  *See Zean*, 858 F.3d at 526.  The Court also notes, however, that the Complaint does not explicitly adopt or incorporate as true everything said in the letter or at the hearings.  *See* Compl. (Doc. 1) ¶¶ 258–60, 263–73.  Nor does the Court read the Complaint as trying to implicitly adopt or incorporate as true everything said in the letter or at the hearings.  *See id.*

But what about the record materials completely outside the Complaint?  There are some easy calls.  The affidavit for the search warrant and the search warrant itself are embraced by the Complaint.  *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27); Compl. (Doc. 1) ¶¶ 44–52 (alleging that there was a valid search warrant and referring to its contents).  So, the Court will consider them.  Any audio or video that directly recorded the events at the Malinowski home on the morning of March 19, 2024, is embraced by the Complaint.  *See* Defs.' Joint Ex. 2 (Little Rock Police Dep't Audio from Motor Vehicle Recording) to United States' Mot. to Dismiss (Doc. 27); *see also Ching v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) ("Videos of an incident are necessarily embraced by the pleadings, and we will consider the videos here.").  The same goes for any audio or video that directly recorded the alleged detention of Ms. Malinowski in the aftermath of the shooting of Mr. Malinowski.  *See* Defs.' Joint Ex. 2 (Little Rock Police Dep't Audio from Motor Vehicle Recording) to United States' Mot. to Dismiss (Doc. 27); Compl. (Doc. 1) at 23 n.3 (alleging that the audio from the Little Rock Police Department's Motor Vehicle Recording "allow[s] for an unbiased review and accurate timeline of ATF's actions"); *see also Ching*, 73 F.4th at 620–21.  So, the Court will consider the video and audio from the Little Rock Police Department Motor Vehicle Recording (Defs.' Joint Ex. 2).

A harder call concerns the two exhibits Defendants submitted under seal.  *See* Sealed Joint Ex. 11 (ATF Order 3220.1B, Searches and Examinations) to United States' Mot. to Dismiss (Doc. 27); Sealed Joint Ex. 12 (ATF Order 8200.3C, Post Shooting and Use of Force Reporting and Review Procedures) to United States' Mot. to Dismiss

### A. Factual Background Relevant to the Facial Attack

In December of 2023, ATF began investigating whether Mr. Malinowski was unlawfully buying and selling firearms.[41]  On March 6, 2024, three months into ATF's investigation, a Magistrate Judge in the Eastern District of Arkansas issued a search and seizure warrant authorizing ATF to search the Malinowski home and two iPhones.[42]  The warrant ordered ATF to conduct the search and seizure on or before March 20, 2024.[43]  According to the warrant, the search would be to find (and seize) the following:

    a.   Firearms, firearm parts and accessories, ammunition;

---

(Doc. 27).  The Court will consider these exhibits insofar as they demonstrate that ATF has internal policies and procedures.  But the Court will not consider the contents of these two exhibits to the extent they contravene or are in excess of the allegations in the Complaint.  Although the Complaint does refer to some ATF policies and procedures, *see, e.g.*, Compl. (Doc. 1) ¶¶ 53–61, 78–81, 120–21, 247–50, the Complaint does not refer to the policies and procedures contained in the sealed exhibits.  Therefore, the content of these sealed exhibits are not embraced by the Complaint.

The hardest question is whether and how the Court should consider the audio recordings of Arkansas State Police interviews (including of several individual Defendants) conducted during their investigation of the shooting of Mr. Malinowski.  *See* Defs.' Joint Ex. 3 (ATF Agent Shannon Hicks Audio Statement) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 4 (ATF Agent Timothy Boles Audio Statement) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 5 (Maria Malinowski Audio Statement) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 6 (ATF Agent Matthew Sprinkles Audio Statement 1) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 7 (ATF Agent Matthew Sprinkles Audio Statement 2) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 8 (ATF Agent Amy Ness Audio Statement) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 9 (ATF TFO Michael Gibbons Audio Statement) to United States' Mot. to Dismiss (Doc. 27); Defs.' Joint Ex. 10 (ATF Agent Tyler Cowart Audio Statement) to United States' Mot. to Dismiss (Doc. 27).  On one hand, the Complaint does include quotes (or paraphrases) from some of those interviews.  *See, e.g.*, Compl. (Doc. 1) ¶¶ 69, 74 (quoting Agent Hicks); *id.* ¶ 70 (quoting Agent Cowart); *id.* ¶¶ 62, 99–100 (quoting Agent Boles).  On the other hand, portions of the recordings—depending on how they are interpreted—are either in conflict with or otherwise undermine fact allegations in the Complaint.  *See, e.g.*, United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 17–20 (alleging facts from the Arkansas State Police interviews that contradict the Complaint).  Ultimately, the Court concludes that considering the interview recordings (other than the quotes independently set out in the Complaint) at the motion to dismiss stage would overread the materials-embraced-by-the-complaint exception to the general rule of only considering a complaint's allegations.  Indeed, if the exception were expansive enough to reach these interview recordings, it would all but swallow the general rule.

[41] *See* Compl. (Doc. 1) ¶ 44; *see generally* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27).

[42] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 33–40.  A second search warrant (issued by the same Magistrate Judge on the same day) permitted ATF to search Mr. Malinowski's white 2022 Toyota Highlander and "[o]ther cellular and electronic devices located in the [vehicle]." *See id.* at 34–35, 39–40.

[43] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 37–40.

b. Electronic devices and all internet browsing history, as well as telephonic, text, and electronic mail messages regarding the unlawful acquisition, transportation, disposition, and/or transfer of firearms; information regarding the payment(s) for firearms or payment for the acquisition, transportation, disposition, and/or transfer of firearms; the acquisition, transportation, sale, or distribution of controlled substances, or the acquisition, transfer, or concealment of assets, money, or proceeds by any means;

c. All bank records, wire transfer records, bank statements, tax records, tax returns, financial records and notes, checks, credit card bills, account information, and other financial records;

d. Correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity and/or times when firearms or controlled substances were obtained and/or sold;

e. Any and all address books, telephone records, telephone books, date books, calendars, payment records, and telephone call logs and other items reflecting names, addresses, and telephone numbers;

f. Records reflecting the purchase or lease of real estate, vehicles, or other items, obtained with the proceeds from the sale of firearms and related activities;

g. Records of off-site locations to store records, firearms, or controlled substances, including safe deposit keys, records, receipts, rental agreements for storage facilities;

h. Records of mail and communication services;

i. Mementos, including photographs, and other historical keepsake items which document the association of co-conspirators, with each other and other suspected associates involved in the transportation/shipment of firearms, receipt/possession/sale of firearms; or conspiracy to commit said offenses as well property or assets purchased with illegal proceeds;

j. Lists of sources of supply, customers, and related identifying information;

k. Types, amounts, and prices of firearms and controlled substances, as well as dates, places, and amounts of specific transactions;

l. Text messages and other communications stored on electronic devices relating to the above-referenced offenses or identification of co-conspirators;

m. Any information related to the co-conspirators, customers, and fences (including names, addresses, phone numbers, or any other identifying information);

11

n.  Evidence of user attribution showing who used or owned the cellular telephones or electronic devices . . . at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, photographs, saved usernames and passwords, documents, spreadsheets, and browsing history; and

o.  Evidence regarding the user's location and all location information that may be obtained from cellular telephones and GPS devices.[44]

The search warrant was issued based on the Magistrate Judge's conclusion that the Government had shown probable cause to believe the authorized search would reveal evidence of violations of dealing in firearms without a license and unlawful acquisition of firearms.[45]  And the Magistrate Judge's probable cause conclusion relied on an affidavit from an ATF agent.[46]  In summary, here's the story the ATF agent tells in the affidavit.[47]

Mr. Malinowski's name first came to ATF's attention in November of 2023, when a trace of multiple firearms revealed Mr. Malinowski as the original purchaser of several of the firearms.[48]  The trace had been requested by Canadian law enforcement officials.[49]  Upon further investigation, ATF learned that, in the approximately two years between November 2021 and December 2023,

---

[44] Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 35–36.

[45] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 37.  18 U.S.C. § 922(a)(1)(A) makes it illegal "for any person[,] except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce . . . ."  Colloquially, a violation of this subsection of § 922 is known as dealing in firearms without a license.  Similarly, 18 U.S.C. § 922(a)(6) makes it illegal "for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter . . . ."  Colloquially, a violation of this subsection of § 922 is known as unlawful acquisition of a firearm.

[46] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 1, 37.

[47] Although the Court takes cognizance of the affidavit as explained in footnote 40 *supra*, the Court's role is not to determine whether Mr. Malinowski did any of the things alleged in the affidavit or whether those things constitute crimes.  The point of summarizing the affidavit is instead to explain and acknowledge what law enforcement believed at the time the warrant was applied for, received, and executed.

[48] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 16.  According to the affidavit, "[a] trace request is completed by the National Tracing Center (NTC).  During a trace request, NTC attempts to identify the original purchaser of a firearm after the firearm leaves a manufacturer."  *Id.*

[49] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 16.

Mr. Malinowski had purchased more than 70 firearms: 24 Glock Model 45 pistols, 9 Fed Arm Model FR-16 pistols, 9 Beretta Model 92A pistols, 7 North American Arms Model NA22 pistols, 4 Glock Model 22 pistols, 4 SAR Model SAR9 pistols, 3 ATI Model OMNI pistols, 3 Glock Model 19 pistols, 3 Glock Model 17 pistols, 3 Beretta Model 92FS pistols, and multiple different handguns.[50] This information led ATF to begin officially investigating Mr. Malinowski.[51] The official investigation was opened on December 15, 2023.[52] Through this investigation, it was revealed that Mr. Malinowski had purchased at least 142 firearms between 2019 and the end of 2023.[53] ATF also discovered that 3 of those firearms were recovered by law enforcement during the commission of a crime.[54] The time from Mr. Malinowski's purchase of a particular firearm to use of that firearm in a crime was 281 days, 193 days, and 15 days, respectively.[55]

Although Mr. Malinowski's name first came to ATF's attention in November of 2023, Mr. Malinowski himself—unidentified at the time—had popped up on ATF's radar nearly half a year earlier.[56] In June of 2023, during an unrelated investigation, an ATF agent had seen Mr. Malinowski at a gun show in Conway, Arkansas.[57] At the gun show, the agent had observed Mr. Malinowski selling firearms to several subjects of her investigation without asking for identification or any paperwork.[58] At the time, the agent did not know the name of the person she

---

[50] *Id.* at 16–17.

[51] *See id.* at 17.

[52] *See id.*

[53] *See id.*

[54] *See id.* at 18.

[55] *See id.* Mr. Malinowski does not appear to have been a suspect in any of those crimes. *See id.*

[56] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 18–19.

[57] *See id.*

[58] *See id.* at 19.

saw selling firearms at the gun show.[59]  But, on December 21, 2023, after viewing a picture of Mr. Malinowski in connection with the firearm-trace investigation, the agent recognized that the person she had observed in June of 2023 was in fact Mr. Malinowski.[60]

On January 27, 2024—a couple of months after the initial November 2023 firearms trace— two undercover ATF agents purchased firearms from Mr. Malinowski at a gun show.[61] Mr. Malinowski did not ask either undercover agent to fill out any paperwork before selling them multiple firearms.[62]  Mr. Malinowski stated that, because he was a private seller, no paperwork was needed to purchase a firearm.[63]  After completing the transactions, Mr. Malinowski gave his phone number to both undercover agents and told them that they could contact Mr. Malinowski outside of the gun show for any additional purchases.[64]  ATF's investigation and surveillance of Mr. Malinowski continued, ultimately culminating in obtaining the March 6, 2024 search and seizure warrant.[65]

---

[59] *See id.*

[60] *See id.* at 18–19.

[61] *See id.* at 23–24.

[62] *See id.* at 24.  Mr. Malinowski sold two firearms to the first undercover agent (a FSAAP Model FR-16 multi caliber pistol and a Glock Model 30 .45 caliber pistol) and one firearm to the second undercover agent (a SCCY Model CPX-2 9mm caliber pistol).  *See id.*

[63] *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 24.

[64] *See id.*  One of the undercover agents told Mr. Malinowski that his family and friends might be interested in purchasing firearms from Mr. Malinowski, to which Mr. Malinowski responded, "okay . . . [c]ash, no paper." *See id.* (internal quotations omitted).

[65] Between the January 27, 2024 undercover operation and the March 6, 2024 search and seizure warrant, ATF's investigation included, among other things, tailing Mr. Malinowski while he was in his vehicle, collecting data of firearm purchases that Mr. Malinowski made, and observing multiple firearm transactions involving Mr. Malinowski. *See* Defs.' Joint Ex. 1 (ATF Application and Search Warrant) to United States' Mot. to Dismiss (Doc. 27) at 25–29. During this time, ATF agents also observed Mr. Malinowski driving erratically on several occasions. *See id.* at 28–29.  The overall investigation revealed that Mr. Malinowski had purchased over 150 firearms between May 2021 and February 27, 2024, that approximately 6 of those firearms had been recovered in the commission of a crime, and that several of the firearms Mr. Malinowski purchased were later sold by Mr. Malinowski at gun shows (including the 3 firearms purchased by undercover agents on January 27, 2024). *See id.* at 30.

After obtaining the search warrant, ATF Agent Troy Dillard drafted an Operations Plan for executing that warrant.[66]  The Operations Plan was approved by Clayton Merrill, who was the resident agent in charge of the Little Rock ATF office.[67]  The Operations Plan documented that the agents and task force officers were aware of the following facts:

a.  [Mr.] Malinowski was the director of the Bill and Hillary Clinton National Airport in Little Rock, Arkansas;

b.  He had no criminal history and no history of violence;

c.  He lived at home with his wife and possibly a small-sized dog;

d.  There were no other known occupants of the home;

e.  Based on data obtained from a GPS tracking device that ATF placed on [Mr. Malinowski's] vehicle, [Mr. Malinowski] was not expected to leave for work until approximately 9:00 to 10:00 a.m.;

f.  [Mr. Malinowski] worked in a gun-free zone, an airport;

g.  [Mr. Malinowski's] home was situated on a 0.6 acre lot located at the end of a cul-de-sac; [and]

h.  Based on county records, [Mr. Malinowski's] home was a large, single-story home, approximately 2,780 square feet with four (4) bedrooms, three (3) full bathrooms, and two (2) half bathrooms . . . .[68]

The Operations Plan also laid out that, upon arriving at the Malinowski home, the team would first knock on the front door and announce their presence.[69]  Then, if a reasonable amount of time passed with no answer, the team would forcibly enter the home in a "limited penetration dynamic entry."[70]  ATF also planned to wear full tactical gear, execute the warrants "under the cover of

---

[66] *See* Compl. (Doc. 1) ¶ 63.

[67] *See id.* ¶¶ 29, 64.

[68] *Id.* ¶ 72.

[69] *See id.* ¶¶ 75, 76, 81–82.

[70] *See id.* ¶¶ 75–76, 82, 99.  The Complaint states that "limited penetration" is a category of dynamic entry "where [the] ATF agent carrying the shield enters first[;] [t]he agent with the shield then stops a foot or two inside the threshold of the door, followed by additional agents visually securing each part of the home visible from the front door threshold[;] [and] [a]gents then call out to the occupants." *Id.* ¶ 76.

darkness[,]" and "cover the home's doorbell to obscure [ATF's] presence."[71]  The Operations Plan stated that the warrant was to be executed on the morning of March 12, 2024.[72]

In the pre-dawn hours of March 12, 2024, the team—consisting of ATF special agents, task force officers (TFOs), and Little Rock Police Department (LRPD) officers—congregated in a Walmart parking lot approximately 1.5 miles from the Malinowski home to prepare to execute the search warrants.[73]  Before leaving the parking lot, however, the team learned that Mr. Malinowski wasn't home that morning; he had taken an early flight to Washington, D.C., for work.[74]  In light of this discovery, the team decided to reschedule executing the warrant to a day that Mr. Malinowski would be home.[75]

On March 15, 2024, Agent Dillard prepared a new Operations Plan (which was approved by Agent Merrill on that same day).[76]  The new plan set the warrant-execution date as March 19, 2024.[77]  Due to the date change, some of the original team members were replaced because of scheduling conflicts.[78]  So it makes sense that the new Operations Plan called for a team briefing to be held on March 18, 2024, the day before the warrant was to be executed.[79]  But, despite what the new Operations Plan called for, no briefing occurred until March 19, 2024, "just prior to executing the search warrant."[80]  The 13-person team was briefed at the same Walmart parking lot

---

[71] Compl. (Doc. 1) ¶¶ 83, 85.

[72] *See id.* ¶ 87.

[73] *See id.* ¶¶ 88–89.

[74] *See id.* ¶¶ 90–91.

[75] *See id.* ¶¶ 93–94.

[76] *See id.* ¶ 95.

[77] *See id.*

[78] *See id.* ¶ 96.  For example, the officer assigned to conduct the knock-and-announce was changed from TFO Robert Bell to Agent Matthew Sprinkles.  *See id.*

[79] *See* Compl. (Doc. 1) ¶ 97.

[80] *See id.* ¶¶ 97–98.

where the original team had met.[81]  At this briefing, ATF Agent Tim Boles assigned the team their

respective responsibilities/tasks:[82]

    a.  ATF Agent Boles was "responsible for deciding when to initiate the knock and announce procedure, for ensuring that the knock and announce procedure would be conducted lawfully in compliance with the Constitution and applicable statutes, and for assigning roles and responsibilities for the team of agents . . . ."[83]

    b.  ATF Agent Merrill was to "serve[] as the on-scene commander, and [to] form[] part of the front perimeter with LRPD Officer Steve Woodall."[84]

    c.  ATF Agent James Bass was assigned to "place[] tape over the video doorbell at the front door of the home," and "was supposed to be first in the home, leading the team with his ballistic shield" that had "POLICE" displayed across the front.[85]

    d.  ATF Agent Matthew Sprinkles was assigned to "conduct[] the 'knock and announce' procedure[,]" and "was supposed to be the second agent to enter the home" (behind Agent Bass).[86]

    e.  ATF Agent Tyler Cowart was assigned to be "a member of the entry team, and in the event of a forced entry[,] was responsible for using a Halligan pry tool to force open the glass, French-style storm doors protecting the main, wooden

---

[81] *See id.* ¶¶ 98, 101.  As had been true for the aborted operation on March 12, 2024, the team consisted of ATF agents, TFOs, and LRPD officers.  *See id.* ¶ 101.  Entry Team Leader Agent Boles had this to say about the March 19, 2024 parking lot briefing:

> We didn't really have a brief, another sit down brief at the office like we did [the week] before.  We all met at the Walmart on Chenal, and got everybody together.  Kind of went through a few things. I made the assignments.  I told them that we were going to—told the team we were going to do a limited penetration on the house if nobody came to the door, if we had to breach the door.  That was pretty much it for the brief.

*Id.* ¶ 99 (alteration in original).

[82] *See* Compl. (Doc. 1) ¶ 100.  Agent Boles was responsible for these assignments because he was the entry team leader.  *See id.* ¶¶ 99–101.  It's unclear whether Agent Boles assigned tasks to the entire team or just to the new team members.  *See id.*  As to the team members who had been on the team from the start, it is unclear if they were given the same assignments that they had been given the first time around.  *See id.*

[83] Compl. (Doc. 1) ¶ 103.

[84] *Id.* ¶ 102.

[85] *Id.* ¶¶ 105–06.

[86] *Id.* ¶¶ 107–08.

doors on the front porch."[87]  Agent Cowart was supposed "to be approximately the fourth agent to enter the home during a forced entry . . . ."[88]

f.  TFO Michael Gibbons "was assigned to carry the ram . . . to break down the front, wooden doors of the home" in the event of a forced entry.[89]

g.  ATF Agent Dillard was assigned to be part of the entry team.[90]

h.  TFO Chris Giggs was assigned to be "the final member of the seven-man entry team."[91]

i.  ATF Agents Shannon Hicks and Amy Ness were assigned to "form[] the rear perimeter" at the back of the home.[92]

j.  LRPD Officer Steve Woodall was assigned to be "part of the front perimeter" with Agent Merrill.[93]

k.  LRPD Officer Olen Lakey was assigned to "park[] in front of the home, facing a neighbor's house[,]" and to "turn[] on his flashing lights and bump[] his car's siren" "upon Agent Boles' command to initiate . . . ."[94]

l.  LRPD Officer Clint Williams was assigned to "park[] his vehicle at the top of the cul-de-sac and [to] keep[] any non-law enforcement personnel from entering the cul-de-sac."[95]

After being briefed and receiving their assignments, the team departed the Walmart parking lot. The team was dressed in "dark blue long-sleeved shirts, and any law enforcement insignia or identification on the front and back of their shirts were mostly or completely covered by their bullet proof vests."[96]  Any identifying markings that may have been on the agents' vests "were obscured

---

[87] *Id.* ¶ 109.

[88] *Id.* ¶ 110.

[89] *Id.* ¶ 111.

[90] *See id.* ¶ 112.

[91] *Id.* ¶ 113.

[92] *Id.* ¶ 114.

[93] *Id.* ¶ 116.  Officer Woodall was initially going to be part of the entry team, "but based on the recommendation of his supervisor" he was removed from the entry team and instead assigned to be part of the front perimeter.  *See id.*

[94] Compl. (Doc. 1) ¶ 117.

[95] *Id.* ¶ 118.

[96] *Id.* ¶ 124.

by equipment strung across the chest and by the agents' arms and rifles, which were held in front of their bodies."[97]  Indeed, no one on the team wore anything that would quickly identify them as law enforcement.[98]

It was before 6:00 a.m. and still dark when the 10-car caravan arrived at the Malinowski home.[99]  The 7-man entry team formed a line (or "stack") and began approaching the front door.[100]  When they arrived at the door, Agent Bass "placed a piece of painter's tape over the video doorbell camera" to "disable[] the camera and conceal[] the presence and identity of the armed team on the front porch."[101]  At 6:02:58 a.m., with the entry team in place and the doorbell taped, "Agent Boles gave the command to initiate the knock and announce procedure."[102]  Officer Lakey immediately turned on "his vehicle's lights and sirens and then shut off the siren after [1.5] seconds."[103]  As soon as Officer Lakey chirped the siren, "Agent Sprinkles began shouting and knocking on the glass of the Malinowskis' outer storm doors protecting their wooden front door."[104]  After a brief

---

[97] *Id.* ¶ 125.

[98] *Id.* ¶¶ 124–31.  The Complaint acknowledges that the shield Agent Bass was assigned to carry had the word "POLICE" in large letters across the front.  *See id.* ¶ 128.  But, as will be discussed later, the shield never made it into the home (where Mr. Malinowski may have seen it prior to the fateful shooting).  *See id.* ¶ 129.

[99] *See* Compl. (Doc. 1) ¶¶ 132–33.

[100] *See id.* ¶ 136.  Not a single member of the team activated his or her body camera during the raid at the Malinowski home, despite agency/department policies requiring them to do so.  *See id.* ¶¶ 120–22.  This error is the reason we only have the video/audio footage from LRPD Officer Lakey's vehicle dashcam.  *See id.* ¶ 123; Defs.' Joint Ex. 2 (Little Rock Police Dep't Audio from Motor Vehicle Recording) to United States' Mot. to Dismiss (Doc. 27).

[101] *See* Compl. (Doc. 1) ¶ 141.

[102] *See id.* ¶¶ 142, 145.

[103] *See id.* ¶ 145.  Although Officer Lakey's police lights remained on through the rest of the entry, the police siren was only run for the initial 1.5 seconds.  *See id.* ¶¶ 145, 148; Defs.' Joint Ex. 2 (Little Rock Police Dep't Audio from Motor Vehicle Recording) to United States' Mot. to Dismiss (Doc. 27).  Indeed, Agent Sprinkles recalled that Officer Lakey "chirped the siren a few times."  *See* Compl. (Doc. 1) ¶ 146.

[104] *See* Compl. (Doc. 1) ¶ 151.

4-second pause, Agent Sprinkles resumed knocking.[105]  In total, the knocking lasted approximately 19 seconds (from 6:02:58 a.m. to 6:03:17 a.m.).[106]

While Agent Sprinkles knocked and shouted, Agent Boles peered "through the angled plantation shutters into the home . . . ."[107]  Agent Boles "did not see any lights turn on and did not observe any movement or hear any noises or voices coming from inside the home."[108]  After Agent Sprinkles stopped knocking/shouting, the team waited an additional 9 seconds.[109]  Then, at 6:03:26 a.m.—28 seconds after the "initiate" command was given and the knocking/shouting began— Agent Boles gave the order to "break the glass doors, breach the wooden doors, and enter the Malinowski home by force."[110]

Once Agent Boles gave the order to break down the doors, Agent Cowart used the Halligan tool to break open the glass storm doors.[111]  TFO Gibbons then "used a ram to batter the wooden front doors[,] . . . causing the doors to burst open with a loud bang upon a single strike."[112]  TFO Gibbons breached the main door at 6:03:35 a.m.[113]  (That was 37 seconds after the "initiate" command was given and the knocking/shouting began.)[114]  At this point, "the entry team became

---

[105] *See id.* ¶ 153.

[106] *See id.* ¶ 154.  The Complaint expressly alleges that law enforcement did not do certain things.  The Complaint alleges that "[n]o officer or agent attempted to announce their presence by using an electronic public announcement (PA) system, though the Operations Plan provided that a PA system would be used to announce their presence."  *Id.* ¶ 144.  The Complaint alleges that no officer called Mr. Malinowski's cellphone, even though his phone number was in the Operations Plan.  *See id.* ¶ 143.  And the Complaint also alleges that law enforcement never rang the Malinowskis' doorbell.  *See id.*

[107] *See* Compl. (Doc. 1) ¶ 157.

[108] *Id.*

[109] *See id.* ¶¶ 161, 163.

[110] *See id.* ¶ 161.  In his Arkansas State Police interview, Agent Boles stated the following: "I've got a clock in my head.  It's like we're out here, we're exposed. . . . [S]o I told them, go ahead and breach the door."  *Id.* ¶ 158.

[111] *See* Compl. (Doc. 1) ¶¶ 162–63.

[112] *Id.* ¶ 164.

[113] *See id.* ¶ 165.

[114] *See id.* ¶ 145 ("initiate" command at 6:02:58 a.m.); *id.* ¶ 164 (doors breached at 6:03:35 a.m.).

20

disorganized."[115]  "Agent Sprinkles unexpectedly found himself at the front of the entry stack[,]" even though he was supposed to be the second agent to enter.[116]  Agent Bass—who was supposed to enter first with the shield—was, for some unbeknownst reason, "setting the shield down on the front porch."[117]  This led the team to briefly hesitate after the doors opened.[118]  Within "a split second" of noticing the hesitation, Agent Boles gave the "go" command.[119]

Still at the front of the entry stack, Agent Sprinkles entered the home, "semi-automatic rifle drawn."[120]  Agent Cowart followed close behind.[121]  As the two agents entered, "no one announced their identity or purpose . . . ."[122]  Immediately upon moving into the entryway, Agent Cowart heard Agent Sprinkles exclaim, "oh, shit."[123]  Approximately 30 feet away from the front door, directly to Agent Sprinkles' left, stood Mr. Malinowski—gun in hand.[124]

The Malinowskis had both been in bed asleep when law enforcement arrived.[125]  Their bedroom was located in the back northwest corner of the house—down a hallway and past Mr. Malinowski's home office.[126]  The Malinowskis "never heard the police siren or any voices at their door."[127]  It wasn't until they heard the loud banging on their front door that Mr. Malinowski

---

[115] Compl. (Doc. 1) ¶ 166.

[116] *See id.* ¶ 167.

[117] *See id.* ¶¶ 167–70.

[118] *See id.* ¶¶ 170–72.  Agent Boles later noted that he "was surprised" by the hesitation, "because with our package, once the door comes open, you go in."  *Id.* at ¶ 172.

[119] *See* Compl. (Doc. 1) ¶ 172.

[120] *See id.* ¶¶ 167, 173.

[121] *See id.*  ¶ 175.

[122] *Id.* ¶ 174.

[123] *See id.* ¶ 176.

[124] *See id.* ¶¶ 177, 181–83, 186.

[125] *See id.* ¶¶ 180-81.

[126] *See id.* ¶ 181.

[127] *Id.* ¶ 180.

scrambled out of bed and "quickly grabbed his handgun from the top drawer of his bedside table and went into the closet to retrieve a magazine."[128]   Mr. Malinowski crept out of the bedroom about "six to seven feet down a short side hallway to gain a view of the intruders coming through his front doors."[129]   From Mr. Malinowski's vantage point in the dark hallway (about 30 feet away from the front door), "there was no clothing or gear on the [agents] that would have identified [them] as . . . law enforcement."[130]   Upon seeing the perceived intruders, Mr. Malinowski raised his gun and fired, striking one of the agents on the sole of his boot.[131]   Agent Cowart returned fire, "pointing his rifle at [Mr. Malinowski's] head and pulling the trigger several times."[132]   At 6:03:43 a.m.—just 45 seconds after Agent Boles gave the "initiate" command and the knocking/shouting began—Mr. Malinowski "lay bleeding on the floor of his hallway, shot in the head."[133]

After Mr. Malinowski hit the floor, agents pointed their guns at Ms. Malinowski (who was standing behind her husband in the hallway when he was shot), and commanded her to "show them her hands . . . ."[134]   It was at this moment that Ms. Malinowski realized that the intruders were law

---

[128] *See id.* ¶¶ 181–82.

[129] *Id.* ¶ 183.

[130] *Id.* ¶ 186.

[131] *See id.* ¶ 188.  More specifically, the Complaint alleges that Mr. Malinowski "fired his gun at the floor and hit one of the agents in the boot sole." *Id.*

[132] Compl. (Doc. 1) ¶ 189.

[133] *Id.* ¶ 190.  The Complaint alleges that Mr. Malinowski was shot "48 seconds after agents first approached his door . . . ." *Id.*  The Court's 45-second calculation is based on the timing of Agent Boles' initiate command (6:02:58 a.m.). *See id.* ¶ 145.

[134] *See* Compl. (Doc. 1) ¶¶ 194–97.

enforcement.[135]   Complying with the agents' orders, Ms. Malinowski raised her hands and "step[ped] over her husband's limp body [to] allow [law enforcement] to secure her."[136]

At 6:07 a.m., law enforcement escorted Ms. Malinowski to the back of LRPD Officer Lakey's police vehicle.[137]   It was 34 degrees Fahrenheit outside at the time.[138]   Ms. Malinowski was "only wearing a spaghetti strap tank top and a pair of boxers . . . ."[139]   She was not even wearing shoes.[140]   Ms. Malinowski was left uncomfortably cold in the police car for nearly 45 minutes before "she was provided a blanket at approximately 6:51 a.m."[141]   Ms. Malinowski repeatedly pled with law enforcement to let her get some "clothes and medicine and to check on her dogs . . . ."[142]   She told them that she needed to use the restroom, and asked if she could use the restroom at her neighbor's home.[143]   She asked them to allow her to ride in the ambulance with her husband to the hospital.[144]   She asked to be released from the vehicle.[145]   Law enforcement

---

[135] *See id.* ¶ 197.

[136] *See id.* ¶ 198.  Mr. Malinowski was not killed immediately upon being shot in the head.  "Several ATF agents and task force officers who subsequently entered the Malinowski home noted that[,] although [Mr. Malinowski] laid on the floor with a gunshot wound to the head, they could hear him struggling to breathe . . . ."  *Id.* ¶ 191.  At some point, Mr. Malinowski was transported by the ambulance to Baptist Medical Center in Little Rock, Arkansas.  *See id.* ¶ 227. Mr. Malinowski succumbed to his injuries two days later.  *See id.* ¶ 229.  He was 53 years old.  *See id.*

[137] *See* Compl. (Doc. 1) ¶¶ 199, 202.

[138] *See id.* ¶ 200.

[139] *Id.* ¶ 201.

[140] *See id.*

[141] *See id.* ¶ 202.  Ms. Malinowski alleges that she was still cold after receiving the blanket.  *See id.*

[142] *See* Compl. (Doc. 1) ¶ 203.

[143] *See id.* ¶¶ 203, 210.

[144] *See id.* ¶ 204.

[145] *See id.* ¶ 206.  Ms. Malinowski's pleas were recorded by Officer Lakey's vehicle dashcam:

> Hear me out.  Let me out!  Let me out!  Please hear me out.  Don't.  I need, I need to go [unintelligible].  I need to . . . Oh my love, oh my love.  Oh Bryan.  Oh Bryan.  You need to come [unintelligible].  You need to come.  I don't know . . . I don't know what to do without him.  God, I don't know what to do.  Guide me, God.  Guide me, God.  Guide me.  Guide me, God, please.  I don't know what to do.  I don't know what to do, God.  I don't know what to do.  Oh God.  I don't know what to do, God.  I can't—I don't know what to do.  Help me!  Help me!

initially and repeatedly denied these requests.[146]   Finally, at about 7:20 a.m., the "[a]gents and officers decided that [she] could use the restroom at a nearby fire station."[147]

Still in custody, Ms. Malinowski was transported by LRPD Officer Gladina Harris to a fire station approximately 3 miles away.[148]   When they arrived at the fire station, Officer Harris told a firefighter "that she had 'a prisoner' that needed to use the restroom . . . ."[149]   Barefoot and wearing only her pajamas, Ms. Malinowski "pulled the blanket over her shoulders to cover her body and legs as she entered the fire station."[150]   Officer Harris entered the restroom with her, stating "I have to go in there with you."[151]   After Ms. Malinowski was done, Officer Harris escorted her "to the

---

*Id.*; Defs.' Joint Ex. 2 (Little Rock Police Dep't Audio from Motor Vehicle Recording) to United States' Mot. to Dismiss (Doc. 27) at 6:55:55 a.m.–6:58:01 a.m.

[146] *See* Compl. (Doc. 1) ¶¶ 204, 207–10.

[147] *See id.* ¶ 212.  The Complaint appears to allege that Officer Harris was acting under ATF's direction, and therefore, that Ms. Malinowski was still in ATF custody until she was turned over to Arkansas State Police at 9:15 a.m.  *See id.* ("At approximately 7:20 a.m., ATF relented to [Ms. Malinowski's] requests to use the bathroom.  Agents and officers decided that [she] could use the restroom at a nearby fire station.  However, they kept [Ms. Malinowski] in custody.").  At the December 5, 2025 hearing, the Court had the following exchange with Ms. Malinowski's counsel regarding the trip to the fire station bathroom:

> THE COURT: Are you saying all that is at the direction of the ATF?
>
> MR. STAUFFER: So I will get into that.  Yes, Your Honor, I am.  I'm not saying specifically they said do this, do that.  We don't know.  We believe discovery will expand upon that.
>
> THE COURT: No.  No.  But is your allegation that the ATF said, here, we're putting her in the car, don't let her go, or keep her in the car?
>
> MR. STAUFFER: What I'm saying [is] it was Little Rock PD's job to hold onto people encountered in the home, and this is how we know that.  Steve Woodall, LRPD Detective Steve Woodall, in his statement with the state police said that was his job. . . . [H]e said his job was, when they find individuals, his was to hold onto them until they wanted to interrogate them.  Steve Woodall is LRPD, but that's exactly what LRPD did.

Dec. 5, 2025 Hr'g Tr. (rough) at 3:53:40–3:54:27.  Like the Complaint, this exchange suggests that Officer Harris was acting (perhaps indirectly) at ATF's direction.  But even if ATF's detention of Ms. Malinowski terminated when she was taken to the fire station, she was at least detained by ATF for over an hour in the patrol vehicle (from approximately 6:07 a.m. to 7:20 a.m.).  *See* Compl. (Doc. 1) ¶¶ 202–12.

[148] *See* Compl. (Doc. 1) ¶¶ 213–14.

[149] *See id.* ¶ 215.

[150] *See id.* ¶ 216.

[151] *See id.* ¶ 218.  The Complaint also alleges that three men and a woman near the bathroom stared at Ms. Malinowski as she walked to the restroom.  *See id.* ¶ 217.

back seat of the patrol vehicle and drove her back to [the] cul-de-sac . . . ."[152]  Ms. Malinowski remained in ATF's custody until approximately 9:15 a.m., when she was turned over to the Arkansas State Police to be interviewed.[153]  In total, Ms. Malinowski was in ATF's custody for more than 3 hours (6:07 a.m. to 9:15 a.m.).[154]  Unsurprisingly, Ms. Malinowski has been in counseling since this tragic event.[155]

## B.  Legal Analysis Relevant to the Facial Attack

Generally speaking, the Government is immune from suit.[156]  This concept is known as "sovereign immunity" and is "jurisdictional in nature."[157]  The Government can waive its sovereign immunity by statute, and it has done so by way of the FTCA.[158]  "The FTCA is a limited waiver of [the Government's] sovereign immunity" that allows, in certain circumstances, an individual "injured by federal employees to sue the [Government] for tort claims in federal district court."[159]  Putting all this together, the Court only has jurisdiction over Ms. Malinowski's claims

---

[152] Compl. (Doc. 1) ¶ 220.

[153] *See id.* ¶ 222.

[154] *See id.* ¶¶ 202, 221–22.  The Arkansas State Police had been notified about the incident immediately after Mr. Malinowski was shot, but it was "quite a while" later before they arrived on scene to conduct their investigation. *See id.* ¶¶ 192–93.  The Complaint alleges that "[f]or several hours after [Mr. Malinowski] was shot, the Malinowski home was secured, but not searched[,]" and "[d]uring this time, ATF decided the Arkansas ATF team involved in that morning's raid would not conduct the search warrant." *Id.* ¶ 223.  Indeed, ATF did not go back into the home to complete the search warrant during the entire time Ms. Malinowski was detained. *See id.* ¶¶ 225–26.  ATF did not reenter the Malinowski home to complete its search until 1:53 p.m. (after the Arkansas State Police completed their officer-involved-shooting investigation and turned the home back over to ATF). *See id.* ¶¶ 192–93, 225–26.

[155] *See* Compl. (Doc. 1) ¶ 232.

[156] *See Meyer*, 510 U.S. at 475 ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." (citing *Loeffler v. Frank*, 486 U.S. 549, 554 (1988))).

[157] *Id.*

[158] *See* 28 U.S.C. §§ 1346, 2671–2680.

[159] *Rollo-Carlson ex rel. Flackus-Carlson v. United States*, 971 F.3d 768, 770 (8th Cir. 2020) (citing *Molzof ex rel. Molzof v. United States*, 502 U.S. 301, 305 (1992)); *see also Meyer*, 510 U.S. at 477 (noting that the FTCA waives sovereign immunity "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred" (quoting 28 U.S.C. § 1346(b))).

against the United States if those claims fall within the FTCA's statutory waiver of sovereign immunity.[160]

There are some important limitations to the FTCA's waiver of sovereign immunity. For one thing, § 1346(b)(1) of the FTCA specifies that "district courts[']  'exclusive jurisdiction' over [FTCA] suits" is limited to "circumstances where the United States, if a private person, would be liable to the [plaintiff] in accordance with the law of the place where the act or omission occurred."[161]  In this case, this means that "the United States has waived immunity only to the extent a private party standing in the government's shoes would be liable under Arkansas law."[162]  Additionally, the FTCA bars "suit against the government for harm caused by a government employee's acts if those acts are subject to discretion that is 'grounded in social, economic, and political policy.'"[163]  This is known as the "discretionary function exception" to the FTCA's waiver of sovereign immunity.[164]

---

[160] *See Meyer*, 510 U.S. at 475.

[161] *Hutchinson v. United States*, 71 F.4th 1115, 1117 (8th Cir. 2023) (internal quotations omitted) (quoting 28 U.S.C. § 1346(b)(1)).

[162] *Id.*; *see also id.* at 1117–18 ("It may seem counterintuitive, but what matters for getting [an FTCA] case into *federal* court is *state* law." (emphasis in original)).

[163] *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (quoting *Herden v. United States*, 726 F.3d 1042, 1047 (8th Cir. 2013) (en banc)).  In its entirety, the discretionary function exception reads:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The discretionary function exception is based on "Congress' desire to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988) (internal quotations omitted) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).

[164] *See Buckler*, 919 F.3d at 1044; 28 U.S.C. § 2680(a).

26

Courts follow a two-step analysis when determining if the discretionary function exception applies to a specific claim.[165]  Step one asks whether the federal employee's allegedly wrongful acts "involve[d] an element of judgment or choice instead of being controlled by mandatory statutes or regulations."[166]  If the answer to the step-one question is no, then the discretionary function exception does not apply.  If the answer to the step-one question is yes, then a court will go on to step two.  Step two asks "whether the [federal] employee's judgment or choice was 'based on considerations of social, economic, and political policy.'"[167]  If the answer to the step-two question is no, then the discretionary function exception does not apply.  If the answer to the step-two question is yes, then the discretionary function exception does apply.

There is one additional quirk to this analysis for courts in the Eighth Circuit.  And it is a very important quirk.  The Eighth Circuit has held that the discretionary function exception does not apply to a federal employee's unconstitutional conduct.[168]  All the parties in this case agree

---

[165] *See Buckler*, 919 F.3d at 1045.

[166] *Id.* at 1045 (internal quotations omitted) (quoting *Herden*, 726 F.3d at 1046); *see also United States v. Gaubert*, 499 U.S. 315, 328 (1991).

[167] *Buckler*, 919 F.3d at 1045 (internal quotations omitted) (quoting *Herden*, 726 F.3d at 1047).  The exception applies "whether or not [a] defendant in fact engaged in conscious policy-balancing . . . . [a]nd, if qualifying discretion exists, the exception applies regardless of whether the government employee abuses that discretion." *Id.* (emphasis in original) (internal citations and quotations omitted).  Moreover, "if discretion exists, a presumption arises that the discretion is grounded in policy considerations, and the plaintiff must rebut this presumption." *Id.* at 1046 (internal quotations and citation omitted).

[168] *See Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (concluding that certain claims "fall outside the FTCA's discretionary-function exception because [the Complaint] alleged they were conducted in violation of [plaintiff's] First and Fourth Amendment rights"); *Raz v. Mueller*, 389 F. Supp. 2d 1057, 1076 (W.D. Ark. 2005), *aff'd* 215 Fed. App'x 571 (8th Cir. 2007) (noting that plaintiff's claims "would be barred by the discretionary function exception unless they involved the violation of a constitutional right" because "[f]ederal agents do not have discretion to commit constitutional violations" (citing *Raz*, 343 F.3d at 948)); *Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986), *abrogated on other grounds by Millbrook v. United States*, 569 U.S. 50 (2013) (stating that "if the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, the outcome would be different since federal officials do not possess discretion to commit such violations."); *but see Shivers v. United States*, 1 F.4th 924, 930–31 (11th Cir. 2021) ("Congress left no room for the extra-textual 'constitutional-claims exclusion' for which [plaintiff] advocates. . . . [T]he FTCA is not based on alleged constitutional violations, and a plaintiff cannot circumvent the limitations on constitutional tort actions under *Bivens*—including the qualified-immunity doctrine—by recasting the same allegations (1) as a common-law tort claim under the FTCA that is not subject to the discretionary function exception or (2) as negating the discretionary function defense.").

that this Eighth Circuit holding is binding on the Court for purposes of this case.[169]  This means that as long as a complaint plausibly alleges that a federal employee's (allegedly) wrongful acts violated the Constitution, the Government will not be able to use the discretionary function exception to prevail on a facial attack against jurisdiction.

With these legal principles in mind, the Court will now address the Government's two buckets of arguments for dismissal.  First, the Court addresses the Government's contention that the discretionary function exception applies to certain claims in this case.[170]  Second, the Court addresses the Government's contention that, were it a private party, it would not be liable for certain claims under Arkansas law.[171]

### 1.  Discretionary Function Exception

The Government argues that the discretionary function exception demands dismissal of the following claims: negligence (Count VII), intentional infliction of emotional distress (Count VIII), criminal mischief (Count XII), and false imprisonment (Count XIII).[172]  As the Court has already noted, the Eighth Circuit has a blanket rule that the discretionary function exception does not apply where the federal employee's conduct at issue is unconstitutional.[173]    Accordingly, Ms. Malinowski's claims will not fall victim to the discretionary function exception—at least with

---

[169] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 14; Pl.'s Resp. to United States' Mot. to Dismiss (Doc. 39) at 14.  It is of no moment whether the Court agrees with the Eighth Circuit's reading of the discretionary function exception.  The Eighth Circuit may choose to reconsider its reading of the discretionary function exception.  Or the Supreme Court may decide to resolve the circuit split on this issue at some later juncture. *See Martin v. United States*, 605 U.S. 395, 401, 414–15 (2025) (recognizing and not resolving the circuit split).  But whether (and how) this particular issue is resolved is not for the District Court to decide.

[170] *See* 28 U.S.C. § 2680(a); United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 7–25.

[171] *See* 28 U.S.C. § 1346(b)(1); United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 25–32.

[172] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 7–25; *see also Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998) ("To the extent an alleged act falls within the discretionary function exception, a court lacks subject matter jurisdiction.").

[173] *See Raz*, 343 F.3d at 948; *Mueller*, 389 F. Supp. 2d at 1076.

28

respect to the Government's 12(b)(1) facial attack—to the extent Ms. Malinowski has plausibly alleged that the federal agents' wrongful conduct on which her claims are based constitute violations of the federal Constitution.[174]

*Pre-Shooting Conduct.* The Court first considers ATF's forced entry into the Malinowski home. This conduct—either on its own or in concert with other conduct—underlies several of Ms. Malinowski's claims: the negligence claim,[175] the intentional infliction of emotional distress claim,[176] and the criminal mischief claim.[177] Ms. Malinowski alleges that, in addition to giving rise to tort liability, this conduct was unconstitutional.[178] Specifically, Ms. Malinowski alleges that ATF violated the Fourth Amendment by failing to properly comply with the knock-and-announce principle before forcibly entering her home.[179]

The knock-and-announce principle is "part of the reasonableness inquiry under the Fourth Amendment."[180] It generally requires that, before forcibly entering a home, law enforcement must

---

[174] *See supra* note 168.

[175] *See* Compl. (Doc. 1) ¶¶ 339–55.

[176] *See id.* ¶¶ 356–63.

[177] *See id.* ¶¶ 388–92.

[178] *See id.* ¶¶ 233–51.

[179] *See id.* The Complaint also cites 18 U.S.C. § 3109 for the knock-and-announce principle, which provides the following:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

This statute codifies the knock-and-announce principle, but it otherwise has little relevance to the question whether ATF violated Ms. Malinowski's *Fourth Amendment* rights.

[180] *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995) ("At the time of the framing, the common law of search and seizure recognized a law enforcement officer's authority to break open the doors of a dwelling, but generally indicated that he first ought to announce his presence and authority. In this case, we hold that this common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment."); *see also id.* at 931 ("'Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable,' our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment. An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering." (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985))); *Hudson v. Michigan*, 547 U.S. 586, 589 (2006)

(1) provide notice of their presence, authority, and purpose, and (2) wait a reasonable amount of time for an occupant to let them in.[181] That is because, generally speaking, forcible entry is unreasonable for purposes of the Fourth Amendment until such time as the homeowner explicitly refuses to allow entry or such refusal can be inferred from silence.[182] To be sure, law enforcement is not *always* required to follow the knock-and-announce principle.[183] The existence of exigent circumstances may outweigh the need to knock and announce.[184] For instance, officers are not required to announce their presence when there is a "threat of physical violence[,]" "a prisoner escapes from [law enforcement] and retreats to his dwelling[,]" or "police officers have reason to believe that evidence would likely be destroyed if advance notice were given."[185]

Where there is no justification for a no-knock entry, the debated Fourth Amendment question usually becomes how long officers must wait to perform a forced entry after knocking and announcing. Although there is no "hard and fast time limit,"[186] the general rule is that "[a]n

---

("The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one.").

[181] *See Wilson*, 514 U.S. at 929, 931; *United States v. Banks*, 540 U.S. 31, 43 (2003) ("Absent exigency, the police must knock and receive an actual refusal or wait out the time necessary to infer one.").

[182] *See Banks*, 540 U.S. at 43.

[183] *See Wilson*, 514 U.S. at 934 ("This is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests. . . . [T]he common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances.").

[184] *See United States v. Smith*, 386 F.3d 753, 759 (6th Cir. 2004) ("Officers are excused from compliance with the knock-and-announce requirement when they 'have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.'" (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997))).

[185] *Wilson*, 514 U.S. at 936. This is not an exhaustive list of scenarios that would relieve law enforcement of the duty to announce their presence. Other "law enforcement interests may also establish the reasonableness of an unannounced entry." *Id.*

[186] *United States v. Vesey*, 338 F.3d 913, 915 (8th Cir. 2003) ("Under the fourth amendment's so-called 'knock-and-announce' principle, whether police officers have waited long enough after knocking to infer that they have been constructively denied admittance, and thus may enter, 'does not turn on any hard and fast time limit, but depends upon the circumstances confronting the officer serving the warrant . . . .'" (quoting *United States v. Lucht*, 18 F.3d 541, 549 (8th Cir. 1994), *cert. denied*, 513 U.S. 949 (1994))); *see also United States v. Stropes*, 387 F.3d 766, 772 (8th Cir. 2004) (same); *Hudson*, 547 U.S. at 590 ("When the knock-and-announce rule does apply, it is not easy to

officer's delay before entering . . . should be long enough to ensure that the resident has had time to hear the police knock and to answer the door."[187]  But, here again, the general rule is not always the governing rule.  Whether law enforcement's delay before forcible entry is reasonable (and therefore constitutional) ultimately depends on the totality of the circumstances present from law enforcement's perspective.[188]  And there are often exigencies that allow law enforcement to forcibly enter a home very shortly after knocking and announcing.[189]  Cases in which courts have recognized such exigencies include (1) drug cases with easily disposable evidence,[190] and (2) cases in which there is reason to believe that waiting any longer would jeopardize officer safety.[191]

In the instant case, all parties appear to agree that law enforcement was required to perform a knock-and-announce.[192]  Accordingly, the critical question is whether Ms. Malinowski has plausibly alleged that ATF's knock-and-announce violated the Fourth Amendment.  That question

---

determine precisely what officers must do.  How many seconds' wait are too few?  Our 'reasonable wait time' standard . . . is necessarily vague." (citing *Banks*, 540 U.S. at 41)).

[187] *Vesey*, 338 F.3d at 915.

[188] *See Banks*, 540 U.S. at 36 ("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."); *id.* at 39 ("[T]he facts known to the police are what count in judging reasonable waiting time . . . .").

[189] *See Banks*, 540 U.S. at 39–40 ("In this case, . . . the police claim exigent need to enter, and the crucial fact in examining their actions is not time to reach the door but the particular exigency claimed.").

[190] *See Lucht*, 18 F.3d at 549 ("The need to force entry may result from danger to the safety of the entering officers or from the imminent destruction of evidence."); *Banks*, 540 U.S. at 39–40 ("In this case, . . . the police claim exigent need to enter, and the crucial fact in examining their actions is not time to reach the door but the particular exigency claimed."); *Vesey*, 338 F.3d at 915 ("[T]he suspected presence of drugs in the place to be searched has been held to lessen the time that police officers are required to wait . . . .").

[191] *See Stropes*, 387 F.3d at 773 (approving a 15 to 20 second delay where "officer safety . . . was the primary concern surrounding the search").  If this exigency standard sounds the same as the no-knock-exigency standard, that's because it is the same.  Indeed, as the Supreme Court has said, "there is no reason to treat a post-knock exigency differently from the no-knock counterpart . . . ." *Banks*, 540 U.S. at 40.

[192] *See* Compl. (Doc. 1) ¶ 344 ("Defendants had a duty to comply with the terms of the warrant, which included knocking and announcing themselves prior to entering the Malinowski home and waiting a reasonable time to be granted or denied entry before forcing down the door."); United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 15 ("[F]ederal agents were to provide notice of their authority and purpose upon execution of this search warrant . . . .").  Neither party asserts that there were exigent circumstances sufficient to allow ATF to conduct a no-knock search.  *See* Compl. (Doc. 1) ¶ 344; United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 15.

31

is really a two-fold question.  Was waiting 28 seconds between knocking and entering reasonably long enough for one of the Malinowskis to hear the officers and answer the door?[193]  And if not, did exigent circumstances otherwise justify a forced entry at the 28-second mark?  Given the totality of the circumstances from the officers' perspective, the answer to both of these questions is no.[194]

One factor to consider is ATF's knowledge of the size of the Malinowski home.  That is because the Supreme Court has stated that the amount of time it takes an occupant to get to the door "will vary with the size of the establishment, perhaps five seconds to open a motel room door, or several minutes to move through a townhouse."[195]  ATF knew the Malinowskis had a relatively large one-story home of 2,670 square feet, with multiple bedrooms and bathrooms.  Cases that approve delays shorter than or similar to 28 seconds typically involve much smaller homes with quicker access to the front door from anywhere in the home.[196]

---

[193] It is worth noting that the Government asserts that the actual wait time was 37 seconds, not 28 seconds.  *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 16–17 ("The Complaint alleges that the command to initiate was given at 6:02:58 a.m.  The Complaint alleges that after the command to initiate was given, Special Agent Sprinkles began shouting and knocking on the glass door of the residence.  That knock and announce paused for four seconds, and it then resumed.  The Plaintiff alleges that entry into the residence began nineteen seconds later at 6:03:17 a.m.  The Plaintiff alleges that the agents completed entry into the residence at 6:03:35.  Thus, according to the Complaint, thirty-seven seconds elapsed between the initiation of the knock and announce and actual entry into the residence." (internal citations and quotations omitted)).  The Court is not persuaded that the correct yardstick to use is the time of ultimate entry as opposed to the time of beginning to break the doors.  But, even if the Government is technically correct, the 9-second delta would not change the Court's analysis.

[194] *Cf. Banks*, 540 U.S. at 41 ("[I]n the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door.").

[195] *Id.* at 40.

[196] *See, e.g.*, *Lucht*, 18 F.3d at 549 (approving a 25-to 60-second delay in part because the house was small); *Vesey*, 338 F.3d at 916 (approving a 10-second delay in part because the home was a small apartment).  *Cf. United States v. Goodson*, 165 F.3d 610, 614 (8th Cir. 1999) (approving a 20-second delay in part because the home was a one-story ranch house).

Another factor to consider is the time of day when the knock-and-announce occurred.[197] ATF knew this knock-and-announce was occurring at approximately 6:00 a.m. ATF knew it was still dark. ATF knew the Malinowskis were likely asleep.[198] Or, at a minimum, ATF had no reason to think the Malinowskis were awake. It takes time to wake from slumber, catch one's bearings, determine law enforcement is at the door, dress or put on a robe if necessary, and actually get to the door. Depending on other circumstances present, 28 seconds may not be a reasonable amount of time in which to do all this in a large home.

Yet another factor to consider is whether law enforcement had reason to think one of the Malinowskis would quickly ascertain that law enforcement was at the door. ATF knew that there had only been a quick chirp of the police siren (for 1.5 seconds) at the very outset of the knock-and-announce procedure. ATF knew that it had not used any type of bullhorn to make its presence and identity known. ATF knew it had not rung the doorbell. ATF knew it had covered up the doorbell camera so that the Malinowskis could not see who was there. And, although one police cruiser outside the Malinowski home had its police lights running, ATF had no way of knowing whether the Malinowskis could see those lights from their bedroom.

There's even more to this factor. Taking all inferences in favor of Ms. Malinowski—as the Court must at this stage—ATF knew that they never announced their identity as law enforcement. The Complaint acknowledges that law enforcement shouted as the knocking was going on. But the Complaint never alleges what was shouted. And, on a 12(b)(1) facial attack, the Court must draw the inference most favorable to Ms. Malinowski, which is that law

---

[197] *See, e.g., Vesey*, 338 F.3d at 916 ("We think that it was reasonable for the officers to believe that their pounding and yelling would have immediately alerted anyone in the small apartment of their presence at the door, particularly because they arrived in the afternoon, when it was likely that any occupants were awake.").

[198] The Complaint alleges that ATF knew that Mr. Malinowski "was not expected to leave for work until approximately 9:00 to 10:00 a.m. . . ." Compl. (Doc. 1) ¶ 72. The reasonable inference from this allegation is that ATF knew Mr. Malinowski would likely be asleep at 6:00 a.m. Most people are not awake 3–4 hours before they leave for work.

enforcement was shouting something other than their identity and purpose. This is an important

consideration where, as here, ATF knew that Mr. Malinowski had no criminal history and had no

reason to suspect Ms. Malinowski had such history. Persons who have had multiple run-ins with

law enforcement might be quicker to recognize a knock-and-announce scenario.[199] But the

Malinowskis are not those persons.

Add to all this that, during the knock-and-announce, law enforcement was peering through

the window into the Malinowski home and saw no indication that either of the Malinowskis were

awake or heard the knock-and-announce. No lights went on and no movement was seen.[200] In

light of these factors, 28 seconds was not enough time to reasonably suggest to law enforcement

that the Malinowskis were refusing them entry.[201]

---

[199] *Cf. Lucht*, 18 F.3d at 549 (occupant who was on parole would be "especially sensitive to a knock and announcement for a search"). The Court acknowledges that, in *Stropes*, the Eighth Circuit approved a forced entry after 15–20 seconds of knocking and announcing even though Mr. Stropes had no criminal history. *See Stropes*, 387 F.3d at 772. But there are many salient differences between the case at bar and *Stropes*, including the fact that law enforcement had reason to believe Mr. Stropes knew a raid was coming. *See id.* at 770–71 ("In addition, [an officer] claimed" that Mr. Stropes's sister "might have told Mr. Stropes about Mr. Blakely's arrest[,]" which could have tipped Mr. Stropes off that law enforcement was coming for him next.).

[200] It is probably worth noting that that ATF was aware that Mr. Malinowski "lived at home with his wife and possibly a small-sized dog." Compl. (Doc. 1) ¶ 72. During the knock-and-announce, the Agent peering through the window did not see or hear a dog. *See id.* ¶ 157.

[201] Although not entirely on all fours with our case and not binding on this Court, the D.C. Court of Appeals' analysis in a somewhat similar case has purchase here. In *Griffin v. United States*, the D.C. Court of Appeals held that a 30-second delay before a forced entry at 1:40 a.m. was unreasonable. *See* 618 A.2d 114, 121 (D.C. 1992). Explaining its decision, the D.C. Court of Appeals stated the following:

> If a person is awakened by banging on the door, an immediate and appropriate response may not be feasible. For at least a brief period, the erstwhile sleeper is likely to be too bewildered to react. He or she must then focus on the possibility that those demanding entry may have no legitimate business on the premises. This is especially true where, as here, the bedroom is a considerable distance from the door, so that a suddenly awakened individual may not hear the officer's oral announcements identifying the apparent disturbers of a peaceful night as police officers armed with a search warrant. . . . Moreover, . . . the officers observed nothing suggesting that anyone in the apartment was awake. . . . There were no . . . lights on. There were no footsteps. Beyond the events that had led to the issuance of the search warrant a week and a half to two weeks earlier, there was no suspicious activity at all.

*Id.* (footnotes omitted).

Despite the foregoing, the Court must ask whether, from the perspective of law enforcement, there were exigencies or other circumstances that made this quick of a forcible entry reasonable. That is because, when it comes to analyzing the totality of the circumstances in a knock-and-announce case, whether exigent circumstances existed is often the most "crucial" question.[202] So a fair assessment of the totality of the circumstances must look at possible exigencies.

In this case, the Government focuses primarily on the safety of the agents and officers executing the search warrant.[203] The Government is right that ATF reasonably believed there were likely a considerable number of firearms present in the Malinowski home. The Government is right that ATF reasonably believed that Mr. Malinowski had purchased and sold multiple firearms. The Government is right that ATF reasonably believed that Mr. Malinowski had committed federal crimes involving firearms—namely, dealing in firearms without a license and unlawful acquisition of firearms. And so the Government is right that ATF reasonably believed that Mr. Malinowski "would be armed when the agents entered the residence."[204]

The problem for the Government is that none of this suggests it was reasonable for ATF to believe that: (1) Mr. Malinowski would use one of his firearms against himself, his wife, or law enforcement; or (2) forcing entry after 28 seconds would mitigate the safety risk compared to waiting additional time to see if one of the Malinowskis would answer the door. The fact that Mr. Malinowski had guns doesn't make it reasonable to assume he would use them violently. Indeed, the Eighth Circuit has expressly held that "[t]he reasonable belief that firearms may have

---

[202] *See Banks*, 540 U.S. at 40 ("[T]he crucial fact in examining [the police's] actions is not time to reach the door but the particular exigency claimed.").

[203] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 17.

[204] *Id.*

been within the residence, standing alone, is clearly insufficient" to justify an otherwise unlawful entry.[205]

It is true that, from ATF's perspective, Mr. Malinowski was buying and selling guns unlawfully. But Mr. Malinowski's alleged unlawful conduct was neither violent nor drug-related. Rather, it was much more in the nature of a regulatory violation. There was nothing to suggest he intentionally bought guns from or sold guns to violent criminals or drug dealers. There was nothing to suggest he was part of any larger criminal organization. Instead, Mr. Malinowski's allegedly wrongful conduct was, essentially, buying and selling guns without a license and without filling out the right paperwork. That is obviously a crime. But it is an untenable leap to suggest this conduct, without anything else, shows the potential for violence.

The Court acknowledges that the Eighth Circuit has held that "neither a criminal record, a history of resisting arrest, nor a history of violence" are "prerequisites to a finding that officers had a reason to suspect danger" in a way that justifies an abbreviated knock-and-announce period.[206] The Court also acknowledges that the Eighth Circuit has found that the likely presence of firearms in a home combined with other factors can create a sufficient safety concern to justify a "fifteen to twenty second[] . . . wait before entering the home . . . ."[207] But, in that case, the officers "knew there was a high probability that there were drugs" in the home as well as guns.[208] Moreover, the officers "reasonably suspected that they faced a drug dealer who sought multiple firearms and

---

[205] *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir. 1993); *see also id.* ("[A] ruling which excuses actions which would otherwise constitute clear misconduct, based upon the subjective fears and beliefs of officers, would emasculate the rule, reducing it to nothing more than a 'knock and enter' rule."); *United States v. Quarterman*, 877 F.3d 794, 798 (8th Cir. 2017) ("The presence of a weapon in a home does not necessarily constitute exigent circumstances.").

[206] *See Stropes*, 387 F.3d at 773.

[207] *Id*. Mr. Stropes, like Mr. Malinowski, had no criminal history. *See id.* at 773.

[208] *See Stropes*, 387 F.3d at 770 ("Officer Jirak testified that he knew there was a high probability that there were drugs and guns in Mr. Stropes's residence.").

traded drugs for those firearms."[209]  Accordingly, one reasonable inference in that case was that the suspect wanted guns to protect his drugs and drug dealing, whether from other criminals or from law enforcement.  There is no similar reasonable inference in our case.

At bottom, there is just not enough to definitively say that ATF reasonably believed that Mr. Malinowski posed a danger to them (or to himself or to his wife) that justified forcible entry at the 28-second mark.  Put another way, the Complaint's allegations make it plausible that any such belief was unreasonable.  And insofar as the Government advances a spoliation-based exigent circumstances argument—that Mr. Malinowski could have quickly destroyed evidence—this argument fails as well.  Cases where a delay of less than or about 28 seconds was deemed reasonable typically involved drugs that could be quickly destroyed.[210]  Unlike drugs, firearms cannot be flushed down the toilet or sink (or otherwise discarded) in a matter of seconds.[211]  Thus, ATF could not have had a reasonable belief that forced entry was necessary at the 28-second mark to prevent Mr. Malinowski from destroying evidence.[212]

So, what's the rub of all this?  Given the totality of the circumstances as alleged in the Complaint, Ms. Malinowski has plausibly alleged that ATF's forcible entry violated the knock-and-announce principle and, by extension, the Fourth Amendment.  Accordingly, to the extent Ms. Malinowski's negligence, intentional inflection of emotional distress, and criminal mischief

---

[209] *See id.* at 773.

[210] *See Vesey*, 338 F.3d at 916 (approving a 10-second delay where the home was small and officers "suspected [the] presence of drugs"); *Goodson*, 165 F.3d at 614 (approving a 20-second delay where officers suspected the presence of drugs and the suspect "had a record for assault with a deadly weapon"); *Lucht*, 18 F.3d at 549 (approving a delay of 25 to 60 seconds where the home was small and there was probable cause to believe drugs were present); *see also Banks*, 540 U.S. at 38 ("[W]e think that after 15 or 20 seconds without a response, police could fairly suspect that cocaine would be gone if they were reticent any longer.").

[211] *See Hudson*, 547 U.S. at 590 (noting that the necessary delay between knocking and entering is "extended when . . . the suspected contraband [is] not easily concealed"). C*f. Stropes*, 387 F.3d at 773.

[212] The search warrant also authorized a search of two iPhones, as well as other documentary evidence. *See supra* p. 10.  The Government does not allege that the potential destruction of this kind of evidence was an exigent circumstance in this case. *See* Dec. 5, 2024 Hr'g Tr. (rough) at 2:09:47–2:11:13.

37

claims are based in whole or in part on ATF's forcible entry, those claims do not fall victim to the FTCA's discretionary function exception.

*Post-Shooting Conduct.*  The Court now moves to Ms. Malinowski's false imprisonment claim.[213]  That claim arises from ATF's detention of Ms. Malinowski for several hours following Mr. Malinowski's shooting.  Ms. Malinowski alleges that ATF's actions were an unlawful seizure of her person in violation of the Fourth Amendment.[214]  "The Fourth Amendment to the Constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[215]  To sufficiently allege an unlawful seizure, the Complaint must allege facts that make it plausible that (1) a seizure occurred, and (2) the seizure was unreasonable.[216]

A "seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority."[217]  Where law enforcement intentionally applies force or authority, a person has been seized if "a reasonable person would have believed that [she] was not free to leave."[218]  The Complaint alleges that, after shooting her husband, law enforcement "pointed their rifles at [Ms. Malinowski,]" "yelled at her to show them her hands[,]" and "ordered [her] to . . .

---

[213] *See* Compl. (Doc. 1) ¶¶ 393–403.  Under Arkansas law, the tort of false imprisonment is defined as the "unlawful violation of the personal liberty of another consisting of detention without sufficient legal authority."  *Headrick v. Wal-Mart Stores, Inc.*, 293 Ark. 433, 435, 738 S.W.2d 418, 420 (1987).

[214] *See* U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").  In addition to the allegations set out in Section II.A. of this Order, the Complaint also alleges that ATF agents "falsely arrested Plaintiff [Ms.] Malinowski when they detained her for hours in an LRPD patrol car, refusing her requests to leave, without any reasonable articulable suspicion and without probable cause."  Compl. (Doc. 1) ¶ 396.

[215] *Wilson*, 514 U.S. at 931 (cleaned up); *see also id.* ("In evaluating the scope of this right, we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing.").

[216] *See Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 839 (8th Cir. 2021).

[217] *Id.* (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)).

[218] *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

allow them to secure her."[219]  The Complaint further alleges that "[t]he agents then escorted her to the back of an LRPD cruiser . . . ."[220]  There, according to the Complaint, Ms. Malinowski "was held in custody by LRPD officers at the direction of ATF agents" for more than 3 hours.[221]  Ms. Malinowski "begg[ed] to be released, but officers ignored her hysterical cries and denied her requests to be let out of the squad car . . . ."[222]  Her requests to leave the vehicle to change her clothes, retrieve her medicine, check on her dogs, and use the restroom at her neighbor's house were all denied.[223]  And, even when she was eventually taken to the bathroom at the fire station, she was in continuous police presence and under continuous police control.[224]  These facts sufficiently allege that law enforcement intentionally restrained Ms. Malinowski's liberty from the time they pointed their rifles at her through the entire time she was in LRPD custody.  And a reasonable person in Ms. Malinowski's situation would have believed she was not free to leave.

To determine whether a seizure is unreasonable, the Court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[225]  As a general matter, the Supreme Court and Eighth Circuit have concluded that law enforcement may "detain occupants of a premises while executing a [valid] search warrant . . . ."[226]  That is because, in such circumstances,

---

[219] Compl. (Doc. 1) ¶¶ 197–98.

[220] *Id.* ¶ 199.

[221] *Id.* ¶ 221.

[222] *Id.* ¶ 206.

[223] *See id.* ¶¶ 203–11.

[224] *See id.* ¶¶ 217–20.

[225] *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 934 (8th Cir. 2016) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

[226] *See id.* at 934.  Although the baseline rule for Fourth Amendment seizures is that "an official seizure of the person must be supported by probable cause, even if no formal arrest is made[,] . . . some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard . . . ." *Michigan v. Summers*, 452 U.S. 692, 696–97 (1981).  Cases falling in this latter category are those in which "the intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection

it is usually the case that a "detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant."[227]  This general rule serves three governmental interests: (1) "preventing flight in the event that incriminating evidence is found"; (2) "minimizing the risk of harm to the officers"; and (3) "facilitating the orderly completion of the search."[228]  Notwithstanding this general rule and its justifications, however, binding precedent also recognizes that an initially valid seizure "may become unlawful if unreasonably prolonged . . . ."[229]

No one disputes that ATF obtained a valid warrant from a Magistrate Judge permitting a search of the Malinowski home.[230]  Accordingly, during the search, ATF could constitutionally

---

and in the police officer's safety' could support the seizure as reasonable."  *Id.* (quoting *Dunaway v. New York*, 442 U.S. 200, 209 (1979)).

[227] *Summers*, 452 U.S. at 703.  The Supreme Court provided the following rationale for this rule:

> The existence of a search warrant . . . provides an objective justification for the detention.  A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime.  Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home.  The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Id.* at 703–04 (footnote omitted).  The Government cites *Summers* for its contention that Ms. Malinowski's detention was reasonable, stating that "[o]fficers may detain occupants of a premises when executing a search warrant[,]" as "[s]uch a 'detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant.'"  United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 24 (quoting *Summers*, 452 U.S. at 703).

[228] *Mountain Pure*, 814 F.3d at 934 (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)).

[229] *Id.* (citing *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008)).  *Cf. Peralez*, 526 F.3d at 1119 (holding that where "complications arise during [a traffic stop], the vehicle may reasonably be detained 'for a longer duration than when a stop is strictly routine[,]' because "[w]hether a traffic stop 'is reasonable in length is a fact intensive question, and there is no *per se* time limit on all traffic stops'" (internal citations omitted) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007))).

[230] *See* Compl. (Doc. 1) ¶ 51 ("ATF Special Agent Troy Dillard obtained two federal search warrants, which authorized federal agents to search the Malinowski home and [Mr. Malinowski's] vehicle for firearms, ammunition, electronics, sales records, and correspondence."); United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 10 ("Here, there is no dispute that federal agents had a valid search warrant for the residence of Malinowski based upon the investigation of criminal activity involving firearms.").  Indeed, the warrants are embraced by the Complaint.  *See supra* note 40.

40

detain Ms. Malinowski as an occupant of the premises to be searched.[231]  The stickier issue is whether Ms. Malinowski's detention was unreasonably prolonged.

Under ordinary circumstances, detaining Ms. Malinowski for 3 hours may have ventured into the "unreasonably prolonged" territory if such detention was out of proportion to the length of time reasonably needed for the search of the Malinowski home.[232]  But the circumstances of this case are far from ordinary.  A major complicating factor had arisen.  The home had become a crime scene.  Specifically, the home had become the scene of what had to be investigated as a potential homicide, attempted homicide, or battery.[233]  This reasonably necessitated a pause in the planned search at least until the Arkansas State Police arrived and conducted a preliminary investigation.   And, likely because of the early hour, it took the Arkansas State Police significant time to arrive and complete its investigation.[234]

The Court acknowledges that, in theory, ATF agents—either the original set of agents or agents that had not been a part of the original raid—could have physically reentered the home and conducted the search before the Arkansas State Police arrived.  But doing so would have risked

---

[231] As to whether Ms. Malinowski's detention occurred during the search or not, see *infra* at pp. 42–43.

[232] *But see Muehler*, 544 U.S. at 100 (holding that a 2–3 hour detention in handcuffs was reasonable because the prolonged detention did not "outweigh the government's continuing safety interests"); *Mountain Pure*, 814 F.3d at 934 (holding that detaining individuals in a break room during a nearly 12-hour search was reasonable in part because "the detention . . . was not particularly intrusive"); *Segura v. United States*, 468 U.S. 796, 812 (1984) (holding that occupying an apartment "throughout the night and into the next day" due to a delay in obtaining a warrant was reasonable because "[s]uch delay in securing a warrant in a large metropolitan center . . . is not uncommon[,] . . . [a]nd there is no suggestion that the officers, in bad faith, purposely delayed obtaining the warrant").

[233] On one hand, the officer who shot Mr. Malinowski could be subject to homicide charges (if Mr. Malinowski died) or attempted homicide or battery charges (if Mr. Malinowski survived).  On the other hand, Mr. Malinowski could be subject to attempted homicide or battery charges for shooting the officer in the foot.  Either way, the home was now a crime scene.

[234] *See* Compl. (Doc. 1) ¶¶ 225–26.

41

contaminating the crime scene and could have led to suggestions of fabricated evidence.[235]  ATF's

decision to wait for the Arkansas State Police to conduct its work first was reasonable.

The Court also acknowledges that ATF did not actually go back into the home to complete

the search warrant *while* Ms. Malinowski was detained.[236]   According to Ms. Malinowski,

Supreme Court precedent only permits law enforcement to detain an occupant during the actual

search itself.[237]   Since Ms. Malinowski's detention was in the morning hours and ATF didn't

conduct its search until the early afternoon, Ms. Malinowski argues that the above-described

precedent is inapplicable and her detention therefore violated the Fourth Amendment.  The Court

does not read the applicable Supreme Court precedent so narrowly.  In the Court's view, for

purposes of interpreting the precedent in this area, ATF's execution of the search warrant began

the moment the agents started knocking on the Malinowskis' front door.  And although paused,

the search was appropriately considered as still active during the time Ms. Malinowski was

detained.  Even though ATF wasn't physically in the home looking for evidence at the exact time

of Ms. Malinowski's detention, that was because of a pause in execution of the search warrant that

---

[235] Similarly, allowing Ms. Malinowski to retrieve clothes from her home or use the restroom in the home could also have risked contaminating the crime scene or otherwise interfered with the Arkansas State Police investigation.  The Court acknowledges that officers also refused to let Ms. Malinowski leave the vehicle to use her neighbor's restroom. *See id.* ¶ 210.  Allowing Ms. Malinowski to use her neighbor's restroom would not have risked contaminating the crime scene.  But, given that the officers eventually took Ms. Malinowski to the fire station to use the restroom, the Court believes that the officers acted in good faith and within the realm of reasonableness. *Cf. Segura*, 468 U.S. at 812 (holding that seizing an apartment overnight was reasonable in part because "there [was] no suggestion  . . . [of] bad faith" or "purpose[ful] delay[]" on the officers' part).

[236] *See* Compl. (Doc. 1) ¶¶ 225–26.  Indeed, ATF did not reenter the Malinowski home to complete its search until 1:53 p.m.—after the Arkansas State Police completed their officer-involved-shooting investigation and turned the home back over to ATF. *See id.* ¶¶ 192–93, 225–26.  Specifically, the Complaint alleges that "[f]or several hours after [Mr. Malinowski] was shot, the Malinowski home was secured, but not searched." *Id.* ¶ 223.  The Complaint further alleges that, "[d]uring this time, ATF decided the Arkansas ATF team involved in that morning's raid would not conduct the search warrant." *Id.* ¶ 223.  Instead, the agent in charge "contacted the ATF office in Mississippi, which [then] sent its agents to Little Rock to search the Malinowski home." *Id.* ¶ 224.

[237]*See* Pl.'s Resp. to United States' Mot. to Dismiss (Doc. 39) at 26; *Summers*, 452 U.S. at 705 ("[A] warrant . . . founded on probable cause implicitly carries with it the limited authority to detain occupants of the premises *while* a proper search is conducted." (emphasis added)).

was reasonable under all of the circumstances present.   In sum, the fact that ATF waited for the Arkansas State Police to complete its own investigation before reentering the home to continue execution of the search does not take this case outside of the general rule related to detention of house occupants during a search.[238]

Given the unique circumstances at play here, it was reasonable for ATF agents to keep Ms. Malinowski detained from approximately 6:07 a.m. until approximately 9:15 a.m., when they "turned [her] over to the Arkansas State Police . . . ."[239]   Accordingly, ATF's detention of Ms. Malinowski—imperfect as it may have been—meets the Fourth Amendment's reasonableness standard.   That is, Ms. Malinowski has failed to plead sufficient facts to make it plausible that ATF violated her Fourth Amendment rights by the alleged conduct that comprises her false imprisonment claim.[240]   So, the Eighth Circuit's unconstitutional-conduct exception to the discretionary function exception does not apply.

The Court therefore moves on to the more traditional test used to determine whether the discretionary function exception applies.[241]   As a reminder, this traditional test asks whether:

---

[238] *Cf. Summers*, 453 U.S. at 711 (Stewart, J., dissenting) ("The explicit holding of the Court is that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.   Though on superficial reading, this language may suggest a minor intrusion of brief duration, a detention while a proper search is being conducted can mean a detention of several hours. The police thereby make the person a prisoner . . . for a potentially very long period of time." (internal citations, footnotes, and quotations omitted)).

[239] Compl. (Doc. 1) ¶ 222.   The Court emphasizes that Ms. Malinowski was only detained for about 3 hours. *See id.* ¶ 221.   If Ms. Malinowski had been detained by ATF for the full time from her initial seizure through the actual end of ATF's search of the Malinowski home, the Court is not one-hundred percent sure what conclusion it would have reached.

[240] Because the Court concludes that Ms. Malinowski's detention was constitutional even if it was a little more than 3 hours long—between approximately 6:07 a.m. and approximately 9:15 a.m.—the Court need not concern itself with the debate between the parties as to whether her detention at the direction of ATF was for the full 3 hours or only for 1 of those 3 hours. *See supra* note 147.

[241] The Court notes that Ms. Malinowski's response to the Government's discretionary function exception argument rests entirely on the assertion that she properly alleged that ATF violated her Fourth Amendment rights. *See* Pl.'s Resp. to United States' Mot. to Dismiss (Doc. 39) at 23 ("[A]s a threshold matter—and the principal basis on which this Brief rests—the discretionary function exception does not apply when a plaintiff alleges that federal officials violated the Constitution.").   Ms. Malinowski makes no alternative argument that ATF's actions would otherwise fall

43

(1) the federal employee's allegedly wrongful acts at issue "involve[d] an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations'";[242] and (2) "the [federal] employee's judgment or choice was 'based on considerations of social, economic, and political policy.'"[243]  The answers to these questions strike the Court as pretty easy.

First, ATF's decision to detain Ms. Malinowski incident to the execution of the search warrant (and how to, where to, and how long to detain her) obviously involved judgment or choice.[244]  ATF was not required by statute or regulation to detain her.  Nor was ATF prevented from detaining her by statute or regulation.  And no statute or regulation prohibited her detention in a police car.  Second, deciding whether, where to, how to, and how long to detain an occupant of a home during a search of that home requires officers to weigh competing social and political policy considerations.[245]  Nothing Ms. Malinowski has pled rebuts the presumption—described in Eighth Circuit caselaw—that ATF's discretionary choices involved policy considerations.[246]  And

---

outside the discretionary function exception.  But, for the sake of thoroughness—and because the Court has rejected Ms. Malinowski's constitutional argument—the Court has included the relevant discretionary-function analysis.

[242] *Buckler*, 919 F.3d at 1045 (quoting *Herden*, 726 F.3d at 1046); *see also Gaubert*, 499 U.S. at 328.

[243] *Buckler*, 919 F.3d at 1045 (quoting *Herden*, 726 F.3d at 1047).

[244] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 21–22 (regarding such decisions, "law enforcement officers are allowed to weigh certain governmental interests: 'to prevent flight in the event that incriminating evidence is found; to minimize the risk of harm to the officers; and to facilitate the orderly completion of the search.'" (quoting *Mountain Pure*, 814 F.3d at 934)).  In addition to these governmental interests, law enforcement officers are also allowed to weigh a person's interest in not having their freedom of movement restricted and potential blowback from media and citizens arising from detaining persons (or detaining them too aggressively) during a search.  This is especially true where the person is not directly suspected of wrongdoing.

[245] The considerations described in footnote 244 *supra* and other considerations described in the Government's Brief, *see* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 22–23, readily fall within the concept of public policy calls.  How to strike the balance between competing interests will depend on how law enforcement officers, their supervisors, and ultimately their political leadership value different political and social considerations.  For one of many potential examples, weighing risks to officer safety against the liberty of a home occupant that is not even the occupant suspected of wrongdoing requires multiple political judgments: how important is officer safety, how important is the liberty of the home occupant, and should the weighing scale be—at the outset—weighted in favor of one of these values.

[246] *See Buckler*, 919 F.3d at 1046 ("[I]f discretion exists, a presumption arises that the discretion is grounded in policy considerations, and the plaintiff 'must rebut this presumption.'" (quoting *Herden*, 726 F.3d at 1048)).

44

Ms. Malinowski's briefing strongly suggests that she does not really contest the point.[247]    The

bottom line is that the Government has satisfied both steps of the two-step test and so the

[247] *See* Pl.'s Resp. to United States' Mot. to Dismiss (Doc. 39) at 13 (describing the Eighth Circuit's unconstitutional-conduct rule, in contradistinction to the traditional two-step discretionary function exception test, as "the principal basis on which this Brief rests"). With respect to the detention of Ms. Malinowski, Ms. Malinowski argues that the discretionary function exception is inapplicable because Ms. Malinowski's detention was unconstitutional. *See id.* at 36–38. To be clear, Ms. Malinowski does not alternatively argue that the Government fails to meet the traditional two-step test governing the discretionary function exception. *See id.* This omission is particularly striking—and appears intentional—because Ms. Malinowski did make such an alternative argument with respect to ATF's entry into the home. *See id.* at 24–25; *id.* at 25 ("The decisions [the ATF agents] made on the morning of March 19, 2024 about how and when to enter the Malinowski home did not involve weighing social, economic, or political considerations, nor were such policy judgments part of their responsibilities. The agents' role was limited to carrying out the Operations Plan within the bounds of the Fourth Amendment and the rules governing warrant execution."). Consistent with all this, Ms. Malinowski did not argue at the motion to dismiss hearing that the Government failed to meet the traditional two-step discretionary function exception test with respect to her detention. *See generally* Dec. 5, 2025 Hr'g Tr. (rough) at 2:36:36–2:42:15, 3:52:43–3:56:23.

To the extent one could possibly read the Malinowski Brief's discussion of the two-step traditional test as covering both ATF's forcible entry into the Malinowski home and Ms. Malinowski's subsequent detention, the Court is not persuaded by Ms. Malinowski's argument. The statute Ms. Malinowski points to—18 U.S.C. § 3109—is not about the detention of a home occupant during the execution of a search of the home. As for the ATF Order to which she also points—Order 3220.1B—recall that the Court is not considering the content of that document for purposes of deciding the Government's facial attack on jurisdiction. *See supra* note 40.

Finally, and again indulging the very generous assumption that the Malinowski Brief's discussion of the two-step traditional test covers both ATF's forcible entry into the Malinowski home and Ms. Malinowski's subsequent detention, Ms. Malinowski's reliance on the partial concurrence and concurrence in judgment from Justice Scalia in *Gaubert* is misplaced. *See* Pl.'s Resp. to United States' Mot. to Dismiss (Doc. 39) at 25 (citing *Gaubert*, 499 U.S. at 335 (Scalia, J., concurring)). Quoting and paraphrasing various portions of Justice Scalia's concurrence, Ms. Malinowski argues that ATF agents did not exercise the type of discretion necessary to satisfy the second step of the traditional discretionary function exception test because they were functioning at the operational level as opposed to the planning level. *See id.* The problem for Ms. Malinowski is that *Gaubert*'s majority was 8 justices strong, Justice Scalia's concurrence was solo, and the majority's analysis was vastly different from Justice Scalia's analysis on the relevant legal point. *See generally Gaubert*, 499 U.S. 315. Without belaboring things, the Court simply notes that a fair read of the *Gaubert* majority makes it very clear that decisions made at the operational level can, and often do, involve the type of discretion necessary to satisfy the second step of the traditional discretionary function exception test. *See generally id.* And, consistent with *Gaubert*, the Eighth Circuit has found law enforcement actions involved in the execution of search warrants and the detention of persons to require the type of discretion necessary to satisfy the second step of the traditional discretionary function exception test. *See Hart v. United States*, 630 F.3d 1085, 1089–91 (8th Cir. 2011) (holding that "a federal law enforcement officer's on-the-spot decisions concerning how to effectuate an arrest—including how best to restrain, supervise, control or trust an arrestee" involve policy considerations). *Cf. Muehler*, 544 U.S. at 99–102 (noting that law enforcement's use of force to detain occupants during the execution of a search warrant "was reasonable because the governmental interests outweigh the marginal

discretionary function exception applies to Ms. Malinowski's false imprisonment claim. Accordingly, the false imprisonment claim falls outside the scope of the United States' limited waiver of sovereign immunity in the FTCA.  The Court therefore dismisses that claim (Count XIII) against the United States.

### 2.   Liability under Arkansas Law

The Government contends that several claims brought under the auspices of the FTCA should be dismissed because the Government, were it a private party, would not be liable under Arkansas law.[248]   Based on this contention, the Government seeks dismissal of the following claims in the Complaint: wrongful death (Count V), assault and battery (Count VI), negligence (Count VII), intentional infliction of emotional distress (Count VIII), and the claims under the Arkansas Victim of Felonies Act (Counts IX-XII).[249]

Let's begin with the Government's principal argument on this front.  According to the Government, Ark. Code Ann. § 16-120-302 immunizes the ATF agents (and thus also the Government) from civil liability for the use of deadly force in the circumstances alleged in the Complaint.  This argument is the basis for the Government's request to dismiss the following

---

intrusion" and then discussing the balancing and weight of those interests); *Bailey v. United States*, 568 U.S. 186, 194–99 (2013) (discussing policy considerations relevant to law enforcement's decision to detain individuals during the execution of a search).

[248] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 25–33.  Recall from page 26 *supra* that 28 U.S.C. § 1346(b)(1) "gives district courts 'exclusive jurisdiction' over negligence suits 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Hutchinson*, 71 F.4th at 1117 (quoting 28 U.S.C. § 1346(b)(1)).  And that, therefore, "the United States has waived immunity only to the extent a private party standing in the government's shoes would be liable under Arkansas law." *Id.* at 1118; *see also id.* at 1117–18 ("It may seem counterintuitive, but what matters for getting [an FTCA] case into *federal* court is *state* law." (emphasis in original)).

[249] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 25–33.  With respect to the negligence, intentional infliction of emotional distress, and criminal mischief claims, the Government makes its argument in the alternative to its discretionary function exception argument.  *See id.*

claims: wrongful death (Count V), assault and battery (Count VI), negligence (Count VII), and the claims under the Arkansas Victim of Felonies Act (Counts IX-XII).[250]

As the Government contends, Ark. Code Ann. § 16-120-302 provides that "[a] person is immune from civil action for the use of deadly physical force against another person who is an initial aggressor if the use of the deadly physical force was in accordance with [Ark. Code Ann.] § 5-2-607."[251]  In turn, Ark. Code Ann. § 5-2-607 states in relevant part:

(a) A person is justified in using deadly physical force upon another person if the person reasonably believes that the other person is:

(1) Committing or about to commit a felony involving physical force or violence;

(2) Using or about to use unlawful deadly physical force; or

(3) Imminently endangering the person's life or imminently about to victimize the person from the continuation of a pattern of domestic abuse.

(b) A person is not required to retreat before using deadly physical force if the person:

(1) Is lawfully present at the location where deadly physical force is used;

(2) Has a reasonable belief that the person against whom the deadly physical force is used is imminently threatening to cause death or serious physical injury to the person or another person;

---

[250] With respect to this portion of its argument, the Government separates into different sections its discussion of Counts V–VII (wrongful death, assault and battery, and negligence) and Counts IX–XII (the Civil Action by Crime Victim State claims).  *Compare* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 25–30, *with id.* at 30–32. Despite this formal separation, the Court reads the Government's Brief as pressing the same exact argument for both sets of claims.  *Compare id.* at 26–30 (arguing that that Ark. Code Ann. § 16-120-302 immunizes the ATF agents from civil suit for the shooting because the shooting was justified under Ark. Code. Ann. § 5-2-607), *with id.* at 31 (pointing to the same two statutes and arguing that the shooting "was justified under Arkansas law pursuant to Arkansas's civil use of deadly physical force statute"); *see also* United States' Reply Br. in Supp. of Mot. to Dismiss (Doc. 41) at 7–8 (not making any distinction between the two sets of claims).  Because the Government makes a single argument that covers both sets of the claims, the Court will only address that single argument.  There may well be other, better arguments concerning the claims that are based on asserted felonies—for example, arguments that press upon the *mens rea* required for such felonies.  But the Court limits itself in the instant Order to addressing the arguments that were actually made and not arguments that might be made in future stages of the litigation.

[251] Ark. Code Ann. § 16-120-302.

(3) Except as provided under § 5-2-606(b)(2)(B), is not the initial aggressor and has not provoked the person against whom the deadly physical force is used;

(4) Is not committing a felony offense of possession of a firearm by certain persons, § 5-73-103, with the firearm used to employ the deadly physical force, unless the person is in or at the person's dwelling or in the curtilage surrounding the person's dwelling;

(5) Is not engaged in criminal activity that gives rise to the need for the use of deadly physical force at the time the deadly physical force is used; and

(6) Is not engaged in any activity in furtherance of a criminal gang, organization, or enterprise as defined in § 5-74-103.[252]

It is the Government's position that Ms. Malinowski "admits that [Mr.] Malinowski was the initial aggressor in the use of deadly physical force."[253]  It is also the Government's position that the § 5-2-607 analysis—which would be required if Mr. Malinowski was the initial aggressor—must be resolved in the Government's favor.[254]  But both of these positions are wrong, at least given how the Court must view the facts at the current litigation stage.

The Government's first mistake is reading too much into certain alleged facts that Ms. Malinowski pled in the Complaint.  It is true, of course, that Ms. Malinowski alleged the following: "Believing they were intruders, [Mr. Malinowski] fired his gun at the floor and hit one of the agents in the boot sole.  Agent Cowart . . . [then] returned fire . . . ."[255]  But the Government is wrong to try to transform those alleged facts into a concession concerning who was the initial aggressor.  As explained below, the alleged facts highlighted by the Government do not, on their own, definitively determine who was the initial aggressor under Arkansas law.

---

[252] *Id.* § 5-2-607.

[253] United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 27 (citing Compl. (Doc. 1) ¶¶ 188–89).

[254] *Id.* at 28–30.

[255] Compl. (Doc. 1) ¶¶ 188–89.

For at least 60 years, the Arkansas Supreme Court has defined the initial aggressor as "the person who committed the first act of aggression."[256] And the facts alleged in the Complaint make it plausible—far from certain, but plausible—that the ATF agents committed the first act of aggression here. Taking all the Complaint's allegations as true and drawing all inferences in favor of Ms. Malinowski, it is plausible that the ATF agents—under the cover of darkness and without identifying themselves—unconstitutionally and violently forced their way into the Malinowski home with their guns drawn.[257] If such a scenario turns out to be true, that would make the ATF agents—and not Mr. Malinowski—the initial aggressor for purposes of Ark. Code Ann. § 16-120-302. And that would mean that § 16-120-302's immunity from civil actions would not apply to the claims arising out of the shooting of Mr. Malinowski—because the immunity only applies where a person is being sued for using deadly force against a person "who is an initial aggressor."[258]

But let us assume, for the sake of argument, that the Court could find its way around the initial aggressor problem. Things don't get much better for the Government under Ark. Code Ann. § 5-2-607. Consider subsection (b) of that statute, which provides that "[a] person is not required to retreat before using deadly physical force if the person[,]" among other things, "is lawfully

---

[256] *See Decker v. State*, 234 Ark. 518, 524–25, 353 S.W.2d 168, 172 (1962) ("Let us keep in mind that the evidence excluded is *only* admissible as tending to show the probable aggressor—the person who committed the first act of aggression. It appears from appellant's testimony that Mrs. Decker only picked up the pistol after she was slapped and shoved against the table by her husband." (emphasis in original)).

[257] Recall this was a pre-dawn raid. Law enforcement only chirped the police siren for a second or so. They did not ring the doorbell, phone the Malinowskis, or use a bullhorn. Although we know they yelled as they knocked on the door, we don't know what they yelled. The inference most favorable to Ms. Malinowski is that they yelled something other than "police." They intentionally covered the doorbell camera. And, once they broke through the two sets of doors to the house, they neither verbally nor visually identified themselves as law enforcement.

[258] This is true regardless of what the ATF agents might have subjectively believed. Ark. Code Ann. § 16-120-302's initial aggressor language speaks in terms of what actually is and not in terms of what was reasonably believed. *See* Ark. Code Ann. § 16-120-302 (immunizing "the use of deadly physical force against another person *who is an initial aggressor*" (emphasis added)). Such language signals an objective inquiry, not a subjective one. And, objectively speaking, an unidentified party that unlawfully barges into another's house in the dark with guns drawn is the initial aggressor.

49

present at the location where deadly physical force is used."[259]  The Court has already concluded that the Complaint's allegations make it plausible that the relevant ATF agents were unlawfully in the Malinowski home at the time of the shooting.  Although the agents had a search warrant, the Constitution still forbade the agents' entry into the Malinowski home at the moment they entered. That is because—based on the facts pled in the Complaint—the agents had not waited enough time to reasonably conclude that the Malinowskis were refusing them entry.  Since the agents were not lawfully in the home, they were under a duty to retreat (at least if possible).  And there is no suggestion within the four corners of the Complaint that the ATF agents could not safely do so.[260] That means the ATF agents' use of deadly force was not "in accordance with § 5-2-607."[261] Consequently, § 16-120-302's immunity from civil actions would not apply to the claims arising out of the shooting of Mr. Malinowski.[262]

This disposes of the Government's principal argument.  But the Government also sets out two more limited arguments concerning the scope of liability under Arkansas law.  First, the Government attacks the Civil Action by Crime Victim Statute Act claim for criminal mischief

---

[259] Ark. Code Ann. § 5-2-607(b)(1).

[260] Here again, the ATF agents' subjective belief that they were lawfully in the house is not relevant.  Some portions of Ark. Code Ann. § 5-2-607 speak in terms of reasonable belief.  But not subsection (b)(1).  *Compare* Ark. Code Ann. § 5-2-607(a) (permitting the use of deadly force if the user "reasonably believes" one of three things about other person), *and id.* § 5-2-607(b)(2) ("[I]f the person . . . [h]as a *reasonable belief* that the person against whom the deadly physical force is used is imminently threatening to cause death . . . ." (emphasis added)), *with id.* § 5-2-607(b)(1) ("[I]f the person . . . [i]s lawfully present at the location where deadly physical force is used . . . .").

[261] Ark. Code Ann. § 16-120-302.  Given this conclusion, the Court need not analyze whether the other requirements of the non-retreat rule in Ark. Code Ann. § 5-2-607(b) would be satisfied.  The Court will simply note that, for essentially the same reasons that have been discussed already, the Government would have a serious problem under subsection (b)(3)—which (once again, in objective language) requires retreat if the person who wants to use deadly force is either the "initial aggressor" or "provoked the person against whom the deadly physical force is used."  Ark. Code. Ann. § 5-2-607(b)(3).

[262] Given this conclusion, the Court need not address Ms. Malinowski's argument that "justification is not a valid defense for claims alleging recklessness or negligence[.]"  *See* Pl.'s Resp. to United States' Mot. to Dismiss (Doc. 39) at 32–34 (cleaned up).

(Count XII).  This claim is for both the breaking down of the doors of the Malinowski home and for the property damage resulting from the shooting.  According to the Government:

> (1) "criminal mischief in Arkansas is committed when a person purposely and *without legal justification* destroys or causes damage to any property of another person[;]"[263]
>
> (2) 18 U.S.C. § 3109 permits federal officers "to break open a door to execute a search warrant if, after giving notice of their purpose and authority, they are refused entry[;]"[264] and
>
> (3) ATF "was justified in [its] return of fire, causing any property damage inside the residence."[265]

Putting those three points together, the Government argues that the agents had legal justification to break the doors to the Malinowski home and to shoot.  Therefore, says the Government, the ATF agents (and the Government) would not be liable for criminal mischief under Arkansas law.  But this is just a redux of other arguments that the Court has already addressed.  Because the Complaint makes it plausible that the agents did not wait enough time—under the Fourth Amendment precedent—to begin their forcible entry, the Complaint also makes it plausible that their conduct falls outside of 18 U.S.C. § 3109's safe harbor.[266]  Similarly, because the Complaint makes it plausible that the ATF agents were the initial aggressors (not to mention unlawfully in the Malinowski home), the Complaint also makes it plausible that their use of deadly force was not legally justified.[267]

---

[263] United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 31 (emphasis in original) (citing Ark. Code Ann. § 5-38-203(a)(1)).

[264] *Id.* at 31–32 (citing 18 U.S.C. § 3109).

[265] *Id.* at 32.

[266] *See United States v. Scroggins*, 361 F.3d 1075, 1080 (8th Cir. 2004) ("[B]oth section 3109 and the Fourth Amendment codified the same common-law knock-and-announce principle, and . . . both are subject to the same exceptions. . . . [Thus,] section 3109 and the Fourth Amendment are coextensive . . . ." (internal citations omitted)).

[267] The Government's Brief in this section ends with a cryptic reference to the "lack of requisite intent . . . ."  United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 32.  If this was meant to argue something other than the arguments already addressed in this Order, the point was not sufficiently developed to be considered raised at this juncture.

Second, the Government attacks the intentional infliction of emotion distress claim (Count VIII).  In Arkansas, another name for this alleged tort is the tort of outrage.  Although the Government spends a few paragraphs setting out the legal requirements of this tort, the Government's actual argument encompasses just three sentences:

> As explained [in other parts of the Brief], the agents were justified in their actions here.  Acting in a way in which one has the legal right to act does not "equate with outrageous conduct necessary for the tort of outrage."  This is not sufficient to show state law liability for intentional infliction of emotional distress."[268]

Of course, the Court has already rejected the argument—for purposes of resolving a facial attack—that the agents were justified in their actions of forcibly knocking down the doors and shooting Mr. Malinowski.  Because the Court has rejected the only argument that the Government raises, the Court allows the intentional infliction of emotional distress claim to move forward.[269]

### C.  Conclusions as to Facial Attack on Jurisdiction

For purposes of the Government's facial attack on jurisdiction, the Court has: (1) rejected all of the Government's discretionary-function arguments except the argument made with respect to the false imprisonment claim (Count XIII); and (2) rejected all of the Government's scope-of-

---

[268] United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 33 (internal citations omitted) (quoting *Ross v. Patterson*, 307 Ark. 68, 71, 817 S.W.2d 418, 420 (1991)).

[269] To be fair, the Government could have made this a much harder issue for the Court to decide.  The Government could have argued that, even if (based on the allegations in the Complaint) the agents' conduct in breaking the doors and shooting Mr. Malinowski was unconstitutional, it was not "extreme and outrageous" in the sense of being "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *See Chandler v. Wal-Mart Stores Inc.*, 2016 Ark. App. 372, at 13, 498 S.W.3d 766, 772–73.  That would have been a tough argument to resolve.  On the one hand, there are all the serious problems with the raid that the Court has pointed out earlier in this Order.  On the other hand, this was not a completely unauthorized armed raid of a random citizen's house.  ATF had specific reason to suspect Mr. Malinowski of a crime.  ATF had a search warrant, signed by a neutral Magistrate Judge.  When they initiated the raid, they kept the police cruiser lights flashing outside the Malinowski home.  ATF knocked on the door and yelled for around 19 seconds and then waited for a response for around 9 seconds. (The Court's constitutional conclusion that the agents waited too short a time is not the same thing as a conclusion that they waited no time or an outrageously short amount of time.)  ATF intended to enter the house with a shield that identified themselves as law enforcement.  And ATF only shot Mr. Malinowski after they were fired upon.  The bottom line is that the Court is not going to make this close call at this juncture because the argument was not sufficiently raised in the briefing.

state-law-liability arguments. Accordingly, the only claim that does not make it to the factual attack is the false imprisonment claim (Count XIII).

## III.    FACTUAL ATTACK ON JURISDICTION

The Court now turns briefly to the Government's factual attack on jurisdiction. As explained in Section I. above, a factual attack allows the Court to look to "matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards."[270] In other words, "no presumptive truthfulness attaches" to Ms. Malinowski's allegations.[271] And, generally speaking, a court will make factual findings relevant to the jurisdictional question or questions based on all the evidence in the record. However, in this instance and for the reasons explained below, the Court chooses a different course.

Where jurisdictional questions of fact are "bound up with the merits[,]" the Court has discretion to wait for "a full trial on the merits . . . to resolve the issue."[272] That is what the Court does today. In the Court's view, the jurisdictional questions of fact in this case are so closely bound up with the merits of Ms. Malinowski's claims that it would be far better (and far fairer to both parties) to wait until trial to resolve these issues. Among other things, additional discovery will only help clarify what truly transpired in this case, and such information will be simultaneously relevant to the jurisdictional issues and to the merits issues. Although the Court does not wish to belabor things much further, the Court will, for the sake of thoroughness, provide

---

[270] *Carlsen*, 833 F.3d at 908 (internal quotations omitted) (quoting *Osborn*, 918 F.2d at 729 n.6)); *see also Moss*, 895 F.3d at 1097 ("Where . . . a party brings a factual attack, a district court may look outside the pleadings to affidavits or other documents.").

[271] *Osborn*, 918 F.2d at 730 (quoting *Mortensen*, 549 F.2d at 891).

[272] *Moss*, 895 F.3d at 1097 (internal quotations omitted) (quoting *Heartwood Enters.*, 885 F.3d at 547); *see also Osborn*, 918 F.2d at 730 ("Once the evidence is submitted, the district court must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue. The only exception is in instances when the jurisdictional issue is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" (internal citations omitted)).

53

two (extremely non-exhaustive) examples of the tight overlap between the jurisdictional issues and merits issues. Between the two, these examples are representative of all the other claims in the case with respect to their overlap with jurisdictional issues.

Consider first the criminal mischief claim. On the merits of that claim, the Court will eventually have to decide whether 18 U.S.C. § 3109 allowed ATF to forcibly bust down the doors of the Malinowski home. But that question requires the Court to decide what is essentially the same question that it will have to decide to resolve a part of the Government's discretionary function exception argument: under a totality of circumstances viewed from the perspective of law enforcement, did the agents wait long enough after a proper knock-and-announce to treat silence as a refusal and thus justify forcible entry. All or nearly all of the underlying fact questions overlap. What exactly did officers do to announce their presence and purpose? How long exactly was the knocking? What exactly did ATF know about Mr. Malinowski before executing the warrant? What reasons did the officers have to believe that they were in danger if they waited longer than 28 seconds before entering? What did the officers know about the layout of the home and did this factor into a determination that 28 seconds was long enough to wait?

Consider for a second example the wrongful death claim. On the merits of that claim, the Court is going to have to decide, among other things, whether the ATF agents were the initial aggressors and whether they were lawfully present in the Malinowski home at the time of the shooting. But those questions (and the factual issues underlying them) overlap significantly with the jurisdictional question identified in the preceding paragraph: whether the ATF agents' forcible entry into the home was constitutional or not. Moreover, and in any event, because the Government is also pressing a jurisdictional scope-of-state-law-liability argument with respect to

the wrongful death claim, there is obviously complete overlap between the merits of that claim and the jurisdictional scope-of-state-law-liability issue.

The Government more or less acknowledges that the jurisdictional fact issues are bound up with merits.[273]  Nonetheless, the Government asks the Court to resolve its factual attack today. To the extent the Government is asking the Court to make determinations of disputed facts by a preponderance of the evidence, the Court declines the invitation for the reasons just explained.  To the extent the Government is suggesting that there are no genuine disputes of material fact and that the Government is entitled to judgment as a matter of law, the Court disagrees.  The Court believes there are genuine disputes of material fact as to each remaining claim.

It seems like the delta between the Government's position and that of the Court is largely driven by the Government's view that the Court should assume the veracity and accuracy of the full content of numerous interviews conducted by the Arkansas State Police when investigating the Malinowski shooting.[274]  The Government's view may be based on its contentions that: (1) the Complaint's allegations sometimes repeat statements made during those interviews; (2) Ms. Malinowski provided no record evidence to dispute the content of the interviews on which the Government relies; or (3) some combination of the foregoing.  Whatever the basis, the Government's view is wrong.  The mere fact that the Complaint repeats some statements from the interviews is not an acknowledgement or concession that all the statements made in the interview are truthful and accurate.[275]  And, to the extent that the statements relied on by the Government

---

[273] At the December 5, 2025 hearing, one of the Government's attorneys made the following statement: "the facts are bound up with the merits in general because they are.  I mean . . . that is our position."  Dec. 5, 2025 Hr'g Tr. (rough) at 1:57:59–1:58:07.

[274] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 6 n.1; *id.* at 17 ("A complete review of those statements offers the context from the agents' point of view . . . .").

[275] Sometimes people under investigation or witnesses in an investigation tell a truthful and accurate story in one part of an interview and not in another part. *Cf. Eighth Circuit Manual of Model Jury Instructions (Civil)* 3.03 (2025) ("In

55

tell a different story than the story told by the Complaint—either directly contradictory or gap-filling in a way that would undermine reasonable inferences in favor of Ms. Malinowski—the Complaint's allegations create the genuine dispute of material fact for purpose of a factual attack at the motion to dismiss stage where the factual attack involves merits-intertwined issues.[276]  At least, this is so where, as here, the Court chooses not to grant Plaintiff's request for pre-answer jurisdictional discovery and an evidentiary hearing.[277]

The long and short of it is that the Court exercises its discretion to leave the resolution of the factual attack on jurisdiction until summary judgment or trial.  Accordingly, all of Ms. Malinowski's claims that survived the Government's 12(b)(1) facial attack also survive (for now) the Government's 12(b)(1) factual attack.[278]

---

deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe all of what a witness said, or only part of it, or none of it.").

[276] Recall that, much earlier in this Order, the Court called factual attacks odd ducks.  *See supra* p. 8.  One of the reasons for that is that, although a complaint generally loses its presumption of truthfulness on factual attacks, *see supra* p. 7, that is not true where the jurisdictional facts at issue are inextricably intertwined with the merits.  In such circumstances, at the motion to dismiss stage, fact allegations in a complaint retain their cloak of truthfulness and thus would count as evidence for purposes of deciding whether a genuine dispute of material fact exists.  *Cf. Moss*, 895 F.3d at 1097–98; *Osborn*, 918 F.2d at 729–31.  This is because, at this early point in the litigation, a plaintiff has not had the opportunity to conduct discovery (such as, but not limited to, depositions) in order to be in a position to controvert a defendant's evidence.  Of course, a court could permit a plaintiff to do jurisdictional discovery.  But that doesn't always make sense.  Consider, for example, the case at bar.  Having the parties engage in jurisdictional discovery would be nearly entirely duplicative of what would be merits discovery later on.  That seems an unwise use of resources and time.

[277] *See* United States' Br. in Supp. of Mot. to Dismiss (Doc. 23) at 35–37 (requesting jurisdictional discovery and an evidentiary hearing if the Court was to decide the factual attack on jurisdiction at the current stage of the proceedings); *see also supra* note 276 (explaining why pre-answer jurisdictional discovery in this case would be inefficient and why the better approach is to decide the factual attack on jurisdiction at a later stage of these proceedings).

[278] The Court would like to reiterate something it said at the December 5, 2025 hearing.  The Court's ruling today by no means bars either side from bringing a future motion for summary judgment (including a factual attack on jurisdiction).  *See* December 5, 2025 Hr'g Tr. (rough) at 2:33:08–2:33:32 ("[W]hile a 12(b)(1) factual attack resembles a sort of summary judgment motion[,] when everything is bound up with the merits[,] [j]ust because [the Court] denied that now doesn't mean that [the Court] would not allow [a summary-judgment motion] after discovery . . . .").  At the summary judgment stage, Ms. Malinowski will not be able to rely on her Complaint at all.

**CONCLUSION**

For the reasons stated above, the Court DENIES the Government's Motion to Dismiss for lack of jurisdiction with regard to the following claims: wrongful death (Count V), assault and battery (Count VI), negligence (Count VII), intentional infliction of emotional distress (Count VIII), crime victim manslaughter and negligent homicide (Count IX), crime victim battery (Count X), crime victim aggravated assault (Count XI), and criminal mischief (Count XII).  The Court GRANTS the Government's Motion with regard to the false imprisonment claim (Count XIII).  That claim is dismissed without prejudice.  The Clerk is also directed to terminate the Bureau of Alcohol, Tobacco, Firearms and Explosives as a party Defendant in this case.

IT IS SO ORDERED this 17th day of June 2026.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE